IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE No. 1:21-cv-20706

MEUDY ALBÁN OSIO in her personal
capacity and in her capacity as the
personal representative of the Estate of
FERNANDO ALBERTO ALBÁN,
FERNANDO ALBÁN OSIO, and MARIA
FERNANDA ALBÁN OSIO,

     Plaintiffs,

                                **JURY TRIAL
                                DEMANDED**

vs.

NICOLAS MADURO MOROS;
FUERZAS ARMADA REVOLUCIONARIAS
DE COLUMBA ("FARC");  THE CARTEL OF
THE SUNS A.K.A. CARTEL DE LOS SOLES;
VLADIMIR PADRINO LOPEZ; MAIKEL
JOSE MORENO PEREZ; NESTOR LUIS
REVEROL TORRES; and TAREK WILLIAM
SAAB,

     Defendants,

_____/

1

# TABLE OF CONTENTS

Page

COMPLAINT ...................................................................................................... 4

INTRODUCTION ............................................................................................... 4

PARTIES .............................................................................................................. 9

JURISDICTION AND VENUE ....................................................................... 15

FACTUAL ALLEGATIONS ............................................................................ 20

I.     U.S. AND INTERNATIONAL CONDEMNATION OF THE MADURO REGIME'S MURDER OF MR. ALBÁN ........................................................ 20

II.    BACKGROUND ....................................................................................... 22

    A.    The Maduro Regime ........................................................................ 22

    B.    The Cartel of the Suns ..................................................................... 25

    C.    The FARC ........................................................................................ 26

    D.    The Maduro Criminal Enterprise and the Maduro Criminal Conspiracy ...................................................................................... 28

        1.    The Maduro Criminal Enterprise's Narcotics Trafficking and Narco-Terrorism ............................................................ 30

        2.    The Maduro Criminal Enterprise's Acts of, and Material Support for, Terrorism ......................................................... 36

        3.    The Maduro Regime's Human Rights Abuses ................... 39

            i.    Overview ................................................................... 39

            ii.    The "Playbook" for the arbitrary detention, torture and murder of political opponents. ..................... 44

        4.    Kleptocracy and Corruption ............................................... 46

        5.    Money Laundering .............................................................. 48

    E.    The Albán Family ............................................................................ 49

III.   THE MADURO CRIMINAL ENTERPRISE'S CRIMES AGAINST MR. ALBÁN AND HIS FAMILY .................................................................. 51

    B.    Mr. Albán's family saw him alive for the last time during a brief visit to New York. ........................................................................... 53

    C.    In disregard of U.S. sovereignty, Maduro operatives, acting in New York, aided and abetted Mr. Albán's kidnapping and murder. ................. 53

D. The Maduro Criminal Enterprise abducted Mr. Albán at Simón Bolívar International Airport.................................................................... 57

E. The Maduro Regime subjected Mr. Albán to a forced disappearance. ...... 58

F. The Maduro Regime pressured Mr. Albán to give false testimony against Maduro's political opponents. ........................................................ 59

G. The Maduro Criminal Enterprise fabricated charges to support its abduction and detention of Mr. Albán. ..................................................... 62

H. The Maduro Regime tortured and murdered Mr. Albán. .......................... 63

I. The Maduro Regime closed ranks to protect the SEBIN officers who murdered Mr. Albán. ............................................................................... 78

J. The Maduro Criminal Enterprise stole Mr. Albán and Ms. Albán Osio's property, destroyed their business and raided their home. ............. 79

COUNT I VIOLATION OF THE FLORIDA ANTI-TERRORISM ACT, FLA. STAT. § 772.13 (ALL PLAINTIFFS AGAINST ALL DEFENDANTS)............ 81

COUNT II WRONGFUL DEATH, FLA. STAT. § 768.16 ET SEQ. (BY PLAINTIFF MEUDY, IN HER CAPACITY AS THE PERSONAL REPRESENTATIVE FOR THE ESTATE OF ALBÁN, AGAINST ALL DEFENDANTS)............................................................................................ 92

COUNT III FEDERAL CIVIL RICO, 18 U.S.C. § 1964(C) (BY PLAINTIFF MEUDY AGAINST MADURO AND THE INDIVIDUAL DEFENDANTS)............................................................................................ 94

COUNT IV CONSPIRACY TO VIOLATE FEDERAL CIVIL RICO, 18 U.S.C. § 1962(D) (BY MEUDY AGAINST MADURO AND THE INDIVIDUAL DEFENDANTS).......................................................................................... 103

COUNT V DEFAMATION PER SE (BY MS. ALBÁN OSIO IN HER CAPACITY AS THE REPRESENTATIVE OF THE ESTATE OF ALBÁN AGAINST SAAB, REVEROL AND MADURO; MS. ALBÁN OSIO IN HER PERSONAL CAPACITY AGAINST MADURO) ................... 105

COUNT VI CONSPIRACY (BY ALL PLAINTIFF AGAINST ALL DEFENDANTS)............................................................................................ 110

COUNT VII FALSE IMPRISONMENT (BY MS. ALBÁN OSIO IN HER CAPACITY AS THE REPRESENTATIVE OF THE ESTATE OF ALBÁN AGAINST ALL DEFENDANTS) ....................................................... 111

COUNT VIII INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (ALL PLAINTIFFS AGAINST ALL DEFENDANTS).................................... 111

PRAYER FOR RELIEF ................................................................................. 112

**COMPLAINT**

Plaintiffs, by and through counsel, bring this action seeking damages arising out of the kidnapping, torture, and murder of Fernando Alberto Albán ("Mr. Albán"), the subsequent cover-up of the murder, defamation of Mr. Albán, and further retaliatory actions against his surviving relatives, by Nicolás Maduro Moros ("Maduro"), the unlawful apparatus through which Maduro and his deputies control Venezuela (the "Maduro Regime"), and their narco-terrorist coconspirators.

**INTRODUCTION**

1.     Mr. Albán was a devout Catholic and dedicated family man who was deeply committed to the cause of a free and democratic Venezuela. In 2018, Mr. Albán travelled from Venezuela to United States to speak out against the Maduro Regime and to visit his wife and children (who had earlier relocated to the United States to seek asylum).  While Mr. Albán was in the United States, Maduro's agents stalked him and marked him for retribution.  As a result, when Mr. Albán returned to Venezuela, Maduro, through the vast criminal empire he leads, kidnapped Mr. Albán and, between October 5 and 8, 2018, brutally tortured and murdered him.

2.     Mr. Albán's murder prompted vehement outcry from the Catholic Church, the Organization of American States ("OAS"), the United Nations, the

White House, the U.S. State Department, and legislative leaders such as Senator Marco Rubio. Mr. Albán's family, including his wife ("Ms. Albán Osio") and their two children, as well as his extended family that still resides in Venezuela, were devastated, and continue to suffer terribly from the trauma of his loss.

3.      Before his murder, Mr. Albán had dedicated much of his life to helping others. Among additional efforts, he worked with the Archdiocese of Caracas on numerous charitable projects. He served as the Secretary of Justice First, a progressive Venezuelan political party founded in 2000 in opposition to the Hugo Chavez government. In 2013, on the Justice First ticket, Mr. Albán was elected as a municipal councilman in Venezuelan regional elections.

4.      The same year that Mr. Albán was elected, Hugo Chavez died and his protégé, Maduro, became President of Venezuela. Maduro immediately began to consolidate his authoritarian control of the country. To suppress dissent, Maduro utilized torture, extrajudicial killings, "disappearances" and other crimes against humanity on a grand scale, indiscriminately oppressing real and perceived political rivals alike. As the United Nations explains, "[a]s the opposition has been debilitated, the executive [branch with Maduro at the helm] has taken on increasingly expansive powers."[1]

---

[1] *See* U.N. Human Rights Council [UNHRC], Detailed Findings of the Independent International Fact-finding Mission on the Bolivarian Republic of Venezuela, ¶ 133, U.N.

5.      At the same time, Maduro leveraged his power to enrich himself and his cronies at the expense of Venezuela's law-abiding citizens.  Maduro and his criminal enterprise looted Venezuela's treasury, partnered with Fuerzas Armadas Revolucionarias de Colombia ("FARC") to traffic in cocaine by the ton, and laundered the ill-gotten gains internationally, including the United States.  Maduro and all but one of the Individual Defendants have been indicted for narco-terrorism, money laundering and/or other crimes in various U.S. jurisdictions including the Southern District of Florida.

6.      Maduro's gross mismanagement and avarice plunged Venezuela into an epic humanitarian crisis, with rampant disease, starvation and malnutrition.  In response, Mr. Albán redoubled his efforts to advocate for democracy and against corruption, and in the best tradition of Catholic charity, to lend assistance to Venezuela's most vulnerable and needy population.

7.      In 2015, Mr. Albán and his family began to receive death threats. Fearing for their lives, Mr. Albán's wife and children fled to the United States, where they applied for asylum.  Mr. Albán made the difficult choice to stay behind in Venezuela to continue his efforts to rehabilitate his home country.

8.      In August 2018, Mr. Albán traveled from Venezuela to New York to see his family, and then to connect with the Justice First delegation for

---

Doc. A/HRC/45/CRP.11 (Sept. 15, 2020) ("UNHRC Detailed Findings Report"), available at https://reliefweb.int/sites/reliefweb.int/files/resources/A_HRC_45_CRP.11.pdf.

meetings and events in connection with the U.N. General Assembly meeting in September.  In the company of senior members and luminaries of the Justice First party, Mr. Albán spoke in favor of democracy and against corruption in Venezuela.

9.     Because of Mr. Albán's high-profile companions, to say nothing of the U.N. event itself, Mr. Albán came the attention of senior members of the Maduro Regime.  When Maduro Regime operatives took to the streets of New York, where—in violation of U.S. law—they brazenly tailed the Justice First delegation, openly surveilling and photographing them, they spotted Mr. Albán.  On information and belief, they targeted Mr. Albán for retribution and transmitted the intelligence they gathered about him back to Venezuela—with deadly consequences.

10.    On October 5, 2018, Mr. Albán left the United States and returned to Venezuela.  Immediately upon landing at Simón Bolivar International Airport, Mr. Albán was kidnapped by armed members of the Maduro Regime's feared security services ("SEBIN") and taken to SEBIN headquarters, where SEBIN is notorious for torturing detainees.  As the United Nations High Commissioner for Human Rights has explained, SEBIN "routinely resort[s]" to forms of torture including "electric shocks, suffocation with plastic bags, water

boarding, beatings, sexual violence, water and food deprivation, stress positions and exposure to extreme temperatures."[2]

11.     Over that weekend, SEBIN tortured Mr. Albán with excruciatingly painful electronic shocks and, ultimately, murdered him. On Monday, October 8, 2018, SEBIN threw Mr. Albán's body from their building, where it plunged at least ten stories before hitting the ground, mutilating his corpse.

12.     Not content to stop with the gruesome torture and murder of Mr. Albán, the Maduro Regime defamed Mr. Albán, falsely claiming that he had committed suicide (a particularly ugly lie, given his Catholic faith), and falsely claiming that he did so because he had been found with child pornography (another vile and gratuitous untruth).  And, as if that were not enough, Maduro's agents raided, and ultimately destroyed, the Venezuelan accounting business that Mr. Albán and his wife had, until that time, successfully built and nurtured, and which was Ms. Albán Osio's source of income after Mr. Albán's murder.

13.     When Maduro sent his thugs to New York to follow and intimidate pro-democracy advocates in the Justice First delegation and chose to kidnap and murder Mr. Albán the moment Mr. Albán left the safety of the United

---

[2] *See* UNHRC, Annual report of the United Nations High Commissioner for Human Rights and Reports of the Office of the High Commissioner and the Secretary-General, Human Rights in the Bolivarian Republic of Venezuela, ¶ 43, U.N. Doc. A/HRC/41/18 (July 5, 2019), available at https://reliefweb.int/sites/reliefweb.int/files/resources/A_HRC_41_18.pdf.

States and landed at an international airport in Caracas, Maduro was sending a message—not just to Mr. Albán, not just to Venezuela's citizens who might dare speak against the Maduro regime, but to the United States as well.

14.     The United States is a globally recognized bastion of freedom and democracy.  That is why Mr. Albán's family sought refuge *here* when the Maduro regime threatened their lives.  That is why Mr. Albán chose to come to the *United States* to speak out against Maduro's corruption and authoritarianism.  That is why, of all Mr. Albán's actions, it was Mr. Albán's exercise of his voice in the *United States* that caused Maduro to take note of Mr. Albán, that Maduro found deeply threatening, and that inspired Maduro to torture and assassinate Mr. Albán.

15.     Maduro's message—his affront to US sovereignty by sending agents onto U.S. soil to aid him in committing a murder, his murder of Mr. Albán to suppress Mr. Albán's free speech in this country—should not be the last word.   Maduro and his criminal enterprise must be held accountable for their crimes.

## **PARTIES**

16.     Plaintiff Meudy Albán Osio is the surviving spouse of Mr. Albán.  She sues in her personal capacity and as the executor and personal representative for the estate of Mr. Albán.  She is a lawful permanent resident of the United States who resides in New York, where she was residing when

the Maduro Regime murdered her husband and destroyed her accounting business.

17.     Plaintiff Maria Fernanda Albán Osio is the surviving daughter of Mr. Albán and Ms. Albán Osio.  She is a lawful permanent resident of the United States who resides in New York, where she was residing when the Maduro Regime tortured and murdered her father.

18.     Plaintiff Fernando Albán Osio is the surviving son of Mr. Albán and Ms. Albán Osio.  He is lawfully residing in New York while the United States considers his petition for asylum, and was lawfully residing in New York when the Maduro regime tortured and murdered his father.

19.     Defendant Maduro is the former President of Venezuela.  On July 31, 2017, the U.S. Department of Treasury, Office of Foreign Assets Control ("OFAC") sanctioned Maduro for "undermining democracy in Venezuela."[3]  On March 26, 2020, the Department of Justice unsealed a criminal indictment against Maduro, pending in the United States District Court for the Southern District of New York, for orchestrating a "corrupt and violent narco-terrorism conspiracy between the between the Venezuelan Cartel de Los Soles ('Cartel of

---

[3] *See* Press Release, U.S. Dep't of the Treasury, Treasury Sanctions the President of Venezuela, ¶ 1 (July 31, 2017), available at https://www.treasury.gov/press-center/press-releases/pages/sm0137.aspx.

the Suns') and the Fuerzas Armadas Revolucionarias de Colombia ('FARC')."[4]

Maduro is a citizen and resident of Venezuela, where (although he has no recognized or lawful government position) he openly and notoriously controls the country, flouts U.S. authority, and remains a fugitive from justice. The U.S. Department of State, through its Narcotics Rewards Program, is offering rewards of up to $15 million for information leading to the arrest and/or conviction of Maduro.[5]

20.     Defendant Cartel of the Suns (or Cartel de los Soles) is a Venezuelan drug-trafficking cartel. Maduro—along with several others—controls the Cartel of the Suns. The DOJ has explained that "Maduro," including through his leadership of the Cartel, "expressly intended to flood the United States with cocaine in order to undermine the health and wellbeing of our nation."[6] The Cartel of the Suns is an unincorporated association based in Venezuela. Several senior members of the Cartel of the Suns are incarcerated in prison in the United States, including (Former) Major General Cliver Alcala

---

[4] *See* Superseding Indictment, ¶ 1 *United States v. Maduro*, 11-cr-205 (S.D.N.Y. 2011) ("Maduro Indictment"), available at https://www.justice.gov/opa/page/file/1261806/download.

[5] *See* DEA Reward Poster, available at https://www.justice.gov/opa/page/file/1262286/download.

[6] *See* Press Release, U.S. Dep't of Justice ("DOJ"), Nicolás Maduro Moros and 14 Current and Former Venezuelan Officials Charged with Narco-Terrorism, Corruption, Drug Trafficking and Other Criminal Charges, ¶ 3 (March 26, 2020) ("DOJ Press Release"), available at https://www.justice.gov/opa/pr/nicol-s-maduro-moros-and-14-current-and-former-venezuelan-officials-charged-narco-terrorism.

Cordones, a Cartel de los Soles leader (charged with conspiracy to commit narco-terrorism, conspiracy to import cocaine and associated firearms charges); and Efraín Antonio Campo Flores and Francisco Flores de Freitas, both nephews of Maduro's wife (charged with conspiracy to import 770 kilos of cocaine to the United States).

21.     Defendant FARC is a terrorist organization that between 1999 and 2021 became one of the largest producers of cocaine in the world and perpetrated acts of violence against United States nationals and property.  The United States designated FARC as a Foreign Terrorist Organization ("FTO") on October 8, 1997.[7]  FARC is an unincorporated association based in Columbia with operations throughout South and Latin America.  Certain senior FARC leaders, such as Juvenal Ovidio Ricardo Palmera Pineda, are imprisoned in the United States.

22.     Defendant Vladimir Padrino Lopez is the *de facto* Minister of Defense of Venezuela. On September 25, 2018, OFAC imposed US sanctions on Padrino Lopez, explaining that Padrino Lopez is "a member of [Maduro's] inner circle and lifelong member of the Venezuelan military," who Maduro installed "to help ensure the military's loyalty to the Maduro

---

[7] *See* U.S. Dep't of State, Terrorist Designations and State Sponsors of Terrorism: Foreign Terrorist Organizations, available at https://www.state.gov/foreign-terrorist-organizations/.

regime."[8]  Padrino Lopez was indicted in the United States District Court for the District of Columbia.[9]  The indictment alleges that from March 2014 until May 2019, Padrino Lopez conspired with others to distribute cocaine on board an aircraft registered in the United States.  Padrino Lopez is a senior member of the Cartel of the Suns.  Padrino Lopez is a citizen and resident of Venezuela, where he remains a fugitive from justice.

23.    Maikel Jose Moreno Perez is the current Chief Justice of the Venezuelan Supreme Court, a position he has held since February 2017.  In May 2017, OFAC sanctioned him for "judicial rulings . . . that have usurped the authority of Venezuela's democratically-elected legislature." [10]  He has been criminally charged in the United States District Court for the Southern District of Miami.[11] He is charged with conspiracy to commit money laundering and money laundering in connection with the corrupt receipt of millions of dollars and bribes—largely originating from accounts in South Florida—to illegally alter the outcome of dozens of civil and criminal cases in Venezuela.

---

[8] *See* Press Release, U.S. Dep't of the Treasury, Treasury Targets Venezuela President Maduro's Inner Circle and Proceeds of Corruption in the United States (Sept. 25, 2018), ¶ 5, available at https://home.treasury.gov/news/press-releases/sm495.

[9] *See* Indictment, *United States v. Vladimir Padrino Lopez,* 1:19-cr-176 (D.D.C. 2019), available online at https://www.justice.gov/opa/page/file/1261721/download.

[10] *See* Press Release, U.S. Dep't of the Treasury, Treasury Sanctions Eight Members of Venezuela's Supreme Court of Justice (May 18, 2017), ¶ 1, available at https://www.treasury.gov/press-center/press-releases/Pages/sm0090.aspx.

[11] *See* Criminal Complaint, *United States v. Moreno Perez,* 20-cr-2407 (S.D. Fla. March 2, 2020), available at https://www.justice.gov/opa/page/file/1261816/download.

The U.S. State Department has offered a reward of $5 million for information leading to his arrest and/or conviction.[12]   He is a citizen and resident of Venezuela, and a fugitive from justice.

24.     Defendant Nestor Luis Reverol Torres has held many government positions in Venezuela.  He is currently the Minister of People's Power for Electric Power.  He is the former general director of Venezuela's La Oficina Nacional Antidrogas ("ONA"), which is the Venezuela government agency charged with fighting narcotics production and trafficking (its mission is similar to that of the Drug Enforcement Agency in the United States).  On July 26, 2017, OFAC imposed sanctions on Torres for "undermining democracy" in Venezuela.[13]   In 2016, the DOJ unsealed an indictment against Torres for offenses including trafficking and distributing cocaine.[14]   Defendant Reverol Torres is a senior member of the Cartel of the Sun.  He is a citizen and resident of Venezuela and a fugitive from justice.

---

[12] *See* Press Release, U.S. Dep't of State, Transnational Organized Crime Rewards Program: Maikel Jose Moreno Perez (July 21, 2020) available at https://www.state.gov/inl-rewards-program/transnational-organized-crime-rewards-program/maikel-jose-moreno-perez/.

[13] *See* Press Release, U.S. Dep't of Treasury, Treasury Sanctions 13 Current and Former Senior Officials of the Government of Venezuela, ¶ 1 (July 26, 2017) ("July 26, 2017 OFAC Press Release") available at https://www.treasury.gov/press-center/press-releases/Pages/sm0132.aspx.

[14] *See* Indictment, *United States v. Torres*, 15-cr-20 (E.D.N.Y. Jan. 21, 2015), available at https://www.justice.gov/doj/page/file/1261891/download.

25.     Defendant Tarek William Saab is the Attorney General (sometimes called the Prosecutor General) of Venezuela.  On July 26, 2017, he was sanctioned by OFAC for undermining democracy in Venezuela.[15]  He has been sanctioned by other countries, such as Switzerland, for human rights violations.   Tarek William Saab is a citizen and resident of Venezuela.

26.     Defendants Vladimir Padrino Lopez, Maikel Jose Moreno Perez, Nestor Reverol Torres, and Tarek William Saab are collectively the "Individual Defendants."

## JURISDICTION AND VENUE

27.     This Court has jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' RICO claims arise under the law of the United States.  This court has supplemental jurisdiction over Plaintiffs' state-law claims because those claims arise from the same nucleus of operative facts, and are part of the same case or controversy under Article III of the United States Constitution, as Plaintiffs' RICO claims.

28.     Venue properly lies in this forum pursuant to 18 U.S.C. § 1965(a), which provides that "[a]ny civil action or proceeding under this chapter against any person may be instituted in the district court of the United States for any district in which such person resides, is found, has an agents, or transacts his

---

[15] *See* July 26, 2017 OFAC Press Release, *supra* n. 13.

affairs," because each of the defendants "transacts his affairs" in this jurisdiction, including but not limited to (a) flooding this jurisdiction with cocaine, (b) laundering ill-gotten proceeds of narcotics trafficking and Venezuela government corruption through this jurisdiction, and/or (c) accepting bribes from accounts maintained in this judicial district.

29.     The Court has personal jurisdiction, under the Florida long-arm statute, Florida Stat. § 48.193, and the Due Process Clause of the Constitution, over the Defendants because they personally and/or through agents committed a tortious act within the State of Florida, giving rise to Plaintiffs' claims, including that Defendants themselves and/or through agents:

a.     defaming Mr. Albán in Florida by publishing defamatory statements about Mr. Albán on Twitter, YouTube and globally accessible other media, causing those defamatory statements being read, heard and reviewed by numerous third parties in Florida, including members of the large population of Venezuelan ex-patriots residing in South Florida;

b.     criminally trafficking millions of dollars of illicit drugs into Florida for distribution in Florida, causing the kidnapping, torture and murder of Mr. Albán in retribution for, and to silence his opposition to, such criminal narcotics trafficking and narco-terrorism; and

c.     laundering millions of dollars of ill-gotten proceeds of narcotics trafficking and public corruption offenses through South Florida, causing the

kidnapping, torture and murder of Mr. Albán in retribution for, and to silence his opposition to, such narcotics trafficking, public corruption offenses and money laundering.

30.     Defendants' torts against Mr. Albán were inextricably intertwined with, and a necessary and foreseeable component of, Defendants' trafficking of illegal drugs into and throughout South Florida, and their laundering money throughout South Florida, for their profit and gain.

31.     This court has personal jurisdiction over defendants served pursuant to the nationwide service provision of RICO, 18 U.S.C. § 1965(d), because, in light of defendants' contacts with the United States as a whole, exercising jurisdiction over the defendants in the United States (including in this district) is consistent with the United States Constitution.  Defendants themselves and/or through agents committed the following conduct in the United States, giving rise to Plaintiffs' claims:

a.     Aiding and abetting Mr. Albán's murder by stalking Mr. Albán in the United States, flagging Mr. Albán for retribution in the United States, providing intelligence from the United States to members of the Maduro Regime in Venezuela, and engaging in a course of conduct hostile to Mr. Albán that began in the United States and culminated in Venezuela, but for which Mr. Albán would not have been kidnapped, tortured and murdered, and which

17

was a direct and proximate cause of Mr. Albán's kidnapping, murder and torture;

b.      criminally trafficking millions of dollars of illicit drugs into the United States for distribution in the United States, causing the kidnapping, torture and murder of Mr. Albán in retribution for, and to silence his opposition to, such criminal narcotics trafficking and narcoterrorism;

c.      laundered millions of dollars of ill-gotten proceeds of narcotics trafficking and public corruption offenses through the United States, causing the kidnapping, torture and murder of Mr. Albán in retribution for, and to silence his opposition to, such public corruption offenses and money laundering; and

d.      injuring Plaintiffs Ms. Albán Osio, Fernando Albán Osio, and Maria Fernanda Albán Osio in the United States (where they were residents) through the kidnapping, torture and murder of Mr. Albán and the destruction of Ms. Albán Osio's accounting business and other property.

32.      In the alternative, this court has personal jurisdiction over the defendants under Fed. R. Civ. P. 4(k)(2) because the defendants (a) are not subject to jurisdiction in any state's courts of general jurisdiction and (b) exercising jurisdiction over the defendants in the United States, including in this district, is consistent with the United States Constitution. Defendants

themselves and/or through agents committed the following conduct in the United States, giving rise to Plaintiffs' claims:

a.     Aiding and abetting Mr. Albán's murder by stalking Mr. Albán in the United States, flagging Mr. Albán for retribution in the United States, providing intelligence from the United States to members of the Maduro Regime in Venezuela, and engaging in a course of conduct hostile to Mr. Albán that began in the United States and culminated in Venezuela, but for which Mr. Albán would not have been kidnapped, tortured and murdered, and which was a direct and proximate cause of Mr. Albán's kidnapping, murder and torture;

b.     criminally trafficking millions of dollars of illicit drugs into the United States for distribution in the United States, causing the kidnapping, torture and murder of Mr. Albán in retribution for, and to silence his opposition to, such criminal narcotics trafficking and narcoterrorism;

c.     laundered millions of dollars of ill-gotten proceeds of narcotics trafficking and public corruption offenses through the United States, causing the kidnapping, torture and murder of Mr. Albán in retribution for, and to silence his opposition to, such public corruption offenses and money laundering; and

d.     injuring Plaintiffs Ms. Albán Osio, Fernando Albán Osio, and Maria Fernanda Albán Osio in the United States (where they were residents)

through the kidnapping, torture and murder of Mr. Albán and the destruction of Ms. Albán Osio's accounting business and other property.

33.     To the extent that this Court requires an additional basis to exercise jurisdiction over any of Plaintiffs' claims against any particular Defendant, this court may exercise pendant personal jurisdiction to the maximum extent permitted by the Constitution over such claims because Plaintiffs' claims all arise from the same common nucleus of operative fact.

## FACTUAL ALLEGATIONS

### I.   U.S. AND INTERNATIONAL CONDEMNATION OF THE MADURO REGIME'S MURDER OF MR. ALBÁN

34.     The United States and the world have condemned the Maduro Regime for its torture and murder of Mr. Albán.

35.     White House spokeswoman Sarah Sanders said:  "The United States condemns the Maduro regime's involvement in the death of Venezuelan opposition councilman Fernando Alban.  Venezuelan authorities took Alban into custody on October 5, upon his return from the United Nations General Assembly, where he spoke to the world about the importance of returning democracy to the people of Venezuela.  He died three days later while in the custody of Venezuela's intelligence service."[16]

---

[16] *See* Dierdre Shesgreen, *White House Blames Venezuelan President Maduro's Regime for Opposition Leader's Death*, USA Today (Oct. 10, 2018, 11:21 AM) available at https://www.usatoday.com/story/news/world/2018/10/10/white-house-blasts-venezuelan-regime-opposition-leaders-death/1588844002/.

36.     The U.S. State Department, through deputy spokesperson Robert Palladino, echoed the White House's sentiments, stating that Mr. Albán's murder "highlights a continuing pattern of human rights abuses in that country, repression, and excessive use of force."[17]

37.     Venezuela's Catholic bishops' conference and Luis Almagro, the head of the OAS, said Albán's death was "the direct responsibility of a torturing and homicidal regime" of Maduro in Venezuela.[18]

38.     Representatives Carlos Curbelo (FL-26), Ileana Ros-Lehtinen (FL-27), Mario Diaz-Balart (FL-25), and Albio Sires (NJ-08) engaged in a bipartisan effort to urge President Trump to demand a thorough independent investigation into Mr. Albán's death and asked for sanctions against those found to be responsible.[19]

39.     Senator Marco Rubio (FL), who supported the House Members' effort, stated "Albán's death must be thoroughly investigated in order to understand the regime's involvement in this heinous crime. As the Venezuelan people continue to be oppressed and starved, the United States and its allies

[17] *See US Condemns Venezuela for Alleged Involvement in Death of Opposition Activist*, VOA News (Oct. 10, 2018, 1:06 PM) available at https://www.voanews.com/usa/us-condemns-venezuela-alleged-involvement-death-opposition-activist.

[18] Scott Smith and Fabiola Sanchez, *Opposition Venezuelan Politician Dies in Jail*, Kold News 13 (Oct. 18, 2018, 6:46 PM), available at https://www.kold.com/2018/10/09/opposition-venezuelan-politician-dies-jail/.

[19] *See* Press Release, Reps. Curbelo, Ros-Lehtinen, Diaz-Balart, Rubio Urge President to Sanction Anyone Found Responsible for Death of Venezuelan Opposition Leader (October 17, 2018).

must unite in holding Maduro and his cronies accountable for their crimes against humanity and other human rights abuses."[20]

## II.   BACKGROUND

### A. The Maduro Regime

40.   Maduro assumed the Presidency of Venezuela on March 5, 2013, upon the death of then Venezuelan President Hugo Chavez.

41.   On May 20, 2018, Venezuela held a presidential election. Although Maduro nominally "won" the presidential election, the election was neither free nor fair. As U.S. Secretary of State Michael Pompeo explained, "[s]ham elections change nothing. We need Venezuelan people running this country."[21]

42.   Accordingly, on June 27, 2018, the Organization of American States ("OAS") recognized the presidency of the Venezuela opposition leader, Juan Guaidó ("Guaidó").

43.   Notwithstanding the fact that the May 20, 2018 election was illegitimate, on January 10, 2019, Maduro was inaugurated as Venezuela's president—a result Maduro achieved by the forceful and unlawful suppression of the legitimate government led by Guaidó.

---

[20] *Id.*

[21] Michael Pompeo (@SecPompeo) (May 20, 2018), https://twitter.com/SecPompeo/status/998254964408545283.

44.    On January 15, 2019, Venezuela's freely elected National Assembly declared Maduro a "usurper."  On January 23, 2019, Guaidó declared himself President.

45.    Also on January 23, 2019, the United States recognized Mr. Guaidó as Venezuela's legitimate President.  The U.S. State Department implored "Maduro to step aside in favor of a legitimate leader reflecting the will of the Venezuelan people."[22]  The White House stated that the United States will "continue to hold the illegitimate Maduro regime directly responsible for any threats it may pose to the safety of the Venezuelan people."[23]

46.    Over 50 other recognized and respected countries—including leading western democracies, and excluding holdouts such as North Korea, Iran, Syria and Cuba—have likewise recognized Guaidó as the legitimate President of Venezuela.

47.    The State Department's 2019 Country Reports on Human Rights Practices: Venezuela, sums up the political situation, explaining that "Venezuela is legally a multiparty, constitutional republic, but for more than a

---

[22] *See* Reuters, *Pompeo Calls on Venezuela's Maduro to Step Down, Urges Support from Military* (Jan. 23, 2020), available at https://www.reuters.com/article/us-venezuela-politics-pompeo/pompeo-calls-on-venezuelas-maduro-to-step-down-urges-support-from-military-idUSKCN1PH2HI.

[23] *See* Jeremy Diamond and Boris Sanchez, Trump recognizes Venezuelan opposition leader as nation's president, CNN, Jan. 24, 2019, available online at https://www.cnn.com/2019/01/23/politics/trump-juan-guaido-venezuela/index.html.

decade, political power has been concentrated in a single party with an authoritarian executive exercising significant control over the judicial, citizens' power (which includes the prosecutor general and ombudsman), and electoral branches of government, and standing up a parallel, illegitimate legislative body [the Constituent  Assembly] alongside the existing elected one [the National Assembly]."[24]

48.    In short, although Maduro continues to exert authoritarian control over Venezuela, he is no longer the head of state, and he has not been the head of state, or a member of the recognized government of Venezuela, since May 20, 2018.

49.    The Maduro Regime includes myriad individuals, including many in governmental positions, who are beholden to Maduro and who execute unlawful instructions from Maduro and his deputies.

50.    A Washington Post article captures the essence of the Maduro Regime: "the reality is that the [Venezuelan] regime is less a government — much less a socialist one — than a criminal gang," in which "the money it is reaping from criminal activity is serving as a prop that allows it to survive U.S. sanctions."[25]

---

[24] *See* U.S. Dep't of State, Venezuela, 2019 Country Reports on Human Rights Practices, at 1 ("Venezuela Country Report"), available at https://www.state.gov/wp-content/uploads/2020/03/VENEZUELA-2019-HUMAN-RIGHTS-REPORT.pdf.

[25] *See* Jackson Diehl, *The Real Reason Venezuela's Maduro Survives: Dirty Money*, Washington Post (May 12, 2019, 7:15 PM) available at

## B. The Cartel of the Suns

51.    Member of the Venezuelan military became involved in the drug trade in 1990s, largely in the form of accepting bribes to ignore drug traffickers. Around 1992, Hugo Chavez formed a Venezuela drug cartel, which at the time was known as the "Cartel Bolivariano" or "Bolivarian Cartel." In 1993, the name changed to the "Cartel of the Suns," a reference to the sun insignia on the Venezuelan military uniforms of many of the cartel's leaders.

52.    The Venezuelan government under Hugo Chavez grew the cartel, affording Venezuelan officials engaged in drug trafficking immunity in exchange for their loyalty to Chavez. In 2005, the Chavez government expelled the U.S. Drug Enforcement Agency (U.S. DEA) from Venezuela, making Venezuela a more attractive route for drug trafficking. As discussed further below, the Cartel of the Suns began coordinating with FARC to traffic cocaine. Venezuelan air force bases began to shelter planes loaded with cocaine that arrived from Columbia.

53.    When Chavez died in 2013, Maduro stepped up to become one of the leaders of the Cartel. Defendants Nestor Reverol Torres and Padrino Lopez

---

https://www.washingtonpost.com/opinions/global-opinions/the-real-reason-venezuelas-maduro-survives-dirty-money/2019/05/12/ba96413e-7263-11e9-8be0-ca575670e91c_story.html.

are senior figures within the Cartel.  Defendants Tarek William Saab and Defendant Maikel Jose Moreno Perez also support the Cartel's activities.

### C. The FARC

54.    The FARC is an armed and violent organization based primarily in the Republic of Colombia.  Since its inception in 1964, FARC has engaged in armed conflict against the government of the Republic of Colombia, which is a constitutional, multi-party democracy. Although many FARC rebels laid down arms as part of a 2016 peace agreement, a significant number—notably, those that are in league with Maduro and the Maduro Regime—continue to  fight to derail the peace process and to destabilize all levels of the Colombian government by means of violence, including murders and hostage takings, threats of violence, and other terrorism-related activities. The FARC's activities throughout Colombia have caused hundreds of civilian deaths and injuries.

55.    The FARC has been, and remains, strongly anti-American.  It characterizes American citizens as "military targets," and it has engaged in violent acts against U.S. nationals in Colombia, including murders and hostage takings.

56.    FARC supports itself largely through the trafficking of cocaine. FARC rebels on Columbia's borders, particularly the Venezuelan border, are responsible for transporting cocaine outside of Colombia, and facilitating the

exchange of cocaine and cocaine paste for weapons and supplies that are used by the FARC to support their international terrorism activities.

57.    FARC leadership frequently noted during meetings that the FARC could not survive without the proceeds generated from cocaine and cocaine paste manufacturing and distribution.  Recognizing that the United States has contributed significantly to Colombian fumigation efforts, the FARC leadership ordered FARC members to kidnap and murder U.S. nationals to intimidate the United States and coerce it from efforts to fumigate and disrupt the FARC's cocaine and cocaine paste manufacturing and distribution activities.

58.    On October 8, 1997 the Secretary of State of the United States, designated the FARC designated foreign terrorist organization ("FTO"), pursuant to Title 8, United States Code, Section 1189. The FARC was re-designated on September 5, 2001. At all times material to this action, the FARC is a designated FTO. Specifically, 8 U.S.C. § 1189(a)(1) authorizes the Secretary of State to designate an organization as a foreign terrorist organization . . . if the Secretary finds that (A) the organization is a foreign organization; (B) the organization engages in terrorist activity . . . ; and (C) the terrorist activity or terrorism of the organization threatens the security of United States nationals or the national security of the United States. 8 U.S.C. § 1189(a)(1).

### D. The Maduro Criminal Enterprise and the Maduro Criminal Conspiracy

59.     The Maduro Criminal Enterprise is an association that includes, among others, Maduro, the Maduro Regime, the Cartel of the Suns, FARC, and the Individual Defendants.

60.     Members of the Maduro Criminal Enterprise have conspired and agreed to commit a wide variety of interrelated crimes (the "Maduro Criminal Conspiracy"), including (a) narcotics trafficking; (b) acts of terrorism including but by no means limited to narco-terrorism; (c) human rights violations including kidnapping, torture, and murder; (d) public corruption offenses; and (e) money laundering.

61.     Each of Maduro Criminal Enterprise's criminal endeavors is intrinsic to, and necessary to the functionality of, the overall criminal enterprise.  Put differently, each line of criminal wrongdoing supports and reinforces the ability of the Maduro Criminal Enterprise to commit each of the other criminal wrongdoing in which the Maduro Criminal Enterprise engages.

a.     For example, a central objective of the Maduro Criminal Enterprise and the Maduro Criminal Conspiracy is to assist Maduro to retain authoritarian control over Venezuela.  By ensuring that Maduro unlawfully controls the Venezuelan state, the Maduro Criminal Enterprise ensures that it can continue to commit profitable crimes—such as narcotics trafficking and

looting the Venezuela treasury—with impunity and without interference from legitimate law enforcement.

b.      Conversely, the Maduro Criminal Enterprise, through its earnings from profitable crimes such as narcotics trafficking and public corruption, obtains wealth through which Maduro purchases the loyalty of Maduro Criminal Enterprise's leaders and loyalists, thereby cementing Maduro's authoritarian control over Venezuela.  In other words, dirty money is the lifeblood of the Maduro Criminal Enterprise and the Maduro Criminal Conspiracy.  As the Washington Post explains, "each year [the Cartel of the Suns, the drug cartel that lies at the heart of the Maduro Criminal Enterprise] flies hundreds of tons of Colombian cocaine from Venezuelan airfields to Central America and the Caribbean for eventual distribution in the United States and Europe — and that [cartel] includes some of the most senior officials in the Maduro regime. These men are not clinging to power because they are true believers in socialism . . . .  They hang on because, in spite of Venezuela's economic implosion, they are still reaping millions."[26]

c.      And, through acts of terrorism and human rights abuses, the Maduro Criminal Enterprise suppresses opposition to its narcotics trafficking, public corruption, and Maduro's authoritarian control of Venezuela.

---

[26] *Id.*

29

62.     Because the foregoing crimes are interrelated, because each type of criminality furthers the other types of criminality, and because the Maduro Criminal Enterprise conspicuously engages in each type of criminality, each and every co-conspirator in the Maduro Criminal Conspiracy has knowingly and intentionally agreed to all types of criminality in which the Maduro Criminal Enterprise engages.

63.     The key lines of criminal conduct in which the Maduro Criminal Enterprise engages are discussed in more detail below.

### 1. The Maduro Criminal Enterprise's Narcotics Trafficking and Narco-Terrorism

64.     For at least 20 years, and continuing through today, Maduro, along with a cadre of his Venezuelan loyalists and the FARC, has run a vast narco-terrorism conspiracy, and through it, has intentionally inundated the United States with cocaine, not only to enrich Maduro himself along with the other members of the Maduro Criminal Enterprise, but also to harm the United States and its citizens.

65.     On March 26, 2020, the DOJ unsealed indictments charging myriad crimes against Maduro, other Venezuelan leaders, and their FARC co-conspirators, for narcotics trafficking and narcoterrorism.  Summing up the charges, U.S. Attorney General William P. Barr explained that "[t]he Venezuelan regime, once led by Nicolás Maduro Moros, remains plagued by

criminality and corruption. . . .  For more than 20 years, Maduro and a number of high-ranking colleagues . . . conspired with the FARC, causing tons of cocaine to enter and devastate American communities."[27]

66.    The United States Attorney for the Southern District of New York, Geoffrey S. Berman, further explained how Maduro and his cronies leveraged their authoritarian power in Venezuela to support their narcoterrorism and narcotics trafficking conspiracy:

> Today we announce criminal charges against Nicolás Maduro Moros for running, together with his top lieutenants, a narco-terrorism partnership with the FARC for the past 20 years. . .  ***The scope and magnitude of the drug trafficking alleged was made possible only because Maduro and others corrupted the institutions of Venezuela and provided political and military protection for the rampant narco-terrorism crimes described in our charges***.  As alleged, Maduro and the other defendants expressly intended to flood the United States with cocaine in order to undermine the health and wellbeing of our nation.  Maduro very deliberately deployed cocaine as a weapon.  While Maduro and other cartel members held lofty titles in Venezuela's political and military leadership, the conduct described in the Indictment wasn't statecraft or service to the Venezuelan people.  As alleged, the defendants betrayed the Venezuelan people and corrupted Venezuelan institutions to line their pockets with drug money. [28]

67.    Attorney General Barr further explained the role of FARC in the conspiracy:  "there is a dissident group of about 2,500 FARC members, and they have taken up on the border between Venezuela and Colombia.  These

---

[27] *See* DOJ Press Release, *supra* n. 6, ¶ 1.

[28] *Id.* ¶ 3.

FARC dissidents continue to be involved in drug trafficking and armed insurgency. They have obtained the support of the Maduro regime, which is allowing them to use Venezuela as a safe haven from which they can continue to conduct their cocaine trafficking and their armed insurgency."[29]

68.     Attorney General Barr further explained: "There is an area right on the border in Colombia, Norte de Santander, which is one of the primary cocaine producing areas remaining in Colombia. FARC gets this cocaine over into Venezuela and then is given safe haven by the regime to fly this cocaine from an area called Zulia, near Lake Maracaibo, up into Central America. Since 2016, this air bridge has been established and has grown fivefold in just those four years. In addition, the regime is allowing these drug traffickers to take drugs by a maritime route into the Caribbean. We estimate that somewhere between 200 and 250 metric tons of cocaine are shipped out of Venezuela by these routes per year."[30]

---

[29] *See* Press Release, Dep't of Justice, Attorney General William P. Barr Delivers Remarks at Press Conference Announcing Criminal Charges against Venezuelan Officials (March 26, 2020) ("AG Barr Remarks") available at https://www.justice.gov/opa/speech/attorney-general-william-p-barr-delivers-remarks-press-conference-announcing-criminal; *see also* Douglas Farah and Caitlyn Yates, *MADURO'S LAST STAND Venezuela's Survival Through the Bolivarian Joint Criminal Enterprise with the FARC*, IBI Consultants LLC ((May 2019) ("The alliance of the [Maduro Regime] together w/ the FARC have coalesced into . . . a consortium of criminalized states and non-state actors working in concert with shared objectives"), available at https://www.ibiconsultants.net/_pdf/maduros-last-stand-final-publication-version.pdf.

[30] *See* AG Barr Remarks, *supra* n. 29.

69.    As set forth in the Maduro indictment, a member of the FARC high command "agreed to provide a multi-ton quantity of cocaine to DEA confidential sources so that the drugs could be imported into the United States. The sources purported to work for Rafael Caro Quintero, a Mexican drug trafficker who participated in the 1985 torture and murder of DEA Agent Enrique 'Kiki' Camarena.   During a recorded meeting, [the FARC leader] referred to the murder of Camarena by characterizing Caro Quintero as the person who had killed the 'son of the bitch of the DEA.'"[31]

70.    U.S. Attorney Berman explained the role of the Cartel of the Suns in the conspiracy.  He stated that Maduro and the Individual Defendants "called their cartel the 'Cartel of the Suns.' The name they chose reflects the Cartel's identity and operations. It is a direct reference to the sun-shaped stars that Venezuelan military officers wear on their uniforms. Indeed, three former military officers of the highest rank are charged in this indictment. At the direction of Maduro, and in pursuit of their own personal profits, these officers: negotiated drug sales; protected the FARC's transportation of coca leaves from Colombia; provided safe haven in Venezuela for cocaine manufacturing facilities; and supplied authorization codes and cover for the planes and boats

---

[31] Maduro Indictment, *supra* n. 4, at ¶ 15(p).

33

that transported the shipments as they began their journey to the United States."[32]

71.     Assistant Attorney General Brian A. Benczkowski explained the role of Defendant Padrino Lopez in the narcotrafficking conspiracy:  "[The Venezuelan] military—led by Padrino Lopez—was responsible for interdicting suspected drug traffickers flying through Venezuelan air space.  But as Minister of Defense, Padrino Lopez instead wielded his power to allow drug traffickers to use Venezuela as a transshipment route for narcotics destined for the United States.  Padrino Lopez allegedly accepted bribes from drug trafficking organizations to allow them free passage to fly through Venezuelan air space.  So long as he was paid off, cocaine-filled aircraft could get by and avoid interdiction.  Far from stopping drug traffickers, the military – for the right price – gave safe passage to drug traffickers, terrorists, and other criminals."[33]

72.     The United States Attorney's Office for the Eastern District of New York has charged Defendant Torres (the former general director of Venezuela's DEA),  for his role in the Maduro Criminal Enterprise's narcotics trafficking.

---

[32] *See* Press Release, Dep't of Justice, U.S. Attorney Geoffrey S. Berman Announces Charges in *U.S. v. Maduro et al.* New York, N.Y. (March 26, 2020) available at https://www.justice.gov/opa/page/file/1262756/download.

[33] *See* Press Release, Dep't of Justice, Assistant Attorney General Brian A. Benczkowski Delivers Remarks at Press Conference Announcing Criminal Charges Against Venezuelan Officials (March 26, 2020) available at https://www.justice.gov/opa/speech/assistant-attorney-general-brian-benczkowski-delivers-remarks-press-conference-announcing.

According to the indictment, Torres "receive[d] payments from narcotics traffickers in exchange for assisting the narcotics traffickers in conducting their illicit drug trafficking business."

73.   In exchange for payments from narcotics traffickers, Torres, among other things, (a) alerted narcotics traffickers to future drug raids or locations of law enforcement counter-narcotics activities so that the narcotics traffickers could change the storage locations of narcotics or alter transportation routes or times and thus avoid detection by law enforcement; (b) stopped or hindered ongoing narcotics investigations or counter-narcotics actions so that vehicles loaded with narcotics could depart from Venezuela; (c) arranged for the release of individuals detained for narcotics violations or for suspicion of narcotics trafficking activities; (d) arranged for the release of seized narcotics or narcotics-related currency; and (e) prevented the arrest or deportation of individuals sought for prosecution in foreign countries, including the United States.

74.   In 2017, two of Maduro's wife's cousins, Efrain Antonio Campo Flores and Franqui Francisco Flores, were convicted of conspiracy to smuggle cocaine into the United States and sentences to 18 years in prison.  The Acting Manhattan U.S. Attorney explained that the crime was motivated, in part, by a desire to enhance Maduro's political power at home: "In part to fund an election campaign for the First Lady of Venezuela, Efrain Antonio Campo

Flores and Franqui Francisco Flores de Freitas devised a plan to work with the FARC terrorist organization to send literally tons of cocaine to the United States."[34]

## 2. The Maduro Criminal Enterprise's Acts of, and Material Support for, Terrorism.

75.    A defining feature of the Maduro Criminal Enterprise is the symbiotic relationship among its principal members: on one hand, Maduro, the apparatus of the Venezuelan state that he controls, and the Cartel of the Suns, and on the other hand, the FARC.

76.    As described above, FARC, Maduro and the Cartel of the Suns have worked hand in glove to perpetrate a massive, ongoing, highly profitable narcoterrorism conspiracy aimed at the United States.  But the collaboration goes much farther and deeper.

77.    Venezuela also provides a safe haven for FARC.[35]  As a result, the FARC has taken over state functions in parts of Venezuela and has a vested interest in supporting the Maduro regime. Expansion into Venezuela has

---

[34] Press Release, U.S. Dep't of Justice, *Nephews Of Venezuela First Lady Each Sentenced To 18 Years In Prison For Conspiring To Import Cocaine Into The United States* (Dec. 14, 2017), available at https://www.justice.gov/usao-sdny/pr/nephews-venezuela-first-lady-each-sentenced-18-years-prison-conspiring-import-cocaine.

[35] Reuters Staff, *Amid Columbia Rebel Rearmament, U.S. Sees Support from Maduro* (Aug. 31, 2019), available at https://www.reuters.com/article/us-venezuela-politics-usa/amid-colombia-rebel-rearmament-u-s-sees-support-from-maduro-official-idUSKCN1VL0FZ.

enabled the FARC to carry out attacks in Colombia and withstand blows from Colombian security forces.[36]

78.    In addition, Maduro provides high-end military grade weapons and munitions to FARC, such as shoulder-launched anti-tank weapons.[37] Years ago, Maduro attended a meeting with a FARC representative at which the attendees agreed that the Cartel of the Suns would provide the FARC cash and weapons in exchange for increased cocaine production.[38]

79.    Conversely, at Maduro's request, FARC supplied training to unsanctioned militia groups (known as Colectivos or "Collectives") that function as an armed-forces unit for the Cartel of the Suns.[39]  The Colectivos engage in kidnapping, extortion, drug trafficking and murder.  They are associated with extrajudicial killings and terrorizing dissidents.

80.    Venezuela's democratically elected National Assembly has designated the Colectivos as terrorist groups due to their "violence, paramilitary actions, intimidation, murders and other crimes," declaring their acts to be nothing short of state-sponsored terrorism.  The Colectivos have

---

[36] Ross Dayton, *Maduro's Revolutionary Guards: The Rise of Paramilitarism in Venezuela*, 12 CTC Sentinel 7,  (Aug. 2019) available at https://www.ctc.usma.edu/maduros-revolutionary-guards-rise-paramilitarism-venezuela/.

[37] *See* CNN, *Columbia: FARC Arms Traced to Venezuela*, July 27, 2009, available at http://www.cnn.com/2009/WORLD/americas/07/27/colombia.venezuela.arms/.

[38] Maduro Indictment, *supra* n. 4, ¶ 15f.

[39] *See* DOJ Press Release, *supra* n. 6, at ¶ 13.

attacked anti-government protesters and Venezuelan opposition television staff, sent death threats to journalists, and once even teargassed the Vatican envoy.

81.    FARC's ongoing acts of international terrorism are not limited to collaborating with South American terrorists.  US Attorney Geoffrey S. Berman—unsealing the indictment of Adel El Zabayar, a member of the Maduro Criminal Enterprise—explained that:  "As alleged, Adel El Zabayar was part of the unholy alliance of government, military, and FARC members using violence and corruption to further their narco-terrorist aims.  El Zabayar was allegedly a key part of the apparatus that conspired to export literally tons of cocaine into the U.S.  We further allege today, for the first time, that the *Cártel de Los Soles* sought to recruit terrorists from Hizballah and Hamas to assist in planning and carrying out attacks on the U.S., and that El Zabayar was instrumental as a go-between.  Allegedly, El Zabayar obtained from the Middle East a cargo planeload of military-grade weaponry."[40]

---

[40] *See* Press Release, U.S. Dep't of Justice, Former Member Of Venezuelan National Assembly Charged With Narco-Terrorism, Drug Trafficking, And Weapons Offenses (May 27, 2020), available at https://www.justice.gov/usao-sdny/pr/former-member-venezuelan-national-assembly-charged-narco-terrorism-drug-trafficking-and.

### 3. The Maduro Regime's Human Rights Abuses

### i.   Overview

82.   The Maduro Regime engages in violent and unlawful human rights violations to suppress political opposition, maintain its authoritarian grip on Venezuela, and facilitate the Maduro Criminal Enterprise's lucrative narcotics trafficking and public corruption income.

83.   The State Department's 2019 Country Reports on Human Rights Practices: Venezuela, explains:

> Significant human rights issues included: ***unlawful or arbitrary killings, including extrajudicial killings by security forces of the former Maduro regime***, including *colectivos* (regime-sponsored armed groups); ***forced disappearances***; ***torture by security forces***; ***arbitrary detention by security forces***; harsh and life-threatening prison conditions; political prisoners; unlawful interference with privacy; and lack of judicial independence. . . .  The former Maduro regime used violence to repress peaceful demonstrations and repressed freedom of assembly. Other issues included: ***intimidation, harassment, and abuse of AN members***, including denial of due process and parliamentary immunity; pervasive corruption and ***impunity among all Maduro-aligned security forces*** and in other national and state regime offices, including at the highest levels; trafficking in persons; violence against indigenous persons; and the worst forms of child labor, which the former regime made minimal efforts to eliminate.[41]

84.   Expanding on the description of Maduro's use of torture described above, the State Department Report further explains that "[r]egime-aligned

---

[41] *See* Venezuela Country Report at 2, *supra* n. 24.

authorities reportedly subjected detainees to asphyxiation, electric shock, broken bones, being hung by their limbs, and being forced to spend hours on their knees. Detainees reported regime-aligned security forces moved them from detention centers to houses and other clandestine locations where abuse took place. Cruel treatment frequently involved former regime authorities denying prisoners medical care and holding them for long periods in solitary confinement. The latter practice was most prevalent with political prisoners. NGOs detailed reports from detainees whom regime-aligned authorities allegedly sexually abused."[42]

85.    In September of 2019, the United Nations Human Right Council ("UNHRC") established an independent fact finding mission (the "U.N. Fact Finding Mission" or "Mission") to Venezuela "to investigate extrajudicial executions, enforced disappearances, arbitrary detentions and torture and other cruel, inhumane or degrading treatment since 2014 with a view to ensuring full accountability for perpetrators and justice for victims."[43]   The Mission carried out 274 interviews with victims, witnesses, family members, former State officials, lawyers, representatives of non-Governmental organizations, and international personnel.[44]  The Mission produced a report,

---

[42] *Id.* at 5-6.

[43] *See* UNHRC Detailed Findings Report, *supra* n.1, at ¶ 1.

[44] *Id.* ¶ 9.

dated September 15, 2020, titled "Detailed findings of the independent international fact-finding mission on the Bolivarian Republic of Venezuela" (the "UNHRC Detailed Findings Report").

86.     Like the U.S. State Department Report, the UNHRC Detailed Findings Report documented "acts of torture and other ill-treatment" including the use of: (1) "[s]tress positions called the "crucifixion" (arms spread out and handcuffed to pipes or grilles) and 'the octopus'/'el pulpo' (a metal belt with chains attached to immobilize the wrist and ankles); (2) "[a]sphyxiation with plastic bags, chemical substances or a bucket of water"; (3) "[b]eatings, sometimes with a stick or other blunt object"; (4) "[e]lectric shocks to the genitals or other parts of the body"; (5) "[d]eath threats or threats of additional violence"; (6) "[t]hreats of rape against the victim and/or their relatives; (7) "[p]sychological torture including sensorial deprivation, constant lighting and extreme cold"; and(8) "[f]orced nudity including in rooms kept at extremely low temperatures."

87.     The Bolivarian National Intelligence Service (the Servicio Bolivariano de Inteligencia Nacional or "SEBIN")—which has been described as the political police force of Venezuela—is particularly notorious for harassment, arrest, torture and murder of political prisoners in Venezuela. Former SEBIN Director Christopher Figuera told the United Nations that, upon taking up his position at the end of October 2018 (the same month during

which SEBIN earlier tortured and murdered Mr. Albán), that he discovered what he described as "a culture of torture" within SEBIN, which pre-dated his appointment.[45]

88.    SEBIN routinely tortures detainees and prisoners at its headquarters, a 16-story office building at the Plaza Venezuela in Caracas. Interrogations, including acts of torture, led by the Counter Intelligence Directorate, are carried out on the tenth floor of the Plaza Venezuela building. Accounts of former detainees indicate that from 2014 to 2018, SEBIN officers committed such acts of torture in the presence and/or under the supervision of more senior officers.

89.    The Plaza Venezuela building also includes five underground floors, dubbed "La Tumba," or "The Tomb," by Venezuelan officials.  There, political prisoners are held five stories underground in inhumane conditions at below freezing temperatures and with no ventilation, sanitation, or daylight. The cells are two by three meters, with a cement bed, security cameras and barred doors, each cell aligned next to one another so there are no interactions between prisoners.  These conditions have caused prisoners to become very ill, despite which they are denied medical treatment.

---

[45] *Id.* at ¶ 1985.

90.     SEBIN also detains political prisoners at a second building, known as El Helicoide. The Guardian describes it as a "high-profile prison for political detainees" where prisoners report "people being beaten, electrocuted, hung by their limbs, forced into stress positions and forced to plunge their face into a bag of feces and breathe in."[46]  Other El Helicoide prisoners report being forced to eat excrement.[47]

91.     In addition, SEBIN agents perpetrate "acts of sexual or gender-based violence against detainees in an attempt to elicit confessions or information implicating others, or to degrade, humiliate or punish them. During interrogation, SEBIN officers threaten[] to rape both male and female detainees using body parts and objects."[48]

92.     Maduro himself "knew of violations and crimes, notably the arbitrary detentions and acts of torture or cruel, inhuman and degrading treatment, including acts of sexual violence, documented in this report and carried out within SEBIN since 2014."[49]

---

[46] *See* Emma Graham Harrison, Downward Spiral: How Venezuela's symbol of progress became a political hell, The Guardian, Sept. 15, 2017, available online at https://www.theguardian.com/world/2017/sep/15/el-helicoide-venezuela-caracas-building-symbol.

[47] *See* Rachell Krygier and Joshua Partlow, *In Venezuela, Prisoners Say Abuse Is So Bad They Are Forced to Eat Pasta Mixed with Excrement*, Washington Post, June 24, 2017, available online at https://www.washingtonpost.com/world/the_americas/in-venezuela-prisoners-say-abuse-is-so-bad-they-are-forced-to-eat-pasta-mixed-with-excrement/2017/06/23/39a0c85e-4acb-11e7-987c-42ab5745db2e_story.html.

[48] UNHRC Detailed Findings Report, *supra* n.1, at ¶ 286.

[49] *Id.* ¶ 1988.

ii.     **The "Playbook" for the arbitrary detention, torture and murder of political opponents.**

93.     The Maduro Criminal Enterprise's suppression of political dissidents follows a well-worn playbook.  To begin, SEBIN acts at the behest of the Maduro Criminal Enterprise, including Maduro himself, who "at times . . . gave orders to the Director General and to Directors of other units in SEBIN," marking individuals for SEBIN to persecute.[50]  According to a former SEBIN officer interviewed by the U.N. Fact Finding Mission, orders determining targets for investigation came from President Maduro and other Cartel of the Suns leaders.

94.     SEBIN then conducts surveillance on the targeted dissidents.  The targets, their family, and their associates may be followed and photographed, and their phones tapped, their electronic messages intercepted.[51]  SEBIN receives full support from the Maduro Regime in these unlawful activities, including any necessary human and material resources.

95.     After the surveillance stage, SEBIN conducts arbitrary arrests. The UNHRC observed that, since the end of July 2017, security forces, notably the intelligence services, have used arbitrary and unlawful detentions as one of the main tools to intimidate and repress the political opposition or any

---

[50] *Id.*

[51] *Id.* at ¶ 1984.

person perceived as a threat to the Government for expressing dissent or discontent. Persons arbitrarily deprived of their liberty included political and social activists, students, human-rights defenders, media workers, and members of the armed forces.

96.    After making baseless arrests, SEBIN then tortures, and in some instances arbitrarily executes, the detainees.

97.    Thereafter, SEBIN takes various steps to justify and cover-up its misconduct. SEBIN often falsifies and plants evidence in an attempt to "incriminate" its victims. According to a former SEBIN employee, the planting of evidence was sufficiently pervasive that it made its way into the workplace lexicon in SEBIN, being referred to as "the seeds."[52] Former SEBIN director Christopher Figuera, similarly, said that he had received orders directly from President Maduro to plant weapons in the apartment of an opposition politician. As well, SEBIN attempts to force its victims to confess to crimes they did not commit and to implicate others for the purported crimes that they did not commit.

98.    A related part of the playbook is that SEBIN will fabricate spurious charges against the victim. The UNHRC noted that leaders and members of opposition parties, including elected representatives, as well as

---

[52] *Id.*

social activists, and human-rights defenders were publicly accused of terrorism, treason and other serious crimes. A common pattern in nearly all the cases investigated by the U.N. Fact Finding Mission was that high-level government officers, including Defendants Maduro and Attorney General Tarek William Saab, made public statements referring to detentions either shortly before or shortly after they took place, commenting on the supposed criminal responsibility of the accused.

99.     Finally, in many instances, SEBIN conducts raids of the homes and offices of its victims, destroying evidence and stealing property.

### 4. Kleptocracy and Corruption

100.   In the words of the United States District Attorney for the Southern District of Florida, Ariana Fajardo Orshan, "[o]ver the last decade, corrupt Venezuelan government officials have systematically looted Venezuela of billions of dollars."[53] The Maduro Regime's looting of *billions* of dollars from Venezuela's Treasury has played a major role in sending Venezuela's economy into a death spiral and in causing a humanitarian crisis of unfathomable proportions.

101.   The looting of the Venezuelan treasury took multiple forms. For example, U.S. law enforcement identified almost a billion dollar in transfers

---

[53] DOJ Press Release, *supra* n. 6, at 1.

from subsidiaries of Venezuela's state-owned oil company—Petróleos de Venezuela, S.A. ("PDVSA")—to the bank accounts of various Venezuelan contractors in South Florida.[54]  From there, a substantial amount of money was transferred from the contractors' accounts in Miami as bribes for the benefit of Venezuelan government officials.

102.  Defendant Moreno Perez, in his position as Chief Justice of the Venezuelan Supreme Court, supported this corruption by accepting massive bribes in exchange for affecting the outcomes of criminal and civil cases in Venezuela, including directing lower-court judges to dismiss particular cases or release certain defendants.  For example, with respect to an individual charged in the United States for his role in a multibillion-dollar PDVSA fraud scheme, Moreno Perez helped the individual get the case against him in Venezuela dismissed.[55]  In exchange for a $1 million bribe—which came from a Miami bank account that held the proceeds of corruptly inflated PDVSA contracts—Moreno Perez arranged for a PDVSA contractor charged with corruption to be released from detention in Venezuela.[56]

---

[54] *See* Affidavit of Shauna L. Willard, Special Agent, Homeland Security Investigations, ¶ 7, *United States v. Maikel Jose Moreno Perez,* 20-cr-2407 (S.D. Fla. 2020), available online at https://www.justice.gov/opa/page/file/1261816/download.

[55] *Id.* ¶ 20.

[56] *Id.* ¶¶ 23-32.

### 5. Money Laundering

103.  The Maduro Criminal Enterprise laundered proceeds of its criminal endeavors through the United States, especially South Florida.

104.  For example, Defendant Moreno Perez laundered and expended a significant portion of his ill-gotten gains in South Florida.  From 2012 to 2016—when his salary in Venezuela was $12,000 per year—Moreno Perez's bank records show approximately $3 million in expenditures primarily in the geographical area of South Florida. Additionally, bank records show that he paid approximately $1 million for a private aircraft and private pilot. Bank records also show that he spent more than $600,000 in credit or debit card purchases at stores primarily in the South Florida area (including tens of thousands of dollars at luxury stores in Bal Harbor, such as Prada and Salvatore Ferragamo), approximately $50,000 in payments to a luxury watch repair store in Aventura, and approximately $40,000 in payments to a Venezuelan beauty pageant director.

105.  Similarly, Motta Dominguez, the Venezuela Minister of Electrical Energy and President of Corporacion Electrica Nacional, S.A. ("Corpoelec"), Venezuela's state-owned electricity company, is a member of the Maduro Criminal Enterprise who participates in the Maduro Criminal Enterprise's public-corruption offenses.  He was part of a multimillion-dollar scheme in which Florida companies, in violation of the Foreign Corrupt Practices Act,

paid bribes to receive awards of Corpoelec contracts.  He was indicted in the United States District Court for the Southern District of Florida for conspiracy to launder the bribe proceeds in this district.[57]

106.  In addition, "Maduro and others agreed to launder many millions of dollars from the FARC by purchasing palm oil extraction equipment from Malaysia with drug proceeds, which would be used to support the operation of African palm plantations in Venezuela that would appear legitimate."[58]

107. Similarly, the Maduro Criminal Enterprise choreographed a billion-dollar international scheme to launder funds embezzled from Venezuelan state-owned oil company PDVSA using Miami, Florida real estate and sophisticated false investment schemes.[59]

### E. The Albán Family

108.  Around thirty-five years ago, Ms. Albán Osio and Ms. Albán met when they were working together at entry-level positions at a bank in Caracas. They soon began dating.  At that time, they had very little to their names. They came from poor families.  They owned neither a home nor a business;

---

[57] *See* Indictment, *United States v. Luis Alfredo Motta Dominguez*, 19-cr-20388 (S.D. Fla. 2019), available online at https://www.justice.gov/opa/page/file/1261781/download.

[58] *See* Maduro Indictment, *supra* n. 4, at ¶ 15c.

[59] *See* Press Release, U.S. Dep't of Justice, Two Members of Billion-Dollar Venezuelan Money Laundering Scheme Arrested (July 25, 2018), available at https://www.justice.gov/opa/pr/two-members-billion-dollar-venezuelan-money-laundering-scheme-arrested#:~:text=Matthias%20Krull%2C%2044%2C%20a%20German,conspiracy%20to%20commit%20money%20laundering.

they had neither college degrees nor children.  But they were in love, they were honest and hardworking, and they were determined to build a life together.

109.   Six years later, they were married. They were still in college—a first in both of their families.  And they were each working two jobs just to pay tuition.

110.   Some five years after the wedding, Ms. Albán Osio gave birth to their first child, a son, Fernando Albán Osio. Mr. Albán was so happy and joked that he wanted three more. Two years later, he was completely enamored with their newborn daughter, Maria Fernanda Albán Osio.  Together, they had formed a beautiful family.

111.   Mr. Albán and his wife then put their college degrees to work. They founded their own corporate legal and accounting firm called Audi-Con Contadores Publicos S.C. ("Audi-Con"), which Ms. Albán Osio used to call "their second marriage" and "their third child."  They worked together every day to grow their fledgling business.

112.   In the fullness of time, they bought a home together.  They stayed focused on work, family and faith, and by doing that, they flourished.  Their life was peaceful and lovely.  It was everything they had dreamed.  It was what they had realized through love, sweat and tenacity.  It is what the Maduro Regime was about to destroy.

### III.   THE MADURO CRIMINAL ENTERPRISE'S CRIMES AGAINST MR. ALBÁN AND HIS FAMILY

#### A. Death threats forced Mr. Albán's family to flee Venezuela, breaking the family apart.

113.   The trouble for the Albán family started in 2013, when Mr. Albán ran for city council.  Mr. Albán ran as a member of the Justice First party.  The Justice First party is a highly diverse, progressive political party that is united in its opposition to the Maduro regime.  Justice First favors, among other things, increasing local autonomy and abolishing the corrupt and unlawful Constituent Assembly that Maduro installed to support his authoritarian control of Venezuela.

114.   On December 8, 2013, Mr. Albán won his contested election for a low-level Venezuelan office: municipal council representative for the Libertador Municipality of the Capital District (Caracas).

115.   As committed as Mr. Albán was to the cause of a free and democratic Venezuela, his even greater passion was serving his constituents, an objective he worked to achieve above and beyond expectations, from the seemingly modest platform of his local municipal position.

116.   For example, as a board member of Justice First, he accepted what others saw as an undesirable assignment: religious outreach. Fernando, who was a pious Catholic, relished it.  He quickly made friends with clergy from all

51

religious denominations:  priests, ministers, rabbis, imams—they all saw the good that Fernando was trying to do.

117.  Mr. Albán and his wife also started a soup kitchen for the poor. Like their accounting business, it was a family affair.  They did the cooking and food distribution themselves.

118.  In 2015, Mr. Albán and his family received a series of serious of threats of violence and death from low-level, local members of Maduro's party.

119.  In September 2015, Mr. Albán's son, Fernando Albán Osio, fled Venezuela after receiving multiple death threats and sought asylum in the United States.

120.  In July and September 2017, Mr. Albán's wife and daughter also fled Venezuela following what they took to be serious threats of death and violence.

121.  Both Ms. Albán Osio and Maria Fernanda Albán Osio were granted asylum in the United States in July 2018.

122.  For the Albán family—a family that lived under the same roof, worked together at the family business, worshiped together at the same neighborhood church where the children were baptized, served together at the family soup kitchen—being forced to separate due to the death threats was extraordinarily disruptive and painful.

123.   While Ms. Albán Osio and the children were in the United States and Mr. Albán remained in Venezuela, they would talk on the phone for hours every day.  Mr. Albán missed his family dearly, but he also had a deep sense of duty to the people of Venezuela, a country that had grown poorer and more destitute under the Maduro Regime.

### B. Mr. Albán's family saw him alive for the last time during a brief visit to New York.

124.   In mid-August 2018, Fernando traveled to New York to see his family.   It was a happy time for the Albán family—they celebrated Mr. Albán's birthday and talked about plans for their life in New York.

125.   As it happened, the janitor in the apartment where the Albán family was staying had just been fired.  Mr. Albán did not hesitate to lend a hand.  He gladly washed floors and cleaned the bathroom they shared with other tenants—because that was the right thing to do.

126.    Sadly, this visit was the last time that Mr. Albán's family would ever see him alive.

### C. In disregard of U.S. sovereignty, Maduro operatives, acting in New York, aided and abetted Mr. Albán's kidnapping and murder.

127.  As discussed above, ¶¶ 93-94, when the Maduro Regime takes action against political opponents, it typically works from a "playbook," in

which the first step is surveillance of the victim, his associates, friends and family.  That is what happened here.

128.  While in New York, Mr. Albán met with Justice First party leaders, including two of the party's leaders and foremost luminaries: Julio Borges and Gustavo Marcano.  In 2018, together with Mr. Borges and Mr. Marcano, Mr. Albán participated in several meetings and events at the United Nations General Assembly.

129.  At the same time, Maduro's agents took to the streets of New York, where they surveilled and photographed the Justice First delegation while the delegates attended events in connections with the U.N. General Assembly.

130.  Members of the Justice First opposition delegation in which Mr. Albán participated spotted Maduro's agents, became suspicious of them, and in particular, the fact that the agents were following and photographing the delegation.  Delegation members were extremely concerned for their safety and wellbeing, and promptly reported the unlawful espionage to the police.

131.  It is unclear whether members of the delegation were able to spot Maduro's agents tailing them because of the delegation's heightened situational awareness borne of years of living in a Venezuelan police state, or if Maduro's agents chose to allow themselves to be seen to intimidate members of the delegation.

132.   In any event, on information and belief, it was precisely because Maduro agents flagged Mr. Albán in New York that the Maduro Regime, at the highest levels, focused its wrath on Mr. Albán.  The actions of the Maduro agents in New York not only aided and abetted, but indeed caused, Mr. Albán's kidnapping, torture and murder.

133.   One of the Justice First delegation members—Gustavo Marcano, who cofounded Justice First, who holds a Public Policy degree from Georgetown University, and who was elected as Mayor of the city of Lecheria at age 25, the youngest mayor in Venezuelan history—sat for a television interview four days after Albán's murder.  During the interview, Mr. Marcano explained that Mr. Albán concluded that he needed to return to Venezuela serve his community.  In Mr. Marcano's words: "And what Fernando [Mr. Albán] told us is that . . . he had to return to fulfill his function as counselor of Caracas and with the function that he also had in the parish where he lived, he worked in food shelters that had been created to care of children, hundreds of children in Caracas."[60]

134.   Mr. Marcano further explained that it was the actions of Maduro's agents in New York that led to Mr. Albán's death:  "When we were in New

---

[60] *See "La Noche", ¿Suicidio o Asesinato? Las Diferentes Hipótesis Alrededor de la Muerte de Fernando Albán*, (Interview of Gustavo Marcano, Justice First party member, by Jefferson Beltran Neira, subdirector "La Noche", starting at minute 42) (Canal NTN 24 television broadcast Oct. 12, 2018), available at https://www.youtube.com/watch?v=Z_g9FYQ6Lcg.

York, the Venezuelan delegation led by Julio Borges was being persecuted by people accredited by the Venezuelan Consulate.  They were handling the monitoring, photographs, videos.  I am convinced . . . that this is where Fernando Albán was identified [by the Maduro regime].  And that is what led to his arrest [upon] returning to Caracas. Fernando was a low-profile leader. . . .  He was not a leader with high public exposure and the only way that the regime, I am convinced, recognized Fernando was a product of that persecution that we went through when we were there in New York." [61]

135.    The Reporter then asked Mr. Marcano a follow-up question, and Mr. Marcano again confirmed that the actions of Maduro's henchmen in New York had led to Mr. Albán's death:

> **Reporter:**  Doctor Marcano, what you are telling me that as a result of going to New York to the United Nations meeting is for that reason why the [Maduro] regime makes the decision to capture him at the moment he steps on Venezuelan soil?
>
> **Marcano:**  Yes, for attending the United Nations meeting and the regime had people following the Venezuelan opposition delegation there in New York and I am sure that this is how they managed to identify Fernando Albán and that is why when Fernando just landed in Caracas he was arrested [and] . . . illegally kidnapped by the SEBIN.[62]

---

[61] *Id.* (unofficial translation).

[62] *Id.* (unofficial translation).

### D. The Maduro Criminal Enterprise abducted Mr. Albán at Simón Bolívar International Airport.

136.   In early October 2018, Mr. Albán prepared to travel back to Venezuela.

137.   He purchased enough goods to fill three suitcases with gifts for family and friends in Venezuela, from basic items such as toiletries and food (which have been scarce in Venezuela for years), to electrical and mechanical educational kits to teach children trade skills.

138.   On October 5, 2018, Mr. Alban returned to Venezuela, arriving at Simón Bolívar International Airport near Caracas.

139.   As was his custom, Mr. Albán called his wife on his cell phone and informed her that he had landed.  However, shortly thereafter, when Mr. Albán passed through immigration, he was unexpectedly "detained" and abducted by armed, masked SEBIN officers.  SEBIN's detention and abduction of Mr. Albán was unlawful under Venezuela law and international law—they had no grounds to detain Mr. Albán, let alone a warrant for his arrest.

140.   In detaining and abducting Mr. Albán, the SEBIN officers acted as Maduro's agents, as members of the Maduro Criminal Enterprise, and pursuant to the Maduro Criminal Conspiracy.

141.   Through quick action, Mr. Albán managed to inform a family member via text message that SEBIN officers were in the process of detaining

him.  The family member ("John Doe") prefers to remain unnamed for fear of reprisal by the Maduro Criminal Enterprise.  But for that text-message warning, Mr. Albán might have vanished without a trace after SEBIN snatched him at the airport.

142.  Maduro Regime agents, in connection with Mr. Albán's kidnapping, stole Mr. Albán's luggage and the contents, which the Maduro Regime has never returned to his family.

### E. The Maduro Regime subjected Mr. Albán to a forced disappearance.

143.  Fearing for Mr. Albán's safety, John Doe reached out for support to a lawyer and a Justice First party representative.  The three of them immediately traveled in person to Simón Bolivar International Airport to investigate.

144.  Upon arriving at airport, John Doe, the lawyer, and the Justice First party representative inquired about Mr. Alban at the airport's SEBIN office, but SEBIN provided them with no information whatsoever.  Indeed, SEBIN did not even confirm that it had taken Mr. Albán.

145.  Concerned that the SEBIN office at the airport was stonewalling them, and that Mr. Albán might be subject to a forced disappearance, Mr. Albán's relative, the lawyer, and the Justice First official immediately traveled from the airport into the city of Caracas.  They first went to SEBIN

headquarters in Plaza Venezuela and inquired about Mr. Albán, but SEBIN falsely denied having him in custody there.[63] Mr. Albán's advocates then went to the El Helicoide prison, but again SEBIN officers denied having Mr. Alban in custody.

146.   In short, John Doe's fears that Maduro Regime was subjecting Mr. Albán to a forced disappearance were confirmed.

## F. The Maduro Regime pressured Mr. Albán to give false testimony against Maduro's political opponents.

147.   The following morning (Saturday, October 6, 2018), Mr. Albán's family filed a formal complaint with the Public Prosecutor's Office for Fundamental Rights, setting forth that Mr. Albán was missing. Several prominent people, including religious leaders, made public demands that the Maduro Regime provide information on Mr. Albán's whereabouts and detention status.[64]

---

[63] *See  La Tarde, Abogado del Concejal Fernando Albán Duda Que el Edil se Haya Suicidado* (NTN24 Venezuela broadcast October 8, 2018) (Counselor Fernando Albán's Lawyer Doubts That the Mayor Has Committed Suicide) available at https://www.youtube.com/watch?v=jQ6rpRa8Xjs; *Diputados y Representantes de la Oposición Venezolana se Encuentran en las Afueras del Sebin de Plaza Venezuela Para Intentar Obtener Información Sobre la Muerte del Concejal Fernando Albán* (Viva Play television broadcast Oct. 8, 2018) (Deputies and Representatives of the Venezuelan Opposition Meet on the Outskirts of SEBIN in Plaza Venezuela to Try to Obtain Information on the Death of Councilor Fernando Albán), available at: https://www.youtube.com/watch?v=2DIEkiDthxE.

[64] Rossana Franco Zambrano, *Cardinal Urosa Savino Demands Respect for the Rights of Fernando Albán*, Analytica, (Oct. 6, 2018) available at https://www.analitica.com/actualidad/actualidad-nacional/cardenal-urosa-savino-exige-respeto-a-los-derechos-de-fernando-alban/;

148.   In response to the sudden and very public pressure by these various leaders, SEBIN permitted Mr. Albán, during in the afternoon of October 6, 2018, to make a telephone call to his wife.  By then, more than 24 hours had already elapsed since his kidnapping.

149.   Mr. Albán informed his wife that he was in detention on the tenth floor of the SEBIN's Plaza Venezuela building, home to the counter-intelligence section.  This news was immediately terrifying to Ms. Albán Osio. She was well aware of SEBIN's reputation for torturing political prisoners, especially on the 10th Floor of the HQ building and in its basement, The Tomb. Many political prisoners have died brutal deaths there at hands of Maduro Regime agents, after experiencing various forms of torture including waterboarding, electric shocks, asphyxia, beatings, mock executions, deep cuts, cigarette burns and sexual abuse.

150.   Mr. Albán was forced to make the call to his wife on speaker phone, and Ms. Albán Osio could hear several other voices in the background behind her husband.  Although Mr. Albán was limited in what he could tell his wife about his treatment because he was on speaker phone, he was able to drop hints about the dangers he was facing.

151.   To begin, when Ms. Albán Osio asked her husband why he was being detained, Mr. Albán loudly repeated the question to the Maduro Regime agents surrounding him, and Ms. Albán Osio heard different voices chime in

with responses.   The SEBIN officers offered a laundry list of fabricated offenses, such as  "terrorism," and "attempt to assassinate the president."

152.   In addition, Mr. Albán was able to reveal that he was being pressured to falsely incriminate a leader of the Justice First party. Specifically, he told his wife that: "the [SEBIN] captain told me that if I blame [Justice First co-founder and party leader] Julio Borges for the [August 4, 2018] drone [attacks that supposedly were an attempt on Maduro's life], they will let me go…. But I don't know anything about that, I told him that already…"

153.   Mr. Albán offered his wife additional insight into the pressure he was facing, explaining  that the agents told him to ask to be "transferred" to the El Helicoide (the other notorious SEBIN facility) so that he could be with his "people" (the other political prisoners).

154.   Mr. Albán also asked his wife about their kids and told her to remain strong and united.  Ms. Albán Osio was optimistic that SEBIN would eventually let her husband go—everyone knew that Mr. Albán had nothing to do with that alleged drone attack, and that any suggestion to the contrary was preposterous.  But unbeknownst to Ms. Albán Osio, that was the last time she would ever hear her husband's voice.  Mr. Albán was never again allowed to call anyone else, including other family members or even legal counsel.

## G. The Maduro Criminal Enterprise fabricated charges to support its abduction and detention of Mr. Albán.

155.   On October 7, 2018, almost two days after his kidnapping, SEBIN officers took Mr. Alban to Caracas Palace of Justice Courthouse, where he was presented to a court that declined jurisdiction and instead referred the case to the Court of Control on Terrorism-Related Crimes (the "Terrorism Court"), for assignment to Judge Carol Padilla.

156.   This Terrorism Court is the part of the judiciary that the Maduro Regime uses to target opposition leaders.  Within the court, the Maduro Regime frequently steers cases against opposition politicians to Judge Carol Padilla.   She has presided over several other cases that independent international observers have widely criticized for denying defendants due process and imposing political motivated convictions and sentences against innocent individuals.[65]

157.   In any event, on October 7, 2018, the Terrorism Court was supposedly "closed," so no hearing took place.  Consequently, Mr. Albán was not informed of the alleged "crimes" with which he was being charged, there was no hearing for his release from custody (as required by Venezuelan law),

---

[65] See  Nurelyin Contreras, *Profile: Who is Judge Carol Padilla? The Lawyer in Charge of Convicting the Opposition*, Punto de Corte (May 26, 2019) available at: https://puntodecorte.com/juez-carol-padilla/; *Carol Padilla: Profile of a Commissioned Judge*, Armando Info (Aug. 18, 2019), available at: https://armando.info/Reportajes/Details/2593.

nor was he able to access to any of the documents upon which the "arrest" was supposedly based.

158.  Mr. Albán was permitted to speak to his attorneys for just a few minutes.  He used the time to let them know that SEBIN was putting undue pressure on him to falsely testify that National Assembly deputy Julio Borges had been behind the purported drone attack against Nicolas Maduro on August 4, 2018.

159.  Mr. Albán's attorney's received a copy of a only a single document: an "arrest warrant" that falsely accused Mr. Albán of crimes including terrorism, attempting to murder the President and the military high command, treason and conspiracy.  Contrary to the requirements of the Venezuelan Criminal Procedure Code, the  warrant did not provide any evidentiary support for Mr. Albán's arrest.  Indeed, no such evidence ever existed.

160.  This was the last time Mr. Albán spoke to his attorneys—and that he was seen alive by anyone other than members of the Maduro Criminal Enterprise.

## H. The Maduro Regime tortured and murdered Mr. Albán.

161.  Between Saturday, October 6, when Mr. Albán met briefly with his lawyers, and Monday, October 8, when SEBIN threw Mr. Albán's corpse from their headquarters, SEBIN tortured and murdered Mr. Albán.  The truth,

however, was slow to emerge in full due to the Maduro Regime's cover-up and its smear campaign against Mr. Albán.

162.   To begin, at around 3.35 p.m. on October 8, 2018—the same day that Mr. Albán's body was thrown from SEBIN HQ—Venezuelan Attorney General Tarek William Saab announced by telephone during a VTItv broadcast that Mr. Albán "had committed suicide."  AG Saab's story, at least at that moment, was that "[t]he councilman asked to go to the bathroom and, while there, threw himself into the void from the tenth floor."[66]  The Attorney General also claimed Mr. Albán "was being investigated for" a variety of trumped-up charges including "the attempted assassination of President Nicolás Maduro."[67]

163.   The Maduro Regime posted the VTItv broadcast on the official Venezuelan VTtv channel on Youtube.com[68] and elsewhere on YouTube. [69]   AG Saab's false statements were picked up by the Miami Herald and other leading US media.[70]

---

[66] *See EN DIRECTO: Fiscal General Sobre Presunto Suicidio del Concejal Fernando Albán* (VTV Canal 8 television broadcast Oct. 8, 2018) (the "AG Saab Television Broadcast"), available at *https://www.youtube.com/watch?app=desktop&v=K1j1PLu4m7s&t=152s%3B*
[67] *Id.*
[68] *See EN VIVO: Confirman Muerte Del Concejal Fernando Albán* (VPItv television broadcast Oct. 8, 2018), available at https://www.youtube.com/watch?app=desktop&v=CTmxMprMJJI.
[69] *See* AG Saab Television Broadcast, *supra* n. 64.
[70] Antonio Delgado**,** *Did Venezuelan Opposition Leader Jump or Was He Thrown from Secret Police Building?*, Miami Herald (Oct. 9, 2018), 2018 WLNR 31271158 ("According to Maduro's prosecutor, Tarek William Saab, Albán was being held at the police headquarters

164. In fact, AG Saab's story was a total fabrication, and it did not withstand scrutiny for long because the bathrooms on the 10th floor of that building—from which Saab claimed that Mr. Albán jumped—do not have windows.[71]

*[Continued on Next Page]*

---

in Caracas when he 'asked to go to the bathroom, and once there he jumped from an open window.'") ("*Was He Thrown*"), available at https://www.miamiherald.com/news/nation-world/world/americas/venezuela/article219725780.html; Scott Smith, Deb Riechmann, and Ariana Cubillos, *Venezuelan Politician Mourned after Suspicious Death*, AP Alerts (Oct. 10, 2018) ("Venezuela's chief prosecutor doubled down Wednesday on claims that a jailed opposition activist killed himself while the Trump administration condemned the government of President Nicolas Maduro for its alleged involvement in the suspicious death."), available at https://nationalpost.com/pmn/news-pmn/us-sees-venezuela-government-involvement-in-activists-death.

[71] Ibéyise Pacheco, *The Bathroom Cubicle in the Sebin Has No Window*, The National (Oct. 8, 2018), available at https://www.elnacional.com/venezuela/politica/ibeyise-pacheco-cubiculo-del-bano-sebin-tiene-ventana_254969/; Carla Angola (@carlaangola) (Oct. 8, 2010 11:50 AM), https://twitter.com/carlaangola/status/1050051051062222849 ("Tarek lied by saying that @albanfernando was launched from the restrooms (NO WINDOWS) and Reverol lied by saying he was launched from the meeting room (NO WINDOWS). They will not be able to cover up this state murder.") (unofficial translation).

.

Bathroom Area (no windows)



Waiting Room (no windows either)

165.   Later that same day, Venezuelan Interior Minister Néstor Reverol made a statement with a significantly different version of events.  According to Minister Reverol: "Mr. Alban had been in the waiting room [and not the

bathroom, as AG Saab claimed] at SEBIN Plaza Venezuela for transfer to court, when he threw himself out of a window falling to his death."[72]

166.   Minister Reverol also tweeted on October 8, 2018: "It was learned of the suicide of Fernando Alban, who had been detained in the Sebin since October 5 for the investigation of the attempted assassination and being involved in destabilizing acts directed from abroad, of which there is sufficient evidence."[73]  On information and belief, this tweet was reviewed by numerous members of the Venezuelan community in exile in South Florida.

167.   Minister Reverol made his announcements that Mr. Albán had committed suicide before any investigation had been (or could have been) performed.  Like AG Saab's statements, Minister Reverol's statements were lies.

168.   After hearing AG Saab and Minister Reverol's announcements, Mr. Albán's relatives, along with lawyers, political activists, and friends, went to SEBIN headquarters in Plaza Venezuela seeking information. But SEBIN officers refused to provide any information and, through implicit threats of violence, quickly forced everyone seeking information to disperse.

---

[72] Unofficial translation.  *See* Nestor Luis Reverol (@NestorReverol), Twitter (Oct. 8, 2018), https://twitter.com/VPITV/status/1049387595032158213/photo/1

[73] Valentina Larez Martiz, *Muere Líder Opositor Venezolano que Estaba en Poder del Sebin*, El Tiempo (Oct. 8, 2018 10:29 PM) (unofficial translation), available at https://www.eltiempo.com/mundo/venezuela/muere-lider-opositor-venezolano-fernando-alban-por-presunto-suicidio-278748.

169. Eventually, after providing multiple inconsistent versions of events surrounding Mr. Albán's death, the Maduro Regime claimed that Mr. Alban had jumped from this window:[74]



DIVISIÓN DE INSPECCIÓN TÉCNICA

Inspección Técnica Nº 2.219    Fecha: 08-10-2018    Expediente: **K-18-0017-00631**

Grafica  Nº 17:



170. But again, the Maduro Regime's story does not withstand scrutiny. The only fingerprints found on the window from which Mr. Alban allegedly jumped belong to a SEBIN officer; none of Mr. Albán's prints were found.[75]  Given that the window only opened to about 30 degrees and Mr. Alban was about 5" 8' tall, it would have been impossible for him to climb though it without touching it.

---

[74] UNHRC Detailed Findings Report, *supra* n. 1, at ¶ 661.
[75] *Id.* ¶ 661.

171.   Continuing with the hasty cover-up that began with AG Saab and Minister Reverol lying to the public about Mr. Albán's cause of death, the Maduro Regime, in the late afternoon of October 8, secretly transferred Mr. Alban's body to a forensic medicine unit in Bello Monte that they controlled.

172.   Fortunately, this closely held news nevertheless leaked to certain of Mr. Albán's associates.   His family members and several others, after learning where Mr. Albán's body was being held, travelled to the morgue in Bello Monte.

173.   A close family member was eventually allowed enter to the morgue to identify Mr. Albán's body, but once inside, was denied access to the body.  Instead, Maduro Regime agents insisted that the family member "identify the body" based on a photograph that the agents kept afterwards.  At around 8.35 p.m. on the same day that Mr. Albán was thrown from the SEBIN building, and after Mr. Albán's corpse had been in the Bello Monte morgue for only a handful of hours, Mr. Albán's body was delivered to his family for burial.[76]

174.   Also that day, the Bello Monte forensic medicine unit issued a death certificate to Mr. Albán's family. Cause of death was recorded as "severe

---

[76] *EN VIVO: Entregan Cuerpo del Concejal de Primero Justicia* (VPItv television broadcast Oct. 8, 2018) (body of Justice First official is delivered), available at https://www.youtube.com/watch?v=ozucDPMjVWs.

cranial encephalic trauma; secondary hypovolemic shock; abdominal pelvic thoracic trauma from a fall from height." The death certificate was not dated.

175.   The following day (October 9, 2018), Mr. Albán's family requested a *dated* death certificate. In response, the Maduro Criminal Enterprise issued a new death certificate, but it changed the supposed cause of death to "severe craniofacial trauma" (rather than severe cranial encephalic trauma).[77]

176.   A different doctor signed the new death certificate.[78] The doctor who had signed the original death certificate was registered as a community doctor (general practitioner) and, on information and belief, did not have any expertise in anatomical pathology (or otherwise in conducting autopsies). As such, under the Venezuelan Criminal Procedure Code, that doctor would not have been authorized to conduct an autopsy.[79]

177.   Even more troubling, the doctor who signed the second death certificate identified himself on the certificate using an identity card number that, according to the website of the National Electoral Council, corresponds to another person. In other words, the second doctor provided a false identity.

---

[77] Death Certificate No. 37ro90 issued by the Civil Registrar of San Pedro Parish, Libertador Municipality, Capital District (Oct. 9, 2018).

[78] Death Certificate EV14 No. 90100289, issued by the Forensic Medicine Office of Bello Monte, Libertador Municipality, Capital District (Oct. 9, 2018).

[79] Criminal Procedure Code, art. 200.

178.   Subsequently, the U.N. Fact Finding Mission retained two independent, international forensic experts to review the so-called "autopsy" of Mr. Albán.  Both experts confirmed that the Maduro Regime, which had Mr. Albán's corpse for less than a day, simply did not have sufficient time to perform a forensically valid autopsy.

179.   The U.N. experts specialized in (a) the Minnesota Protocol on the Investigation of Potentially Unlawful Death (2016), a set of international guidelines for the investigation of suspicious deaths, particularly those in which the responsibility of a State is suspected and (b) the Manual on Effective Investigation and Documentation of Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, commonly known as the Istanbul Protocol, which is the first set of international guidelines for documentation of torture and its consequences.  The U.N. experts concluded that Mr. Albán's autopsy complied with neither the Istanbul Protocol nor the Minnesota Protocol.

180.   The U.N. experts condemned the autopsy because there was "no indication that those performing the autopsy searched for evidence of torture or ill-treatment, sexual violence, asphyxiation, hallucinogen drugs or

sedatives."[80] The U.N. additionally criticized the Maduro Regime for failing to allow anyone representing the family to observe the autopsy.

181.  In sum, the Maduro Regime conducted rushed and shoddy "autopsy" that was designed to cover-up Mr. Albán's torture and murder.

182.  On October 10, 2018, two days after Mr. Albán's murder, Attorney General Tarek William Saab made another public statement about Mr. Alban's death, supposedly based on the "autopsy."  During those remarks, AG Saab contradicted his early statement about Mr. Albán's supposed suicide, stating that "[i]t has never been said that Fernando Alban threw himself out of the bathroom window. When he said he wanted to go to the bathroom, he took advantage of the circumstance and ran to throw himself out from a panoramic window on the tenth-floor corridor."[81]

183.  Another member of the Maduro Criminal Enterprise—Diosdado Cabello, who is both the President of National Constituent Assembly (the legislative body that Maduro created as an alternatively to the democratically elected National Assembly) and a leader of the Cartel of the Suns—also made false statements about Mr. Albán's death.  Ironically, Cabello intonated that the opposition was "playing politics" by refusing to accept the Maduro Criminal

---

[80] *Id.* at ¶ 664.
[81] Luigino Bracci Roa, *Situación en Venezuela, Nueva rueda de prensa del Fiscal Tarek William Saab Sobre Muerte de Fernando Albán*, YouTube (Oct. 10, 2018) (New press conference by Prosecutor Tarek William Saab on the Death of Fernando Albán), available at https://www.youtube.com/watch?v=5TsGLC3n88Q.

Enterprise's phony narrative that Mr. Albán had killed himself. Specifically, on Cabello's show "Con el Mazo Dando," he told the audience that, "It is very sad that the opposition continues doing politics with death and doesn't even respect a person's decision to end their own life."[82]

184. Around the same time, various publications affiliated with the Maduro Regime began publishing articles on the internet falsely claiming that the Regime had found child pornography on Mr. Alban's phone, asserting that an "psychological evaluation" was performed while Mr. Albán was in custody, and untruthfully asserting that the "evaluation" had revealed that Mr. Albán had "fanatic religious beliefs," and thus his "suicide" was a "self-immolation."[83]

185. On October 31, 2018, a journalist asked Attorney General Tarek William Saab during a television interview whether Mr. Alban had been handcuffed at the time of his death. Saab responded that there was no indication that Mr. Albán had been handcuffed when he died. AG Saab's response may have been designed to support the Maduro Regime's spurious suicide narrative, i.e., Mr. Albán was said to have been unshackled because a

---

[82] Luigino Bracci Roa, *Situación en Venezuela, Lo que Dijo Diosdado Cabello Sobre la Muerte del Concejal Fernando Albán,* YouTube (Oct. 10, 2018, minute 1:49) (What Diosdado Cabello Said About the Death of Councilor Fernando Albán), available at https://www.youtube.com/watch?v=pMJd-VHJZF4.

[83] *See Controversial Scenario Behind the Profile of Councilor Albán*, VTActual Venezuela (Oct. 9, 2018), https://www.vtactual.com/controversial-escenario-tras-el-perfil-del-concejal-alban/.

shackled prisoner would have had little chance of escaping his SEBIN guards to leap from a window.

186.   But Saab's story that Mr. Albán was not handcuffed while he was *alive* defies credulity.   According to two SEBIN officers, Mr. Alban's "hands were cuffed in front of him when he requested bathroom access."[84]   And former political prisoners detained and tortured at SEBIN headquarters have explained that all prisoners are always handcuffed, and always accompanied by SEBIN agents—even when they go to the bathroom.[85]

187.   This is not the only part of AG Saab's attempted obfuscation to crumble under scrutiny.   AG Saab maintained that security cameras footage from the tenth floor of the SEBIN HQ building did not exist.[86]   But the U.N. Fact Finding Mission was "informed that the Information Technology System

---

[84] UNHRC Detailed Findings Report, *supra* n. 1, at ¶ 661.

[85]   Rosmit   Mantilla   (@RosmitMantilla),   Twitter   (Oct.   8,   2018   7:21   PM), https://twitter.com/rosmitm/status/1049439670931808256; *see also* Vanessa Moreno Losada, *Cuando eres un preso político, nunca te dejan solo', afirman ex detenidos del Sebin,"* Efecto Cocuyo (Oct. 9, 2018), available at https://efectococuyo.com/sucesos/cuando-eres-un-preso-politico-nunca-te-dejan-solo-afirman-exdetenidos-del-sebin/ ("When you are a political prisoner, they never leave you alone, say former SEBIN detainees"); Fernando Penalver, *Diputado Venezolano Responsabilizó a Nicolás Maduro por 'Suicidio' del Concejal Fernando Albán,"* Metro World News (Oct. 8, 2018) (Venezuelan Deputy Blamed Nicolás Maduro for 'Suicide'   of   Councilor   Fernando   Albán),   available   at https://www.publimetro.cl/cl/noticias/2018/10/08/diputado-venezolano-responsabilizo-a-nicolas-maduro-por-suicidio-del-concejal-fernando-alban.html.

[86]   See *Vladamir a la Unu, Fiscal General: Albán Murió Tras el Impacto, sin Evidencias de Tortura (2/6)* (Globovision televisión braodcast Nov. 1, 2018, at minute 2:14) (denying the existence   of   video   footage   from   the   tenth   floor   of   SEBIN   HQ),   available   at https://www.youtube.com/watch?v=RBNGy8lv64k.

Analysis Division of the Public Prosecutor's Office collected and stored footage."[87]

188.   Likely recognizing that the Maduro Regime's cover-up was implausible, AG Saab capped off his October 31, 2018 remarks with an ominous threat: "anyone claiming that Mr. Alban did not commit suicide would be committing a felony."[88]

189.   Despite the Maduro Regime's flimsy cover-up, the evidence (including much that was obtained through backchannels by Mr. Alban's legal team in Venezuela) makes clear beyond doubt that Mr. Albán was murdered inside of the SEBIN HQ building.  Among other things:

     a.   A firefighter (only identified as "Alexander," for fear of reprisals by the Maduro Regime) who retrieved Mr. Albán's corpse from where it landed testified in an interview (by Maduro Regime agents) that even before anyone had accessed the body, SEBIN agents told him that Mr. Albán was already dead.

     b.   The Maduro Regime agents also asked Alexander about the "condition of the *cadaver*" before anyone had confirmed that Mr. Alban was indeed dead.

---

[87] UNHRC Detailed Findings Report, *supra* n. 1, at ¶ 653.
[88] UNHRC Detailed Findings Report, *supra* n. 1, at ¶ 653.

c.      As noted above, no handcuffs were recovered from Mr. Albán's corpse,[89] despite SEBIN policy of keeping all (living) prisoners in restraints.

d.      Mr. Albán's corpse was also recovered without shoes.  This is all but impossible to reconcile with the Maduro Regime's version of events, in which Mr. Albán slipped his guards while waiting to be transported to court, ran to the window, and threw himself out—a sequence that would not have allowed him time to remove his shoes.

e.      When Mr. Albán's lifeless body was recovered, it had blood only on the ears and nose—nowhere else.  Moreover, there was no blood on his clothes, or even on the subway grate on which his corpse had crashed.  If Mr. Albán had died from his fall, the area would have been bathed in blood.  Doubling down on the cover-up, the case file does not show a photograph of Mr. Albán's body where it landed, but rather shows the body placed on a stretcher.

f.      Mr. Albán's body did not have the broken bones that would be associated with a living person plummeting to his death.  His arms were not broken, and on his legs, only the left femur had a fracture.

---

[89] Images of Mr. Alban's body are on file with the U.N. Fact Finding Mission, planimetric lifting No. 1378 and 1378 b, Technical Inspection No. 2.219 File: K-18-0017-00631 Chart No. 31, 8 October 2018.

190.   The evidence further confirms that SEBIN tortured Mr. Albán. They either (a) tortured him to death or (b) tortured him first and murdered him second.

a.   To begin, the fact that (as set forth above) Mr. Albán was murdered while in SEBIN custody, before his body was thrown from building, is consistent with his having been tortured, and with SEBIN mutilating the corpse by flinging it from the building in an effort to cover up the injuries they caused while Mr. Albán was still living.

b.   In addition, the fact that Mr. Albán's corpse was not wearing shoes is consistent with the SEBIN's practice of removing the shoes of prisoners when subjecting them to electronic shock torture, so that their feet can be placed in water, which has a tenfold multiplying effect on electronic shocks.  Moreover, burns marks of the type associated with electronic shock torture were observed on Mr. Albán's body.

c.   The photographs of Mr. Albán's body show bruises consistent with SEBIN having beaten him while he was alive.[90]

191.   The New Yorker has reported on Mr. Albán's death, stating that "[t]he official explanation was suicide, but rumors persisted that agents had

---

[90] *See Miami NGO sends Bachelet evidence of torture to councilor Albán*, Nueva Prensa Digital (July, 23, 2019, available at https://soynuevaprensadigital.com/npd/ong-de-miami-envia-a-bachelet-pruebas-de-torturas-a-concejal-alban/ (explaining that the Miami based NGO Venezuela Awareness has "a photographic series of Albán's lifeless body that shows that on October 8, 2018 he was the victim of brutal torture, which it caused his death.").

drowned him in 'the bathtub,' a local equivalent of waterboarding, and then thrown his body out a window.[91]

192.   On February 7, 2019, the Venezuelan Communications Minister, Jorge Rodríguez Gómez, held a press conference in which he accused Mr. Albán of participating in conspiracy acts.  In the same speech, Mr. Rodríguez Gómez falsely claimed that Ms. Albán Osio—who is not even a politician, let alone a revolutionary—was linked to a lieutenant colonel who has been accused of involvement in the purported drone attack of August 4, 2018.[92]

### I.   The Maduro Regime closed ranks to protect the SEBIN officers who murdered Mr. Albán.

193.   The Maduro Regime took steps to protect its agents who tortured and murdered Mr. Albán.

194.   To begin, the Maduro Regime assigned Farik Karin Mora Salcedo and Dinora Bustamante Puerta—the same prosecutors handling the prosecution for the supposed drone attack on Maduro that Mr. Albán was supposedly being investigated for committing—to oversee the "investigation" in Mr. Albán's death.

---

[91] *See* John Lee Anderson, *Our Man in Caracas*, The New Yorker, 2019 WLNR 18154825 (June 10, 2019); *see also* John Lee Anderson, *Venezuela's Two Presidents Collide,* The New Yorker (June 3, 2019), available at https://www.newyorker.com/magazine/2019/06/10/venezuelas-two-presidents-collide.

[92] Luigino Bracci Roa, *Jorge Rodríguez, Rueda de Prensa Sobre Sucesos en Frontera Venezuela-Colombia*, YouTube (Feb. 24, 2019), at https://www.youtube.com/watch?v=ZeNLBSxozGA&feature=youtu.be.

195.   Both of these prosecutors were recently sanctioned by the Council of the European Union for, among other things: "initiating politically motivated prosecutions and creating obstacles to a political and democratic solution to the crisis in Venezuela, as well as serious violations of human rights and restrictions of fundamental freedoms, such as freedom of press and speech."[93]

196.   In Mr. Albán's case, these prosecutors subverted the justice system to ensure that the SEBIN agents who tortured and murdered Mr. Albán would receive only the proverbial "slap on the wrist":  the prosecutors charged the SEBIN agents with only a minor offense ("breach of custodial obligations") and may not even have convicted the SEBIN agents of that.   Because the prosecutors kept the proceedings secret, excluding Albán's family and international observers, it is entirely possible that the SEBIN murderers did not even get a "slap on the wrist."

### J.  The Maduro Criminal Enterprise stole Mr. Albán and Ms. Albán Osio's property, destroyed their business and raided their home.

197.   Pursuant to the same course of conduct through with the Maduro Regime kidnapped, tortured and murdered Mr. Albán, the Maduro Regime also

---

[93] *See* Press Release, Nat'l Assembly, Bolivarian Republic of Venezuela, European Union Sanctions 11 Senior Officials Linked to Nicolas Maduro's Dictatorship (June 29, 2020), available at https://presidenciave.com/international/european-union-sanctions-11-senior-officials-linked-to-nicolas-maduros-dictatorship/.

stole Mr. Albán and Ms. Albán Osio's marital property, including but not limited to:  (1) the luggage that Mr. Albán brought with him to Venezuela (three suitcases including toiletries, food, gifts, and electrical and mechanical educational kits), (2) the cell phone, watch, cash, keys, passport and much of the clothing Mr. Albán was wearing when he was kidnapped at Simón Bolivar International Airport.

198.  In October and November 2018, Maduro Regime agents raided Audi-Con's offices multiple times and stole all of their computers and equipment.  As a result, the business was unable to continue operations and had to close.  To date, the Maduro Regime has not returned any of the computers or other equipment they misappropriated from Plaintiff's business.

199.  On March 1, 2019, Maduro regime agents also raided Ms. Albán Osio's home. They wore military uniforms, carried assault rifles, and had their faces covered with ski masks.  They terrified all the neighbors, and blocked all access to the entire area while they conducted the raid.  This type of military-type raid is very uncommon, and was clearly meant to frighten Ms. Albán Osio and her family.  The agents stole a mobile phone that was there when they arrived.

200.  In addition, Ms. Albán Osio incurred legal expenses as the result of the entire ordeal, e.g., for legal work in connection with her lawyers'

attempts to secure the release of her husband, and later, to secure the release of her husband's body.

## COUNT I
### Violation of the Florida Anti-Terrorism Act, Fla. Stat. § 772.13
### (All Plaintiffs Against All Defendants)

201.    Plaintiffs incorporate by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

202.    Florida Statute Section 772.13 provides in relevant part:

> A person who is injured by an act of terrorism as defined in § 775.30 or a violation of a law for which the penalty is increased pursuant to § 775.31 for facilitating or furthering terrorism has a cause of action for threefold the actual damages sustained and, in any such action, is entitled to . . . reasonable attorney fees and court costs in the trial and appellate courts.

203.    Plaintiffs (a) Ms. Albán Osio in her personal capacity and in her capacity as the personal representative and executor of the Estate of Fernando Albán, (b) Maria Fernanda Albán Osio, and (c) Fernando Albán Osio are "persons." *See* Fla. Stat. § 1.01(3) (defining "person" to include "individuals, children, firms, associations, joint adventures, partnerships, estates, trusts, business trusts, syndicates, fiduciaries, corporations, and all other groups or combinations.").

204.    An "act of terrorism" is "[a] violent act or an act dangerous to human life which is a violation of the criminal laws of this state or of the United States," that "[i]s intended to: 1. [i]ntimidate, injure, or coerce a civilian

population; 2. [i]nfluence the policy of a government by intimidation or coercion; or 3. [a]ffect the conduct of government through destruction of property, assassination, murder, kidnapping, or aircraft piracy."

205.   The kidnapping of Mr. Albán from Simón Bolivar International Airport in Caracas was an act of terrorism.

      a.   The kidnapping of Mr. Albán from Simón Bolivar International Airport in Caracas was an act dangerous to human life.

      b.   The kidnapping of Mr. Albán from Simón Bolivar International Airport in Caracas was in violation of United States law because it occurred pursuant to, and in furtherance of, a narco-terrorism conspiracy designed to flood the United States with cocaine and to launder the proceeds through the United States.

      c.   The kidnapping of Mr. Albán from Simón Bolivar International Airport in Caracas was in violation of Florida law because it occurred pursuant to, and in furtherance of, a narco-terrorism conspiracy designed to flood Florida with cocaine and to launder the proceeds through the Florida, and acts in furtherance of the conspiracy occurred in Florida. *See* Fla. Stat. § 910.005 (State Criminal Jurisdiction) ("A person is subject to prosecution in this state for an offense that she or he commits, while either within or outside the state, by her or his own conduct or that of another for which the person is legally accountable, if . . . The conduct outside the state

constitutes a conspiracy to commit an offense within the state, and an act in furtherance of the conspiracy occurs in the state.").

d.      The kidnapping of Mr. Albán from Simón Bolivar International Airport in Caracas was in violation of United States law, specifically, 18 U.S.C. § 37, which makes it a crime to unlawfully and intentionally, using any device, substance, or weapon—perform an act of violence against a person at an airport serving international civil aviation that causes or is likely to cause serious bodily injury . . . if such an act endangers or is likely to endanger safety at that airport." Mr. Albán's kidnapping was unlawful because the Maduro Criminal Enterprise intended it to silence dissent and protect the Maduro regime, and because the kidnapping was committed in retaliation for Mr. Albán's lawful speech in the United States. Mr. Albán's kidnapping was intentional, and made use of weapons including firearms and devices including handcuffs. Kidnapping is a crime of violence that is likely to result in serious bodily injury, and in this instance, the kidnapping endangered, or was likely to endanger, the safety of Mr. Albán and others at the airport.

e.      The kidnapping of Mr. Albán from Simón Bolivar International Airport in Caracas was intended to "[i]ntimidate, injure, or coerce a civilian population," and in fact was part of a pattern of human rights abuses the by the Maduro Criminal Enterprise designed to suppress civilian

opposition to the Maduro Criminal Enterprise's acts of public corruption and authoritarian control of Venezuela.

f.     The kidnapping of Mr. Albán from Simón Bolivar International Airport in Caracas was intended to "[i]ntimidate, injure, or coerce a civilian population," and in fact was part of a pattern of human rights abuses the by the Maduro Criminal Enterprise designed to suppress civilian opposition to the Maduro Criminal Enterprise's acts of public corruption and authoritarian control of Venezuela.

g.     The kidnapping of Mr. Albán from Simón Bolivar International Airport in Caracas was intended to "[i]nfluence the policy of a government by intimidation or coercion," and in fact was part of a pattern of human rights abuses by the Maduro Criminal Enterprise designed influence to policies of:

(i)     The legitimate government in Venezuela, including Mr. Albán, who was a member of the Justice First opposition party, an elected municipal leader, and a friend of leading opposition politicians including the co-founders of the Justice First party.  Among other things, the Maduro Criminal Enterprise sought to cause the legitimate government in Venezuela to abandon and yield its lawful governmental authority to the Maduro Criminal Enterprise.

(ii)    The government of the United States, which Maduro wished to punish and humiliate for hosting, promoting and recognizing the legitimacy of opposition politicians, providing a platform for their criticisms of the Maduro Regime, and imposing sanctions on the Maduro Regime.

h.    The kidnapping of Mr. Albán from Simón Bolivar International Airport in Caracas was intended to "[a]ffect the conduct of government through destruction of property, assassination, murder, kidnapping, or aircraft piracy," in fact was part of a pattern of kidnapping and murder the by the Maduro Criminal Enterprise designed influence:

(i)    The legitimate government in Venezuela, including Mr. Albán, who was a member of the Justice First opposition party, an elected municipal leader, and a friend of leading opposition politicians including the co-founders of the Justice First party.  Among other things, the Maduro Criminal Enterprise sought to cause the legitimate government in Venezuela to abandon and yield its lawful governmental authority to the Maduro Criminal Enterprise.

(ii)    The government of the United States, which Maduro wished to punish and humiliate for hosting, promoting and recognizing the legitimacy of opposition politicians, providing a platform for their criticisms of the Maduro Regime, and imposing sanctions on the Maduro Regime.

206.   The torture of Mr. Albán at SEBIN headquarters in Caracas was an act of terrorism.

a.      The torture of Mr. Albán at SEBIN headquarters in Caracas was an act dangerous to human life.

b.      The torture of Mr. Albán at SEBIN headquarters in Caracas was in violation of United States law because it occurred pursuant to, and in furtherance of, a narco-terrorism conspiracy designed to flood the United States with cocaine and to launder the proceeds through the United States.

c.      The torture of Mr. Albán at SEBIN headquarters in Caracas was in violation of Florida law because it occurred pursuant to, and in furtherance of, a narco-terrorism conspiracy designed to flood Florida with cocaine and to launder the proceeds through the Florida, and acts in furtherance of the conspiracy, including trafficking and sales of cocaine and transfers of ill-gotten gains occurred in Florida.  *See* Fla. Stat. § 910.005 (State Criminal Jurisdiction) ("A person is subject to prosecution in this state for an offense that she or he commits, while either within or outside the state, by her or his own conduct or that of another for which the person is legally accountable, if . . . The conduct outside the state constitutes a conspiracy to commit an offense within the state, and an act in furtherance of the conspiracy occurs in the state.").

d.      The torture of Mr. Albán at SEBIN headquarters in Caracas was intended to "[i]ntimidate, injure, or coerce a civilian population," and in fact was part of a pattern of human rights abuses the by the Maduro Criminal Enterprise designed to suppress civilian opposition to the Maduro Criminal Enterprise's acts of public corruption and authoritarian control of Venezuela.

e.      The torture of Mr. Albán at SEBIN headquarters in Caracas was intended to "[i]ntimidate, injure, or coerce a civilian population," and in fact was part of a pattern of human rights abuses  by the Maduro Criminal Enterprise designed to suppress civilian opposition to the Maduro Criminal Enterprise's acts of public corruption and authoritarian control of Venezuela.

f.      The torture of Mr. Albán at SEBIN headquarters in Caracas was intended to "[i]nfluence the policy of a government by intimidation or coercion," and in fact was part of a pattern of human rights abuses the by the Maduro Criminal Enterprise designed to influence the policies of:

g.      (i)      The legitimate government in Venezuela, including Mr. Albán, who was a member of the Justice First opposition party, an elected municipal leader, and a friend of leading opposition politicians including the co-founders of the Justice First party.  Among other things, the Maduro Criminal Enterprise sought to cause the legitimate government in Venezuela to abandon and yield its lawful governmental authority to the Maduro Criminal Enterprise.

(ii)    The government of the United States, which Maduro wished to punish and humiliate for hosting, promoting and recognizing the legitimacy of opposition politicians, providing a platform for their criticisms of the Maduro Regime, and imposing sanctions on the Maduro Regime.

207.   The murder of Mr. Albán at SEBIN headquarters in Caracas was an act of terrorism.

a.    The murder of Mr. Albán at SEBIN headquarters in Caracas was an act dangerous to human life.

b.    The murder of Mr. Albán at SEBIN headquarters in Caracas was in violation of United States law because it occurred pursuant to, and in furtherance of, a narco-terrorism conspiracy designed to flood the United States with cocaine and to launder the proceeds through the United States.

c.    The murder of Mr. Albán at SEBIN headquarters in Caracas was in violation of Florida law because it occurred pursuant to, and in furtherance of, a narco-terrorism conspiracy designed to flood Florida with cocaine and to launder the proceeds through Florida, and acts in furtherance of the conspiracy, including sales and trafficking of cocaine, occurred in Florida.  *See* Fla. Stat. § 910.005 (State Criminal Jurisdiction) ("A person is subject to prosecution in this state for an offense that she or he commits, while either within or outside the state, by her or his own conduct or that of another for which the person is legally accountable, if . . . [t]he conduct outside the state

constitutes a conspiracy to commit an offense within the state, and an act in furtherance of the conspiracy occurs in the state.").

        d.    The murder of Mr. Albán at SEBIN headquarters in Caracas was intended to "[i]ntimidate, injure, or coerce a civilian population," and in fact was part of a pattern of human rights abuses by the Maduro Criminal Enterprise designed to suppress civilian opposition to the Maduro Criminal Enterprise's acts of public corruption and authoritarian control of Venezuela.

        e.    The murder of Mr. Albán at SEBIN headquarters in Caracas was intended to "[i]ntimidate, injure, or coerce a civilian population," and in fact was part of a pattern of human rights abuses by the Maduro Criminal Enterprise designed to suppress civilian opposition to the Maduro Criminal Enterprise's acts of public corruption and authoritarian control of Venezuela.

        f.    The murder of Mr. Albán at SEBIN headquarters in Caracas was intended to "[i]nfluence the policy of a government by intimidation or coercion," and in fact was part of a pattern of human rights abuses by the Maduro Criminal Enterprise designed influence to policies of:

        g.    (i)    The legitimate government in Venezuela, including Mr. Albán, who was a member of the Justice First opposition party, an elected municipal leader, and a friend of leading opposition politicians including the co-founders of the Justice First party.  Among other things, the Maduro Criminal Enterprise sought to cause the legitimate government in Venezuela

to abandon and yield its lawful governmental authority to the Maduro Criminal Enterprise.

(ii)    The government of the United States, which Maduro wished to punish and humiliate for hosting, promoting and recognizing the legitimacy of opposition politicians, providing a platform for their criticisms of the Maduro Regime, and imposing sanctions on the Maduro Regime.

a.    The murder of Mr. Albán at SEBIN headquarters in Caracas was intended to "[a]ffect the conduct of government through destruction of property, assassination, murder, kidnapping, or aircraft piracy," in fact was part of a pattern of kidnapping and murder by the Maduro Criminal Enterprise designed influence to policies of:

(i)    The legitimate government in Venezuela, including Mr. Albán, who was a member of the Justice First opposition party, an elected municipal leader, and a friend of leading opposition politicians including the co-founders of the Justice First party.  Among other things, the Maduro Criminal Enterprise sought to cause the legitimate government in Venezuela to abandon and yield its lawful governmental authority to the Maduro Criminal Enterprise.

(ii)    The government of the United States, which Maduro wished to punish and humiliate for hosting, promoting, and recognizing the

legitimacy of opposition politicians, providing a platform for their criticisms of the Maduro Regime, and imposing sanctions on the Maduro Regime.

208.   The Defendants and/or their agents stalked, kidnapped, tortured and murdered Mr. Albán.

209.   Plaintiff Meudy Osio was injured by the acts of terrorism set forth above.  She suffered loss of solatium,  loss of consortium, mental anguish, past and future emotional pain and suffering, loss of society, companionship, comfort, protection, marital care, attention, advice and, counsel.  She also suffered loss of household services and loss of income.

210.   Plaintiff Maria Fernanda Alban Osio was injured by the acts of terrorism set forth above.  She suffered loss of solatium, loss of consortium, mental anguish, past and future emotional pain and suffering, loss of society, companionship, comfort, protection, parental care, attention, advice, counsel. She also suffered loss of household services and loss of income.

211.   Plaintiff Fernando Albán Osio was injured by the acts of terrorism set forth above.   He suffered loss of solatium, loss of consortium, mental anguish, past and future emotional pain and suffering, loss of society, companionship, comfort, protection, parental care, attention, advice, counsel. He also suffered loss of household services and loss of income.

212.   Plaintiff Estate of Albán was injured by the acts of terrorism set forth above.  Mr. Albán (and his estate) suffered physical and mental pain and anguish, death, and loss of wages.

213.   Plaintiffs seek an award of compensatory damages (including treble damages) for the foregoing injuries, plus reasonable attorneys' fees and costs.

## COUNT II
### Wrongful Death, Fla. Stat. § 768.16 *et seq.*
### (By Plaintiff Meudy, in her capacity as the personal representative for the Estate of Albán, Against All Defendants)

214.   Plaintiffs incorporate by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

215.   The death of Mr. Albán was caused by the Defendants wrongful acts, including but not limited to a criminal conspiracy to murder Mr. Albán and a criminal conspiracy to traffic narcotics that was furthered by the murder of Mr. Albán.  The events that led to Mr. Albán's death would have entitled Mr. Albán to sue in his own name if he had survived.

216.   The Maduro Regime caused Mr. Albán's death deliberately, with the specific intent to harm Mr. Albán.

217.   The potential beneficiaries of a recovery in wrongful death include Plaintiff Meudy (spouse of the deceased), Fernando (son of the deceased) and Maria (daughter of the deceased), and the Estate of Albán.

218.  As a proximate result of Defendants actions, Plaintiff Meudy, in her personal capacity, has suffered:

      a.  lost support and services;

      b.  loss of the decedent's companionship and protection;

      c.  mental pain and suffering, and;

      d.  funeral expenses.

219.  As a proximate result of Defendants actions, Plaintiffs Fernando and Maria have has suffered:

      a.  lost support and services;

      b.  loss of the decedent's parental companionship, instruction, and guidance, and;

      c.  mental pain and suffering.

220.  As a proximate result of Defendants actions, Plaintiff Meudy, in her capacity as the personal representative for the Estate of Albán, has suffered:

      a.  Loss of earnings

      b.  Loss of the prospective net accumulations of an estate

221.  Plaintiffs seek an award of compensatory damages for the foregoing injuries, the imposition of punitive damages sufficient to deter Defendants from committing such unlawful conduct in the future, and reasonable attorneys' fees and costs.

## COUNT III
## Federal Civil RICO, 18 U.S.C. § 1964(c)
## (By Plaintiff Meudy Against Maduro and the Individual Defendants)

222.   Plaintiffs incorporate by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

223.   18 U.S.C. § 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . " 18 U.S.C. § 1962(c).

224.   **Persons.**  Each Defendant is a "person" capable of holding legal or beneficial interest in property within the meaning of 18 U.S.C. § 1961(3).

225.   **The Enterprise.**   The FARC, the Cartel of the Suns, and the Maduro Regime form an association in fact for the common and continuing purpose described here, i.e., for purpose of exerting unlawful authoritarian control over Venezuela, furthering the Maduro Criminal Conspiracy and engaging in (a) narcotics trafficking; (b) acts of terrorism including but by no means limited to narco-terrorism; (c) human rights violations including kidnapping, torture, and murder; (d) public corruption offenses; and (e) money laundering.   The Maduro Criminal Enterprise constitutes an "enterprise" within the meaning of 18 U.S.C. § 1961(4) engaged in the conduct of their affairs through a continuing pattern of racketeering activity.   The members of

the enterprise functioned as continuing unit with an ascertainable structure separate and distinct from that of the conduct of the pattern of racketeering activity.   The Maduro Criminal Enterprise is the poster child for what Congress had in mind when it created a civil RICO remedy:  a well-organized, long standing, hierarchical crime syndicate engaged in myriad violent criminal endeavors.

226.   In the alternative FARC, the Cartel of Suns, and Maduro Regime each constitute a separate enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Alternative Enterprises").

227.   **Interstate and Foreign Commerce.**   The Maduro Criminal Enterprise and the Alternative Enterprises have engaged in, and their activities have affected, interstate and foreign commerce.

228.   **Pattern of Racketeering Activity.**   Defendants, each of whom are persons associated with, or employed by, the Maduro Criminal Enterprise and/or the Alternative Enterprises, did knowingly, willfully and unlawfully conduct or participate, directly or indirectly, in the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5), and l962(c). The racketeering activity was made possible by Defendants' regular and repeated use of the facilities and services of the enterprise. Defendants had the specific intent to engage in the substantive RICO violation alleged herein.

229.   Defendants each committed at least two predicate acts of racketeering activity that are indictable under provisions of the U.S. Code enumerated in 18 U.S.C. § 1961(1), as more specifically alleged below.

230.   The acts of racketeering were not isolated, but rather the acts of Defendants were related in that they had the same or similar purpose and result, participants, victims and method of commission. Further, the acts of racketeering by Defendants have been continuous. There was repeated conduct during a period of time beginning in 2013 (when Maduro became President of Venezuela following the death of Hugo Chavez), if not sooner, and continuing to the present. Moreover, there is a continued threat of repetition of such conduct.

231.   Plaintiffs specifically allege that Defendants participated in the operation and management of the Maduro Criminal Enterprise and the Alternative Enterprises by overseeing and coordinating the commission of multiple acts of racketeering as described below.

232.   **Predicate:  Conspiracy to commit narco-terrorism.**  RICO predicates include "any offense involving . . . the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance."  *See* 18 U.S.C. § 1961.  Defendant Maduro committed acts indictable for an offenses "involving the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a

controlled substance," and in fact has been indicted for a narco-terrorism conspiracy beginning in 1999 and continuing through today, in violation of 21 U.S.C. § 960a, the object of which was to violate 21 U.S.C. § 841(a) (distribution of five kilograms or more of cocaine), "knowing and intending to provide, directly and indirectly, something of pecuniary value to a person and organization that has engaged and engages in terrorism and terrorist activity, to wit, the FARC."   Maduro committed this offense in conspiracy with Individual Defendants.

233.   **Predicate: Cocaine importation conspiracy.** RICO predicates include "any offense involving . . ." the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance."   *See* 18 U.S.C. § 1961.   Defendant Maduro committed acts indictable for an offenses "involving the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance," and in fact has been indicted for a cocaine importation conspiracy that began in 1999 and continues through today, including importing cocaine into the United States from abroad in violation of 21 U.S.C. § 952(a) and 21 U.S.C. § 960(a)(1), and including manufacturing, distributing and possessing with intent distribute cocaine knowing, and having reasonable cause to believe that the cocaine would be unlawfully imported in the United States, in violation of 21 U.SC. § 959(a) and 21 U.S.C. § 960(a)(3), and possessing cocaine

with intent to distribute on board an aircraft registered in the United States in violation of 21 U.S.C. § 959(c) and 21 U.S.C. § 960(a)(3).  Maduro committed this offense in conspiracy with the Individual Defendants.

234.  **Predicate:  Conspiracy to commit murder and kidnapping.** RICO predicates include "any act or threat involving murder [or] kidnapping . . . which is chargeable under State law and punishable by imprisonment for more than one year." *See* 18 U.S.C. § 1961. Conspiracy to commit murder and kidnapping are acts involving murder or kidnapping that are chargeable under State law (including the law of New York) and punishable by imprisonment of more than a year.  The Defendants conspired to kidnap and murder Mr. Albán. That conspiracy is chargeable in New York conduct constituting an element of the offense occurred in New York.  Specifically, overt acts in furtherance of the conspiracy occurred in New York, in that agents of Maduro Criminal Enterprise followed and surveilled Mr. Albán in New York, and, on information and belief, they did so pursuant to the conspiracy to kidnap and murder Mr. Albán and communicated information concerning Mr. Albán to the Defendants with the intent to facilitate the kidnapping and murder of Mr. Albán.  Maduro and the Individual Defendants were all members of the conspiracy to kidnap and murder Mr. Albán.

235.  **Predicate:  Use of interstate commerce in the commission of murder-for-hire.**  RICO predicate offences include violations of 18 U.S.C.

§ 1958.  *See* 18 U.S.C. § 1961.  Section 1958 provides penalizes "[w]hoever travels in or causes another (including the intended victim) to travel in interstate or foreign commerce, or uses or causes another (including the intended victim) to use the mail or any **facility of interstate or foreign commerce**, with intent that a murder be committed in violation of the laws of any **State** or the United **States** as consideration for the receipt of, or as consideration for a promise or agreement to pay, **anything of pecuniary value,** or who conspires to do so."   Mr. Albán's murder was committed in violation of the laws of New York, as set forth above.  Mr. Albán's murder was a murder for hire, because members of the Maduro Criminal Enterprise who committed the murder received payment (in the form of salaries) from the Maduro Criminal Enterprise.  On information and belief, Defendants used and caused others to use facilities of interstate commerce with the intent that the murder-for-hire of Mr. Albán occur, specifically, that Maduro Criminal Enterprise agents in New York communicated with the Defendants in Venezuela the information they had gathered by surveilling Mr. Albán in New York to facilitate his murder and kidnapping.

236. **Predicate:   Violence at international airports.**   RICO predicates include "any act that is indictable under any provision listed in section 2332b(g)(5)(B)."  18 U.S.C. § 1961(1).  In turn, 18 U.S.C. § 2332b(g)(5)(B) ("Act of Terrorism Transcending National Boundaries")

includes violations of 18 U.S.C. § 37, which makes it a crime to unlawfully and intentionally, using any device, substance, or weapon—perform an act of violence against a person at an airport serving international civil aviation that causes or is likely to cause serious bodily injury . . . if such an act endangers or is likely to endanger safety at that airport." Defendants committed acts indictable under 37 U.S.C. § 37, because they: (1) unlawfully and intentionally (i.e., without a warrant or legitimate basis, and intending to persecute Mr. Albán for his political views), using weapons (i.e., guns), performed an act of violence (i.e., the kidnapping of Mr. Albán) at an airport serving international civil aviation (i.e., Simón Bolivar International Airport) that causes or is likely to cause serious bodily injury (i.e., kidnapping, a crime of violence that is likely to cause the injury or death of the victim, which in fact occurred in the case of Mr. Albán) which act endangers or is likely to endanger the safety of the airport (i.e., an armed kidnapping of travelers upon arrival, which does, of course, endanger the safety of the airport).

237. **Predicate: Theft from an Interstate Shipment.** RICO predicates include 18 U.S.C. § 659, which deems guilty of a felony "[w]hoever . . . steals, or unlawfully takes, carries away, or conceals . . . from any . . . from any aircraft, air cargo container, air terminal, airport, aircraft terminal or air navigation facility. . . with intent to convert to his own use any goods or chattels moving as or which are a part of or which constitute an interstate or foreign

shipment of freight, express, or other property" as well as "[w]hoever buys or receives or has in his possession any such goods or chattels, knowing the same to have been embezzled or stolen."  Section 659 **prohibits unlawfully taking baggage from an airport, including baggage shipped internationally from the United States.**  Defendants committed acts indictable under 37 U.S.C. § 37, because they stole Mr. Albán's luggage at Simón Bolivar International Airport before he received it.

238.  **Predicate:  Travel Act violations.**  Violations of the Travel Act, 18 U.S.C. § 1952, are RICO predicate offenses.  18 U.S.C. § 659.  Under the Travel Act, it is unlawful to use "any facility of interstate or foreign commerce" (which includes any "means of communication," *see* 18 U.S.C. § 1958(b)(2)) to "promote, manage, establish, carry on or facilitate the promotion, management, establishment and carrying on, of any unlawful activity" or to "commit any crime of violence to further unlawful activity." The Travel Act defines the term "unlawful activity" to include, among other things, "any business enterprise involving  .  .  .  narcotics or controlled substances." *Id.* § 1952(b)(1).  Here, Defendants committed offenses indictable under the Travel Act because they used a facility of interstate or foreign commerce (i.e., the communications devices by which they relayed intelligence on Mr. Albán gathered by Maduro Regime agents in New York to co-conspirators in Venezuela to facilitated Mr. Albán's kidnapped at Simón

Bolivar International Airport) to promote, carry on or facilitated an unlawful activity (i.e., their narcotics trafficking business). The kidnapping and murder of opposition politicians such as Mr. Albán was integral to the Maduro Regime maintaining authoritarian control over Venezuela, which in turn was the backbone of the narcotics trafficking conspiracy.

239. **Continuity of Conduct**. Defendants' violations of state and federal law as set forth herein, each of which directly and proximately injured Plaintiffs, constituted a continuous course of conduct spanning a period from at least 2013 to the present, which was intended to obtain money through narcoterrorism, narcotics trafficking, and other improper and unlawful means. Therefore, said violations were a part of a pattern of racketeering activity under 18 U.S.C. § 1961(l) and (5).

240. **Conduct of Affairs.** Defendants have conducted and/or participated, directly and/or indirectly, in the conduct of the affairs of the Maduro Criminal Enterprise and the Alternative Enterprises through a pattern of racketeering activity as alleged above in violation of 18 U.S.C. § 1962(c).

241. **Proximate cause and damages to business and property.** The unlawful actions of Defendants, and each of them, have directly, illegally, and proximately caused and continue to cause injuries to the Plaintiffs in their business or property. Plaintiff seeks an award of damages in compensation

for, among other things, the property that Defendants stole from Mr. Albán and Meudy (e.g., luggage, cell phone, other personal effects; computers and files from Mr. Albán and Meudy's accounting business), the legal costs that Defendants imposed upon Meudy (e.g., legal costs associated with attempting to free Mr. Albán while he was alive, recover his body after he was deceased, and cause the Maduro Regime to investigate Mr. Albán's death), and the business (Mr. Albán and Meudy's accounting business) that the Maduro Regime destroyed.

242.   Plaintiffs seek an award of compensatory damages (including treble damages) for the foregoing injuries, plus reasonable attorneys' fees and costs.

## COUNT IV
### Conspiracy to Violate Federal Civil RICO, 18 U.S.C. § 1962(d)
### (By Meudy Against Maduro and the Individual Defendants)

243.   Plaintiffs incorporate by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

244.   In violation of 18 U.S.C. § 1962(d), Maduro and the Individual Defendants, and each of them, knowingly, willfully, and unlawfully conspired to facilitate a scheme which included the operation or management of a RICO enterprise through a pattern of racketeering activity as alleged in paragraphs [insert] above.

245. The conspiracy commenced at least as early as 2013 and is ongoing.

246. The conspiracy's purpose is to exercise unlawful authoritarian control over Venezuela, further the Maduro Criminal Conspiracy, and engage in (a) narcotics trafficking; (b) acts of terrorism including but by no means limited to narco-terrorism; (c) human rights violations including kidnapping, torture, and murder; (d) public corruption offenses; and (e) money laundering.

247. Each Defendant committed at least one overt act in furtherance of such conspiracy. These acts in furtherance of the conspiracy included kidnapping, torturing and murdering Mr. Albán, communicating in foreign and/or interstate commerce in support of the kidnapping, stealing Mr. Albán's and Meudy's property from international shipments and from the offices of their accounting business.

248. Even if some of the Defendants did not agree to harm Plaintiff specifically, the purpose of the acts they engaged in was to advance the overall object of the conspiracy, and the harm to Plaintiff was in furtherance of the conspiracy.

249. Plaintiff has been injured and continues to be injured in her business and property by Defendants' conspiracy in violation of 18 U.S.C. § 1962(d). The unlawful actions of Defendants, and each of them, have directly,

illegally, and proximately caused and continue to cause injuries to Plaintiff in her business and property.

250.   Plaintiffs seek an award of compensatory damages (including treble damages) for the foregoing injuries, plus reasonable attorneys' fees and costs.

**COUNT V**
**Defamation *Per Se***
**(By Ms. Albán Osio in her capacity as the Representative of the Estate of Albán Against Saab, Reverol and Maduro; Ms. Albán Osio in her Personal Capacity Against Maduro)**

251.   Plaintiffs incorporate by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

252.   On October 8, 2018, Defendant Saab—acting as Maduro's agent—published a false statement about Mr. Albán when he said on a VTItv broadcast that Fernando Alban "had committed suicide."

253.   Defendant Saab's false statement is defamation *per se* because it accuses Mr. Albán of an infamous crime (suicide) and such a falsehood tends to subject one to hatred, distrust, ridicule, contempt, or disgrace.

254.   Saab's VTItv broadcast was published on VTItv's official YouTube channel, where it remains through today.

255.   Saab's false statement that Mr. Albán had committed suicide was viewed by persons in South Florida, including the Miami Herald, which

reported on Mr. Saab's statement, and by numerous readers of the Miami Herald.

256.   Saab made the false statement that Mr. Albán had committed suicide, with the specific intent to harm Mr. Albán and his reputation.   On information and belief, Mr. Saab wished to blame Mr. Albán's for his own death, cover-up the Maduro regime's murder of Mr. Albán, forestall an investigation into the murder of Mr. Albán, and tilt public sympathy against Mr. Albán.

257.   On October 8, 2018, Saab published a false statement about Mr. Albán when he indicated on a VTItv broadcast that Mr. Albán might have been responsible for "the attempted assassination of President Nicolás Maduro," when in Mr. Albán had nothing to do with the drone explosion near President Maduro and, on information and belief, the drone explosions were a false flag attack orchestrated by the Maduro Regime to justify its oppression of its political opponents.

258.   Saab's false statement is defamation *per se* because it accuses Mr. Albán of an infamous crime (attempted assassination) and such a falsehood tends to subject one to hatred, distrust, ridicule, contempt, or disgrace.

259.   Saab's VTItv broadcast was published on VTItv's official YouTube channel, where it remains through today.

260.   The Maduro Regime's accusation that Mr. Albán was involved in the alleged attempted assassination of Maduro was covered in the Miami Herald and thus was viewed by persons in Florida.[94]

261.   Saab made the false statement that Mr. Albán was potentially responsible for an assassination attempt against Maduro with the specific intent to harm Mr. Albán and his reputation.  On information and belief, Mr. Saab wished to blame Mr. Albán's for his own death, cover-up the Maduro regime's murder of Mr. Albán, forestall an investigation into the murder of Mr. Albán, and tilt public sympathy against Mr. Albán.

262.   On October 8, 2018, Defendant Reverol—acting for himself and as Maduro's agent—published a false statement about Mr. Albán when he tweeted that "Mr. Alban had been in the waiting room at SEBIN Plaza Venezuela for transfer to court, when he threw himself out of a window falling to his death."

263.   Defendant Reverol's false statement is defamation *per se* because it accuses Mr. Albán of an infamous crime (suicide) and such a falsehood tends to subject one to hatred, distrust, ridicule, contempt, or disgrace.

---

[94] *See* Delgado, *Was He Thrown*, supra. n. 70.

264.   On information and belief, Defendant Reverol's tweet was viewed by persons in South Florida.  CNN and other leading news sources reported on Defendant Reverol's tweet.[95]

265.   Defendant Reverol made the false statement that Mr. Albán had committed suicide with the specific intent to harm Mr. Albán and his reputation.   On information and belief, Mr. Reverol wished to blame Mr. Albán's for his own death, cover-up the Maduro regime's murder of Mr. Albán, forestall an investigation into the murder of Mr. Albán, and tilt public sympathy against Mr. Albán.

266.   In October or November 2018, the Maduro published a false statements about Mr. Albán when it said that the Maduro Regime had found child pornography on Mr. Albán's phone when it arrested him (and that being caught with such pornography was one of the reasons for Mr. Albán's supposed "suicide.").

267.   The Maduro Regime's false statement is defamation *per se* because it accuses Mr. Albán of an infamous crime (possession of child pornography) and such a falsehood tends to subject one to hatred, distrust, ridicule, contempt, or disgrace.

---

[95] Mallory Gafas and Joshua Berlinger, *Suspect in Maduro Assassination Plot Dies in Mysterious Fall from Window*, CNN (Oct. 10, 2018), available at https://www.cnn.com/2018/10/09/americas/venezuela-assassination-plot-intl/index.html.

268.   The Maduro Regime made the false statement that Mr. Albán had committed suicide with the specific intent to harm Mr. Albán and his reputation.  On information and belief, the Maduro Regime wished to blame Mr. Albán's for his own death, cover-up the Maduro Regime's murder of Mr. Albán, forestall an investigation into the murder of Mr. Albán, and tilt public sympathy against Mr. Albán.

269.   On February 7, 2019, the Venezuelan Communications Minister, Jorge Rodríguez Gómez—acting as an agent for, and in conspiracy with Maduro—held a press conference in which he falsely accused Mr. Albán of participating in a conspiracy to assassinate Maduro.  In the same speech, Mr. Rodríguez Gómez falsely claimed that Ms. Albán Osio—who is not even a politician, let alone a revolutionary—was linked to a lieutenant colonel who has been accused of involvement in the drone attack of August 4, 2018.

270.   The foregoing false statements by Communications Minister Jorge Rodríguez Gómez are defamation *per se* because they accuse Mr. Albán and Ms. Albán Osio of an infamous crime (conspiracy to commit murder) and such a falsehood tends to subject one to hatred, distrust, ridicule, contempt, or disgrace.

271.   Minister Jorge Rodríguez Gómez made the foregoing false statements with the intend, and for the express purpose, of injuring the reputation of Mr. Albán and Ms. Albán Osio.

272.   On information and belief, the foregoing false statements were heard and/or viewed by members of the Venezuelan community and others living in South Florida (and others in Florida).

273.   Plaintiffs seek an award of compensatory damages for the foregoing injuries, the imposition of punitive damages sufficient to deter Defendants from committing such unlawful conduct in the future, and reasonable attorneys' fees and costs.

### COUNT VI
### Conspiracy
### (By All Plaintiff Against All Defendants)

274.   Plaintiffs incorporate by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

275.   All of the Defendants agreed to the Maduro Criminal Conspiracy to perform unlawful acts including (a) narcotics trafficking; (b) acts of terrorism including but by no means limited to narco-terrorism; (c) human rights violations including kidnapping, torture, and murder; (d) public corruption offenses; and (e) money laundering.

276.   The kidnapping, torture and murder of Mr. Albán were overt  acts in furtherance of that Maduro Criminal Conspiracy.

277.   The Maduro Regime's defamation of Mr. Albán and Ms. Meudy Osio Albán were overt acts in furtherance of the Maduro Criminal Conspiracy.

278.   Plaintiffs seek an award of compensatory damages for the foregoing injuries, the imposition of punitive damages sufficient to deter Defendants from committing such unlawful conduct in the future, and reasonable attorneys' fees and costs.

## COUNT VII
## False Imprisonment
### (By Ms. Albán Osio in her capacity as the Representative of the Estate of Albán Against All Defendants)

279.   Plaintiffs incorporate by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

280.   The Defendants, starting from when they kidnapped Mr. Albán at Simón Bolivar International Airport and continuing until they murder Mr. Albán, unlawfully and intentionally restrained Mr. Albán against his will and through unlawful use of force prevented him from leaving SEBIN custody.

281.   As a result of Defendants' misconduct in falsely imprisoning Mr. Albán, Mr. Albán was harmed, in that he was unable to leave while Defendants subjected him to torture and murder.  Defendants' false imprisonment of Mr. Alban was both a but-for and proximate cause of Mr. Albán's injuries.

## Count VIII
## Intentional Infliction of Emotional Distress
### (All Plaintiffs Against All Defendants)

282.   The Defendants' conduct in torturing and murdering Mr. Alban was extreme and outrageous.

283.   The Defendants' conduct was intentionally designed to cause, indeed, to maximize, emotional distress to the Plaintiffs.  This is evidenced by, among other things, (a) the fact that the Defendants had Mr. Albán speak with his wife while he was in SEBIN custody, compounding her worry, heartbreak and concern; (b) the fact that the Maduro Regime's method of operation is to terrorize and intimidate opposition leaders; and (c) the fact that the Maduro regime followed up with additional conduct targeting Ms. Albán Osio and her children with further injury, such as the destruction of the family accounting business in Venezuela, making false and defamatory statements that Ms. Albán Osio was involved in a plot to assassinate Maduro.

284.   As a result of the Defendants' conduct, Plaintiffs have suffered severe emotional distress, including feelings of depression, anger, helplessness, and symptoms of post-traumatic stress disorder ("PTSD"), such as flashbacks, nightmares and severe anxiety, as well as uncontrollable thoughts about the event.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully requests that the Court:

A.   An award of compensatory and consequential damages, including treble damages, in an amount to be determined at trial;

B.   An award of exemplary and punitive damages in an amount to be determined at trial;

C.      An award of attorneys' fees and costs;

D.      A jury trial on all issues so triable; and

E.      Such other relief as is just and proper.

Respectfully submitted,

| /s/ Jaime D. Guttman | /s/ Alex C. Lakatos |
|---|---|
| Fla. Bar No. 44076 | D.C. Bar. No. 453763 |
| jaime@scale.law | *Pro Hac Vice Pending* |
| Scale Law Partners, LLC | alakatos@mayerbrown.com |
| 777 Brickell Avenue, Suite 500 | Stephen M. Medlock |
| Miami, FL 33131 | D.C. Bar No. 995636 |
| (786) 273-9033 (Main) | *Pro Hac Vice Pending* |
| | smedlock@mayerbrown.com |
| | Mayer Brown LLP |
| | 1999 K Street NW |
| | Washington, DC 20006 |
| | (202) 263-3000 (Main) |