## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 21-20706-Civ-GAYLES/TORRES

MEUDY ALBÁN OSIO in her personal capacity
And in her capacity as the personal representative
of the Estate of FERNANDO ALBERTO ALBÁN,
FERNANDO ALBÁN OSIO, and MARIA FERNANDA
ALBÁN OSIO,

       Plaintiffs,

v.

NICOLAS MADURO MOROS; FUERZAS
ARMADAS REVOLUCIONARIAS DE COLOMBIA
("FARC"); THE CARTEL OF THE SUNS A.K.A.
CARTEL DE LOS SOLES; VLADIMIR PADRINO
LOPEZ; MAIKEL JOSE MORENO PEREZ; NESTOR
LUIS REVEROL TORRES; and TAREK WILLIAM
SAAB,

       Defendants.

_____/

## REPORT AND RECOMMENDATION
## ON PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT
## <u>AGAINST DEFENDANT CARTEL OF THE SUNS</u>

This matter is before the Court on Plaintiffs' motion for a default judgment. [D.E. 46]. Defendant has not responded in opposition and the time to do so has since passed. Therefore, the motion is now ripe for disposition. After careful consideration of the motion, the relevant authorities, and the record presented, Plaintiffs' motion for a final default judgment should be **GRANTED.**

## I.   BACKGROUND

### A.   *Procedural background*

Plaintiffs initiated this lawsuit on February 22, 2021, with an eight-count complaint against Defendants Nicolás Maduro Moros, the Cartel of the Suns, FARC, and four other individuals for, *inter alia*, orchestrating the kidnapping, torture, and murder of decedent Fernando Alberto Albán in 2018. [D.E. 1].

On April 5, 2021, this Court granted Plaintiffs' motion to serve the complaint and summons on Cliver Antonio Alcala Cordones, a leader of the Cartel of the Suns, who is in custody of the U.S. Marshal's service. [D.E. 23]. On April 27, 2021, a Deputy Sheriff served the complaint and summons on the Cartel of the Suns through the care of Cordones. [D.E. 28]. The deadline for Cordones to respond to the complaint expired on May 18, 2021. [D.E. 28].

After Defendants failed to timely plead or otherwise defend the complaint, the clerk entered a default against the Cartel of the Suns on May 26, 2021. [D.E. 40]. Plaintiffs filed a motion for a final default judgment on September 2, 2021, that is now ripe for disposition. [D.E. 46].

### B.   *Factual background*

#### 1.   *The Maduro Criminal Enterprise*

According to the complaint, as Nicolás Maduro has consolidated power in Venezuela, his country has fallen into disarray. In recent years, Venezuela has become a haven for international drug-trafficking, with the blessing and involvement of the Maduro regime. But Maduro does not act alone. In addition to controlling

Venezuela, Plaintiffs claim that Maduro serves as the leader of the Cartel of the Suns, an elaborate criminal syndicate operating at all levels of the Venezuelan government that smuggles drugs abroad in order to keep the Maduro regime afloat amid international sanctions. The Cartel, in turn, has enlisted FARC—a Colombian paramilitary group designated a terrorist organization by the United States—to help execute its illicit activities in and outside of Venezuela. Together, these three entities (the Maduro Regime, the Cartel of the Suns, and FARC) comprise what Plaintiffs refer to as the "Maduro Criminal Enterprise." [D.E. 1].

### 2. *Crimes Committed by the Maduro Criminal Enterprise*

The Maduro Criminal Enterprise engages in a wide range of criminal activities that go beyond drug-trafficking. Senior members of the Venezuelan government have been indicted by the United States for recruiting international terrorists to plan attacks on U.S. territory. In 2017, two members of Maduro's inner circle were convicted of conspiracy to smuggle cocaine into the U.S., each being sentenced to 18 years in prison. The Department of Justice estimates that the Cartel of the Suns traffics somewhere between 200 and 250 metric tons of cocaine from Venezuela into the United States each year. But most egregious is the Maduro regime's treatment of Venezuelan citizens. The Department of State's *2019 Country Reports on Human Rights Practices: Venezuela*, explains that the Maduro regime engages in acts of terrorism to intimidate its civilian population through means of arbitrary, extrajudicial killings by state security forces and regime-sponsored armed groups, forced disappearances, and the detention and torture of political opponents. [D.E. 1].

### 3. _Events Leading Up to the Death of Fernando Alberto Albán_

Fernando Alberto Albán was a politically active and outspoken critic of the Maduro regime. He ran an accounting business in Venezuela. Mr. Albán's political involvement eventually led to his immediate family fleeing to the U.S. from persistent death threats in Venezuela. While in the U.S., Mr. Albán brought his condemnation of the Maduro regime to the international stage: in September 2018, alongside other members of his political party, _Justice First_, Mr. Albán denounced the Maduro regime's human rights abuses to important political leaders at the United Nations General Assembly (UNGA), in New York. Plaintiffs allege that, while Mr. Albán was in New York, agents at the behest of the Maduro regime stalked him and tracked his every move, leading up to his return to Venezuela. [D.E. 1].

Shortly after Mr. Albán's participation at the UNGA, he flew back to Venezuela. Upon Mr. Albán's arrival at the Simón Bolivar International Airport, he was kidnapped by Maduro regime agents and taken to the Venezuelan secret police's (SEBIN) headquarters in downtown Caracas. These agents stole Mr. Albán's luggage, which was never returned to his family. Plaintiffs allege that during Mr. Albán's imprisonment, Maduro agents tortured him with painful electronic shocks, waterboarding, and other forms of torture. Three days after Mr. Albán's kidnapping, these same agents threw his corpse out of a window from the tenth floor of the SEBIN headquarters, falsely claiming that he jumped off to commit suicide. Plaintiffs, Mr. Albán's surviving wife and two children, maintain that Mr. Albán was tortured and

killed by the government agents, and any claim by the Maduro regime that he committed suicide is false. [D.E. 1].

### 4. *Allegations Following Mr. Albán's Death*

Hours after Mr. Albán was thrown from the window, named Defendant and Venezuelan attorney general Tarek Saab reported on state television that Mr. Albán had jumped from the tenth-floor bathroom of the SEBIN detention center and was "being investigated for" a variety of trumped-up charges including the "attempted assassination of President Nicolás Maduro." The Miami Herald and other U.S. news outlets repeated Saab's claims about Mr. Albán's purported suicide and assassination attempt of Maduro. It was soon revealed, however, that the tenth-floor bathroom had no windows from which Mr. Albán could have jumped. Named Defendant Nestor Torres tried to cover the initial claim by tweeting that Mr. Albán had in fact been in the waiting room, not the bathroom, when he jumped; yet, Torres provided no evidence to back this claim. Maduro-controlled media outlets also promulgated the claim that Mr. Albán housed child pornography on his phone, for which they provided no evidence. [D.E. 1].

Shortly after Mr. Albán's death, Plaintiffs allege that, on several occasions in October and November 2018, the Maduro regime raided the Albán family accounting business's office in Venezuela, stealing computers and equipment and causing the business to shut down altogether. Plaintiffs assert that these raids were meant for the Maduro regime to intimidate Mr. Albán's family from speaking out, even after purportedly murdering him. [D.E. 1].

## II.    APPLICABLE PRINCIPLES AND LAW

### A.    *Default Judgment*

Federal Rule of Civil Procedure 55 sets forth a two-step process for obtaining a default judgment.  First, when a defendant fails to plead or otherwise defend a lawsuit, the clerk of court is authorized to enter a clerk's default.  *See* Fed. R. Civ. P. 55(a).  Second, after entry of the clerk's default, the court may enter default judgment against the defendant so long as the defendant is not an infant or incompetent person. Fed. R. Civ. P. 55(b)(2).  "The effect of a default judgment is that the defendant admits the plaintiff's well-pleaded allegations of fact, is concluded on those facts by entry by the judgment, and is barred from contesting on appeal the facts thus established." *Buchanan v. Bowman*, 820 F.2d 359, 361 (11th Cir. 1987) (internal quotation and citation omitted).

A court must review the sufficiency of the complaint before determining whether a moving party is entitled to default judgment pursuant to Rule 55(b).  *See United States v. Kahn*, 164 F. App'x 855, 858 (11th Cir. 2006) (citing *Nishimatsu Constr. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975)).  "While a complaint . . . does not need detailed factual allegations," a plaintiff's obligation to provide the grounds of his entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). If the admitted facts are sufficient to establish liability, the Court must then ascertain the appropriate amount of damages and enter final judgment in that amount.  *See*

6

*Nishimatsu*, 515 F.2d at 1206; *see also PetMed Express, Inc. v. MedPets.com, Inc.*, 336 F. Supp. 2d 1213, 1216 (S.D. Fla. 2004).

Damages may be awarded only if the record adequately reflects the basis for the award, which can be shown with submission of detailed affidavits establishing the facts necessary to support entitlement to the damages requested by the plaintiff. *See Adolph Coors Co. v. Movement Against Racism and the Klan*, 777 F.2d 1538, 1544 (11th Cir. 1985). Rule 55 does not require an evidentiary hearing on the appropriate amount of damages, and it is within the Court's discretion to choose whether such a hearing should take place. *See SEC v. Smyth*, 420 F.3d 1225, 1232 n.13 (11th Cir. 2005).

### III.   ANALYSIS

Plaintiffs seek a final default judgment for one count of violating the Florida Anti-Terrorism Act, two counts of federal civil RICO violations, and five counts of common law torts against the Cartel of the Suns, a criminal association based in Venezuela. Before proceeding to the merits of Plaintiffs' motion, it must be determined whether this Court has subject matter jurisdiction over the claims and personal jurisdiction over the Cartel of the Suns. If so, then the Court may assess whether the Cartel is liable and what compensation is owed to Plaintiffs. Each question will be explored in turn.

### A.   *The Court has subject matter jurisdiction over all claims*

As will be discussed in detail below, Plaintiffs plausibly plead sufficient factual allegations to establish two federal civil RICO claims against the Cartel of the Suns.

Accordingly, this Court has federal question jurisdiction over Plaintiffs' two RICO claims. *See* 18 U.S.C. § 1964 (federal civil RICO statute); *see also* 28 U.S.C. § 1331 (federal question jurisdiction statute). This Court may also exercise supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiffs' state law claims against the Cartel because they arise from the same nucleus of operative facts: the kidnapping, torture, and murder of Mr. Albán. *See, e.g., Licea v. Curaçao Drydock Co., Inc.*, 584 F. Supp. 2d 1355, 1358 (S.D. Fla. 2008) (allowing the exercise of federal question jurisdiction over plaintiff's civil RICO claim and supplemental jurisdiction over plaintiff's common law claims in case involving the kidnapping, forced labor and torture of an individual by the Cuban government).

### B. *The Court has personal jurisdiction over the Cartel of the Suns*

Florida's long-arm statute provides that a defendant who commits tortious acts in Florida giving rise to a plaintiff's claim will be subject to personal jurisdiction by courts within the state. Fla. Stat. § 48.193(1)(a)(2). The reach of Florida's long-arm statute "extends to the limits on personal jurisdiction imposed by the Due Process Clause of the Fourteenth Amendment." *Fraser v. Smith*, 594 F.3d 842, 846 (11th Cir. 2010) (denying personal jurisdiction over defendant based on lack of minimal contacts with Florida).

Plaintiffs plausibly allege that the long-arm statute is satisfied on three grounds: (1) the Cartel committed tortious conduct against Mr. Albán in Florida, giving rise to his injuries; (2) the Cartel conspired against Mr. Albán in Florida, giving rise to his injuries; and (3) the Cartel defamed Mr. Albán in Florida. As explained

below, the Court finds these predicate acts to constitute sufficient minimum contacts to exercise personal jurisdiction over the Cartel of the Suns under Florida's long-arm statute, as well as to satisfy constitutional due process.

Moreover, service on the Cartel was proper as it is an unincorporated association, which may be served "in a judicial district of the United States" "by delivering a copy of the summons and of the complaint to an officer" of such association. *See* Fed. R. Civ. P. 4(h)(1)(B).  Because Mr. Cordones is a leader of the Cartel of the Suns, his service effectuates valid service on the entire association.  *See, e.g., Caballero v. FARC*, No. 1:18-cv-25337 (S.D. Fla.), at D.E. Nos. 7, 25 and 62 (summons issued to FARC through care of an imprisoned FARC leader in the U.S.; summons returned and executed; default judgment against FARC granted).

**C.  _Plaintiffs are entitled to a default judgment on all claims against the Cartel of the Suns._**

### 1.  *Federal civil RICO*

To establish a civil RICO claim, the plaintiff must allege a violation of 18 U.S.C. § 1962(c), i.e., that the defendant (1) conducted or participated in the conduct of (2) an enterprise, (3) through a pattern of racketeering activity. *See Durham v. Business Management Associates*, 847 F.2d 1505, 1511 (11th Cir. 1988) (finding that plaintiffs alleged the defendant's use of mails with sufficient particularity to withstand motion to dismiss their civil RICO claim, therefore precluding summary judgment).

To establish liability for a civil RICO claim, the plaintiff must further allege that the unlawful racketeering activity caused injury to their business or property.

*See, e.g., Walgreen Co. v. Premier Prod. Of Am., Inc.*, 2012 WL 527169 (M.D. Fla. Feb. 17, 2012) (denying motion to dismiss because plaintiffs sufficiently alleged civil RICO claim by demonstrating "(1) requisite injury to business or property, and (2) that such injury was by reason of the substantive RICO violation.").

Here, Plaintiffs have pleaded sufficient factual matters to establish that the Maduro Criminal Enterprise, of which the Cartel of the Suns is a member, does in fact constitute a RICO enterprise that has committed the types of offenses that the very RICO statute was enacted to prevent.

a) *The RICO Enterprise*

The Maduro Criminal Enterprise qualifies as an "association-in-fact" enterprise, which need not have any structural features beyond "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009) (holding that a group that convenes even if only to carry out criminal activities may meet the definition of an enterprise for RICO purposes). The critical determination in evaluating whether an "association of individual entities" qualifies as a "RICO enterprise" is whether "the association of individual entities, however loose or informal, . . . furnishe[d] a vehicle for the commission of two or more predicate crimes." *United States v. Goldin Indus., Inc.*, 219 F.3d 1271, 1275 (11th Cir. 2000).

Here, the Maduro Criminal Enterprise functions to achieve the common and continuing purpose of the Maduro regime exerting control over the Venezuelan

population by engaging in narcotics trafficking, acts of terrorism, human rights violations, and public corruption offenses. Mr. Albán's murder is just one example of the many extrajudicial killings that the Cartel, through the use of Maduro regime agents, commits in order to suppress any and all opposition. [D.E. 1]. Accordingly, Plaintiffs have pleaded sufficient factual allegations to establish that the Cartel of the Suns is a member of a RICO enterprise (the Maduro Criminal Enterprise).

   *b) Conducting the Affairs of the Enterprise*

   "To conduct or participate, directly or indirectly, in the conduct of such [an] enterprise's affairs," as required under 18 U.S.C. § 1962(c), "one must participate in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993) (holding that accounting firm for a farmer's cooperative sued by purchasers of demand notes did not "participate in operation or management" of the cooperative's affairs, as required to impose liability for accountants under RICO).

   Here, based on the undisputed facts set forth in the complaint, members of the Cartel of the Suns, including Maduro, have direct involvement in the Maduro Criminal Enterprise's illegal activities. This includes the death of Mr. Albán, who disappeared and was murdered at the hands of government agents acting under the tutelage of Nicolás Maduro, a leader of the Cartel. [D.E. 1]. Accordingly, the Cartel is liable for conducting the affairs of the RICO enterprise.

   *c) The Pattern of Racketeering Activity*

   "The heart of any RICO complaint is the allegation of a *pattern* of racketeering activity." *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 154

(1987) (finding that lower court's dismissal of plaintiff's RICO claims based on state's statute of limitations was improper in part because some of the predicate RICO violations occurred less than four years before action commenced). To show a pattern of racketeering activity, the plaintiff must plead that the defendant engaged in two or more predicate RICO offenses. *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 237 (1989) (finding a pattern of racketeering activity where defendant, a telephone company, partook in the same predicate RICO offense on at least two occasions). The second RICO offense must also be related to the first, or have "similar purposes, results, participants, victims, or methods of commission . . . ." *Id.* at 240.

Here, the Maduro Criminal Enterprise committed myriad predicate offenses through its drug trafficking actions in and against the United States. The following RICO predicate acts are related to one another because they were committed by the same group of actors (the Maduro Regime, the Cartel of the Suns, and FARC) and have the same purposes: to raise revenue through drug-trafficking abroad and reinforce Maduro's authoritarian control over Venezuela. [D.E. 1]. Plaintiffs have demonstrated through the well-pleaded factual allegations of this complaint that the following acts occurred over a substantial period of time and present a risk of continuing conduct.

RICO predicates include "any offense involving . . . the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance." 18 U.S.C. § 1961(1)(d).

So Plaintiffs have pleaded sufficient factual allegations to establish that Nicolás Maduro, leader of the Cartel, has engaged in a conspiracy to commit narco-terrorism against the U.S. and import cocaine into the U.S. Maduro has in fact been indicted in the U.S. for a narco-terrorism conspiracy in violation of 21 U.S.C. § 960a (knowing or intending to provide, directly or indirectly, anything of pecuniary value to any person or organization that has engaged or engages in terrorist activity). Maduro has also been indicted for offenses involving "the felonious manufacture, importation, receiving . . . or otherwise dealing in a controlled substance," including importing cocaine into the U.S. from abroad in violation of 21 U.S.C. § 952(a) (importing controlled substances in schedule I or II and narcotic drugs in schedule III, IV or V).[1]

RICO predicates include any act that is indictable under any provision listed in 18 U.S.C. § 2332b(g)(5)(B), which, in turn, lists violations of 18 U.S.C. § 2339B (providing material support to U.S. designated foreign terrorist organizations) and 18 U.S.C. § 2339C (prohibiting financing of terrorism). Section 2339B makes it a crime to knowingly provide material support or resources to a U.S. designated foreign terrorist organization.

Here, Plaintiffs have pleaded sufficient factual allegations to establish that the Maduro Criminal Enterprise violated this section by knowingly selling narcotics in

---

[1] See Superseding Indictment, ¶ 1 United States v. Maduro, 11-cr-205 (S.D.N.Y. 2011) ("Maduro Indictment"), available at https://www.justice.gov/opa/page/file/1261806/download.

Florida and providing proceeds of the sales to FARC, which is at all relevant times designated a foreign terrorist organization by the U.S. [D.E. 1].

RICO predicate offenses include violations of 18 U.S.C. § 1958, which penalizes "[w]hoever travels in or causes another . . . to travel in interstate or foreign commerce, or uses or causes another . . . to use the mail or any facility of interstate or foreign commerce, with intent that a murder be committed in violation of the laws of any State or the United States as consideration for . . . a promise or agreement to pay, anything of pecuniary value, or who conspires to do so." 18 U.S.C. § 1958.

Here, Plaintiffs have pleaded sufficient factual allegations to establish that that Mr. Albán's murder was a murder for hire because members of the Maduro Criminal Enterprise who committed the murder received payment (in the form of salaries) from the Maduro regime. Defendants used and caused others to use facilities of interstate commerce with the intent that the murder-for-hire occur. Specifically, Maduro regime agents in New York communicated with the Defendants in Venezuela the information they had gathered by surveilling Mr. Albán in New York to facilitate his murder and kidnapping once he arrived in Caracas. [D.E. 1].

RICO predicates include 18 U.S.C. § 659, which criminalizes the felony for "[w]hoever . . . steals, or unlawfully takes, carries away, or conceals . . . from any aircraft . . . with intent to convert to his own use any goods . . . which constitute an interstate or foreign shipment of freight, express, or other property," including baggage shipped internationally from the United States.

Here, Plaintiffs have pleaded sufficient factual allegations to establish that Defendants committed acts indictable under 37 U.S.C. § 37, because they stole Mr. Albán's luggage at Simón Bolivar International Airport before he received it. [D.E. 1].

### d) Injury to business or property due to RICO violations

Finally, the complaint plausibly alleges that the Maduro Criminal Enterprise's RICO offenses were the proximate cause of injury to Plaintiffs' business and property First, the theft from a foreign shipment in violation of 18 U.S.C. § 659 caused the loss of Mr. Albán's luggage, cell phone, and other personal effects. [D.E. 1]. Second, the Maduro Criminal Enterprise's murder for hire in violation of 18 U.S.C. § 1958, caused Plaintiff Mrs. Albán to incur various costs, including legal expenses to free Mr. Albán while he was still alive and recover his body after his death. *See, e.g., Geraci v. Women's All., Inc.,* 436 F. Supp. 2d 1022, 1039 (D.N.D. 2006) (holding that, where plaintiff's children were kidnapped, "alleged out-of-pocket expenses incurred as a direct result of this ordeal in the form of travel, lodging, telephone calls, food, attorneys' fees" were recoverable under a civil RICO action). Third, the Maduro Criminal Enterprise's murder of Mr. Albán in violation of 18 U.S.C. § 1958 was the proximate cause of the destruction of Mrs. Albán's accounting business. *See Diaz v. Gates*, 420 F.3d 897, 905 (9th Cir. 2005) (Kleinfeld, J., concurring) (where "a person whom a business needs to function is murdered," resulting injury to business is compensable through civil RICO claim). Accordingly, Plaintiffs are entitled to a default judgment on their federal civil RICO claim.

### 2.  *Conspiracy to violate federal civil RICO*

Plaintiffs have plausibly alleged that, in violation of 18 U.S.C. § 1962(d), Maduro and the individual Defendants knowingly, willfully, and unlawfully conspired to facilitate a scheme which included the operation of a RICO enterprise through a pattern of racketeering activity as alleged in the sections above. The conspiracy began in 2013 and is ongoing. [D.E. 1]. The conspiracy's purpose is to exercise unlawful authoritarian control over Venezuela, further the Maduro Criminal Conspiracy, and engage in (a) narcotics trafficking; (b) acts of terrorism including but by no means limited to narco-terrorism; (c) human rights violations including kidnapping, torture, and murder; (d) public corruption offenses; and (e) money laundering. [D.E. 1].

Here, Plaintiffs have pleaded sufficient factual allegations to establish that the Cartel committed at least one overt act in furtherance of such conspiracy, which included kidnapping, torturing and murdering Mr. Albán, communicating in foreign and/or interstate commerce in support of the kidnapping, stealing Mr. Albán's and property from international shipments and from the offices of his accounting business. [D.E. 1]. Accordingly, Plaintiffs are entitled to a default judgment on their claim for conspiracy to violate federal civil RICO.

16

### 3. *The Florida Anti-Terrorism Act*

The Florida Anti-Terrorism Act (ATA) grants a right to civil remedy for a "person who is injured by an act of terrorism as defined in Section 775.30." Fla. Stat. § 772.13(1). Section 775.30 defines an act of terrorism as involving:

> 1. A violent act or an act dangerous to human life which is a violation of the criminal laws of this state or of the United States; or
> 2. A violation of s. 815.06; and
> (b) Is intended to:
> 1. Intimidate, injure, or coerce a civilian population;
> 2. Influence the policy of a government by intimidation or coercion; or
> 3. Affect the conduct of government through destruction of property, assassination, murder, kidnapping, or aircraft piracy.

Plaintiffs have plausibly alleged that the Cartel engaged in two types of terrorism that injured Plaintiffs: (1) narco-terrorism and related terror financing; and (2) conspiracy to kidnap, torture, and murder Mr. Albán. Either, standing alone, is sufficient to give rise to liability under the Florida ATA. The kidnapping of Mr. Albán from the Caracas airport was an act of terrorism because it was inherently "dangerous to human life" and contravened 18 U.S.C. § 37, which criminalizes acts of violence "against a person at an airport serving international civil aviation that causes or is likely to cause serious bodily injury." *See, e.g., United States v. Haipe*, 769 F.3d 1189, 1192 (D.C. Cir. 2014) (noting that 18 U.S.C. § 37 applies to "international airports, both within and outside of the United States.")

The torture and murder of Mr. Albán also qualify as acts of terrorism under the Florida ATA because they were inherently "dangerous to human life." The torture

17

of Mr. Albán, which, as alleged by Plaintiffs, included severe beatings, waterboarding, and electrocution, posed inherent dangers to human life. The actions described above were intended to "intimidate, injure, or coerce a civilian population. The high-profile kidnapping and murder of Mr. Albán by Maduro regime agents was designed to deter other opposition members from speaking out against the Venezuelan government. *See Almog v. Arab Bank, PLC*, 471 F.Supp.2d 257 (E.D.N.Y.) (holding that allegations that Jordanian bank knowingly provided services that facilitated the actions of terrorist organizations were sufficient to state claims for violations of federal ATA provisions prohibiting financing terrorism).

Finally, the kidnapping, torture, and murder of Mr. Albán violated the Florida ATA because they occurred pursuant to a narco-terrorism conspiracy designed to flood Florida with cocaine and to launder the illegal drug money through Florida, and acts in furtherance of the conspiracy occurred in Florida (such as the possession and sale in Florida of cocaine and the laundering of ill-gotten bank accounts in Florida). [D.E. 1]. Accordingly, Plaintiffs are entitled to a default judgment on their claim for violating the Florida ATA.

### *4. Wrongful Death*

In Florida, a plaintiff may bring an action "[w]hen the death of a person is caused by the wrongful act . . . of any person . . . and the event would have entitled the person injured to maintain an action and recover damages if death had not ensued." Fla. Stat. § 768.19. Plaintiff Meudy Albán Osio, in her capacity as the personal representative of Mr. Albán's estate, enjoys the right to sue in Mr. Albán's

stead. Fla. Stat. § 768.20. ("The action shall be brought by the decedent's personal representative.")

Here, based on the well-pleaded factual allegations in the complaint, the deliberate torture and execution of Mr. Albán by members of the Cartel of the Suns, violated Florida's Wrongful Death Act. Although the Defendants' obfuscation has prevented Mr. Albán's family from learning the exact cause of death, the Cartel admits by defaulting that Mr. Albán was tortured and murdered at the hands of SEBIN agents, who then threw him out of the tenth-story window. Accordingly, Plaintiffs are entitled to a default judgment on their claim for wrongful death.

### 5. *False Imprisonment*

False imprisonment is the "unlawful restraint of a person against his will." *Escambia Cnty. School Bd. v. Bragg*, 680 So. 2d 571 (Fla. 1st DCA 1996). A plaintiff need only prove "imprisonment contrary to his will and the unlawfulness of the detention." *Rivers v. Dillards Dept. Store, Inc.*, 698 So. 2d 1328, 1331 (Fla. 1st DCA 1997).

Here, Mr. Albán was falsely imprisoned when Maduro agents kidnapped him from the airport and took him to the SEBIN headquarters. [D.E. 1]. The detention of Mr. Albán was unlawful because he did not commit any crime, and all of the accusations of criminality posthumously levied against Mr. Albán by the Maduro regime were unsubstantiated fabrications. Accordingly, Plaintiffs are entitled to a default judgment on their claim for false imprisonment.

### 6. *Defamation Per Se*

Under Florida law, to state a claim for defamation, the plaintiff must allege that "(1) the defendant published a false statement; (2) about the plaintiff; (3) to a third party; and (4) that the falsity of the statement caused injury to the plaintiff." *Matonis v. Care Holdings Grp., L.L.C.*, 423 F. Supp. 3d 1304, 1315 (S.D. Fla. 2019). Statements are defamatory *per se* where they (1) charge that a person has committed a felony, or (2) tend to subject one to hatred, distrust, ridicule, contempt, or disgrace. *Richard v. Gray*, 62 So. 2d 597, 598 (Fla. 1953) (in action by city councilman against radio commentator, finding that the publication complained of was actionable per se).

At issue here are statements made by Defendant Saab on Venezuelan state television that Mr. Albán committed suicide and was plotting to assassinate Maduro. [D.E. 1]. Not only were the uncontroverted statements at issue false and made with the intent of harming Mr. Albán, but they fit the *per se* categories because they (1) falsely accuse Mr. Albán of a felony (attempted assassination); and (2) expose him to disgrace, when considering that he was a devout Catholic and suicide is viewed as a moral sin by his religious community.

There is no dispute that Saab, Venezuela's Attorney General, is a member of the Cartel and works in furtherance of Maduro's, the Cartel's leader, interests. An employer can only be held responsible for an employee's misconduct if that conduct falls within the "scope of employment." *See* Restatement (Third) of Agency Law § 2.04. This limits vicarious liability to situations in which the employee was either (a) performing work assigned by the employer or (b) engaging in a course of conduct

subject to the employer's control. *Id.* § 7.07. Plaintiffs have alleged and Defendants have admitted that it is part of the Maduro Criminal Enterprise's "playbook" to smear political opponents by accusing them of bogus crimes after murdering them at the command of Maduro himself. [D.E. 1, ¶ 97]. When Saab defamed Mr. Albán, he was acting within the scope of his agency as an operative for the Cartel of the Suns, a member of the Maduro Criminal Enterprise, and performing work ordered by Maduro. Accordingly, Plaintiffs are entitled to a default judgment on their claim for defamation per se against the Cartel of the Suns, which is vicariously liable for Mr. Saab's statements.

### 7. *Intentional Infliction of Emotional Distress*

A defendant is liable for intentional infliction of emotional distress when they deliberately or recklessly act "outrageously" and that outrageous conduct causes severe emotional distress to the plaintiff. *Liberty Mut. Ins. Co. v. Steadman*, 968 So. 2d 592, 594 (Fla. 2d DCA 2007) (finding IIED where a workers' compensation carrier delayed payment for plaintiff's lung transplant and knew that plaintiff had a limited life expectancy). A defendant's conduct satisfies the intent requirement if they know that the distress is "substantially certain to result from his conduct" or if they "act[] reckless . . . in deliberate disregard of a high degree of probability that the emotional distress will follow." *Eastern Airlines v. King*, 557 So. 2d 574, 576 (Fla. 1990) (holding that plaintiff failed to state a claim under state law for reckless or intentional infliction of emotional distress where airplane suffered from mechanical failure and almost crashed into the ocean, leaving plaintiff mentally anguished).

Here, the Maduro agents' kidnapping, torture, and murder of Mr. Albán were deliberate and outrageous. The photographs of Mr. Albán's corpse suggest that he was beaten while he was still alive and subjected to electric-shock torture. Mr. Albán's torture and murder caused severe emotional distress to his wife and children, including feelings of depression, anger, helplessness, and symptoms of post-traumatic stress disorder. [D.E. 1]. The Maduro regime, in carrying out these actions and throwing Mr. Albán's corpse out of the window, should have reasonably foreseen that Mr. Albán's family members would experience this type of suffering. Accordingly, Plaintiffs are entitled to a default judgment on their claim for intentional infliction of emotional distress.

### 8. *Civil Conspiracy*

A claim for civil conspiracy requires an agreement between two or more people to participate in an unlawful act, an overt act performed by any party to the agreement in furtherance of the agreement's purpose, and a resulting injury. *See, e.g., Walters v. Blankenship*, 931 So. 2d 137, 140 (Fla. 5th DCA 2006) (finding that plaintiffs properly stated cause of action against neighboring condominium unit owners for civil conspiracy where defendants placed "for sale" signs in front of plaintiff's units that were not for sale).

Here, the Cartel of the Suns entered the Maduro Criminal Enterprise to perform narcotics trafficking in Florida and elsewhere, as well as acts of terrorism and human rights violations, which resulted in the death of Mr. Albán. Likewise, the Maduro regime's defamation of Mr. Albán were overt acts in furtherance of the

criminal conspiracy that the Cartel of the Suns was a part of. Accordingly, Plaintiffs are entitled to a default judgment on their claim for civil conspiracy.

### D. *CALCULATION OF DAMAGES*

After entering default judgment on liability, a court must determine the amount of damages to be awarded. *See Holtz*, 2013 WL 12141515, at *2. The burden is on the plaintiff to prove the amount of damages owed. *Varela v. Innovating Wiring Sols., LLC,* No. 6:07-cv-165-Orl-28KRS, 2009 WL 1795044, at *4 (M.D. Fla. June 22, 2009).

Here, Plaintiffs have elected to pursue their damages primarily under a Florida ATA theory. The Court finds this appropriate. The Florida ATA provides in relevant part:

> A person who is injured by an act of terrorism as defined in § 775.30 or a violation of a law for which the penalty is increased pursuant to § 775.31 for facilitating or furthering terrorism has a cause of action for threefold the actual damages sustained and, in any such action, is entitled to . . . reasonable attorney fees and court costs . . . .

Fla. Stat. § 772.13.

### 1. *Pain, Suffering, and Loss of Companionship to the Survivors of Mr. Albán*

The federal ATA, on which the Florida ATA is largely modeled, has been interpreted as entitling plaintiffs to a broad range of non-economic damages. *See, e.g., Ests. Of Ungar ex rel. Strachman v. Palestinian Auth.*, 304 F. Supp. 2d 232, 267 (D.R.I. 2004) (holding that plaintiffs were entitled to non-economic damages, including loss of companionship and society, and mental anguish experienced by the victim's surviving family members). Similarly, in *Caballero v. FARC,* Case No. 18-cv-

25337 (M.D. Fla), the court awarded the son of a victim killed by FARC terrorists $45 million (trebled to $135 million under the federal ATA) in compensatory damages.

By defaulting, Defendants have admitted to the allegations in Plaintiffs' complaint for causing the death of Mr. Albán in violation of the Florida ATA. Under the egregious circumstances of this case, this Court finds Plaintiffs' request for $25 million ($75 million after trebling) for Ms. Albán and $20 million ($60 million after trebling) for each of Ms. Albán's two children to be an appropriate amount in compensatory damages for the pain, suffering and loss of companionship to the survivors of Mr. Albán.

### 2. Torture Damages to Mr. Albán's Estate

Moreover, Mr. Albán's estate is entitled to damages for his torture, which, as alleged by Plaintiffs, included electric shocks and waterboarding. Courts have previously considered the decedent's suffering from torture in awarding damages to his or her estate. *See, e.g., Alshaar v. Iran*, No. 1:15-cv-23438-DPG (S.D. Fla. 2021) (awarding $4 million to the personal representative of the estate of plaintiff's late husband for his pain and suffering during the seven days following his survival of a terrorist attack); *see also, e.g., Estate of Hirshfeld v. Islamic Republic of Iran*, 330 F. Supp. 3d 107, 145-146 (D.D.C. 2018) (awarding $1 million for decedent's pain and suffering during the 20 minutes he suffered between the start of a terrorist attack and his death); *see also, e.g., Smith ex rel. Smith v. Islamic Emirate of Afghanistan*, 262 F. Supp. 2d 217, 238-239 (S.D.N.Y. 2003) (awarding $2.5 million for pain and suffering to estate of plaintiff who knew for about one hour that he was trapped in

the North Tower of the World Trade Center on 9/11, and likely experienced a painful and agonizing death). Here, the Court finds Plaintiffs' request for $7 million in compensatory damages under the Florida ATA for Mr. Albán's pain and suffering to be appropriate and consistent with precedent cases.

### 3.  Defamation Damages to Mr. Albán

Given the egregious nature of the defamation and the fact that Mr. Albán was unable to defend his reputation because of his murder, Plaintiffs' request for compensatory damages in the amount of $1 million is appropriate. *See, e.g., Handal v. Joseph*, 1:13-cv-20111, at D.E. 45 (S.D. Fla.) (awarding plaintiff $150,000 in compensatory damages and $1 million in punitive damages, where defendant was alleged to have published two stories falsely accusing plaintiff of kidnapping and other crimes and on default judgment); *see also Rety v. Green*, 546 So. 2d 410, 420 (Fla. Dist. Ct. App. 1989) (awarding $10 million in compensatory damages and $10 million in punitive damages, both later remitted to $2.5 million, where defendant falsely accused plaintiff of making anti-semitic remarks, tarnishing his public image).

### 4.  Punitive Damages

Plaintiffs have requested that the Court prioritize compensatory damages, and that it award punitive damages only to the extent that an award in excess of the $203 million in compensatory damages is warranted. As punitive damages are assumed within the trebling of the compensatory damages based on the Florida ATA violation, the Court deems the award of punitive damages in this case to be unnecessary and duplicative.

## IV.   CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that Plaintiff's motion for default judgment [D.E. 46] be **GRANTED** with damages awarded in the amount of:

1. Sixty-five million dollars ($65,000,000.00) in actual compensatory non-economic damages for the pain, suffering and loss of companionship to the survivors of Mr. Albán, which is further trebled pursuant to Fla. Stat. § 772.13;

2. Seven million dollars ($7,000,000.00) in actual, compensatory damages for the torture of Mr. Albán;

3. One million dollars ($1,000,000.00) in actual, compensatory damages for the defamation of Mr. Albán;

4. Zero dollars ($0.00) in punitive damages.

Pursuant to Local Magistrate Rule 4(b) and Fed. R. Civ. P. 73, the parties have seven (7) days from service of this Report and Recommendation within which to file written objections, if any, with the District Judge. Failure to timely file objections shall bar the parties from *de novo* determination by the District Judge of any factual or legal issue covered in the Report *and* shall bar the parties from challenging on appeal the District Judge's Order based on any unobjected factual or legal conclusions included in the Report. 28 U.S.C. § 636(b)(1); 11th Cir. Rule 3-1; *see, e.g., Patton v. Rowell*, 2017 WL 443634 (11th Cir. Feb. 2, 2017); *Cooley v. Commissioner of Social Security*, 2016 WL 7321208 (11th Cir. Dec. 16, 2016).

**DONE AND ORDERED** in Chambers at Miami, Florida, this 5th day of

September, 2022.

/s/ *Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge

27