# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

Case No. 21-20706-Civ-GAYLES/TORRES

MEUDY ALBÀN OSIO in her personal capacity and in
her capacity as the personal representative of the
Estate of FERNANDO ALBERTO ALBÀN,
FERNANDO ALBÀN OSIO, and MARIA FERNANDA
ALBÀN OSIO,

     *Plaintiffs*,

 v.

NICOLAS MADURO MOROS; FUERZAS
ARMADAS REVOLUCIONARIAS DE COLOMBIA
("FARC"); THE CARTEL OF THE SUNS A.K.A.
CARTEL DE LOS SOLES; VLADIMIR PADRINO
LOPEZ; MAIKEL JOSE MORENO PEREZ;
NESTOR LUIS REVEROL TORRES; and TAREK
WILLIAM SAAB,

     *Defendants*.

_____/

## REPORT AND RECOMMENDATION ON PLAINTIFFS'
## MOTION FOR DEFAULT JUDGMENT AGAINST THE
## <u>INDIVIDUAL DEFENDANTS AND FARC</u>

This matter is before the Court on Plaintiffs' motion for default judgment. [D.E.

70]. Defendants have not responded in opposition and the time to do so has since

passed. Therefore, the motion is now ripe for disposition. After careful consideration

of the motion, relevant authorities, and the record presented, Plaintiffs' motion for

default judgment should be **GRANTED.**

## I.   BACKGROUND

### A.   *Procedural Background*

Plaintiffs initiated this lawsuit on February 22, 2021, with an eight-count complaint against Defendants Nicolás Maduro Moros, Vladimir Padrino Lopez, Maikel Jose Moreno Perez, Nestor Luis Reverol Torres, Tarek William Saab ("the Individual Defendants"), FARC, and the Cartel of the Suns for, *inter alia*, orchestrating the kidnapping, torture, and murder of decedent Fernando Alberto Albán in 2018. [D.E. 1]. On September 15, 2022, this Court adopted in full the report and recommendation to grant plaintiffs' motion for default judgment against the Cartel of the Suns. [D.E. 56; 58]. Now, plaintiffs are seeking default judgment against the remaining defendants, the Individual Defendants and FARC. [D.E. 70].

On March 2, 2021, this Court granted Plaintiffs' motion to serve the complaint and summons on FARC through Juvenal Ovidio Ricardo Palmera Pineda, a FARC leader, who is serving a sixty-year sentence in federal prison [D.E. 9]. On July 14, 2021, a Deputy Sheriff served Pineda with the complaint and the FARC summons. [D.E. 41]. After FARC failed to timely respond to the complaint by the August 4, 2021 deadline, the clerk entered a default judgment against FARC on October 22, 2021. [D.E. 50].

On September 23, 2022, this Court granted Plaintiffs' renewed motion to serve the Individual Defendants through alternative means after unsuccessful attempts to serve them via conventional methods. [D.E. 53; 62]. On September 26, 2022, Plaintiffs served each of the Individual Defendants directly through electronic means (email,

text, WhatsApp, etc.) in accordance with this Court's order. [D.E. 62]. Furthermore, the service notice approved by this Court ran for four consecutive weeks in the Miami Herald, El Nuevo Herald, and Diario Las Americas. [D.E. 62-64].

The deadline to respond to the complaint expired on January 6, 2023, twenty-one days after the final publication on December 16, 2022, and the Individual Defendants failed to timely plea or otherwise defend the complaint. Accordingly, on January 10, 2023, the clerk entered a default judgment against the Individual Defendants. [D.E. 66]. Plaintiffs filed a motion for default judgment against FARC and the Individual Defendants on January 24, 2023, that is now ripe for disposition. [D.E. 70].

### B.   *Factual Background*

#### 1.   *The Maduro Criminal Enterprise*

According to the complaint, as Nicolás Maduro has consolidated power in Venezuela, his country has fallen into disarray. In recent years, Venezuela has become a haven for international drug-trafficking, with the blessing and involvement of the Maduro regime. But Maduro does not act alone. In addition to controlling Venezuela, Plaintiffs claim that Maduro serves as the leader of the Cartel of the Suns, an elaborate criminal syndicate operating at all levels of the Venezuelan government that smuggles drugs abroad in order to keep the Maduro regime afloat amid international sanctions. The Cartel, in turn, has enlisted FARC—a Colombian paramilitary group designated a terrorist organization by the United States—to help execute its illicit activities in and outside of Venezuela. Together, these three entities

(the Maduro Regime, the Cartel of the Suns, and FARC) comprise what Plaintiffs refer to as the "Maduro Criminal Enterprise." [D.E. 1].

### 2.   *Crimes Committed by the Maduro Criminal Enterprise*

The Maduro Criminal Enterprise engages in a wide range of criminal activities that go beyond drug-trafficking. Senior members of the Venezuelan government have been indicted by the United States for recruiting international terrorists to plan attacks on U.S. territory. In 2017, two members of Maduro's inner circle were convicted of conspiracy to smuggle cocaine into the U.S., each being sentenced to 18 years in prison. The Department of Justice estimates that the Cartel of the Suns traffics somewhere between 200 and 250 metric tons of cocaine from Venezuela into the United States each year. But most egregious is the Maduro regime's treatment of Venezuelan citizens. The Department of State's 2019 Country Reports on Human Rights Practices: Venezuela, explains that the Maduro regime engages in acts of terrorism to intimidate its civilian population through means of arbitrary, extrajudicial killings by state security forces and regime-sponsored armed groups, forced disappearances, and the detention and torture of political opponents. [D.E. 1].

### 3.   *Events Leading Up to the Death of Fernando Alberto Albán*

Fernando Alberto Albán was a politically active and outspoken critic of the Maduro regime. He ran an accounting business in Venezuela. Mr. Albán's political involvement eventually led to his immediate family fleeing to the U.S. from persistent death threats in Venezuela. While in the U.S., Mr. Albán brought his condemnation

of the Maduro regime to the international stage: in September 2018, alongside other members of his political party, Justice First, Mr. Albán denounced the Maduro regime's human rights abuses to important political leaders at the United Nations General Assembly (UNGA), in New York. Plaintiffs allege that, while Mr. Albán was in New York, agents, at the behest of the Maduro regime, stalked him and tracked his every move, leading up to his return to Venezuela. [D.E. 1].

Shortly after Mr. Albán's participation at the UNGA, he flew back to Venezuela. Upon Mr. Albán's arrival at the Simón Bolivar International Airport, he was kidnapped by Maduro regime agents and taken to the Venezuelan secret police's (SEBIN) headquarters in downtown Caracas. These agents stole Mr. Albán's luggage, which was never returned to his family. Plaintiffs allege that during Mr. Albán's imprisonment, Maduro agents tortured him with painful electronic shocks, waterboarding, and other forms of torture. [D.E. 1].

Three days after Mr. Albán's kidnapping, these same agents threw his corpse out of a window from the tenth floor of the SEBIN headquarters, falsely claiming that he jumped off to commit suicide. Plaintiffs, Mr. Albán's surviving wife and two children, maintain that Mr. Albán was tortured and killed by government agents, and any claim by the Maduro regime that he committed suicide is false. [D.E. 1].

### 4.   *Allegations Following Mr. Albán's Death*

Hours after Mr. Albán was thrown from the window, named Defendant and Venezuelan attorney general Tarek Saab reported on state television that Mr. Albán had jumped from the tenth-floor bathroom of the SEBIN detention center and was

"being investigated for" a variety of trumped-up charges including the "attempted assassination of President Nicolás Maduro." The Miami Herald and other U.S. news outlets repeated Saab's claims about Mr. Albán's purported suicide and assassination attempt of Maduro. It was soon revealed, however, that the tenth-floor bathroom had no windows from which Mr. Albán could have jumped. Defendant Nestor Reverol Torres tried to cover the initial claim by tweeting that Mr. Albán had in fact been in the waiting room, not the bathroom, when he jumped. However, Torres provided no evidence to back this claim. Maduro-controlled media outlets also promulgated the claim that Mr. Albán housed child pornography on his phone, for which they provided no evidence. [D.E. 1].

Shortly after Mr. Albán's death, Plaintiffs allege that, on several occasions in October and November 2018, the Maduro regime raided the Albán family accounting business's office in Venezuela, stealing computers and equipment and causing the business to shut down altogether. Plaintiffs assert that these raids were meant for the Maduro regime to intimidate Mr. Albán's family from speaking out, even after purportedly murdering him. [D.E. 1].

## II.   APPLICABLE PRINCIPLES AND LAW

Federal Rule of Civil Procedure 55 sets forth a two-step process for obtaining a default judgment. First, when a defendant fails to plead or otherwise defend a lawsuit, the clerk of court is authorized to enter a clerk's default. *See* Fed. R. Civ. P. 55(a). By defaulting, the defendants admit the well-plead facts in the complaint.

*Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1307 (11th Cir. 2009).

After entry of the clerk's default, the court may enter a default judgment against a defendant so long as the defendant is neither an infant nor an incompetent person. Fed. R. Civ. P. 55(b)(2). A default judgment bars a defendant from contesting on appeal a plaintiff's well-pleaded allegations of fact. *Buchanan v. Bowman*, 820 F.2d 359, 361 (11th Cir. 1987).

In entering a default judgment, a court must review the sufficiency of the complaint when determining whether a plaintiff is entitled to default judgment under Rule 55(b). *See* United States v Kahn, 164 F. App'x 855, 858 (11th Cir. 2006) (citing *Nishimatsu Constr. Co. v. Houston Nat'l Bank*, 515 F. 2d 1200, 1206 (5th Cir. 1975)). "While a complaint . . . does not need detailed factual allegations," a plaintiff is required to provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

If the court determines that the admitted facts are sufficient to establish liability, the court must ascertain the appropriate amount of damages and enter a final judgment in that amount. *See Nishimatsu*, 515 F.2d at 1206. Damages may be awarded only if the record adequately reflects the basis for the award, which can be shown through the submission of detailed affidavits establishing the facts necessary to support entitlement to the plaintiff's requested damages. *See Adolph Coors Co. v. Movement Against Racism and the Klan*, 777 F.2d 1538, 1544 (11th Cir. 1985). A court

may request an evidentiary hearing to determine the appropriate amount for damages, but it is not required by Rule 55. *See SEC v. Smyth*, 420 F.3d 1225, 1232 n.13 (11th Cir. 2005).

### III.   ANALYSIS

Plaintiffs seek a final default judgment for one count of violating the Florida Anti-Terrorism Act, two counts of federal civil RICO violations, and five counts of common law torts against the Individual Defendants and FARC, who collectively are members of the Maduro Criminal Enterprise. Before proceeding to the merits of Plaintiffs' motion for default judgment, the court must determine if it has subject matter jurisdiction over the claims and personal jurisdiction over the Individual Defendants and FARC. If so, then the Court may assess whether the Individual Defendants and FARC are liable and what compensation is owed to the Plaintiffs. Each question will be explored in turn.

### A.   *The Court has subject matter jurisdiction over all claims*

As will be discussed in detail below, Plaintiffs plausibly plead sufficient factual allegations to establish two federal civil RICO claims against the Individual Defendants and FARC. Accordingly, this Court has federal question jurisdiction over Plaintiffs' two RICO claims. *See* 18 U.S.C. § 1964 (federal civil RICO statute); *see also* 28 U.S.C. § 1331 (federal question jurisdiction statute). This Court may also exercise supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiffs' state law claims against the Individual Defendants and FARC because they arise from the same nucleus of operative facts: the kidnapping, torture, and murder of Mr. Albán. *See,*

*e.g., Licea v. Curaçao Drydock Co., Inc.*, 584 F. Supp. 2d 1355, 1358 (S.D. Fla. 2008) (allowing the exercise of federal question jurisdiction over plaintiff's civil RICO claim and supplemental jurisdiction over plaintiff's common law claims in a case involving the kidnapping, forced labor, and torture of an individual by the Cuban government).

### B.   *This Court has personal jurisdiction over FARC and the Individual Defendants*

### 1.   *Plaintiffs properly served both FARC and the Individual Defendants*

The plaintiffs properly served both defendants. A plaintiff may serve an unincorporated association, such as FARC, "in a judicial district of the United States" "by delivering a copy of the summons and of the complaint to an officer" of the association. [D.E. 1]; *See* Fed R. Civ. R. 4(h)(1)(b). Because Juvenal Ovidio Ricardo Plamera Pineda is a leader of FARC and was incarcerated in the United States at the time of service, his service effectuates valid service on the entire association. [D.E. 5]; *See Caballero v. FARC*, No. 1:18-cv-25337 (S.D. Fla.) at D.E. Nos. 7, 25, and 62 (holding summons issued to an imprisoned FARC leader in the US to be proper service to entire FARC association).

Plaintiffs also properly served the Individual Defendants. In this case, service by email, direct message, and publication were sufficient to satisfy due process. Rule 4(f)(3) allows for a "wide array of methods of service" where Defendants' conduct makes traditional service difficult or impossible. *See Seaboard Marine Ltd., Inc v. Magnum Freight Corp.*, 2017 WL 7796153, at *1 (S.D. Fla. Sept. 21, 2017); *see also FTC v. PCCare247 Inc.*, 2013 U.S. Dist. LEXIS 31969, at *10 (authorizing service of process via e-mail and Facebook). In accordance with this Court's orders, plaintiffs

effectuated service on the Individual Defendants by sending the summons and complaint to the personal email address or cell phone number of each Individual Defendant. [D.E. 53]. Furthermore, Plaintiffs ran service notices for four consecutive weeks starting on November 25th in the Miami Herald, El Nuevo Herald, and Diario Las Americas, three newspapers prominent in the Venezuelan expatriate community per this Court's orders. [D.E. 62].

## 2. *This Court has specific personal jurisdiction over FARC and the Individual Defendants*

Florida's long-arm statute provides that a defendant who commits tortious acts in Florida giving rise to a plaintiff's claim will be subject to personal jurisdiction by courts within the state. Fla. Stat. § 48.193(1)(a)(2). The reach of Florida's long-arm statute "extends to the limits on personal jurisdiction imposed by the Due Process Clause of the Fourteenth Amendment." *Fraser v. Smith*, 594 F.3d 842, 846 (11th Cir. 2010) (denying personal jurisdiction over defendant based on lack of minimal contacts with Florida).

Plaintiffs plausibly allege that the long-arm statute is satisfied on three grounds: (1) FARC and the Individual Defendants committed tortious conduct against Mr. Albán in Florida, giving rise to his injuries; (2) FARC and the Individual Defendants conspired against Mr. Albán in Florida, giving rise to his injuries; and (3) FARC and the Individual Defendants defamed Mr. Albán in Florida. As explained below, the Court finds these predicate acts to constitute sufficient minimum contacts to exercise personal jurisdiction over FARC and Individual Defendants under

Florida's long-arm statute and to satisfy constitutional due process.  Fla. Stat. §
48.193(1)(a)(2).

**C.** **_Plaintiffs are entitled to a default judgment on all claims_**
**_against FARC and the Individual Defendants_**.

### 1. The Florida Anti-Terrorism Act

The Florida Anti-Terrorism Act (ATA) grants a private right of action for a
"person who is injured by an act of terrorism as defined in Section 775.30." Fla. Stat.
§ 772.13(1). The Florida ATA defines acts of terrorism as acts "intended to (1)
[i]ntimidate, injure, or coerce a civil population', (2) [i]nfluence the policy of a
government by intimidation or coercion; or (3) [a]ffect the conduct of government
through destruction of property, assassination, murder, kidnapping or aircraft
piracy." Fla. Stat. § 775.30(1)(b).

Plaintiffs have plausibly alleged two types of terrorism committed by the
Individual Defendants and FARC: (1) narco-terrorism and related terror financing;
and (2) conspiracy to kidnap, torture, and murder Mr. Albán. The kidnapping of Mr.
Albán from the Caracas airport was an act of terrorism because it was inherently
"dangerous to human life" and contravened 18 U.S.C. § 37, which criminalizes acts of
violence "against a person at an airport serving international civil aviation that
causes or is likely to cause serious bodily injury." *See, e.g., United States v. Haipe*,
769 F.3d 1189, 1192 (D.C. Cir. 2014) (noting that 18 U.S.C. § 37 applies to
"international airports, both within and outside of the United States.")

The torture and murder of Mr. Albán, which, as alleged by Plaintiffs, included
severe beatings, waterboarding, and electrocution, also posed inherent dangers to

human life. Additionally, all these actions were intended to "intimidate, injure, or coerce a civilian population." Fla. Stat. § 775.30(1)(b)(1). The high-profile kidnapping and murder of Mr. Albán by Maduro regime agents were designed to deter other opposition members from speaking out against the Venezuelan government. *See Almog v. Arab Bank, PLC*, 471 F. Supp. 2d 257 (E.D.N.Y. 2007) (holding that allegations that Jordanian bank knowingly provided services that facilitated the actions of terrorist organizations were sufficient to state claims for violations of federal ATA provisions prohibiting financing terrorism).

Finally, the kidnapping, torture, and murder of Mr. Albán violated the Florida ATA because they occurred pursuant to a narco-terrorism conspiracy designed to flood Florida with cocaine and to launder the illegal drug money through Florida and acts in furtherance of this conspiracy occurred in Florida (such as the possession and sale in Florida of cocaine and the laundering of ill-gotten bank accounts in Florida). [D.E. 1]. Accordingly, Plaintiffs are entitled to a default judgment on their claim for violating the Florida ATA.

### 2. *Federal Civil RICO*

To establish a civil RICO claim, the plaintiff must allege a violation of 18 U.S.C. § 1962(c), i.e., that the defendant (1) conducted or participated in the conduct of (2) an enterprise, (3) through a pattern of racketeering activity. *See Durham v. Business Management Associates*, 847 F.2d 1505, 1511 (11th Cir. 1988) (finding that plaintiffs alleged the defendant's use of mail with sufficient particularity to withstand motion to dismiss their civil RICO claim, therefore precluding summary judgment).

To establish liability for a civil RICO claim, the plaintiff must further allege that the unlawful racketeering activity caused injury to their business or property. *See, e.g., Walgreen Co. v. Premier Prod. Of Am., Inc.*, 2012 WL 527169 (M.D. Fla. Feb. 17, 2012) (denying motion to dismiss because plaintiffs sufficiently alleged civil RICO claim by demonstrating "(1) requisite injury to business or property, and (2) that such injury was by reason of the substantive RICO violation.").

Here, Plaintiffs have pleaded sufficient factual matters to establish that the Maduro Criminal Enterprise, of which the Individual Defendants are leaders, does in fact constitute a RICO enterprise that has committed the types of offenses that the RICO statute was enacted to prevent. [D.E. 1].

   *a)  The RICO Enterprise*

An "association-in-fact" enterprise requires (1) a purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose." *See Boyle v. United States*, 556 U.S. 938, 946 (2009) (holding that a group that convenes even if only to carry out criminal activities may meet the definition of an enterprise for RICO purposes). In evaluating whether "an association of individual entities" qualifies as a "RICO enterprise", the court must determine whether "the association of individual entities, however loose or informal, . . . furnishe[d] a vehicle for the commission of two or more predicate crimes." *United States v. Goldin Indus., Inc*., 219 F.3d 1271, 1275 (11th Cir. 2000).

Here, the Maduro Criminal Enterprise functions to achieve the common purpose of exerting control over the Venezuelan population by engaging in narcotics trafficking, acts of terrorism, human rights violations, and public corruption offenses. Mr. Albán's murder is just one example of the many extrajudicial killings that the Maduro Criminal Enterprise's leaders, through its agents, commit in order to suppress any and all opposition. [D.E. 1]. Accordingly, Plaintiffs have pleaded sufficient factual allegations to establish that the Individual Defendants are members of a RICO enterprise (the Maduro Criminal Enterprise).

   b) *Conducting the Affairs of the Enterprise*

"To conduct or participate, directly or indirectly, in the conduct of such [an] enterprise's affairs," as required under 18 U.S.C. § 1962(c), "one must participate in the operation or management of the enterprise itself." *Reves v. Ernst & Young,* 507 U.S. 170, 185 (1993). Here, the Defendants have admitted by defaulting that they are leaders of the Maduro Criminal Enterprise, and therefore, are liable for conducting the affairs of the enterprise. [D.E. 1].

   c) *The Pattern of Racketeering Activity*

"The heart of any RICO complaint is the allegation of a *pattern* of racketeering activity." *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 154 (1987) (finding that lower court's dismissal of plaintiff's RICO claims based on state's statute of limitations was improper in part because some of the predicate RICO violations occurred less than four years before the action commenced). To show a pattern of racketeering activity, the plaintiff must first plead that the defendant

engaged in two or more predicate RICO offenses. *See H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 237 (1989) (finding a pattern of racketeering activity where defendant, a telephone company, partook in the same predicate RICO offense on at least two occasions). Second, the two or more RICO offenses must be related, or have "similar purposes, results, participants, victims, or methods of commission . . . ." *Id.* at 240. Furthermore, the pattern must reflect a threat of continuing racketeering activity, which may be established by showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business. *Id.*

1)     Predicate Offenses

According to the undisputed facts of the complaint, the Maduro Criminal Enterprise committed myriad predicate offenses through its drug trafficking actions in and against the United States. RICO predicates include "any offense involving . . . the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance." 18 U.S.C. § 1961(1)(d).

Plaintiffs have pleaded sufficient factual allegations to establish that Individual Defendants, leaders of the Maduro Criminal Enterprise, have engaged in a conspiracy to commit narcoterrorism against the U.S. and import cocaine into the U.S. Maduro has in fact been indicted in the U.S. for a narco-terrorism conspiracy in violation of 21 U.S.C. § 960a (knowing or intending to provide, directly or indirectly, anything of pecuniary value to any person or organization that has engaged or engages in terrorist activity). Defendant Nicolas Maduro has been indicted for offenses involving "the felonious manufacture, importation, receiving . . . or otherwise

dealing in a controlled substance," including importing cocaine into the U.S. from abroad in violation of 21 U.S.C. § 952(a) (importing controlled substances in schedule I or II and narcotic drugs in schedule III, IV or V).

Other RICO predicates include any act that is indictable under any provision listed in 18 U.S.C. § 2332b(g)(5)(B), which, in turn, lists violations of 18 U.S.C. § 2339B (providing material support to U.S. designated foreign terrorist organizations) and 18 U.S.C. § 2339C (prohibiting financing of terrorism). Section 2339B makes it a crime to knowingly provide material support or resources to a U.S.-designated foreign terrorist organization. Here, Plaintiffs have pleaded sufficient factual allegations to establish that the Maduro Criminal Enterprise violated this section by knowingly selling narcotics in Florida and providing proceeds of the sales to FARC, which is at all relevant times designated a foreign terrorist organization by the U.S. [D.E. 1].

RICO predicate offenses further include violations of 18 U.S.C. § 1958, which penalizes "[w]hoever travels in or causes another . . . to travel in interstate or foreign commerce, or uses or causes another . . . to use the mail or any facility of interstate or foreign commerce, with intent that a murder be committed in violation of the laws of any State or the United States as consideration for . . . a promise or agreement to pay, anything of pecuniary value, or who conspires to do so." 18 U.S.C. § 1958.

Here, Plaintiffs have pleaded sufficient factual allegations to establish that that Mr. Albán's murder was a murder for hire because members of the Maduro Criminal Enterprise who committed the murder received payment (in the form of salaries) from the Maduro regime. Defendants used and caused others to use facilities

of interstate commerce with the intent that the murder-for-hire occur. Specifically, Maduro regime agents in New York communicated with the Defendants in Venezuela the information they had gathered by surveilling Mr. Albán in New York to facilitate his murder and kidnapping once he arrived in Caracas. [D.E. 1].

RICO predicates also include 18 U.S.C. § 659, which criminalizes the felony for "[w]hoever . . . steals, or unlawfully takes, carries away, or conceals . . . from any aircraft . . . with intent to convert to his own use any goods . . . which constitute an interstate or foreign shipment of freight, express, or other property," including baggage shipped internationally from the United States. Here, Plaintiffs have pleaded sufficient factual allegations to establish that Defendants committed acts indictable under 37 U.S.C. § 37, because they stole Mr. Albán's luggage at Simón Bolivar International Airport before he received it. [D.E. 1].

2)      Relatedness

The foregoing RICO predicate acts are related to one another because they were committed by the same group of actors (the Maduro Regime, the Cartel of the Suns, and FARC) and have the same purposes: to raise revenue through drug-trafficking abroad and reinforce Maduro's authoritarian control over Venezuela. [D.E. 1]. The relatedness component has thus been satisfied based on these well-pleaded allegations.

3)      Continuity

Plaintiffs have demonstrated through the well-pleaded factual allegations of this complaint that the following acts occurred over a substantial period of time and

present a risk of continuing conduct. In fact, the Individual Defendants have been working together for decades and continue to exercise control over Venezuela through the oppression of its civilian population. [D.E. 1].

### 4) Injury to Business or Property due to RICO Violations

Finally, the complaint plausibly alleges that the Maduro Criminal Enterprise's RICO offenses were the proximate cause of injury to Plaintiffs' business and property. First, the theft from a foreign shipment in violation of 18 U.S.C. § 659 caused the loss of Mr. Albán's luggage, cell phone, and other personal effects. [D.E. 1]. Second, the Maduro Criminal Enterprise's murder for hire in violation of 18 U.S.C. § 1958, caused Plaintiff Mrs. Albán to incur various costs, including legal expenses to free Mr. Albán while he was still alive and recover his body after his death. *See, e.g., Geraci v. Women's All., Inc.*, 436 F. Supp. 2d 1022, 1039 (D.N.D. 2006) (holding that, where plaintiff's children were kidnapped, "alleged out-of-pocket expenses incurred as a direct result of this ordeal in the form of travel, lodging, telephone calls, food, attorneys' fees" were recoverable under a civil RICO action).

Third, the Maduro Criminal Enterprise's murder of Mr. Albán in violation of 18 U.S.C. § 1958 was the proximate cause of the destruction of Mrs. Albán's accounting business. *See Diaz v. Gates*, 420 F.3d 897, 905 (9th Cir. 2005) (Kleinfeld, J., concurring) (where "a person whom a business needs to function is murdered," resulting injury to business is compensable through civil RICO claim). Accordingly, Plaintiffs are entitled to a default judgment on their federal civil RICO claim against Individual Defendants.

### 3. *Conspiracy to Violate Federal Civil RICO*

Plaintiffs have plausibly alleged that, in violation of 18 U.S.C. § 1962(d), Maduro and the individual Defendants knowingly, willfully, and unlawfully conspired to facilitate a scheme that included the operation of a RICO enterprise through a pattern of racketeering activity as alleged in the sections above. The conspiracy began in 2013 and is ongoing. [D.E. 1]. The conspiracy's purpose is to exercise unlawful authoritarian control over Venezuela, further the Maduro Criminal Conspiracy, and engage in (a) narcotics trafficking; (b) acts of terrorism including but by no means limited to narco-terrorism; (c) human rights violations including kidnapping, torture, and murder; (d) public corruption offenses; and (e) money laundering. [D.E. 1].

Here, Plaintiffs have pleaded sufficient factual allegations to establish that the Individual Defendants committed at least one overt act in furtherance of such conspiracy, which included kidnapping, torturing, and murdering Mr. Albán, by communicating in foreign and/or interstate commerce in support of the kidnapping, stealing Mr. Albán's and property from international shipments and from the offices of his accounting business. [D.E. 1]. Accordingly, Plaintiffs are entitled to a default judgment on their claim for conspiracy to violate federal civil RICO.

### 4. *Wrongful Death*

In Florida, a plaintiff may bring an action "[w]hen the death of a person is caused by the wrongful act . . . of any person . . . and the event would have entitled

the person injured to maintain an action and recover damages if death had not ensued." Fla. Stat. § 768.19. Plaintiff Meudy Albán Osio, in her capacity as the personal representative of Mr. Albán's estate, enjoys the right to sue in Mr. Albán's stead. Fla. Stat. § 768.20. ("The action shall be brought by the decedent's personal representative.")

Here, based on the well-pleaded factual allegations in the complaint, the deliberate torture and execution of Mr. Albán by members of the Cartel of the Suns, violated Florida's Wrongful Death Act. Both the Individual Defendants and FARC's wrongful acts of criminal conspiracy to murder Mr. Albán and criminal conspiracy to traffic narcotics that was furthered by the murder of Mr. Albán make them liable for Mr. Albán's wrongful death. Although the Defendants' obfuscation has prevented Mr. Albán's family from learning the exact cause of death, the Cartel admits by defaulting that Mr. Albán was tortured and murdered at the hands of SEBIN agents, who then threw him out of the tenth-story window. [D.E. 1]. Accordingly, Plaintiffs are entitled to a default judgment on their claim for wrongful death.

### 5. False Imprisonment

False imprisonment is the "unlawful restraint of a person against his will." *Escambia Cnty. School Bd. v. Bragg*, 680 So. 2d 571 (Fla. 1st DCA 1996). A plaintiff need only prove "imprisonment contrary to his will and the unlawfulness of the detention." *Rivers v. Dillards Dept. Store, Inc.*, 698 So. 2d 1328, 1331 (Fla. 1st DCA 1997). Here, Mr. Albán was falsely imprisoned when Maduro agents kidnapped him from the airport and took him to the SEBIN headquarters. Individual Defendants

and FARC conspired with SEBON to falsely imprison Mr. Albán when SEBIN unlawfully held him against his will while they tortured and eventually murdered Mr. Albán. [D.E. 1]. The detention of Mr. Albán was unlawful because he did not commit any crime, and all of the accusations of criminality posthumously levied against Mr. Albán by the Maduro regime were unsubstantiated fabrications. Accordingly, Plaintiffs are entitled to a default judgment on their claim for false imprisonment.

### 6.  *Defamation Per Se*

Under Florida law, to state a claim for defamation, the plaintiff must allege that "(1) the defendant published a false statement; (2) about the plaintiff; (3) to a third party; and (4) that the falsity of the statement caused injury to the plaintiff." *Matonis v. Care Holdings Grp., L.L.C.*, 423 F. Supp. 3d 1304, 1315 (S.D. Fla. 2019). Statements are defamatory per se where they (1) charge that a person has committed a felony, or (2) tend to subject one to hatred, distrust, ridicule, contempt, or disgrace. *Richard v. Gray*, 62 So. 2d 597, 598 (Fla. 1953) (in action by city councilman against radio commentator, finding that the publication complained of was actionable per se).

The first statements at issue here were made by Defendant Saab on Venezuelan state television, stating that Mr. Albán committed suicide and was plotting to assassinate Maduro. [D.E. 1]. Not only were the uncontroverted statements at issue false and made with the intent of harming Mr. Albán, but they fit the per se categories because they (1) falsely accuse Mr. Albán of a felony

(attempted assassination); and (2) expose him to disgrace, considering he was a devout Catholic and suicide is viewed as a mortal sin by his religious community.

The second set of statements at issue were made by Defendant Reverol when he published a tweet stating that Mr. Albán had been in the waiting room at SEBIN Plaza when he threw himself out of a window falling to his death. These statements were also false and fit into the per se category because they expose him to disgrace due to his catholic beliefs which condemn suicide. [D.E. 1]

There is no dispute that Saab, Venezuela's Attorney General, and Reverol are members of the Maduro Regime and Cartel and work in furtherance of Maduro's, the Regime and Cartel's leader, interests. An employer can only be held responsible for an employee's misconduct if that conduct falls within the "scope of employment." *See* Restatement (Third) of Agency Law § 2.04. This limits vicarious liability to situations in which the employee was either (a) performing work assigned by the employer or (b) engaging in a course of conduct subject to the employer's control. *Id.* § 7.07. Plaintiffs have alleged and Defendants have admitted that it is part of the Maduro Criminal Enterprise's "playbook" to smear political opponents by accusing them of bogus crimes after murdering them at the command of Maduro himself. [D.E. 1, ¶ 97]. When Saab and Reverol defamed Mr. Albán, they were acting within the scope of his agency as members of the Maduro Criminal Enterprise, and performing work ordered by Maduro. Accordingly, Plaintiffs are entitled to a default judgment on their claim for defamation per se against Defendant Saab, Reverol, and Maduro.

### 7. *Intentional Infliction of Emotional Distress*

A defendant is liable for intentional infliction of emotional distress when they deliberately or recklessly act "outrageously" and that outrageous conduct causes severe emotional distress to the plaintiff. *See Liberty Mut. Ins. Co. v. Steadman*, 968 So. 2d 592, 594 (Fla. 2d DCA 2007) (finding IIED where a workers' compensation carrier delayed payment for plaintiff's lung transplant and knew that plaintiff had a limited life expectancy). A defendant's conduct satisfies the intent requirement if they know that the distress is "substantially certain to result from his conduct" or if they "act[] reckless . . . in deliberate disregard of a high degree of probability that the emotional distress will follow." *Eastern Airlines v. King*, 557 So. 2d 574, 576 (Fla. 1990) (holding that plaintiff failed to state a claim under state law for reckless or intentional infliction of emotional distress where airplane suffered from mechanical failure and almost crashed into the ocean, leaving plaintiff mentally anguished); *Marron v. Moros*, No. 21-23190-CIV-MOORE, 2023 U.S. Dist. LEXIS 11240, at *10 (S.D. Fla. Jan. 20, 2023) (holding the kidnapping and torture of plaintiff by these same defendants satisfied all four elements of intentional infliction of emotional distress).

Here, the Maduro agents' kidnapping, torture, and murder of Mr. Albán were deliberate and outrageous. The photographs of Mr. Albán's corpse suggest that he was beaten while he was still alive and subjected to electric-shock torture. Mr. Albán's torture and murder caused severe emotional distress to his wife and children, including feelings of depression, anger, helplessness, and symptoms of post-traumatic

stress disorder. [D.E. 1]. The Maduro regime, in carrying out these actions and throwing Mr. Albán's corpse out of the window, should have reasonably foreseen that Mr. Albán's family members would experience this type of suffering. Accordingly, Plaintiffs are entitled to a default judgment on their claim for intentional infliction of emotional distress.

### 8. *Civil Conspiracy*

A claim for civil conspiracy requires an agreement between two or more people to participate in an unlawful act, an overt act performed by any party to the agreement in furtherance of the agreement's purpose, and a resulting injury. *See, e.g., Walters v. Blankenship*, 931 So. 2d 137, 140 (Fla. 5th DCA 2006) (finding that plaintiffs properly stated cause of action against neighboring condominium unit owners for civil conspiracy where defendants placed "for sale" signs in front of plaintiff's units that were not for sale).

Here, the Individual Defendants and FARC entered the Maduro Criminal Enterprise to perform narcotics trafficking in Florida and elsewhere, as well as acts of terrorism and human rights violations, which resulted in the death of Mr. Albán. Likewise, the Maduro regime's kidnapping, torture, murder, and defamation of Mr. Albán were overt acts in furtherance of the criminal conspiracy that the Individual Defendants and FARC were a part of. Accordingly, Plaintiffs are entitled to a default judgment on their claim for civil conspiracy.

## IV.   DAMAGES

After entering default judgment on liability, a court must determine the amount of damages to be awarded. *See Holtz*, 2013 WL 12141515, at *2. Florida law requires that intentional tortfeasors be held jointly and severally liable. Fla. Stat. § 768.81(4). In entering default judgment against the Cartel of the Suns in this case, this Court determined the appropriate amount of damages were as follows: (1) $25 million ($75 million after trebling) for Ms. Albán and $20 million ($60 million after trebling) for each of Ms. Albán's two children for the pain, suffering, and loss of companionship (2) $7 million ($21 million after trebling) in compensatory damages under the Florida ATA for Mr. Albán's pain and suffering, and (3) $1 million in compensatory damages for the defamation of Mr. Albán. [D.E. 56; 73] (amending default judgment to treble $7 million damages under ATA).

Here, all Defendants committed intentional torts by conspiring and orchestrating the kidnapping, torture, and murder of Mr. Albán. As joint tortfeasors with Cartel of the Suns (which is already subject to a final default judgment), the Individual Defendants, and FARC are jointly and severally liable for $216 million in compensatory damages.  In addition, Defendants Maduro, Saab, and Reverol are liable for $1 million in compensatory damages for the defamation of Mr. Albán, yielding a total judgment against Maduro, Saab, and Reverol of $216 million.  As per plaintiffs' request, this Court should reserve jurisdiction to award attorneys' fees after all other aspects have been addressed.

## V.     CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that Plaintiff's motion for default judgment [D.E. 70] be **GRANTED** with damages awarded in the amount of:

1. Seventy-five million dollars ($75,000,000.00) in trebled compensatory noneconomic damages for the pain, suffering, and loss of companionship to MEUDY ALBÁN OSIO in her personal capacity and in her capacity as the personal representative of the Estate of FERNANDO ALBERTO ALBÁN;

2. Sixty million dollars ($60,000,000.00) in trebled compensatory noneconomic damages for the pain, suffering, and loss of companionship to FERNANDO ALBÁN OSIO;

3. Sixty million dollars ($60,000,000.00) in trebled compensatory noneconomic damages for the pain, suffering, and loss of companionship to MARIA FERNANDA ALBÁN OSIO;

4. Twenty-one million dollars ($21,000,000.00) in trebled actual, compensatory damages for the torture of Mr. Albán, to the Estate of FERNANDO ALBERTO ALBÁN;

5. One million dollars ($1,000,000.00) in actual, compensatory damages for the defamation of Mr. Albán only against Defendants Maduro, Saab, and Reverol;

6. Zero dollars ($0.00) in punitive damages;

7. This judgment should bear interest at the rate as prescribed by 28 U.S.C. § 1961 until this judgment is satisfied.  The Court should retain jurisdiction of this matter to enforce the Judgment.

Pursuant to Local Magistrate Rule 4(b) and Fed. R. Civ. P. 73, the parties have fourteen (14) days from service of this Report and Recommendation within which to file written objections, if any, with the District Judge. Failure to timely file objections shall bar the parties from de novo determination by the District Judge of any factual or legal issue covered in the Report and shall bar the parties from challenging on appeal the District Judge's Order based on any unobjected factual or legal conclusions included in the Report. 28 U.S.C. § 636(b)(1); 11th Cir. Rule 3-1; *see, e.g., Patton v. Rowell*, 2017 WL 443634 (11th Cir. Feb. 2, 2017); *Cooley v. Commissioner of Social Security*, 2016 WL 7321208 (11th Cir. Dec. 16, 2016).

**DONE AND ORDERED** in Chambers at Miami, Florida, this 19th day of July, 2023.

*/s/  Edwin G. Torres*
EDWIN G. TORRES
Chief Magistrate Judge