**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 1:21-cv-20706-DPG**

MEUDY ALBÁN OSIO in her personal capacity
and in her capacity as the personal representative
of the Estate of FERNANDO ALBERTO ALBÁN,
FERNANDO ALBÁN OSIO, and MARIA
FERNANDA ALBÁN OSIO,

          Plaintiffs / Judgment Creditors,

v.

NICOLAS MADURO MOROS,
FUERZAS ARMADA REVOLUCIONARIAS
DE COLUMBIA ("FARC"); THE CARTEL OF
THE SUNS A.K.A. CARTEL DE LOS SOLES;
VLADIMIR PADRINO LOPEZ; MAIKEL
JOSE MORENO PEREZ; NESTOR LUIS
REVEROL TORRES; and TAREK WILLIAM
SAAB,

          Defendants / Judgment Debtors.

_____/

## PLAINTIFFS' MOTION FOR A WRIT OF EXECUTION

      Plaintiffs respectfully move for a writ of execution for a Learjet 45 (Tail Number YV2739

impounded at the Fort Lauderdale-Hollywood International Airport), blocked by the Office of

Foreign Assets Control ("OFAC") because it is owned by Petróleos de Venezuela, S.A.

("PDVSA"), an instrumentality of Judgment Debtors the Cartel of the Suns (the "Cartel") and

Nicolas Maduro Moros ("Maduro").

## INTRODUCTION

      As this Court has recognized, the Cartel, Maduro, and their co-conspirators kidnapped,

tortured, and murdered Mr. Albán. *See* ECF No. 56 (Report and Recommendation on Plaintiffs'

Motion for Default Judgment Against Defendant Cartel of the Suns) (the "R&R") at 4, *adopted at*

ECF No. 58; *see also* ECF Nos. 89, 90, and 91. The "offense" for which Defendants orchestrated the kidnapping, torture, and murder of Mr. Albán and the mutilation of his corpse was Mr. Albán's "denounc[ing] the Maduro regime's human rights abuses to important political leaders at the United Nations General Assembly (UNGA), in New York." R&R at 4.

It is therefore especially fitting that Mr. Albán's estate and family now seek to enforce their judgment against PDVSA, a crucial tool in the illegitimate Maduro regime's ability to maintain its stranglehold on power in Venezuela, and from that position, to terrorize dissidents like Mr. Albán. As shown below, PDVSA supports the Maduro regime by directly supporting the Maduro regime's unlawful kidnapping of U.S. citizens, and by supporting the Cartel of the Suns, a terrorist organization led by Maduro and an integral component of the modern Venezuelan narco-state, among other material support that PDVSA provides to the judgment debtors.

To start, PDVSA: (1) directly aids the Cartel's U.S. narcoterrorism, including by transporting cocaine in its own aircraft; (2) launders money for the Cartel through the United States; and (3) supports the Maduro Criminal Enterprise (which includes the Cartel and Maduro (R&R at 3)) in perpetrating public corruption and myriad other criminal offenses, including using its planes to transport U.S. citizens that the Maduro regime has kidnapped and unlawfully detained. In turn, PDVSA's support provides the Cartel and the Maduro regime with the hard currency that allows them to continue committing atrocities in Venezuela with impunity—including their crimes against Mr. Albán and his family. Indeed, the very PDVSA Learjet 45 (Tail Number YV2739) at issue here was used for bulk cash smuggling in support of Maduro's narcoterrorism against the United States, among other crimes.

When Congress enacted the Terrorism Risk Insurance Act ("TRIA"), Congress expressly sought to ensure that victims of international terrorism, like Mr. Albán's estate and family, could enforce their judgments not only against the judgment debtors themselves (such as the Cartel and

Maduro), but also any agency or instrumentality of the judgment debtors (such as PDVSA).  TRIA expressly authorizes victims of terrorism, such as Mr. Albán's estate and his family, to enforce their judgments against the assets of a terrorist's instrumentalities (such as PDVSA here) blocked under OFAC sanctions.

Nor can PDVSA avoid TRIA's reach by invoking sovereign immunity. PDVSA's misdeeds in funneling money to support the Cartel's and Maduro's terrorism—which lie at the heart of the Albán claims—are strictly commercial. As such, PDVSA is amenable to suit under the commercial-activities exception to the Foreign Sovereign Immunities Act (FSIA). And even if that exception were not applicable (and plainly, it is), PDVSA would be amenable to suit under TRIA, which allows terrorism victims to satisfy their judgments despite terrorist instrumentalities' putative claims to immunity. Nor are PDVSA's assets immune from execution, for the same reasons. In short, having spent decades conspiring with criminals, laundering their money, and smuggling their drugs, PDVSA cannot benefit from the sovereign immunity that legitimate governments enjoy.

## RELEVANT PROCEDURAL BACKGROUND

On February 9, 2023, this Court awarded an amended final default judgment for Plaintiffs and against Defendant Cartel of the Suns in the amount of $217 million. *See* Amended Final Default Judgment, ECF No. 73.  On August 6, 2023, this Court awarded a final default judgement against Nicolas Maduro and the other individual defendants, jointly and severally with the Cartel, in the same amount.  ECF No. 91.  As of today, the entire judgment remains unsatisfied.  Exhibit 4.

## RELEVANT FACTUAL BACKGROUND

### I.    PDVSA IS AN INSTRUMENTALITY OF THE CARTEL OF THE SUNS.

#### a.    PDVSA Aircraft

##### i.    PDVSA Uses Its Aircraft To Assist Maduro And The Cartel With Their Commission Of Narcoterrorism In The United States.

As this Court has observed, "the kidnapping, torture, and murder of Mr. Albán violated the Florida ATA [Anti-Terrorism Act] because they occurred pursuant to a narco-terrorism conspiracy designed to flood Florida with cocaine and to launder the illegal drug money through Florida." ECF No. 56 at 18.  The Cartel of the Suns was central to that conspiracy. *Id.*  So too was Maduro. And PDVSA plays a direct role in supporting the narcotics trafficking of the Cartel and Maduro, who leads the Cartel.[1]  Among other things, PDVSA utilizes its aircraft to smuggle cocaine for the Cartel and Maduro.[2]  "In January 2015, a senior Venezuelan security official defected to the United States to cooperate with U.S. authorities. The official explained that PDVSA has been using its own aircraft to move drug shipments across international borders."[3]  An April 2019 Report prepared by the Foundation for Human Rights in Cuba explains that "several federal agencies are keeping open a criminal investigation into a drug-trafficking and money-laundering network through which dozens of tons of cocaine are shipped weekly in at least five planes registered in the name of PDVSA; these planes land on runways controlled by the Cuban government."[4] Notably, OFAC has not only blocked PDVSA, but has blocked the specific Learjet that is the

---

[1] Exhibit 6 at ¶ 4 ("NICOLAS MADURO MOROS, the defendant, helped manage and, ultimately, lead the Cartel de Los Soles as he gained power in Venezuela.").

[2] Exhibit 7 at 1-2, available at https://insightcrime.org/news/brief/top-venezuela-govt-official-accused-of-drug-trafficking/ ("Venezuelan state oil firm PDVSA's airplanes were sometimes used to transport drugs, with proceeds laundered through the company."); *see also* Exhibit 5, (Farah Decl.) at ¶¶ 23-24.

[3] Exhibit 8 at 2, available at https://www.law360.com/articles/767389/doj-puts-companies-with-venezuelan-ties-in-its-crosshairs; *see also* Exhibit 9 at 1 ("Apparently Venezuelan government owned aircraft and that includes those belonging to the oil company PDVSA [they have a local office in Kingstown] are never searched."), available at https://www.ieyenews.com/peter-binose-mount-coke-or-a-mountain-of-cocaine-ask-ralph/.

[4] Exhibit 10 at 90-91, available at https://www.fhrcuba.org/wp-content/uploads/2019/04/CUBAZUELA-CUBAN-INTERVENTION-English.pdf.

subject of this motion.[5] This jet has been spotted in Suriname and Guatemala,[6] both known transshipment points for drugs from Latin America to the United States.[7]

Furthermore, Efraín Antonio Campo Flores and Francisco Flores de Freitas, both nephews of Maduro's wife, were convicted of conspiracy to import 770 kilos of cocaine to the United States, where until recently they were serving lengthy federal prison sentences. Compl., ECF No. 1 at ¶ 20. In October of 2022, the United States agreed to release both men in exchange for six U.S. citizens (including five of the "Citgo Six," *i.e.*, senior executives of Citgo who were kidnapped by the Maduro Criminal Enterprise) and one U.S. lawful permanent resident that the Maduro Criminal Enterprise had unlawfully kidnapped.[8] The Maduro Criminal Enterprise utilized PDVSA aircraft to facilitate the return of the illegally kidnapped US nationals—all as part of an effort to free convicted narcotics traffickers with familial ties to Maduro himself.[9]

### ii.  PDVSA Uses Its Aircraft To Assist The Maduro Criminal Enterprise To Evade US Sanctions And Commit Other Crimes.

The Maduro Criminal Enterprise uses PDVSA aircraft to assist in evading U.S. sanctions and "to transport senior members of the former Maduro regime in a continuation of the former

---

[5] *See* Exhibit 11 at 2 ("YV2739; Aircraft Model Learjet 45; Aircraft Manufacturer's Serial Number (MSN) 45-425; Aircraft Tail Number YV2739 (aircraft)"), available at https://ofac.treasury.gov/recent-actions/20200121_33.

[6] *See* Exhibit 12, available at https://www.jetphotos.com/photo/7327140.

[7] *See* Exhibit 13 ("Suriname is a transit zone for South American cocaine en route to Europe, Africa, and, to a lesser extent, the United States."), available at https://www.state.gov/bureau-of-international-narcotics-and-law-enforcement-affairs-work-by-country/suriname-summary/.

[8] Exhibit 14 at 1 ("We welcome the release from Venezuela of six wrongfully detained U.S. citizens"), available at https://www.state.gov/the-release-of-u-s-nationals-from-venezuela/; Exhibit 15 at 1, available at https://www.bbc.com/news/world-latin-america-63105944.

[9] Exhibit 16 at 4 (The U.S. prisoners "boarded a plane belonging to PDVSA and were flown to St. Vincent and Grenadines. The prisoner exchange took place there."), available at https://www.nbcnews.com/news/latino/relatives-us-men-freed-venezuela-detail-release-reunion-rcna50545.

Maduro regime's misappropriation of PDVSA assets."[10]  On September 26, 2023, Orsini Quintero, a PDVSA pilot, pleaded guilty of conspiracy to participate in and assist Tareck El Aissami (the OFAC sanctioned narcotics traffickers and former Vice President of Venezuela) and Samark López Bello (El Aissami's front man)  in violation of OFAC sanctions.[11] The Department of Justice explained that "El Aissami, López Bello, and [others] used SVMI Solution, LLC, [a] U.S. company, to receive payments for transportation services provided to El Aissami and López Bello in violation of the Kingpin Act and the OFAC sanctions, such as a July 2018 funds transfer sent from Manhattan, New York to an SVMI Solution account in Florida."[12]

PDVSA flights also have been spotted in Switzerland, where observers believe that the planes are transporting illicit gold and facilitating money laundering.[13]

### iii.   PDVSA Used The Learjet 45 (Tail Number YV2739) At Issue Here To Smuggle Cash To Miami In Support Of Terrorism Against The United States.

Douglas C. Farah—a leading expert on the illegal conduct of the Maduro Regime, the Cartel of the Suns, and PDVSA, including PDVSA's support for criminal conduct by Maduro and the Cartel in Venezuela and in the United States[14]—explains that he personally assisted the Department of Homeland Security with its efforts to track bulk cash smuggling by PDVSA on behalf of Maduro and the Cartel. Ex. 5 at ¶ 41. In his capacity assisting the United States' efforts

---

[10] Exhibit 17 at 1, available at https://home.treasury.gov/news/press-releases/sm884; *see* Ex. 5 (Farah Decl.) at ¶ 39.

[11] *United States v. Orsini Quintero*, Case No. 1:19-cr-144 (AKH) (S.D.N.Y.) (Sept. 26, 2023 Minute Entry); Exhibit 18 at 1, available at Venezuela Politics: Pilot pleads guilty to violating U.S. sanctions against Tareck El Aissami and Samark López (maibortpetit.info).

[12] Exhibit 19 at 2, available at https://www.justice.gov/usao-sdny/pr/florida-man-pleads-guilty-violating-kingpin-act-sanctions-against-venezuelan-minister.

[13] Exhibit 20 at 2, available at https://www.lapatilla.com/2019/02/26/denuncian-que-avion-de-pdvsa-aterrizo-en-suiza-para-presuntas-operaciones-ilicitas/.

[14] *See generally* Ex. 5 at ¶¶ 1-13 (setting forth Mr. Farah's credentials).

to investigate and combat the Maduro Regime's narcotrafficking, Farah learned that the Learjet that Plaintiffs are now seeking to attach—Learjet 45, Tail Number YV2739, impounded at Fort Lauderdale Airport—was used for bulk cash smuggling. *Id.*

What is more, the Learjet at issue played a central role in an unlawful effort by Maduro to weaponize a "migrant caravan" to create chaos, violence, and despair at the U.S. border and within the United States. *Id.* ¶¶ 42-44. By way of background, starting in October 2018, thousands of migrants gathered and traveled from Central America through Mexico to seek entry to the United States. *Id.* This came to be known as the "migrant caravan." *Id.* U.S. Customs and Border Protection (CBP) feared that the estimated 7,000 to 10,000 members of the migrant caravan could overwhelm CBP's resources and hinder its ability to process the ordinary flow of trade and travel. *Id.* Additionally, because of reports that the migrant caravan entered Mexico by force, CBP was concerned about the potential for mass illegal border crossings and violence against law enforcement when the migrant caravan reached the U.S. border. *Id.*

The Maduro Criminal Enterprise exacerbated these dangers by using ill-gotten and/or misappropriated PDVSA assets to encourage additional migrants to join the caravan. *Id.* To support those efforts, PDVSA supplied an airplane: the Learjet 45 (Tail Number YV2739) at issue here. *Id.* PDVSA stuffed the plane with $500,000 in U.S. dollars in bulk cash. *Id.* PDVSA then sent the plane to the United States, with the intent of utilizing the cash to further its agenda of increasing the harm the migrant caravan might cause at the U.S. border. *Id.*

The flight and the cash were accompanied by Jorge Jesús Rodríguez Gómez (a former Vice President of Venezuela, and the brother of the current Venezuelan Vice President, Delcy Rodríguez), whom OFAC sanctioned on September 25, 2018, for his role in helping Maduro to maintain power and solidify Maduro's authoritarian rule. *Id.* ¶¶ 43-44. On or about October 18, 2018, the Learjet 45—with the cash and Jorge Rodríguez—landed at Fort Lauderdale-Hollywood

International Airport. *Id.* ¶ 44. The U.S. intercepted the aircraft when it landed and impounded it at the airport, where it still remains. *Id.*

### b. PDVSA Money Laundering

#### i. PDVSA Assists The Cartel And Maduro To Launder The Proceeds Of Narcotics Trafficking Through The United States.

PDVSA launders the proceeds of the Cartel's drug running through the United States. Horacio Medina, a former PDVSA executive who retired after more than 20 years of service and now lives in exile in the United States, explains that Cartel leader Maduro appointed Carlos Erik Malpica Flores ("Malpica")—the nephew of Venezuela's First Lady, Cilia Flores, and one of her most trusted advisors—to a position of power at PDVSA.[15] Thereafter, PDVSA "becam[e] a massive industrial money launderer at the service of narcotrafficking." *Id.* Indeed, "US authorities have gathered documents and eyewitness testimonies implicating officers of the state-run oil company, Petróleos de Venezuela S.A. (PDVSA), in engaging in transactions and money laundering on behalf of cocaine smugglers within the government."[16] The Foundation for Human Rights in Cuba elaborates:

> According to witnesses who are currently protected by the U.S. government, Cuba received up to 30 percent of the cash amounts brought in from Venezuela [on

---

[15] *See* Exhibit 21 at 1, available at https://dialogo-americas.com/articles/pdvsa-a-major-money-laundering-operation/#.ZD7UwnbMJdg.

[16] Exhibit 22 at 1, available at https://www.aei.org/foreign-and-defense-policy/latin-america/venezuela-rise-of-a-narcostate/; *see* Exhibit 23 at 2 (PDVSA "launder[s] billions of dollars in illicit proceeds from the sales of cocaine, gold, and other commodities."), available at https://www.atlanticcouncil.org/wp-content/uploads/2020/08/The-Maduro-Regime-Illicit-Activities-A-Threat-to-Democracy-in-Venezuela-and-Security-in-Latin-America-Final.pdf; Exhibit 24 at 1-2 (Venezuela Colonel Julio Rodríguez Salas explained how Cartel of the Suns leader General Hugo Carvajal Barrios described the drug trafficking network and how Carvajal was key in the mechanism that allowed billions of dollars from drug sales to be laundered through PDVSA), available at https://www.infobae.com/2014/07/25/1583136-la-red-complices-del-narcogeneral-carvajal-y-el-papel-pdvsa-el-lavado/; *see also* Ex. 21, *supra* n.15 ("The DEA began to suspect that the Venezuelan oil company was also being used to launder profits from narcotrafficking.").

PDVSA airplanes], in exchange for making transfers to bank accounts in the United States, in order to legitimize the money earned from drug trafficking.[17]

The American Enterprise Institute similarly explains: "Venezuela's rampant corruption and money laundering schemes are integral elements of international narcotics trafficking operations. . . . *Testiferros* (front men) outside the government work with officials to launder cocaine profits by," among other things, "purchasing convertible US-dollar-denominated PDVSA bonds with local currency. . . . Much of these assets are either in the United States or in dollar denominated accounts."[18]

Mr. Farah explains that PDVSA, at its peak in the early 2000s, moved more than $100 billion a year in legitimate oil sales. Ex. 5 at ¶ 23. The volume of money that PDVSA moved around the world for lawful purposes led the Maduro Regime to use PDVSA as the key hub of a multi-billion dollar money laundering system on behalf of the Maduro and the Cartel. *Id.* Because PDVSA was engaging in transactions in petrodollars, its money laundering transactions cleared through the United States. *Id.*

As PDVSA's role in money laundering for the Cartel expanded, the Cartel—working hand-in-glove with PDVSA—became a one-stop-shop for narcotics traffickers throughout the region. *Id.* ¶ 24. Narcotics traffickers not only could purchase cocaine from the Cartel, they also could launder their ill-gotten gains through PDVSA, with PDVSA and the Cartel reaping additional profits for these money-laundering services. *Id.* Because PDVSA had the backing of Maduro, and was cloaked in the (false) appearance of being a legitimate governmental enterprise, PDVSA was able to offer the Cartel and other regional narcotics traffickers stability and certainty, creating a favorable climate for unlawful business and making its services highly desirable to narcotics

---

[17] Ex. 10, *supra* n.4, at 90.

[18] Exhibit 25 at 21, available at https://www.jstor.org/stable/resrep03288.6?seq=4.

traffickers. *Id.* ¶ 26.

By 2005 to 2008, laundering drug money had become the primary function of PDVSA. *Id.* ¶ 27. Such laundering has only increased since then, as the Venezuelan economy has continued to deteriorate. *Id.* During the Maduro regime, and especially under the control and influence of Vice President El Aissami, PDVSA employed (and continues to employ) numerous schemes to assist in the laundering of drug proceeds (and other criminally derived funds) through the United States. *Id.* ¶ 30. Several of the more common methods are described in greater detail in the Farah Declaration. *See id.* ¶¶ 31-38.

     **ii.  PDVSA Launders The Proceeds Of Currency Control Scams, And Other Crimes, Through The United States To Benefit The Maduro Criminal Enterprise.**

PDVSA laundered the proceeds of various currency conversion schemes orchestrated by the Maduro Criminal Enterprise.[19] Former PDVSA executive Medina explains that when Maduro's crony, Malpica, was appointed to the board of PDVSA, "[t]hat's where the massive money laundering cycle through PDVSA started."[20] The "massive money laundering" at issue is routinely executed in and through the United States. DOJ has explained, for example, that a former Swiss banker (who pleaded guilty to conspiracy to commit money laundering) "and members of the [Venezuelan] money laundering conspiracy used Miami, Florida real estate and sophisticated false-investment schemes to conceal that the $1.2 billion was in fact embezzled [through currency scams] from PDVSA."[21]

Indeed, because much of the PDVSA money laundering occurred in Florida, the United States has indicted for money laundering in this District several PDVSA executives, including

---

[19] *See infra* at I.c.ii. (describing currency control scams).

[20] Ex. 21, *supra* n.15, at 1.

[21] Exhibit 26 at 1-2, available at https://www.justice.gov/opa/pr/former-swiss-bank-executive-sentenced-prison-role-billion-dollar-international-money.

Abraham Edgardo Ortega, PDVSA's former Executive Director of Financial Planning, who pleaded guilty and served more than three years in federal prison.[22]  The affidavit from a Homeland Security investigator in the case against Ortega affirms that, from the money obtained through the PDVSA currency control scam, 159,085,876.26 Euros went to "CHAMOS,"[23] *i.e.,* the stepsons of Maduro.[24] Another co-conspirator in the PDVSA currency control conspiracy explained that Maduro's stepsons were able to solve problems with Maduro by intervening with their mother, the First Lady.[25] A source familiar with the U.S. investigation into the PDVSA money laundering scheme told the Miami Herald that "everything runs through him [Maduro]."[26]

In addition, the Maduro Criminal Enterprise uses PDVSA to launder dirty money from myriad other criminal enterprises, beyond the currency scams and drug trafficking described above.  In April 2019, the State Department explained:

> Maduro's most egregious corruption scheme involved embezzlement from the state-owned oil company Petróleos de Venezuela (PdVSA). In 2015, the U.S. Department of the Treasury's Financial Crimes Enforcement Network (FinCEN)

---

[22] *See* Exhibit 27 at 1 ("Abraham Edgardo Ortega, a Venezuelan national who was PDVSA's executive director of financial planning, pled guilty to one count of conspiracy to commit money laundering for his role in the billion-dollar international scheme to launder funds embezzled from PdVSA."), available at https://www.justice.gov/opa/pr/former-executive-director-venezuelan-state-owned-oil-company-petroleos-de-venezuela-sa-pleads; *see also* Exhibit 28 at ¶ 18 ("Two years and over one hundred recordings later [our investigation] revealed an international conspiracy to launder the PDVSA funds through Miami and several large-scale, international third-party money-laundering organizations. More specifically, the investigation revealed the use of Miami real estate and sophisticated false-investment schemes to launder hundreds of millions of U.S. Dollars.").

[23] *See* Ex. 28, *supra* n.22, at ¶ 109(b); *see* Exhibit 29, at ¶ 19(a) ("[A]pproximately 159 million Euros [from the PDVSA currency control scam was routed] to three individuals known as 'Los Chamos,' the stepson of 'Venezuela Official 2' [Maduro][.]").

[24] *See* Exhibit 30 ("Los Chamos actually are Yoswal, Yosser and Walter Flores, the children of First Lady Flores from a previous relationship and thus Maduro's stepsons."), available at https://apnews.com/general-news-7a7fe8b6733a4971859f36df91d27b6f.

[25] Ex. 29, *supra* n.23, at ¶ 28.

[26] Exhibit 31 at 2.

issued a finding under Section 311 of the USA PATRIOT Act. A European bank accepted exorbitant commissions to process approximately $2 billion in transactions related to Venezuelan third–party money launderers, shell companies, and complex financial products to siphon off funds from PdVSA.[27]

In the foregoing State Department report, the very first example of a human rights violation financed by such corruption, including Maduro Criminal Enterprise's use of PDVSA, was the case of Fernando Albán.[28]

"Using PDVSA as the primary laundering vehicle" the Maduro Criminal Enterprise "moved money through PDVSA coffers using programs like 'oil exchanges,' fictitious massive infrastructure projects, from companies and sophisticated offshore financial structures to not only siphon money from the oil company, but also to lauder billions of dollars in illicit proceeds," including from sales of gold and other commodities.[29]

### c.  PDVSA Public Corruption

PDVSA supports the conspiracy among the Cartel and the Maduro regime, which uses public corruption to fund their commission of terrorism.  As this Court has stated:

> [T]he Maduro Criminal Enterprise [which includes Maduro and the Cartel, among others] functions to achieve the common and continuing purpose of the Maduro regime exerting control over the Venezuelan population by engaging in narcotics trafficking, acts of terrorism, human rights violations, and public corruption offenses. Mr. Albán's murder is just one example of the many extrajudicial killings

---

[27] Exhibit 32 at 2, available at https://cu.usembassy.gov/nicolas-maduro-corruption-and-chaos-in-venezuela/.

[28] *Id.* At 3 ("In October 2018, Caracas Councilman Fernando Albán traveled to New York to denounce the Maduro regime's brutality on the sidelines of the United Nations General Assembly. Upon his return to Venezuela on October 5, Maduro's secret police arrested him at the airport. He died in custody a few days later when he mysteriously fell from a 10th floor window of a maximum-security prison in Caracas.").

[29] Ex. 23, *supra* n.16, at 2 ("The Maduro regime is not only involved in the illegal extraction of gold and other minerals, but also participates in their sale to international markets via malign global actors and regional allies. . . . Iran has now become Maduro's partner of choice in the sale of illicit gold.").

that the Cartel, through the use of Maduro regime agents, commits in order to suppress any and all opposition.

ECF No. 56 (R&R), at 10-11. PDVSA directly supports the Maduro Criminal Enterprise, not only by supporting narcotics trafficking and laundering narcotics proceeds as described above, but also by furthering public corruption offenses.

> ### i. To Use PDVSA For Corrupt Purposes, Cartel Of The Suns Leader Maduro Appointed A Relative To Control PDVSA.

In 2014, Maduro appointed Malpica (as noted above, the nephew of Venezuela's First Lady) as the Vice President of Finance of PDVSA.[30]  Through this act of nepotism, Maduro—and his inner circle, including his wife, First Lady Flores, whom OFAC has sanctioned for her support of Maduro's corruption[31]—expanded their personal control over PDVSA. As Venezuela expert Farah has explained, "President [Maduro] and his inner circle directly control PDVSA."[32] Efrain Campo Flores, the above-referenced nephew to First Lady Flores and who was convicted of smuggling cocaine into the United States (and did so to raise funds to support "an election campaign for [her]"[33]), explained in a private text message later acquired by US investigators that Malpica was "the maximum authority there [*i.e.*, PDVSA] since he's a Flores."[34] Efrain Campo Flores further explained that Malpica could help one of Efrain Campo Flores's friends collect a

---

[30] *See* Exhibit 33 at 9 ("In 2014, PDVSA appointed a new finance director: Carlos Malpica, the third nephew of [First Lady Cecilia] Flores . . . .  People close to Flores said Malpica had become the first lady's most trusted relative, especially when it came to financial matters."), available at https://www.reuters.com/investigates/special-report/venezuela-politics-flores/.

[31] *See* Exhibit 34 at 1 (sanctioning Maduro's wife as one of his inner circle, and explaining that "Maduro relies on his inner circle to maintain his grip on power, as his regime systematically plunders what remains of Venezuela's wealth"), available at https://home.treasury.gov/news/press-releases/sm495.

[32] *See* Exhibit 35 at 183-84.

[33] ECF No. 1 at ¶ 86 (quoting Acting Manhattan U.S. Attorney Joon H. Kim).

[34] Ex. 33, *supra* n.30, at 10.

debt from PDVSA, although Malpica "will not do it for free."[35] In 2017, OFAC imposed sanctions on Malpica for his role in corruption at PDVSA.[36]

In March 2021, the United States Executive Branch advised U.S. courts that "[Nicolas] Maduro remains in power in Venezuela, and in control of PDVSA.'"[37] As a federal court in Delaware recently explained, "[d]espite its non-recognition by the U.S. government, the Maduro Regime continues (1) to exercise *de facto* control over . . . PDVSA and its assets and operations in Venezuela" and (2) to "use PDVSA as its *primary conduit for corruption*." *OI Eur. Grp. B.V. v. Bolivarian Republic of Ven.*, --- F. Supp. 3d ---, 2023 WL 2609248, at *14-15 (D. Del. Mar. 23, 2023), *aff'd*, 73 F.4th 157 (3d Cir. 2023) (emphasis added).

### ii.  PDVSA Engages In Public Corruption Offenses, Including Currency Scams, To Benefit The Maduro Criminal Enterprise.

Shortly after Maduro appointed Malpica to control PDVSA, PDVSA began to engage in currency control scams. These scams were one of the Maduro Criminal Enterprise's most profitable techniques to siphon money from the Venezuelan treasury. An explanation of the scam is set forth in an affidavit provided by a Homeland Security Investigations Special Agent in a criminal money-laundering case. The defendant there is charged with conspiring with senior PDVSA officers to engage in currency control scams and launder the proceeds. The affidavit explains:

> Venezuela has a foreign-currency exchange system under which the government will exchange local currency (Bolivars) at a fixed rate for U.S. Dollars. The fixed exchange rate has been well below the true economic rate by a substantial factor for several years. For example, in 2014, the Venezuelan government fixed exchange rate was approximately six Bolivars to one U.S. Dollar. By contrast, the true economic exchange rate was approximately sixty Bolivars to one U.S. Dollar. The difference between the fixed rate and the true economic rate creates

---

[35] *Id.*

[36] *See* Exhibit 36 at 4, available at https://home.treasury.gov/news/press-releases/sm0132.

[37] Exhibit 37 at 8.

opportunity for fraud and abuse.

> For example, in 2014, an individual could exchange 10 million U.S. Dollars for 600 million Bolivars at the true economic rate. Then, if that individual had access to the government fixed rate, he could convert that same 600 million Bolivars into 100 million U.S. Dollars. Essentially, in two transactions, that person could buy 100 million U.S. Dollars for 10 million U.S. Dollars. Massive fraud and corruption is rampant throughout Venezuela's government-run foreign-exchange system. Estimates of the fraud range as high as $20 billion a year, and reports indicate that corrupt government officials take kickbacks to authorize exchanges at the fixed rate.

Ex. 28 at ¶¶ 19-21.

In a more sophisticated version of this fraud, members of the Maduro Criminal Enterprise started with U.S. dollars and used them to purchase "bolivares on the black market."[38]

> They then gave a loan to Venezuela's state-owned oil company—Petróleos de Venezuela, S.A. ('PDVSA')—in bolivares, but PDVSA paid them back in dollars at the official exchange rate, which resulted in them having many more dollars than what they started out with. This allowed the group to increase their initial investment tenfold. The operation began in December of 2014, and was meant to embezzle $600 million (about €534 million). By May 2015, the group had been able to double the amount to $1.2 billion."[39]

The factual proffer of a defendant who pleaded guilty to PDVSA-related money laundering confirms that "corrupt foreign currency exchange schemes occurred with significant frequency within the Venezuelan state-owned oil company, Petróleos de Venezuela, (PDVSA)."[40]

In sanctioning PDVSA under the International Emergency Economic Powers Act (IEEPA), OFAC explained that one of its principal reasons for sanctioning PDVSA was the company's role in the Maduro regime's unlawful currency-control schemes. Specifically, the OFAC Press Release states that OFAC sanctioned PDVSA to "hold[] accountable those responsible for Venezuela's

---

[38] Exhibit 38, available at https://www.dw.com/en/how-millions-of-dirty-dollars-were-laundered-out-of-venezuela/a-47867313.

[39] *Id.*

[40] *See* Exhibit 39 at ¶ 4.

tragic decline," including "a 2014 currency exchange scheme…designed to embezzle and launder around $600 million from PdVSA, money obtained through bribery and fraud. By May 2015, the conspiracy had allegedly doubled in amount, to $1.2 billion embezzled from PdVSA."[41]

### iii. Cartel Of The Suns Leader El Aissami Assumes Control Over PDVSA And Uses It For Personal, Corrupt Purposes, Including Evading Sanctions With The Assistance Of US Persons.

In September of 2018, El Aissami—who at the time was Venezuela's Industry Minister, subject to OFAC sanctions for his drug trafficking,[42] and a Cartel leader[43]—was named to the Board of PDVSA.[44] Then, in April 2020, Maduro appointed El Aissami as Venezuela's oil minister, affording him even greater control over PDVSA.[45] At the helm of Venezuela's oil sector, El Aissami wasted no time in making PDVSA his personal piggybank, looting its coffers to line his own pockets, while simultaneously violating US sanctions and laundering ill-gotten billions of dollars through the United States. In a June 2020 Press Release, OFAC explained:

> As the illegitimate Maduro regime has done before, the regime turned to Petroleos de Venezuela, S.A. (PdVSA), its primary conduit for corruption, and the institutions that no longer serve its people, to exploit and profit from Venezuela's natural resources. Maduro's oil minister and U.S.-designated Kingpin **Tareck El Aissami Maddah** (**El Aissami**) has enlisted a network of facilitators, some of whom

---

[41] *See* Exhibit 40 at 1-2, available at https://home.treasury.gov/news/press-releases/sm594.

[42] *See* **Exhibit 41** at 1 ("Today, the U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) designated Venezuelan national Tareck Zaidan El Aissami Maddah (El Aissami) as a Specially Designated Narcotics Trafficker pursuant to the Foreign Narcotics Kingpin Designation Act (Kingpin Act) for playing a significant role in international narcotics trafficking."), available at https://home.treasury.gov/news/press-releases/as0005.

[43] *See* **Exhibit 42** at 1 ("Both Maduro and El Aissami are believed to be involved with the Cartel of the Suns."), available at https://dialogo-americas.com/articles/venezuelan-generals-and-the-cartel-of-the-suns/.

[44] Exhibit 43 at 1, available at https://www.reuters.com/article/venezuela-pdvsa/venezuela-names-el-aissami-to-pdvsa-board-of-directors-idINKCN1LP0O9.

[45] *See* Exhibit 44 at ¶ 43 and Ex. 39 thereto (Venezuela Official Gazette No. 6.238 and Decree 2.378, July 13, 2016, providing that PDVSA operates under direct supervision of the Vice Presidency of the Economic Sector and Oil Minister).

are designated today, to orchestrate opaque schemes to broker the re-sale of over 30 million barrels of Venezuelan-origin crude oil in order to benefit from the proceeds.

"The illegitimate Maduro regime created *a secret network to evade sanctions*, which Treasury has now exposed," said Deputy Secretary Justin G. Muzinich. "The United States will continue to relentlessly pursue sanctions evaders, who plunder Venezuela's resources for *personal gain* at the expense of the Venezuelan people."

. . .

The exploitation of Venezuela's natural resources, including oil, for the benefit of the illegitimate regime of President Maduro and his cronies is unacceptable.[46]

In connection with the OFAC Press Release, then-Treasury Secretary Steven Mnuchin stated, "We are intent on going after those facilitating Maduro's corruption and predation, including by sanctioning the President of PdVSA and others diverting assets that rightfully belong to the people of Venezuela."[47] El Aissami laundered many of these proceeds through Florida.[48]

U.S. companies have been implicated in assisting in these Venezuelan sanctions-busting efforts.[49] The Associated Press explains:

[A] company with an office in Houston and another owned by two American

---

[46] Exhibit 45 at 1-2 (bold added), available at https://home.treasury.gov/news/press-releases/sm1038; *see* Exhibit 46 at 2-3 ("PDVSA's off the books trading to avoid Treasury sanctions is what kept the lights on. Maduro's main man, Alex Saab, was heavily involved. Maduro has moved heaven and earth to free him. But Tareck, the Rodriguez siblings and Diosdado were also in the sanctions busting deals, which did not cease with Saab's arrest. It would be a mistake to think Maduro does not get the lion share of all dodgy deals done with / by PDVSA."), available at https://infodio.com/nicolas/maduro/corruption/tareck/el/aisami/drug/cartels/03222023.

[47] Exhibit 47 at 1 (further explaining that "PdVSA is Venezuela's primary source of income and foreign currency, and has long been used as a vehicle for significant government corruption. Government officials and businessmen alike devised schemes to launder billions of dollars stolen and embezzled for their personal gain."), available at https://home.treasury.gov/news/press-releases/sm612#:~:text=Washington%20%E2%80%93%20Today%2C%20the%20U.S.%20Dep artment,fraud%20against%20the%20people%20of.

[48] *See* Ex. 41, *supra* n.42, at 1 (describing "an international [money laundering] network spanning the British Virgin Islands, Panama, the United Kingdom, the United States, and Venezuela").

[49] *See* Exhibit 48 at 1-4, available at https://apnews.com/article/business-venezuela-caribbean-curacao-f7e4f0cbcb315e392a5993678ac7341c.

citizens appear to be helping Venezuela bypass U.S. sanctions and quietly transport millions in petroleum products aboard an Iranian-built tanker.… The sanctions evasion effort is centered around an idled refinery and adjacent oil terminal on the Dutch Caribbean island of Curacao that until 2019 was a major shipping hub for Venezuela's state-owned oil company, PDVSA.[50]

Recently, El Aissami and Maduro have begun to quarrel.  The Maduro regime now accuses El Aissami of corruption in connection with his control of PDVSA, alleging that he was involved in sales of Venezuela oil for personal gain, without payment to PDVSA.[51]  On March 20, 2023, El Aissami resigned from his position as Oil Minister.[52]

## II.    OFAC DESIGNATES PDVSA.

On January 28, 2019, OFAC responded to the ongoing corruption and abuse at PDVSA by sanctioning the company under the IEEPA and Executive Order 13850. *See* 84 Fed. Reg. 3282. OFAC explained that it sanctioned PDVSA to "help prevent further diverting of Venezuela's assets by Maduro."[53] OFAC stated that the "illegitimate Maduro regime has continued to use [PDVSA] as its primary conduit for corruption." *OI European*, --- F. Supp. 3d ---, 2023 WL 2609248, at *15.

A few months later, on August 5, 2019, the President through Executive Order 13884 ("E.O. 13884") blocked "all property and interest in property of the Government of Venezuela."[54] Under E.O. 13884, the term "Government of Venezuela" includes:

[T]he state and Government of Venezuela, any political subdivision, agency, or instrumentality thereof, including the Central Bank of Venezuela and Petroleos de

---

[50] *Id.* at 1-2.

[51] *See* Exhibit 49 at 1-2, available at https://apnews.com/article/venezuela-oil-corruption-investigation-pdvsa-maduro-cdf7a6b1969f176411cc6b0d257cfa15.

[52] *See* Exhibit 50 at 1, available at https://www.reuters.com/world/americas/venezuelas-maduro-suspends-pdvsa-restructuring-committee-after-minister-quits-2023-03-27/#:~:text=CARACAS%2C%20March%2027%20(Reuters),the%20company%20and%20the%20judiciary.

[53] *See* Ex. 40, *supra* n.41, at 1.

[54] *See* Exhibit 51 at 1, available at https://www.federalregister.gov/documents/2019/08/07/2019-17052/blocking-property-of-the-government-of-venezuela.

Venezuela, S.A. (PdVSA), any person owned or controlled, directly or indirectly, by the foregoing, and any person who has acted or purported to act directly or indirectly for or on behalf of, any of the foregoing, including as a member of the Maduro regime.[55]

The reasons for the blocking of PDVSA's assets, as explained in the Executive Order, relate directly to human-rights abuses committed against dissidents such as Mr. Albán: The blocking was implemented "in light of the continued usurpation of power by Nicolas Maduro and persons affiliated with him, as well as human rights abuses, including arbitrary or unlawful arrest and detention of Venezuelan citizens, interference with freedom of expression[.]"[56]  That is precisely what this Court concluded that the Cartel did. *See* R&R, ECF No. 56 at 10-11 ("Mr. Albán's murder is just one example of the many extrajudicial killings that the Cartel, through the use of Maduro regime agents, commits in order to suppress any and all opposition.").

## **ARGUMENT**

### I.   **THE APPLICABLE LAW ENDORSES AN *EX PARTE,* PRE-HEARING WRIT OF EXECUTION BASED UPON A *PRIMA FACIE* INSTRUMENTALITY SHOWING.**

The governing law allows an *ex parte,* pre-hearing writ of execution on the assets of agencies and instrumentalities of terrorist judgment debtors—and then affords the agencies and instrumentalities with ample notice and a fulsome opportunity to be heard *subsequently*, when the agencies and instrumentalities can no longer abscond with, or dispose of, the assets at issue. In *Stansell v. Revolutionary Armed Forces of Colom.* ("*Stansell II*"), 771 F.3d 713, 730 (11th Cir. 2014), and *Marrón v. Maduro Moros*, 2023 WL 6356969, at *4 (S.D. Fla. Sept. 29, 2023) (Moreno, J.), the Eleventh Circuit and Judge Moreno respectively endorsed procedures in which the judiciary issues a pre-hearing writ where, as here, the movants make a *prima facie* showing of instrumentality and then permits the instrumentality an opportunity to appear and submit evidence

---

[55] *Id.* at 2.

[56] *Id*. at 1.

rebutting the *prima facie* instrumentality determination. *See Marrón*, 2023 WL 6356969, at *1-2 (following *Stansell II* and adopting a *prima facie* agency/instrumentality standard).

Federal Rule of Civil Procedure 69(a)(1) provides that Florida law governs the procedure on this post-judgment TRIA execution, except to the extent that TRIA applies to supplement or preempt Florida law. *Stansell II*, 771 F.3d at 730. In practice, this "means that Florida law provides the rules of procedure governing execution, and TRIA provides the substantive provisions that allow for executing on assets that OFAC has blocked." *Marrón*, 2023 WL 6356969, at *4.

Florida law, in relevant part, permits a judgment creditor to obtain a writ of execution against "each person who is liable on a judgment, an order, or a decree subject to execution under this chapter [56 of the Florida Statutes]." Fla. Stat. § 56.0101(4). Chapter 56, which governs execution in satisfaction of a judgment, establishes a three-step process where, as here, judgment creditors such as Plaintiffs seek to execute on goods and chattels, such as an aircraft. First, a writ of execution issues. *See, e.g.*, Fla. Stat. §§ 56.031, 56.061. Second, the sheriff or marshal levies on the property (Fla. Stat. § 56.061), effectively attaching the property so that the property owner cannot readily transfer or dispose of it during the ongoing post-judgment proceedings. Third, the sheriff or marshal advertises a notice of sale for four consecutive weeks before selling the property at a marshal's sale. Fla. Stat. § 56.21. In the time between the levy and the marshal's sale, an agency or instrumentality may appear and challenge their agency/instrumentality status.[57]

---

[57] A judgment debtor may obtain a stay by posting a "bond with surety payable to the judgment creditor in double the amount of the execution or the part of which [execution] a stay is sought." Fla. Stat. § 56.15; *see also* Fla. Stat. § 56.16 (also requiring the posting of a bond in "double the value of the" property claimed if someone "other than the judgment debtor claims any property levied on"); *Stansell v. Revolutionary Armed Forces of Colom.*, 2013 WL 12203820, at *5 (M.D. Fla. Apr. 19, 2013) (denying property owners' motion to dissolve or stay writs of execution where "no person or entity has delivered or filed an affidavit with bond and surety for double the property's value as specifically required by Florida's execution statutes").

In *Stansell II*, the Eleventh Circuit approved an *ex parte*, pre-hearing issuance of a writ of execution on the blocked property of a terrorist party's agency or instrumentality, recognizing that the terrorism victims' interest in "ensuring adequate satisfaction of judgments against terrorist parties" weighed strongly in favor of issuing an "immediate," pre-hearing writ. 771 F.3d at 729 (citing *Hausler v. JP Morgan Chase Bank, N.A.*, 740 F. Supp. 2d 525, 531 (S.D.N.Y. 2010) (recognizing that Congress's purpose in enacting TRIA § 201 was to "deal comprehensively with the problem of enforcement of judgments rendered on behalf of victims of terrorism")). The Eleventh Circuit recognized that "[d]uring the pendency of execution proceedings, a number of events may occur which make satisfaction using a particular asset impossible," such as the property owner's "mov[ing] the asset (or proceeds from its sale) outside the reach of the United States." *Id.* Issuing a pre-hearing writ of execution to attach the blocked property provides a "minimally intrusive manner of reducing these risks," and as a result, an owner of blocked property is "not constitutionally entitled to a hearing before the writ issue[s]." *Id.*

PDVSA's status as a sanctioned company and instrumentality of the Cartel makes an *ex parte* writ especially important here. To be sure, after the levy, Plaintiffs will provide PDVSA and its subsidiaries with notice of the writ. PDVSA may then elect to appear and attempt to contest their instrumentality status before the sale of the jet, but as the Eleventh Circuit has affirmed, they lack a right to a hearing before the issuance of the writ of execution. *See Stansell v. López Bello* (*Stansell III*), 802 F. App'x 445, 448 (11th Cir. 2020) (holding that claimants "had no entitlement to a hearing prior to attachment or before a writ of execution is issued" and citing *Stansell II*). This Court consequently may enter an *ex parte*, pre-hearing writ of execution for the PDVSA Learjet at Fort Lauderdale airport.

## II.   PLAINTIFFS ARE ENTITLED TO A WRIT OF EXECUTION UNDER TRIA.

Section 201(a) of TRIA permits victims of international terrorism (such as Plaintiffs) to

execute on "the blocked property not only of the defendant terrorist/judgment debtor, but also the defendant's agency or instrumentality" (*Marrón*, 2023 WL 6356969, at *8):

> Notwithstanding any other provision of law . . . in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism . . . the blocked assets of that terrorist party (***including the blocked assets of any agency or instrumentality of that terrorist party***) shall be subject to execution or attachment in aid of execution.

28 U.S.C. § 1610 Note (emphasis added); *Stansell v. Revolutionary Armed Forces of Colom.* (*Stansell V*), 45 F.4th 1340, 1346 (11th Cir. 2022) (quoting § 1610).

Thus, to satisfy TRIA § 201, Plaintiffs must establish that (1) they have obtained a judgment against a terrorist based on an act of terrorism, (2) the unsatisfied amount of Plaintiffs' judgment does not exceed the value of the blocked assets, (3) that assets they seeks are blocked, and (4) that the assets are owned by an agency or instrumentality of the judgment debtor. *Id.* Here, Plaintiffs easily satisfy all elements.

### A. Plaintiffs' Judgment Is Against A Terrorist Organization For An Act Of Terrorism.

TRIA § 201 defines a terrorist organization by reference to 8 U.S.C. § 1182(a)(3)(B)(vi) ("terrorist organization defined"), which defines a terrorist organization as "a group of two or more individuals, whether organized or not, which engages in," *inter alia*, committing "terrorist activity" under circumstances indicating an intent to "cause death or serious bodily injury." *Id.* § 1182(a)(3)(B)(iv)(I). "Terrorist activity," in turn, includes activity that is unlawful where it occurs, or that would be unlawful if occurring in the United States, and that includes certain enumerated wrongdoing, including "assassination," as well as "the use of any explosive, firearm, or other weapon or dangerous device (other than for mere personal monetary gain), with intent to endanger, directly or indirectly, the safety of one or more individuals." *Id.* § 1182(a)(3)(B)(iii).

Here, the Cartel is a group of two or more persons. ECF No. 56 (R&R) at 3 (the Cartel is "an elaborate criminal syndicate"). Further, the Cartel is responsible for the assassination of Mr.

Albán. *Id.* at 19 ("[B]ased on the well-pleaded factual allegations in the complaint, the deliberate torture and execution of Mr. Albán by members of the Cartel of the Suns, violated Florida's Wrongful Death Act."). The Cartel is also responsible for using weapons or dangerous devices in the torture of Mr. Albán. *Id.* at 4 (describing torture by electric shock). Thus, the Cartel is a terrorist organization, and its torture and execution of Mr. Albán were acts of terrorism.

### B. The Asset At Issue Is Blocked.

Blocking "can be definitively established by the fact that OFAC has taken action against the alleged agency or instrumentality under TWEA or IEEPA."[58] *Stansell II*, 771 F.3d at 726. In other words, OFAC's sanctioning of a person under the IEEPA (or other provisions not at issue in this motion) automatically renders that person's property blocked as a matter of law. *Id.* An agency or instrumentality need not hold the property exclusively in their name or in any particular form. On the contrary, OFAC's designation of a person or entity as an SDN blocks not only property in their name but also any property belonging to entities that the SDN owns (meaning an interest of at least 50 percent).[59] Here, PDVSA is subject to OFAC blocking, and therefore the Learjet, which is owned by PDVSA, is also blocked.[60]

---

[58] Though *Stansell II* mentioned only TWEA and the IEEPA, Congress amended TRIA in 2018 to also apply to assets blocked pursuant to the Kingpin Act. *See Stansell V*, 45 F.4th at 1347 n.2 ("[B]locked assets under § 201 of the TRIA include the assets of a terrorist party (and the assets of any agency or instrumentality of that terrorist party) seized or frozen by the United States pursuant to the Kingpin Act.").

[59] *See* Exhibit 53 at 2 ("OFAC is amending the definition of specially designated narcotics trafficker in § 536.312 of the NTSR and § 598.314 of the FNKSR to clarify that these terms include entities directly or indirectly owned 50 percent or more by one or more specially designated narcotics traffickers, whether individually or in the aggregate[.]"), available at https://www.govinfo.gov/content/pkg/FR-2021-05-17/pdf/2021-10314.pdf.

[60] Here, PDVSA is blocked. Ex. 40, *supra* n.41. Further, the Learjet at issue is property of PDVSA. *See* Exhibit 54 at 2 (True and correct copies of documents produced by Learjet, Inc., confirming that PDVSA owns the jet. Information regarding additional blocked assets owned by Learjet, Inc. and the personal information of Learjet Inc.'s counsel are redacted.).

**C.  PDVSA Is An Instrumentality Of The Cartel And Maduro.**

Although TRIA does not define "instrumentality," the Eleventh Circuit has endorsed a broad definition: An "instrumentality" includes any party that provided material support to a terrorist party at any point in time, whether financial, technological, or the provision of goods or services. *See Stansell V*, 45 F.4th at 1350 (quoting *Stansell II*, 771 F.3d at 724 n.6); *Marrón*, 2023 WL 6356969, at *13 ("A third party who provides material support to a terrorist at any point in time constitutes an agency or instrumentality, even if they purportedly stopped aiding the terrorist."). In *Stansell II*, where the plaintiffs sued the narco-terrorist organization FARC under the federal ATA, 18 U.S.C. § 2333, the Eleventh Circuit approved the district court's defining an "agency or instrumentality" as any party that:

> "is or was ever involved" in any aspect of the [the defendant's] trafficking operations or that assisted with the [the defendant's] "financial or money laundering network" because it "was either (1) materially assisting in, or providing financial or technological support for or to, or providing goods or services in support" of, the [defendant's] international narcotics trafficking activities; and/or (2) "owned, controlled, or directed by, or acting for or on behalf of" the [the defendant]; and/or (3) "playing a significant role in" the [the defendant's] narcotics trafficking.

771 F.3d at 724 n.6.

As made clear by the language "or was ever involved," a third party who provides material support to a terrorist at any point in time constitutes an agency or instrumentality, even if they purportedly stopped aiding the terrorist. *Id.*; *accord Stansell V*, 45 F.4th at 1350 ("[T]he formulation we expressly approved in *Stansell II* encompassed past involvement or association with a terrorist party."). And even if a person works through an intermediary or third party to provide material support to a terrorist party, they still constitute an instrumentality. *Stansell V*, 45 F.4th at 1351 ("[N]othing in § 201(a) of the TRIA suggests that an instrumentality relationship with a terrorist party needs to be direct.").

24

The Eleventh Circuit has described knowledge as the key differentiator between an "agency" and an "instrumentality." Unlike an agency, an "instrumentality" need not know that they have provided material support to a terrorist party (whether directly or indirectly). As the Eleventh Circuit held in *Stansell V*, an instrumentality "refer[s] to unwitting cogs in a criminal scheme." *Id.* at 1354 (citing *United States v. Bachynsky*, 949 F.2d 722, 735 (5th Cir. 1991) ("For each false diagnosis submitted, an unwitting patient was made an instrumentality of the fraud."); Michael N. Giuliano, 22 C.J.S. Criminal Law: Substantive Principles § 170 (May 2022 update) ("Ordinarily, a person who causes a crime to be committed through the instrumentality of an innocent or unwitting agent is punishable as a principal.")).

### i. OFAC's Determinations About PDVSA's Role as an Instrumentality of The Cartel's Leaders Are Entitled To Extraordinary Deference.

Because OFAC's determinations involve "the intersection of national security, foreign policy, and administrative law," the judiciary affords extraordinary deference to OFAC's determinations. *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 734 (D.C. Cir. 2007). As the Eleventh Circuit explained in rejecting a party's challenge to an OFAC designation, the "decision of the OFAC is entitled to great deference, and should be reversed only if arbitrary and capricious." *De Cuellar v. Brady*, 881 F.2d 1561, 1565 (11th Cir. 1989). The Fifth Circuit used even stronger terms: An OFAC designation "receives an even greater degree of deference than the *Chevron* standard, and must prevail unless plainly inconsistent with the regulation." *Paradissiotis v. Rubin*, 171 F.3d 983, 987 (5th Cir. 1999).

Consistent with these decisions, this Court—when presiding over terrorism victims' efforts to satisfy their judgments from the blocked property of instrumentalities of terrorists—agreed that it should afford OFAC's designations "great deference." *Stansell v. Revolutionary Armed Forces of Colom.*, 2019 WL 5291044, at *7 (S.D. Fla. Aug. 21, 2019) (Torres, J.), *R&R adopted*, 2019 WL 5290922 (S.D. Fla. Sept. 26, 2019) (Scola, J.).

Similarly, the Middle District of Florida, also adjudicating claims of the ATA judgment creditors in *Stansell*, denied a motion to dissolve a TRIA writ of garnishment in large part because OFAC's designation of two entities as subject to U.S. sanctions deserved "great deference." *See Stansell v. Revolutionary Armed Forces of Colom.*, 2013 WL 12203820, at *4 (M.D. Fla. Apr. 19, 2013); *see also Stansell v. Revolutionary Armed Forces of Colom.*, 2015 WL 13325432, at *5 (M.D. Fla. Feb. 17, 2015) (applying *De Cuellar*, 881 F.2d at 1565; *Paradissiotis*, 171 F.3d at 987).

And in *Marrón*, Judge Moreno recently explained that even if the Supreme Court were to cabin the deference afforded by the courts to executive agencies' interpretations of the statutes they administer under *Chevron, U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 842 (1984) (as some Supreme Court watchers have predicted), OFAC's factual findings would still deserve deference because *Chevron* "applies to an agency's construction of a statute it administers, and not the agency's factual findings." *Marrón,* 2023 WL 6356969, at *14 (holding that the Court "will give deference to OFAC's agency or instrumentality determination … and allow [the alleged agency/instrumentality] to contest the agency or instrumentality designation before the sale of the property").

### ii. OFAC Already Determined That PDVSA Is An Instrumentality Of Maduro (And Hence Of The Cartel As Well).

As set forth above, in 2019, OFAC designated PDVSA pursuant to Executive Orders 13850 and 13884. *See* Ex. 40; Ex. 51; Ex. 52. OFAC did so based on its determination that PDVSA supported defendant Maduro, who leads the Cartel of the Suns. As OFAC recognized:

- OFAC's designation of "PDVSA will help prevent further diverting of Venezuela's assets by Maduro." Ex. 40 at 1.

- "PDVSA has long been a vehicle for corruption [by the Maduro regime]." *Id.*

- OFAC sanctioned PDVSA to "hold[] accountable those responsible for Venezuela's tragic decline," including "a 2014 currency exchange scheme was designed to embezzle and launder around $600 million from PdVSA, money obtained through bribery and fraud. By May 2015, the conspiracy had allegedly doubled in amount, to

$1.2 billion embezzled from PdVSA." *Id.*

- The Maduro Regime is responsible for "human rights abuses, including arbitrary or unlawful arrest and detention[s]," such as that of Mr. Albán. Ex. 51 at 1.

PDVSA remains designated and blocked by OFAC. *See* Ex. 40.

Subsequently, in designating certain Venezuelan officials affiliated with PDVSA, OFAC announced additional findings, making it even more clear that PDVSA provided material support to defendant Maduro (who leads the Cartel of the Suns), including:

- PDVSA is the "primary conduit for corruption" by Maduro. Ex. 45 at 1.

- "Maduro's oil minister and U.S.-designated Kingpin Tareck El Aissami Maddah (El Aissami) has enlisted a network of facilitators, some of whom are designated today, to orchestrate opaque schemes to broker the re-sale of over 30 million barrels of Venezuelan-origin crude oil in order to benefit from the proceeds." *Id.*

- "The illegitimate Maduro regime created a secret network to evade sanctions" and to "plunder Venezuela's resources for personal gain." *Id.*

- "The exploitation of Venezuela's natural resources, including oil, for the benefit of the illegitimate regime of President Maduro and his cronies is unacceptable." *Id.* at 2.

These OFAC factual findings satisfy the instrumentality test endorsed by *Stansell V*. Based on OFAC's determinations, PDVSA was and is: (1) "materially assisting in" the unlawful conduct of Maduro and Maduro's fellow Cartel leader El Aissami, including by facilitating currency-conversion scams, sanctions evasion, plundering Venezuelan oil for the personal gain of Maduro and his cronies, and laundering the proceeds through the United States; (2) "owned, controlled, or directed by, or acting for or on behalf of" Maduro and fellow Cartel of the Suns leader El Aissami; and (3) playing a significant role in Maduro and the Cartel's myriad crimes. Separately or together, each of these three PDVSA roles propped up the Maduro Regime by supporting its drug trafficking, laundering its drug money, and providing it with the hard currency that allows Maduro to maintain an iron grip on Venezuela and consequently silence political opponents such as Mr. Albán. Because any of this conduct by itself (and certainly all of PDVSA's

conduct taken together) amply satisfies the instrumentality standard, this Court need look no further than the factual basis for OFAC's sanctions to hold that PDVSA is the instrumentality of at least Defendants Maduro and the Cartel of the Suns.

### iii. Additional Evidence Confirms OFAC's Conclusion that PDVSA Is An Instrumentality Of Maduro And The Cartel.

OFAC's factual findings alone show that PDVSA provided material support to Maduro, making it an instrumentality. In addition, the Farah Declaration attached as Exhibit 5 provides additional evidence that PDVSA provided material support to Maduro and the Cartel. First, PDVSA launders the proceeds of narcotics trafficking through the United States on behalf of Maduro and the Cartel. Ex. 5 at ¶¶ 23-38. Second, PDVSA routinely provides Maduro and the Cartel with its aircraft—including the Learjet at issue here—for bulk cash smuggling on behalf of Maduro and the Cartel. *Id.* ¶¶ 39-44.  Third, PDVSA assists with manufacturing narcotics for shipment to the United States on behalf of Maduro and the Cartel, using its status as a petrochemical manufacturer to acquire the otherwise hard-to-obtain chemical precursors needed to make cocaine and to provide cover for the narcotic manufacturing labs that surround certain of PDVSA's facilities. *Id.* ¶¶ 45-49. Any one of these activities, standing alone, makes PDVSA at least an instrumentality (and, for that matter, an agency) of Maduro and the Cartel.

## III.   PDVSA CANNOT INVOKE THE FOREIGN SOVEREIGN IMMUNITIES ACT TO AVOID EXECUTION.

Section II of this motion explains how Plaintiffs made a *prima facie* showing that they hold an unsatisfied judgment against a terrorist organization based on acts of terrorism and that PDVSA is an instrumentality of Maduro and the Cartel. Plaintiffs' *prima facie* showing ends the analysis at this phase of the litigation and warrants issuing a writ of execution now. *See Stansell II*, 771 F.3d at 728-30.

Plaintiffs anticipate that PDVSA might appear and object based upon the Foreign

Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq*. Plaintiffs will respond if PDVSA appears and raises an FSIA argument.  For now, Plaintiffs explain briefly below why PDVSA cannot successfully invoke the FSIA to thwart Plaintiffs' rights under TRIA. In certain circumstances, the FSIA provides foreign nations, and their agencies and instrumentalities, with immunity from (1) the jurisdiction of U.S. courts and (2) execution upon their assets. But here, PDVSA cannot claim sovereign immunity, and even if it could make a legitimate claim to sovereign immunity (it cannot), this TRIA execution proceeding is subject to FSIA exceptions that foreclose any prospective sovereign-immunity claim by PDVSA.

### A.  PDVSA Cannot Invoke The FSIA's Grant Of Jurisdictional Immunity Here.

#### i.  PDVSA Is Subject To The Commercial-Activity Exception To The FSIA.

The FSIA provides in its declaration of purpose: "Under international law, states are not immune from the jurisdiction of foreign courts insofar as their commercial activities are concerned, and their commercial property may be levied upon for the satisfaction of judgments rendered against them in connection with their commercial activities." 28 U.S.C. § 1602. Here, PDVSA not only engaged in commercial activity in the United States, but its commercial activities lie at the heart of Plaintiffs' claims. As a result, PDVSA cannot invoke the FSIA to thwart Plaintiffs' collection efforts under TRIA.

Consistent with the FSIA's purpose codified at 28 U.S.C. § 1602, the FSIA's immunity from the jurisdiction of the U.S courts, set forth in 28 U.S.C. § 1604, is subject to the commercial-activity exception. Under the commercial-activity exception, "[a] foreign state [including its instrumentalities][61] shall not be immune from the jurisdiction of courts of the United States or of the States in any case":

---

[61] The FSIA defines "foreign state" as including "a political subdivision of a foreign state or an agency or instrumentality of a foreign state."  28 U.S.C. § 1603(a).

in which the action is based [1] upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2). Under the commercial-activity exception, a foreign government's agency or instrumentality is not immune from jurisdiction if any of these three clauses quoted above is satisfied. Here, at least the first clause ("a commercial activity carried on in the United States by the foreign state") and the third clause ("an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that caused a direct effect in the United States") each strips PDVSA of jurisdictional immunity.

### 1.  Action Based **Upon** Commercial Activity In the United States

Both elements of the first clause of the commercial-activity exception are satisfied here.

*First,* PDVSA engaged in commercial activity in the United States. The FSIA defines "commercial activity" as

either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.

28 U.S.C. § 1603(d). In assessing the applicability of the exception, the question is "whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in 'trade and traffic or commerce.'" *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992); *Devengoechea v. Bolivarian Republic of Venezuela*, 889 F.3d 1213, 1222 (11th Cir. 2018). Here, PDVSA's U.S. conduct was not that of a sovereign; rather, it did what private (albeit criminal) actors routinely do: participated in narco-terrorist sales of cocaine, evaded sanctions on oil sales, laundered ill-gotten proceeds of unlawful activity

including drug trafficking and currency control scams, and utilized the money to provide support to terrorists.

Courts routinely recognize that the conduct PDVSA engaged in here—dealing drugs, evading sanctions, laundering money, funding terrorists, and committing other crimes—is "commercial activity." *See, e.g.*, *United States v. Turkiye Halk Bankasi A.S.*, 16 F.4th 336, 350 (2d Cir. 2021) (holding that "participation in money laundering and other fraudulent schemes designed to evade U.S. sanctions" was commercial activity for purposes of the FSIA because "those core acts constitute 'an activity that could be, and in fact regularly is, performed by private-sector businesses'"), *aff'd in part, vacated in part on other grounds, and remanded*, 143 S. Ct. 940 (2023) (holding that Second Circuit did not need to reach commercial-activity exception to FSIA because FSIA was inapplicable for other reasons); *Bilalov v. Sberbank*, 2022 WL 4225968, at *7 (S.D.N.Y. Sept. 13, 2022) (acts of bribery were commercial activities under the FSIA because they were "actions . . . in which private parties could engage" and were "committed in the course of business or trade"); *Schansman v. Sberbank of Russia PJSC*, 2022 WL 17540666, at *5 (S.D.N.Y. Dec. 6, 2022) (bank's provision of material support and financing to the Donetsk People's Republic, a terrorist group accused of downing a Malaysia Airlines flight over Eastern Ukraine in 2014, was commercial activity under the FSIA; such "classic commercial behavior . . . does not qualify as sovereign conduct"); *Southway v. Cent. Bank of Nigeria*, 198 F.3d 1210, 1213 (10th Cir. 1999) (holding that commercial exception to FSIA could apply to permit civil RICO claims and rejecting Defendants' argument "that the FSIA's commercial activity exception did not apply to their conduct because … the alleged scheme involved criminal activity in which commercial actors do not typically engage").

*Second*, Plaintiffs' action is "based upon" PDVSA's commercial activity in the United States, through which PDVSA provided material support—in violation of the Anti-Terrorism

Act—to the terrorists that harmed Plaintiffs. To identify the conduct that the Plaintiffs' action is based upon, the court looks at "the particular conduct that constitutes the gravamen of the suit." *Devengoechea*, 889 F.3d at 1222. In other words, the court focuses on the "the core of the suit—the foreign state's acts that actually injured the Plaintiffs." *Id.*

Here, Plaintiffs' suit is for primary violations of the Florida Anti-Terrorism Act. Those violations center on narco-terrorism conspiracy designed to flood the United States with weaponized cocaine, to launder the proceeds through Florida, and to provide the Maduro Criminal Enterprise with the hard currency that it needs to maintain its authoritarian grip over Venezuela. *See* Compl. ¶ 205(b) ("The kidnapping of Mr. Albán from Simón Bolivar International Airport in Caracas was in violation of Florida law because it occurred pursuant to, and in furtherance of, *a narco-terrorism conspiracy designed to flood Florida with cocaine and to launder the proceeds through the Florida*, and acts in furtherance of the conspiracy occurred in Florida."), ¶ 206(c) ("The torture of Mr. Albán at SEBIN headquarters in Caracas was in violation of Florida law because it occurred pursuant to, and in furtherance of, a narco-terrorism conspiracy *designed to flood Florida with cocaine and to launder the proceeds through the Florida*, and acts in furtherance of the conspiracy, including trafficking and sales of cocaine and transfers of ill-gotten gains occurred in Florida.").

The Complaint further explains how acts of narco-terrorism and money laundering in Florida are essential to Maduro's ability commit acts of terrorism in Venezuela: "[T]he Maduro Criminal Enterprise, through its earnings from profitable crimes such as narcotics trafficking and public corruption, obtains wealth through which Maduro purchases the loyalty of Maduro Criminal Enterprise's leaders and loyalists, thereby cementing Maduro's authoritarian control over Venezuela." *Id.* ¶ 61(b). "In other words, dirty money is the lifeblood of the Maduro Criminal Enterprise and the Maduro Criminal Conspiracy." *Id.* The Complaint explains how billions of

dollars in dirty PDVSA money flow through Florida and ultimately help the Maduro Criminal Enterprise silence dissidents, such as Mr. Albán, in Venezuela. Compl. ¶ 107 ("the Maduro Criminal Enterprise choreographed a billion-dollar scheme to launder funds embezzled from Venezuelan state-owned oil company PDVSA using Miami, Florida real estate and sophisticated false investment schemes"); *accord* Compl. ¶¶ 101-02. In fact, the United States indicted several PDVSA executives in this District for a money-laundering scheme involving the investment in Florida real-estate. *See* Ex. 26.

Based on these and other allegations, this Court's order granting a default judgment for Plaintiffs and against Defendants recognized that: "Plaintiffs have plausibly alleged that the Cartel engaged in two types of terrorism that injured Plaintiffs: (1) narco-terrorism and related terror financing; and (2) conspiracy to kidnap, torture, and murder Mr. Albán. Either, standing alone, is sufficient to give rise to liability under the Florida ATA. . . . [T]he kidnapping, torture, and murder of Mr. Albán violated the Florida ATA because they occurred pursuant to a narco-terrorism conspiracy designed to flood Florida with cocaine and to launder the illegal drug money through Florida, and acts in furtherance of the conspiracy occurred in Florida (such as the possession and sale in Florida of cocaine and the laundering of ill-gotten bank accounts in Florida)." R&R, ECF No. 56 at 17-18, *adopted* ECF No. 58.[62]

Accordingly, the first clause of the commercial-activities exception is satisfied, and PDVSA cannot invoke sovereign immunity to avoid suit.

### 2. Action Based Upon An Act Outside The Territory of the United States In Connection With Commercial Activity Elsewhere And That Causes A Direct Effect In the U.S.

---

[62] In addition, PDVSA's commercial activity also constitutes the gravamen of its conduct as an agency/instrumentality of the judgment debtors. Indeed, it is only through its unlawful, commercial activity that PDVSA acts as an agency/instrumentality of the Cartel.

In addition to the first clause of the commercial-activities exception, the third clause is also satisfied. Unlike the first clause, which asks whether the action is based on "commercial activity" carried on in the United States, the third clause asks more broadly whether the action is based upon an "act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere" and that causes a "direct effect in the United States." 28 U.S.C. § 1605(a)(2); *accord, e.g.*, *Adler v. Nigeria*, 107 F.3d 720, 726 (9th Cir. 1997) ("[Plaintiffs'] claims need not be 'based upon' commercial activity; they must merely be based upon acts made 'in connection with' such activity."). Here, the kidnapping and murder of Mr. Albán in Venezuela are "in connection with commercial activity" elsewhere (i.e., PDVSA's trafficking of narcotics into the United States and laundering the proceeds of drug trafficking into the United States), and the kidnapping and murder of Mr. Albán caused "direct effects" in the U.S. (for example, severe emotional harm to Mr. Albán's surviving family that resided in the U.S. at the time of the kidnapping and murder).

A "direct effect" is "one that follows 'as an immediate consequence of the defendant's…activity.'" *Devengoechea*, 889 F.3d at 1224 (quoting *Weltover*, 504 U.S. at 618) (alteration in original). In other words, the court assesses whether the effect is sufficiently direct in that "Congress would have wanted an American court to hear the case[.]" *Id.* (quoting *Guevara v. Republic of Peru*, 608 F.3d 1297, 1309 (11th Cir. 2010)). The direct-effect requirement is satisfied where, for example, commercial activities involve payments to or from the United States. *See, e.g.*, *Turkiye Halk Bankasi A.S.*, 16 F.4th at 349 (direct-effect requirement satisfied where Turkish bank laundered illicit Iranian oil proceeds through the United States financial system); *Exxon Mobil Corp. v. Corporacion CIMEX S.A.*, 534 F. Supp. 3d 1, 18 (D.D.C. 2021) (direct-effect requirement satisfied where state-owned Cuban corporation processed remittances sent from locations in the United States to Cuba). Likewise, the direct-effect requirement is satisfied where

a person suffers injury in the United States in connection with commercial activity abroad. *Aldy v. Valmet Paper Machinery*, 74 F.3d 72, 74-76 (5th Cir. 1996) (direct-effect requirement satisfied where injuries were suffered in United States in connection with Finnish state-owned company's design and manufacture of defective product in Finland).

As this Court recognized, Defendants "traffic[] somewhere between 200 and 250 metric tons of cocaine from Venezuela into the United States each year" (R&R at 2-3, *adopted* ECF No. 58), and that includes trafficking achieved through PDVSA airplanes. Defendants also use PDVSA to launder their narcotrafficking proceeds from abroad into the United States. R&R at 18 (The "acts in furtherance of the conspiracy occurred in Florida (such as the possession and sale in Florida of cocaine and the laundering of ill-gotten bank accounts in Florida)."); *see* Ex. 25 at 21. Additionally, the Maduro Criminal Enterprise's laundering of petrodollars necessarily requires their ill-gotten funds to travel from abroad into the U.S.'s financial system. Ex. 5 (Farah Dec.) ¶ 23; *see also* Ex. 5 ¶¶ 33, 37-38 (explaining that PDVSA laundered money by loaning money to or paying shell companies, which in turn invested in U.S. companies and U.S. real estate). Defendants' use of PDVSA aircraft to evade United States sanctions provides yet another example of the "direct effect" PDVSA's unlawful commercial conduct has on the United States.[63]

What's more, PDVSA's wrongdoing extends beyond Venezuela (where the "act" of the defendants' kidnapping and murder of Mr. Albán took place): PDVSA also works "elsewhere"— including Nicaragua (Farah Decl. ¶ 34), El Salvador, and Panama (Farah Decl. ¶ 35) to help launder money.

In addition, the direct-effect requirement is satisfied because Mr. Albán's surviving family (his wife María and their children María Fernanda and Fernando Albán) all resided in the United States at the time the Maduro Criminal Enterprise tortured and murdered Mr. Albán. Compl.

---

[63] *See U.S. v. Orsini*, *supra* n.11.

¶¶ 16-18. Mr. Albán's surviving family suffered severe emotional harm in the United States. Compl. ¶ 284. Under the plain text of the third clause in Section 1605(a)(2), these emotional harms suffered in the United States qualify as "direct effect[s]" even though not "commercial" or financial injuries; indeed, Congress chose to require only a "direct effect in the United States," not a direct commercial effect or direct financial effect in the United States. *See* 28 U.S.C. § 1605(a)(2).

In sum, Mr. Albán's kidnapping and murder in Venezuela is "in connection with" PDVSA's commercial conduct elsewhere (i.e., supporting narco-trafficking of cocaine into the United States through the use of PDVSA aircraft and laundering the proceeds of those sales through the United States and other Latin American nations (among other crimes for which PDVSA provides the Maduro Criminal Enterprise with material support), and the defendants' kidnapping and murder of Mr. Albán caused "direct effects" in the United States, including the severe emotional harms that Mr. Albán's surviving family suffered in the United States, where they resided at the time of Mr. Albán's kidnapping and murder.

### ii.   TRIA Affords This Court Jurisdiction.

Even if the commercial-activities exception were inapplicable, it would not matter because this Court could properly exercise jurisdiction over PDVSA under TRIA.  In *Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 48-49 (2d Cir. 2010), plaintiffs sought to utilize TRIA to attach the assets of Bank Melli, an agency or instrumentality of Iran that had not been a party to the underlying lawsuit and was not a judgment debtor. Bank Melli argued that the Court needed an independent basis for subject-matter jurisdiction over Bank Melli, separate and apart from TRIA. The Second Circuit rejected Bank Melli's argument. *Id.* (rejecting Bank Melli's argument that "TRIA does not provide an independent basis for jurisdiction over an instrumentality of a

sovereign state when the instrumentality was not itself a party to the underlying tort action that gave rise to judgment on which plaintiff now seeks to recover").

Explaining that TRIA is not merely "an additional ground for abrogating immunity from attachment," but also an independent grant of jurisdiction, the Second Circuit explained:

> Bank Melli's argument is belied by the plain language of Section 201(a), as well as by its history and purpose. Section 201(a) clearly states that "in *every* case in which a person has obtained a judgment against *a terrorist party* ..., the blocked assets of that terrorist party (*including* the blocked assets of *any agency or instrumentality of that terrorist party*) shall be subject to execution or attachment...." Under Bank Melli's interpretation, the parenthetical language in Section 201(a) of the TRIA that permits attachment of funds from agencies and instrumentalities would be rendered superfluous, since the agency or instrumentality would itself have been a "terrorist party" against which the underlying judgment had been obtained. . . . Instead, however, the statute clearly differentiates between the party that is the subject of the underlying judgment itself, which can be any terrorist party (here, Iran), and parties whose blocked assets are subject to execution or attachment, which can include not only the terrorist party but also "any agency or instrumentality of that terrorist party." If this did not constitute an independent grant of jurisdiction over the agencies and instrumentalities, the parenthetical would be a nullity.

*Id.* (quoting TRIA § 201(a))*; see also FG Hemisphere Assocs., LLC v. Republique du Congo*, 455 F.3d 575, 595 (5th Cir. 2006) ("A finding that an exception to executional immunity applies is a finding that the court has jurisdiction over the garnishment action."); *Weininger v. Castro*, 462 F. Supp. 2d 457, 477 (S.D.N.Y. 2006) (holding that "this Court has subject matter jurisdiction over the enforcement action before it pursuant to TRIA § 201(a)"); *Caballero v. FARC,* 562 F. Supp. 3d 867, 883-84 (C.D. Cal. 2021) ("In effect, TRIA § 201(a) constitutes an independent grant of jurisdiction over the blocked assets of 'any agency or instrumentality' of the terrorist party for the purpose of execution and attachment of a valid ATA judgment.").

### B. The FSIA's Grant Of Immunity From Execution Does Not Preclude Execution On PDVSA's Assets.

The FSIA provides that the "the property in the United States of a foreign state shall be immune from attachment, arrest  and execution except as provided in sections 1610 and 1611" of

the FSIA. 28 U.S.C. § 1609. This provision providing for execution immunity "operate[s] independently" of the "the FSIA's provisions governing jurisdictional immunity." *Walters v. Indus. & Commercial Bank of China, Ltd.,* 651 F.3d 280, 288 (2d Cir. 2011). Consequently, "property owned by a foreign state's instrumentalities is generally more amenable to attachment than property owned by the foreign state itself." *Id.*

Section 1610 of the FSIA contains two exceptions that allow attachment, arrest, and execution of PDVSA's assets in this case: the first is TRIA and the second is a commercial-activities exception for execution (that similar to, but distinct from, the commercial-activities exception for jurisdiction in 28 U.S.C. § 1605, discussed above).

### i.   TRIA Permits Execution Against PDVSA's Assets.

Section 1610 of the FSIA enumerates exceptions to the FSIA's grant of execution immunity, *see* 28 U.S.C. § 1610. Section 201 of TRIA was enacted as a Note to Section 1610 of the FSIA, and now appears at 28 U.S.C. § 1610(f), creating a broad exception to FSIA execution immunity. Section 201 of TRIA provides in relevant part:

> Notwithstanding any other provision of law,. . . in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605(a)(7) of title 28, United States Code, the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

28 U.S.C. § 1610(f).

Here, as set forth above, each of the elements of Section 201 of TRIA is satisfied. Accordingly, plaintiffs may utilize TRIA to execute against the assets of agencies and instrumentalities of terrorist judgment debtors, notwithstanding that those agencies or instrumentalities might otherwise enjoy FSIA execution immunity. *See Weininger*, 462 F. Supp. at 488 ("This Court concludes that the 'notwithstanding any other provision of law' language in

TRIA operates as an exception to immunity from both jurisdiction *and execution*.") (emphasis added); *Hill v. Republic of Iraq*, 2003 WL 21057173, at *2 (D.D.C. Mar. 11, 2003) ("[B]y its plain terms, the TRIA overrides any immunity from execution that blocked Iraqi property might otherwise enjoy under the Vienna Convention or the FSIA. Indeed, any contrary construction of the TRIA would frustrate the statutory objective of ensuring that judgments rendered against terrorist states based upon terrorist acts 'are to be enforced.'").

Indeed, courts routinely authorize plaintiffs to execute against the blocked assets of agencies or instrumentalities of terrorists that ordinarily would enjoy immunity from execution under the FSIA. *See, e.g., Weinstein*, 609 F.3d at 48-49 (plaintiffs could utilize TRIA to execute against the assets of Bank Melli, an agency and instrumentality of Iran); *Est. of Heiser v. Bank of Tokyo Mitsubishi UFJ, New York Branch*, 919 F. Supp. 2d 411, 421 (S.D.N.Y. 2013) (compelling respondent bank to turn over funds belonging to agencies and instrumentalities of Iran and noting that "Section 201 of the TRIA also states that these assets may be subject to attachment in aid of execution of judgment"). Because Section 201 of TRIA overrides sovereign immunity for the purpose of enforcing judgments against terrorist parties, PDVSA cannot avoid enforcement under TRIA by invoking the FSIA.

### ii. The Commercial-Activities Exception To The FSIA Permits Execution Against PDVSA's Assets.

TRIA contains an exception to execution immunity for commercial activity that applies when "the judgment relates to a claim for which the agency or instrumentality is not immune by virtue of section 1605(a)(2)." 28 U.S.C. § 1610(b)(2). As set forth above, PDVSA is not immune from jurisdiction by virtue of Section 1605(a)(2). As such, its property in the United States is not

immune from execution.[64]

## IV.    A WRIT OF EXECUTION ON THE PDVSA AIRCRAFT SHOULD BE GRANTED IMMEDIATELY.

As noted above, TRIA allows terrorism victim judgment holders to execute on blocked assets of any designated party "that is *or was ever* involved" in any aspect of Maduro's narcotics trafficking (i.e., the same drug trafficking that allows the Maduro Criminal Enterprise to reap enormous profits that enable it to kidnap and torture people like Mr. Albán who speak out against the Maduro Criminal Enterprise's corruption), even if those agencies/instrumentalities are not named defendants. *See e.g.*, *Stansell II*, 771 F.3d at 725, n.6. Because the evidence discussed throughout this motion shows that PDVSA is an agency/instrumentality of Defendants Maduro and the Cartel, a writ of execution should issue now for the Learjet at Fort Lauderdale airport.

## CONCLUSION

For the foregoing reasons, a writ of execution should issue now for the Learjet at issue. A proposed writ is attached as Exhibit 2.

Respectfully submitted on January 5, 2024.

/s/ Jaime D. Guttman
Fla. Bar No. 44076
*jaime@scale.law*
Scale Law Partners, LLC
777 Brickell Avenue, Suite 500
Miami, FL 33131
(786) 273-9033 (Main)

*Counsel for Plaintiffs*

---

[64] In the event that PDVSA contests Plaintiffs' showing that it is not immune from jurisdiction or and that the Learjet is not immune from execution, Plaintiffs reserve the right to seek jurisdictional discovery. *See generally Licea v. Curacao Drydock Co.*, 870 F. Supp. 2d 1360, 1368 (S.D. Fla. 2012) (rejecting challenge of Netherlands to jurisdictional discovery concerning applicable exceptions to FSIA).

**CERTIFICATE OF SERVICE**

I certify that I filed the foregoing document on January 5, 2024, through CM/ECF, which automatically and electronically delivered notice of filing to counsel of record for all parties that have appeared.

*/s/ Jaime D. Guttman*