IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 1:21-cv-20706-DPG

MEUDY ALBÁN OSIO in her personal capacity
And in her capacity as the personal representative
of the Estate of FERNANDO ALBERTO ALBÁN,
FERNANDO ALBÁN OSIO, and MARIA
FERNANDA ALBÁN OSIO,

       Judgment Creditors,

v.

NICOLAS MADURO MOROS,
FUERZAS ARMADA REVOLUCIONARIAS
DE COLUMBIA ("FARC"); THE CARTEL OF
THE SUNS A.K.A. CARTEL DE LOS SOLES;
VLADIMIR PADRINO LOPEZ; MAIKEL
JOSE MORENO PEREZ; NESTOR LUIS
REVEROL TORRES; and TAREK WILLIAM
SAAB

       Defendants,

_____/

## PLAINTIFFS' MOTION FOR A WRIT OF GARNISHMENT

      Plaintiffs respectfully move for: (1) writ of garnishment for a bank account at Italbank (with a balance of approximately $7.6 million, account no. 100000194), blocked by the Office of Foreign Assets Control ("OFAC"), and frozen by Italbank in August 2019 in accordance with OFAC regulations, because the funds are owned by the Instituto Nacional de Aeronáutica Civil, ("INAC"), an instrumentality of Judgments Debtors the Cartel of the Suns (the "Cartel") and Nicolas Maduro Moros ("Maduro"); and (2) a CD at Italbank (with a balance of approximately $496,000 in the name of Instituto Aeropuerto Nacional de Maiquetía (Simon Bolívar International Airport), an airport under the supervision of INAC, from which Mr. Albán was kidnapped.

## **INTRODUCTION**

As this Court has recognized, the Cartel, Maduro and their co-conspirators kidnapped, tortured, and murdered Mr. Albán.  *See* ECF No. 56 (Report and Recommendation on Plaintiffs' Motion for Default Judgment Against Defendant Cartel of the Suns) (the "R&R") at 4, *adopted* ECF No. 58; *see also* ECF No. 89, 90, and 91.  Moreover, "the kidnapping, torture, and murder of Mr. Albán violated the Florida ATA because they occurred pursuant to a narco-terrorism conspiracy designed to flood Florida with cocaine and to launder the illegal drug money through Florida . . . ." ECF No. 56 at 17-1.

It is therefore especially fitting that Mr. Albán now seeks to enforce his judgment against INAC, a crucial weapon in Cartel's arsenal that is vital to its ability to flood the United States with drugs, reaping illicit gains that prop up the Maduro regime, and thereby enabling Maduro and his henchmen to terrorize dissidents like Mr. Albán.  As shown below, INAC supports the Cartel by facilitating and sheltering its aerial narcotics trafficking at every point in the supply chain, including outbound shipments of cocaine destined for U.S. shores, and has even procured planes for traffickers.  INAC is also central to the Maduro Criminal Enterprise's efforts to evade U.S. sanctions, obtain U.S. dollars, and use those dollars to enrich Maduro and his cronies through currency control scams.  Indeed, INAC's U.S. bank account at Italbank is vital to those illicit activities.  And last, but not least of all, INAC oversaw Simon Bolívar International Airport, from which Mr. Albán was kidnapped just before his murder by the judgment debtors.

When Congress enacted the Terrorism Risk Insurance Act ("TRIA"), Congress expressly sought to ensure that victims of terrorism, like Mr. Albán's estate and family, could enforce their judgments not only against the judgment debtors themselves (such as the Cartel and Maduro), but also any agency or instrumentality of the judgment debtors (such as INAC).  TRIA expressly authorizes victims of terrorism, such as Mr. Albán's estate and his family, to enforce their judgments against the assets of a terrorist's instrumentalities—here, the assets of INAC—that have been blocked pursuant to sanctions implemented by OFAC.

Nor can INAC avoid responsibility by invoking sovereign immunity.  Its misdeeds in supporting the U.S. narcotrafficking that provides crucial funding for the Cartel and Maduro's terrorism—which lie at the heart of the Albán claims—are strictly commercial.  As such, INAC is

amenable to suit under the commercial activities exception to Foreign Sovereign Immunities Act (FSIA).  And even if that exception were not applicable (and plainly, it is), INAC would be amenable to suit under TRIA, the plain terms of which allow actions such as this notwithstanding immunity claims.  Nor are the INAC assets immune from attachment, for the same reasons.  In short, having spent decades conspiring with and doing the bidding of criminals, INAC cannot pretend to the immunity that legitimate governments enjoy.

## RELEVANT PROCEDURAL BACKGROUND

On February 9, 2023, this Court awarded an amended final default judgment for Plaintiffs and against Defendant Cartel of the Suns in the amount of $217 million. *See* Amended Final Default Judgment, ECF No. 73.  On August 6, 2023, this Court awarded a final default judgment against Nicolas Maduro and other individual defendants, jointly and severally with the Cartel, in the same amount.  ECF No. 91.  As of today, the entire judgment remains unsatisfied.  Ex. 4.

## ARGUMENT

### I.   THE APPLICABLE LAW ENDORSES AN PRE-HEARING WRIT OF GARNISHMENT.

The governing law allows even an *ex parte,* pre-hearing writ of garnishment on the assets of agencies and instrumentalities of terrorist judgment debtors—and then affords the agencies and instrumentalities ample notice and a fulsome opportunity to be heard *subsequently*, when the agencies and instrumentalities can no longer abscond with, or dispose of, the assets at issue.

Federal Rule of Civil Procedure 69(a)(1) provides that Florida law governs the procedure on this post-judgment TRIA execution, except to the extent that TRIA applies to supplement or preempt Florida law. *Stansell v. Revolutionary Armed Forces of Colombia* ("*Stansell II*"), 771 F.3d 713, 730 (11th Cir. 2014). In practice, this means that Florida law largely supplies the rules of procedure governing execution, and TRIA largely provides the substantive provisions that allow for executing on assets that OFAC has blocked.

Florida law permits a judgment creditor to obtain a writ of garnishment for "any debt due to defendant by a third person . . . and any tangible or intangible personal property of defendant in the possession or control of a third person." Fla. Stat. § 77.01. Chapter 77, which governs garnishment in satisfaction of a judgment, establishes the process where, as here, judgment creditors such as Plaintiffs seek to garnish property.  First, the statute provides that a creditor begins

the garnishment by filing a motion for writ of garnishment. *See, e.g.*, Fla. Stat. §§ 77.03 & 77.041. Second, the clerk issues the writ. *Id*. Third, the creditor serves the writ upon the garnishee. *Id*. Lastly, Florida's garnishment statutes require that within 3 business days **after** the writ is served Plaintiffs must mail a copy of the motion and issued writ to the debtor's last known address. Fla. Stat. §77.041(2).[1] After the motion is served, the garnishees have twenty days to answer. Plaintiff must also, within 5 days of garnishee's answer, mail to the judgment debtors a copy of the answer and a notice of right to move to dissolve. Fla. Stat. §77.055. A judgment lien is created at the moment a writ of garnishment is served on the garnishee, before any service on the debtor is required. § 77.06(1), Fla. Stat. ("Service of the writ creates a lien in or upon any such debts or property at the time of service or at the time such debts or property come into the garnishee's possession or control.").

Plaintiffs have complied with the Florida garnishment statutes Fla. Stat. §77.03 by filing the instant motion under Fla. Stat. §77.03, and with Fla. Stat. §77.04, form of the writ, and will further comply with statutory notice requirements under Fla. Stat. §77.041(2) (requiring service of motion and writ) and §77.055 (requiring service of garnishee's answer).

In *Stansell II*, the Eleventh Circuit approved *ex parte*, pre-hearing issuance of a writ of execution on the blocked property of a terrorist party's agency or instrumentality, recognizing that terrorism victims' interest in "ensuring adequate satisfaction of judgments against terrorist parties" weighed strongly in favor of issuing an "immediate," pre-hearing writ. 771 F.3d at 729 (citing *Hausler v. JP Morgan Chase Bank, N.A.*, 740 F. Supp. 2d 525, 531 (S.D.N.Y. 2010) (recognizing that Congress's purpose in enacting TRIA § 201 was to "deal comprehensively with the problem of enforcement of judgments rendered on behalf of victims of terrorism")). The Eleventh Circuit recognized that "[d]uring the pendency of execution proceedings, a number of events may occur which make satisfaction using a particular asset impossible," such as the property owner's "mov[ing] the asset (or proceeds from its sale) outside the reach of the United States." *Id.* Issuing a pre-hearing writ of execution to attach the blocked property provides a "minimally intrusive

---

[1] In this case, because the debtor is a Venezuelan government-related entity and in an abundance of caution, Plaintiffs also propose to complete service in accordance with the Foreign Sovereign Immunities Act ("FSIA").

manner of reducing these risks," and as a result, an owner of blocked property is "not constitutionally entitled to a hearing before the writ issue[s]." *Id.*

Here, those same considerations militate in favor of granting an immediate writ of garnishment.  To be sure, after the levy, Plaintiffs will provide INAC with notice of the garnishment.  INAC may then elect to appear and attempt to contest its instrumentality status before garnishment is executed, but as the Eleventh Circuit has held, INAC lacks a right to a hearing before the issuance of the writ. *See Stansell v. López Bello* ("*Stansell III*"), 802 F. App'x 445, 448 (11th Cir. 2020) (holding that Claimants "had no entitlement to a hearing prior to attachment or before a writ of execution is issued" and citing *Stansell II*).  This Court consequently may enter a pre-hearing writ of garnishment for the INAC accounts at Italbank.

## II.    PLAINTIFFS ARE ENTITLED TO A WRIT OF GARNISHMENT UNDER TRIA.

Section 201(a) of the Terrorism Risk Insurance Act of 2002 ("TRIA") provides the substantive law that governs terrorism victims' efforts to satisfy their judgments from the blocked assets of Defendants and their instrumentalities. TRIA permits attaching the blocked property not only of the defendant terrorist/judgment debtor, but also the defendant's instrumentality: "Notwithstanding any other provision of law . . . in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism . . . the blocked assets of that terrorist party (***including the blocked assets of any agency or instrumentality of that terrorist party***) shall be subject to execution or attachment in aid of execution." 28 U.S.C. § 1610 Note (bold added); *Stansell v. Revolutionary Armed Forces of Columbia* ("*Stansell V*"), 45 F.4th 1340, 1346 (11th Cir. 2022) (quoting § 1610).

Thus, to satisfy TRIA § 201, Plaintiffs must establish that (1) they have obtained a judgment against a terrorist based on an act of terrorism, (2) that assets they seeks are blocked, and (3) that the assets are owned by an agency or instrumentality or the judgment debtor.  *Id.*  Here, Plaintiffs easily satisfy all elements.

### A.    Plaintiffs' judgment is against individual terrorists and a terrorist organization, for acts of terrorism.

***First***, Plaintiffs' judgment is for acts of terrorism.  Under TRIA, the applicable definition of an "Act of Terrorism" is set forth in the Immigration and Nationality Act (the "INA"), 8 U.S.C.

§ 1182(a)(3)(B)(iii).  *See* TRIA § 201(d) (cross referencing the INA).  Plaintiffs satisfy the INA's definition in several ways, any one of which is sufficient to satisfy TRIA.

To begin with, the INA defines an "Act of Terrorism" to include "an assassination." 8 U.S.C. § 1182(a)(3)(B)(iii)(IV).  The INA does not define the term "assassination," which means that the courts "give it its ordinary meaning." *United States v. Santos*, 553 U.S. 507, 511 (2008). In plain English, an "assassination" is a "murder by sudden or secret attack often for political reasons."  MERRIAM-WEBSTER,   available   online   at   https://www.merriam-webster.com/dictionary/assassination.  As this Court has recognized, Mr. Albán was murdered by Venezuelan secret police, in a sudden and secret attack, for political reasons.  ECF No. 56 at 18 ("The high-profile kidnapping and murder of Mr. Albán by Maduro regime agents was designed to deter other opposition members from speaking out against the Venezuelan government."); *id.* at 19.

In addition**,** the INA defines an "Act of Terrorism" to include the use of any "explosive, firearm, or other weapon or dangerous device (other than for mere personal monetary gain) . . . with intent to endanger, directly or indirectly, the safety of one or more individuals."  8 U.S.C. § 1182(a)(3)(B)(iii)(V).  As this Court has noted, in this case Mr. Albán was tortured with electric shocks—a dangerous device intended to harm Mr. Albán.  ECF No. 56 at 22.

Finally, as relevant here, the INA defines an "Act of Terrorism" to include a conspiracy to do any of the foregoing.  8 U.S.C. § 1182(a)(3)(B)(iii)(V).  As this Court has recognized, the Cartel and the Individual Defendants engaged in such a conspiracy.  ECF No. 56 at 22 ("the  Cartel  of the  Suns entered the  Maduro  Criminal  Enterprise [which includes the Individual Defendants] to perform narcotics trafficking in Florida and elsewhere, as well as acts of terrorism and human rights violations, which resulted in the death of Mr. Albán.").

**Second**, the Cartel is a "terrorist organization."  TRIA § 201 defines a terrorist organization by cross reference to 8 U.S.C. § 1182(a)(3)(B)(vi) ("terrorist organization defined"), which defines terrorist organization as "a group of two or more individuals, whether organized or not, which engages in," *inter alia*, committing "terrorist activity" under circumstances indicating an intent to cause death or serious bodily injury.  Here, the Cartel is  a group of two or more persons. ECF No. 56, at 3 (the Cartel is "an elaborate criminal syndicate").  Further, the Cartel is responsible for the assassination of Mr. Albán.  *Id.* at 19 ("[B]ased on the well-pleaded factual allegations in the

complaint, the deliberate torture and execution of Mr. Albán by members of the Cartel of the Suns, violated Florida's Wrongful Death Act.").  The Cartel is also responsible for using weapons or dangerous devices in torturing Mr. Albán.  *Id.* at 19, 4.  Finally, the Cartel entered into a criminal conspiracy to engage in these terrorist activities.  *Id.* at 22.  Thus, the Cartel is a terrorist organization, and its torture and execution of Mr. Albán were acts of terrorism.  In this Court's words, "Plaintiffs have plausibly alleged that the Cartel engaged in two types of terrorism that injured Plaintiffs: (1) narco-terrorism and related terror financing; and (2) conspiracy to kidnap, torture, and murder Mr. Albán."  ECF No. 56, at 17.

*Third*, the individual defendants (including Maduro) are also terrorists.  TRIA does not define the term "terrorist," which, as noted above, means that the courts "give it its ordinary meaning."  *Santos*, 553 U.S. at 511.  In ordinary parlance, a terrorist "uses violence such as bombing, shooting, or kidnapping in an attempt to intimidate... especially as a means of achieving a political end." BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "terrorist").  Here, this Court recognized that "Plaintiffs have plausibly alleged two types of terrorism committed by the Individual Defendants . . . : (1) narco-terrorism and related terror financing; and (2) conspiracy to kidnap, torture, and murder Mr. Albán."  ECF No. 89, at 11.  Notably, the kidnapping and murder of Mr. Albán was to achieve a political end—specifically, it was retribution against him because he "denounced the Maduro regime's human rights abuses to important political leaders at the United Nations General Assembly" *Id.* at 5.  Accordingly, the Individual Defendants are terrorists.

### B.  The asset at issue is blocked.

Blocking "can be definitively established by the fact that OFAC has taken action against the alleged agency or instrumentality under TWEA or IEEPA."[2]  771 F.3d at 726.  In other words, OFAC's designation of a person as an agency or instrumentality automatically renders that person's property blocked as a matter of law. *Id.*

---

[2] Although *Stansell II* mentioned only TWEA and the IEEPA, Congress amended TRIA in 2018 to also apply to assets blocked pursuant to the Kingpin Act. *See Stansell V*, 45 F.4th at 1347 n.2 ("blocked assets under § 201 of the TRIA include the assets of a terrorist party (and the assets of any agency or instrumentality of that terrorist party) seized or frozen by the United States pursuant to the Kingpin Act.").

On August 5, 2019, the President through Executive Order 13884 ("E.O. 13884") blocked "all property and interest in property of the Government of Venezuela."[3] Under E.O. 13884, the term "Government of Venezuela" includes Venezuela's agencies, such as INAC:

> [T]he state and Government of Venezuela, any political subdivision, agency, or instrumentality thereof, including the Central Bank of Venezuela and Petroleos de Venezuela, S.A. (PdVSA), any person owned or controlled, directly or indirectly, by the foregoing, and any person who has acted or purported to act directly or indirectly for or on behalf of, any of the foregoing, including as a member of the Maduro regime.[4]

Accordingly, on August 6, 2019, Italbank filed blocking reports with OFAC, indicating that it had blocked an INAC bank account containing $7,621,830.85 and a certificate of deposit ("CD") containing $496,742.33 in the name of Instituto Aeropuerto Nacional de Maiquetía (Simon Bolívar International Airport), an airport under the supervision of INAC from which Mr. Albán was kidnapped.  Ex. 6 and Ex. 7.   In short, OFAC has blocked the assets at issue, as Italbank has recognized.

### C. INAC is an instrumentality of the Cartel and Maduro, as is Simon Bolívar International Airport.

Although TRIA does not define "instrumentality," the Eleventh Circuit has endorsed a broad definition: An "instrumentality" includes any party that provides material support to a terrorist party, whether financial, technological, or the provision of goods or services. *See Stansell V*, 45 F.4th at 1350 (quoting *Stansell II*, 771 F.3d at 724 n.6). In *Stansell II*, the Eleventh Circuit approved the district court's defining an "instrumentality" as any party that:

> "is or was ever involved" in any aspect of the [the defendant's] trafficking operations or that assisted with the [the defendant's] "financial or money laundering network" because it "was either (1) materially assisting in, or providing financial or technological support for or to, or providing goods or services in support" of, the [defendant's] international narcotics trafficking activities; and/or (2) "owned, controlled, or directed by, or acting for or on behalf of" the [the defendant]; and/or (3) "playing a significant role in" the [the defendant's] narcotics trafficking.

---

[3] *See*  Ex. 5, Executive Order 13884, Blocking Property of the Government of Venezuela (Aug. 5, 2019), available at https://www.federalregister.gov/documents/2019/08/07/2019-17052/blocking-property-of-the-government-of-venezuela.

[4] *Id.*

771 F.3d at 724 n.6.

As made clear by the language "or was ever involved," a third party who provides material support to a terrorist at any point in time constitutes an agency or instrumentality, even if they purportedly stopped aiding the terrorist. *Id.*; *accord Stansell V*, 45 F.4th at 1350 ("[T]he formulation we expressly approved in *Stansell II* encompassed past involvement or association with a terrorist party."). And even if a person works through an intermediary or third party to provide material support to a terrorist party, they still constitute an instrumentality. *Stansell V*, 45 F.4th at 1351 ("[N]othing in § 201(a) of the TRIA suggests that an instrumentality relationship with a terrorist party needs to be direct.").

The Eleventh Circuit has described knowledge as the key differentiator between an "agency" and an "instrumentality." Unlike an agency, an "instrumentality" need not know that they have provided material support to a terrorist party (whether directly or indirectly). As the Eleventh Circuit explained in *Stansell V*, an instrumentality "refer[s] to unwitting cogs in a criminal scheme." *Id.* at 1354 (citing *United States v. Bachynsky*, 949 F.2d 722, 735 (5th Cir. 1991) ("For each false diagnosis submitted, an unwitting patient was made an instrumentality of the fraud."); Michael N. Giuliano, 22 C.J.S. Criminal Law: Substantive Principles § 170 (May 2022 update) ("Ordinarily, a person who causes a crime to be committed through the instrumentality of an innocent or unwitting agent is punishable as a principal.")).

\* \* \*

As explained by Douglas Farah—a leading expert on Venezuelan criminal conduct including narcotics trafficking and money laundering—INAC readily constitutes an instrumentality of both Maduro and the Cartel under the Eleventh Circuit's standard. Ex. 8 (Farah Decl.) ¶¶ 19 to 27.

### i. INAC is an instrumentality of the judgment debtors because it assists them to traffic narcotics into the United States, as does Simon Bolívar International Airport.

Maduro and the Cartel have engaged, and are continuing to engage, in a conspiracy to flood the United States with cocaine. ECF No. 1, at ¶ 66; Farah Decl. ¶ 20. According to a 2023 Report from the United Nations Office on Drugs and Crime, Venezuela remains "a major point of

departure for . . . flights" facilitating the northward flow of cocaine."[5]  Indeed, many of the flights orchestrated by the Cartel and loaded with tons of cocaine ultimately destined for the United States originate at Simon Bolívar International Airport just outside of Caracas, Venezuela—which (not coincidentally) happens to be the very same airport from which the Defendants kidnapped Mr. Albán shortly before murdering him.  Farah Decl. ¶ 26.

      For example, the Southern District of New York criminal indictment of Maduro for narcoterrorism explains that "[i]n or about 2006, the Cartel de Los Soles dispatched a 5.6-ton cocaine shipment from Venezuela on a DC-9 jet bearing a United States registration number. . . . The jet departed Venezuela from Simon Bolivar International Airport in Maiquetia, Venezuela."[6] The flight and its cargo was interdicted in Mexico before the cocaine could reach the United States.

      Similarly, "in or about October 2015 and in or about November 2015, Efrain Campo Flores and Franqui Francisco Flores de Freitas -- two relatives of MADURO MOROS -- agreed during recorded meetings with DEA confidential sources to dispatch multi-hundred-kilogram cocaine shipments from MADURO MOROS's 'presidential hangar' at [Simon Bolívar] Airport. During recorded meetings with the sources, Campo Flores and Flores de Freitas explained that they were at 'war' with the United States" and "described the Cartel de Los Soles."[7]

      As Mr. Farah explains, Venezuela and its commercial airports, including Simon Bolívar International Airport, are major hubs for cocaine distribution into the United States by Maduro and the Cartel.  Farah Decl. ¶ 26. These well-worn and highly protected drug routes also pave the way for additional crimes, including other types of terrorism against the United States.  Farah Decl.

---

[5] Ex. 9 (United Nations Office on Drugs and Crime, *2023 Global Report on Cocaine* (March 2023)), at 55, available at https://www.unodc.org/documents/data-and-analysis/cocaine/Global_cocaine_ report_2023.pdf.

[6] *United States v. Maduro Moros*, 11-cr-205 (S.D.N.Y) (Superseding indictment), at ¶ 15d. Similarly, "[i]n or about September 2013, months after MADURO MOROS succeeded to the Venezuelan presidency, the Cartel de Los Soles dispatched 1. 3 tons of cocaine on a commercial flight from the Maiquetia Airport to Paris Charles de Gaulle Airport." *Id.* at ¶ 15i.  "In Venezuela, the operation not only involved corrupt airport workers and National Guard but also top-ranking state officials."  Jeremy McDermott, James Bargent, Douwe den Held, and Maria Fernanda Ramírez, The Cocaine Pipeline to Europe, InsightCrime (Feb. 2021), available at https://globalinitiative.net/wp-content/uploads/2021/02/The-cocaine-pipeline-to-Europe-GI-TOCInsightCrime.pdf.

[7] *Id.* at ¶ 15n.

¶ 27.   For example, Cartel member Diosdado Cabello Rondón directed Adel El Zabayar (an "instrumental go-between" in the Cartel's efforts "to recruit terrorists from Hizballah and Hamas to assist in planning and carrying out attacks on the U.S.") to obtain "weapons, including rocket-propelled grenade launchers, AK-103s, and sniper rifles," which Cabello Rondón and El Zabayar then received from a Lebanese cargo plane that landed at Simon Bolívar airport.[8]

INAC, in turn, controls all aspects civil aviation in Venezuela, including among other things airports, authorized flight paths, and permits and licensing of aircraft.  Accordingly, all of the narcotics trafficking through Venezuela's civil airports and much of the trafficking on airplanes with Venezuelan tail numbers requires INAC's support, protection and assistance—which INAC provides in close collaboration with the Cartel.[9]  Farah Decl. ¶ 26.

Carlos Tablante, ex-chairman of Venezuela's Commission Against the Illicit Use of Drugs, has described Venezuela as "a criminal state" because traffickers no longer need clandestine routes or measures to ship their narcotics.[10]  They can do it openly with the help of corrupt authorities. "The Mexican cartels have now infiltrated our national airports and use airstrips with the help of officials who supervise them," Tablante said.[11]  The Cartel's "unique make-up of high-ranking officials offers them unique command and control posts at every major airport, checkpoint, and port where drugs shipments pass through."[12]

---

[8] Ex. 10, Press Release, Department of Justice, Former Member Of Venezuelan National Assembly Charged With Narco-Terrorism, Drug Trafficking, And Weapons Offenses (May 27, 2020), available at https://www.justice.gov/usao-sdny/pr/former-member-venezuelan-national-assembly-charged-narco-terrorism-drug-trafficking-and.

[9] INAC was created by Giuseppe Yoffreda, a close personal friend of Cartel leader José David Cabello.  *See* Ex. 11, Marcos David Valverde, *Venezuela Bought Chinese Planes at a Price No One Understood*, Dialogo China (Feb. 17, 2021) ("They were extremely close friends and studied together at the University of the Armed Forces (Unefa). He is the one who created the INAC (National Institute of Civil Aeronautics"), available at Venezuela bought Chinese planes at a price no one understood (dialogochino.net).

[10] Ex. 12, Alfredo Meza, *Corrupt Military Officials Helping Venezuela Drug Trade to Flourish*, El Pais (Sept. 26, 2013), available at https://english.elpais.com/elpais/2013/09/26/inenglish/1380217098_793793.html.

[11] *Id.*

[12] Ex. 13, Brenda Fiegel**,** *Venezuela, Military Generals, and the Cartel of the Suns*, Small Wars Journal (June 27, 2015), available at https://smallwarsjournal.com/jrnl/art/venezuela-military-generals-and-the-cartel-of-the-suns; *see also* Ex. 14, Chris Kraul & Sebastian Rotella, *Venezuela's Rising Role in Drug Transit Worries U.S.* (Mar. 21, 2007) LA Times (describing how "smugglers'

For example, a high level narcotrafficker (a partner of Luis Frank Tello Candelo, who was indicted in the Eastern District of New York for conspiracy to import multiple tons of cocaine into the United States and ultimately sentenced to 96 months after pleading guilty[13]) explained that INAC's President, Division General Francisco Paz Fleitas, worked "hand in glove" with Cartel leader Tarek El Aissami to facilitate drug trafficking through Venezuela.[14]  El Aissami, in turn, was sanctioned by OFAC in 2017 for facilitating drug shipments from Venezuela to the United States[15] and is currently on the U.S. Customs and Immigration Enforcement's 10 most wanted list.[16]  According to the drug trafficker turned whistleblower, "[a]ny, day or night-time, route was controlled by Paz Fleitas. We used aircraft for domestic flights in Venezuela and for some shipments abroad. . . .  With him everything went smoothly."[17]  Among other things, Paz Fleitas purchased aircraft required by drug traffickers and eased the way for various Mexican and Colombian cartels to transfer cocaine from and to Venezuela.[18]

Similarly, as noted above, Efraín Antonio Campo Flores and Francisco Flores de Freitas,

baggage went untouched by the Venezuelan National Guard and airport police" because "[t]here is systematic corruption. Maiquetia [Simon Bolívar airport] is wide open"), available at https://www.latimes.com/archives/la-xpm-2007-mar-21-fg-vzdrugs21-story.html.

[13] *United States v. Candello*, 10-cr-6 (E.D.N.Y.), ECF Nos. 1 (Indictment), 154 (judgment).

[14] Ex. 15, Frank López Ballestros, *The Darkest Secrets of a Spy Chief*, ITEMP (Dec. 30, 2020) ("*Darkest Secrets*") ("General Paz Fleitas worked in tandem with the almighty Tareck El Aissami, then Minister of the Interior and Justice, to tune up the drug dealing, including the purchase of some airplanes required by drug traffickers. 'Surely, Tareck and Plaz Fleitas were hand in glove,' the drug trafficker [Carvajal] said during his interview with ITEMP."), available at The darkest secrets of a spy chief - Itempnews.

[15] See Ex. 16, Press Release, U.S. Dep't of Treasury, Treasury Sanctions Prominent Venezuelan Drug Trafficker Tareck El Aissami and His Primary Frontman Samark Lopez Bello, ¶ 1 (Feb. 13, 2017), available at https://www.treasury.gov/press-center/press-releases/pages/as0005.aspx.

[16] See Ex. 17, ICE: Former Venezuelan VP Among 10 Most Wanted Fugitives, NBC Miami (July 31, 2019), available at https://www.nbcmiami.com/news/local/former-venezuelan-vice-president-tareck-el-aissami-most-wanted-ice/125106/.

[17] *Darkest Secrets*, at 1.

[18] *Id.*; *see also* Ex. 18, Cubanet, *Investigation Exposes Links Between Drug Traffickers and Hugo Chavez's Intelligence Chief* (Jan. 7, 2021), available at Investigation Exposes Links Between Drug Traffickers and Hugo Chavez's Intelligence Chief (cubanet.org) ("[I]n addition to "El Pollo" Carvajal, Cabello, El Aissami and other senior officials of the Venezuelan Government, such as Major General Francisco Paz Fleitas, twice president of the National Institute of Civil Aeronautics (INAC) of that country, were linked to the transfer of drugs.")

both nephews of Maduro's wife (the "Narco Nephews"), were convicted of conspiracy to import 770 kilos of cocaine to the United States.  Compl., ECF No. 1, at ¶ 20.  According to evidence obtained by the Department of Justice in connection with the prosecution of the Narco Nephews, the pilot assisting them needed "to obtain the necessary permit for the anticipated drug flight from 'inac.'"[19]

And, according to the Maduro indictment, "to achieve safe passage for the large cocaine shipments transiting Venezuela, members and associates of . . . the Cartel de Los Soles paid bribes, which ultimately benefited NICOLAS MADURO MOROS . . ., among others, in exchange for, for example, access to commercial ports and data from air and maritime radar in Venezuela."[20] Such "helpful" (to narcotraffickers) access to commercial ports and Venezuelan air radar data would have been supplied by INAC.  Farah Decl. ¶ 25.  INAC also approved the acquisition of Venezuela's formerly-state owned airline, Aeropostal Airlines, by Walid Makled,[21] once one of the most powerful civilian drug traffickers in Venezuela, whose power came from his links to the Cartel of the Suns.[22]

In sum, INAC and Simon Bolívar International Airport were integrally involved in the judgment debtors' trafficking operations, including "materially assisting in," providing "technological support for," "providing goods or services in support of" and "playing a significant role in" their narcotics trafficking. 771 F.3d at 724 n.6.

> **ii.  INAC is an instrumentality of the judgment debtors because it uses its U.S. bank account at Italbank to further the judgment debtors' criminal conduct.**

As set forth in the Complaint, "the Maduro Criminal Enterprise, through its earnings from profitable crimes such as narcotics trafficking and public corruption, obtains wealth through which Maduro purchases the loyalty of Maduro Criminal Enterprise's leaders and loyalists, thereby cementing Maduro's authoritarian control over Venezuela.  In other words,

---

[19] *United States v. Campo Flores*, 15-cr-765 (S.D.N.Y.), ECF No. 162, at 9 & fn. 5.

[20] *United States v. Maduro Moros*, 11-cr-205 (S.D.N.Y) (Superseding indictment), at ¶ 14d.

[21] Ex. 19, Virginia Contreras, *A Multifaceted View of the Makled Case*, Runrunes (April 4, 2011), available at A multifaceted view of the Makled case by Virginia Contreras - Runrun

[22] Ex. 20, Venezuela Investigative Unit, *Drug Trafficking Within the Venezuelan Regime: The 'Cartel of the Suns'*, InsightCrime (May 17, 2018), available at Drug Trafficking Within the Venezuelan Regime: The 'Cartel of the Suns' (insightcrime.org).

dirty money is the lifeblood of the Maduro Criminal Enterprise and the Maduro Criminal Conspiracy."  ECF No. 1 at ¶ 61(b).  The INAC bank account at Italbank was integral to that unlawful activity up until the day that OFAC blocked it.  In particular, the Maduro Criminal Enterprise utilized the INAC account at Italbank to (1) evade U.S. sanctions, (2) direct U.S. dollars to Venezuela, and (3) utilize the U.S. dollars for currency scams, personally enriching the judgment debtors and cementing loyalty to the illicit Maduro regime.

To evade U.S. sanctions, the Maduro regime utilizes an digital wallet app called "Jetman Pay" to convert tax revenue from Simon Bolívar airport into Bitcoin and other cryptocurrencies. Farah Decl. ¶ 29.  Then the cryptocurrencies are sent to foreign exchanges in Russia, China, Hong Kong, and Hungary.[23]  *Id.*  Once received, the funds are converted into U.S. dollars and sent back to Venezuela.[24]  *Id.*  The Jetman Pay app is owned by BDCA Aeronautical Solutions, a Florida company[25] founded by a former combat pilot from the Venezuelan air force.[26]  Farah Decl. ¶ 30. From January 1, 2018 until the INAC bank account at Italbank was frozen in August 2019, BDCA Aeronautical Solutions made over 20 payments totaling over $6 million into INAC's Italbank account.  *Id.*

INAC then repatriated to Venezuela the U.S. dollars it collected in its Italbank account, including the payments INAC received from Jetman Pay (among other payments).  Farah Decl. ¶ 31.  Specifically, INAC made periodic round dollar transfers from its account at Italbank to Banco de Desarrollo Económico y Social de Venezuela ("BANDES") through periodic round dollar transfers.  *Id.*  These payments continued until such time as BANDES was sanctioned by OFAC on March 22, 2019, after which funds accumulated in INAC's Italbank account without any material outgoing transfers. *Id.*

Once the U.S. dollars reached BANDES, the judgment debtors used the money for various unlawful currency scams and other crimes.  BANDES is, in fact, a bank with a lengthy history of

---

[23] Ex. 21, Jamie Redman, *Venezuela Government Accused of Using Bitcoin to Bypass US Sanctions*, Bitcoin.com (July 25, 2019), available at <u>Venezuelan Government Accused of Using Bitcoin to Bypass US Sanctions – Bitcoin News</u>.

[24] *Id.; see also*  Ex. 22, Diana Aguilar, *Venezuela Turned Airport Taxes Into Bitcoin to Avoid Sanctions: Report*, CoinDesk (July 25, 2019), available at <u>Venezuela Turned Airport Taxes Into Bitcoin to Avoid Sanctions: Report - CoinDesk</u>

[25] Ex. 23, <u>Detail by Entity Name (sunbiz.org)</u>.

[26] Ex. 24,  <u>https://angelloveraromero.com/en/about-angel/</u>

corruption under Maduro and his fellow kleptocrats running Venezuela.  When the bank was sanctioned, Treasury Secretary Mnuchin explained, "Maduro and his enablers have distorted the original purpose of the bank, which was founded to help the economic and social well-being of the Venezuelan people, as part of a desperate attempt to hold onto power."[27]  Alejandro Andrade— BANDES former president from 2008 to 2010—is serving a ten-year sentence after pleading guilty in Florida to accepting millions of dollars in bribes.[28]  In November 2013, another senior BANDES official pleaded guilty in Manhattan federal court to accepting bribes.[29]  Subsequently, Maduro admitted that BANDES officials had embezzled more that $85 million from a Chinese-Venezuela development fund on deposit with the bank.[30]  Of particular relevance here, while INAC was utilizing its Italbank account to provide US dollars to prop up BANDES, Alex Saab—who OFAC sanctioned because he was "a profiteer orchestrating a vast corruption network that has enabled former President Nicolás Maduro (Maduro) and his regime to significantly profit from food imports and distribution in Venezuela" and who was awaiting trial in Miami until the Maduro Criminal Enterprise kidnapped numerous US citizens and bartered them for Saab's release—was obtaining Bolivars (Venezuelan currency) from BANDES and using it to purchase gold from

---

[27] Ex. 25, Press Release, OFAC, Treasury Sanctions BANDES, Venezuela's National Development Bank, Venezuela National Development Bank, and Subsidiaries, in Response to Illegal Arrest of Guaidó  Aid (Mar. 22, 2019) (Further stating that "The [Maduro] regime's continued use of kidnapping, torture, and murder of Venezuelan citizens will not be tolerated by the U.S."), available at https://home.treasury.gov/news/press-releases/sm636.

[28] Ex. 26, David C. Adams, *US tightens the screws on Venezuela's Maduro with banking sanctions* Univision (22 March 2019), available at https://www.univision.com/univision-news/latin-america/us-tightens-the-screws-on-venezuelas-maduro-with-banking-sanctions.

[29] Ex. 27, Press Release, DOJ, High-Ranking Bank Official At Venezuelan State Development Bank Pleads Guilty In Manhattan Federal Court To Participating In Bribery Scheme (Nov. 18, 2013)         https://www.justice.gov/usao-sdny/pr/high-ranking-bank-official-venezuelan-state-development-bank-pleads-guilty-manhattan.

[30] Ex. 28, Brian Ellsworth, *Venezuela Charges Five Officials with Embezzling China Funds*, Reuters  (July  8,  2013),  available  at  https://www.reuters.com/article/us-venezuela-corruption/venezuela-charges-five-officials-with-embezzling-china-funds-idUSBRE9670VW20130708/.

Venezuelan miners who the Maduro regime pressured to sell at below market rates, as part of a larger scheme by Saab to refine and sell the gold at actual market rates.[31]

Because INAC played a significant role in the judgment debtors' sanctions evasion and money laundering network (as the repository of funds from the Jetman Pay sanctions evasion conspiracy) and because INAC played a significant role in Saab's corrupt profiteering for the benefit of Maduro with such funds, INAC falls squarely within the definition of instrumentality of the judgment debtors.  771 F.3d at 724 n.6.

## III.  INAC CANNOT INVOKE THE FOREIGN SOVEREIGN IMMUNITIES ACT TO AVOID GARNISHMENT.

Section II of this motion explains how Plaintiffs made a *prima facie* showing that they hold an unsatisfied judgment against a terrorist organization based on acts of terrorism and that INAC is an instrumentality of Maduro and the Cartel. Plaintiffs' *prima facie* showing ends the analysis at this phase of the litigation and warrants issuing a writ of garnishment now. *See, e.g., Stansell II*, 771 F.3d at 728-30.

Plaintiffs anticipate that INAC might appear and object based upon the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq*. Plaintiffs will respond if INAC appears and raises an FSIA argument.  For now, Plaintiffs explain briefly below why INAC cannot successfully invoke the FSIA to thwart Plaintiffs' rights under TRIA. In certain circumstances, the FSIA provides foreign nations, and their agencies and instrumentalities, with immunity from (1) the jurisdiction of U.S. courts and (2) execution upon their assets. But here, INAC cannot claim sovereign immunity, and even if it could make a legitimate claim to sovereign immunity (it cannot), this TRIA execution proceeding is subject to FSIA exceptions that foreclose any prospective sovereign-immunity claim by INAC.

### A.  INAC Cannot Invoke The FSIA's Grant Of Jurisdictional Immunity Here.

#### i.  INAC Is Subject To The Commercial-Activity Exception To The FSIA.

The FSIA provides in its declaration of purpose: "Under international law, states are not immune from the jurisdiction of foreign courts insofar as their commercial activities are concerned,

---

[31] Ex. 29, Press Release, Treasury, Treasury Disrupts Corruption Network Stealing from Venezuela's Food Distribution Network, CLAP (July 25, 2019), at https://home.treasury.gov/news/press-releases/sm741.

and their commercial property may be levied upon for the satisfaction of judgments rendered against them in connection with their commercial activities." 28 U.S.C. § 1602. Here, INAC not only engaged in commercial activity in the United States, but its commercial activities lie at the heart of Plaintiffs' claims. As a result, INAC cannot invoke the FSIA to thwart Plaintiffs' collection efforts under TRIA.

Consistent with the FSIA's purpose codified at 28 U.S.C. § 1602, the FSIA's immunity from the jurisdiction of the U.S courts, set forth in 28 U.S.C. § 1604, is subject to the commercial-activity exception. Under the commercial-activity exception, "[a] foreign state [including its instrumentalities][32] shall not be immune from the jurisdiction of courts of the United States or of the States in any case":

> in which the action is based [1] upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2). Under the commercial-activity exception, a foreign government's agency or instrumentality is not immune from jurisdiction if any of these three clauses quoted above is satisfied. Here, at least the first clause ("a commercial activity carried on in the United States by the foreign state") and the third clause ("an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that caused a direct effect in the United States") each strips INAC of jurisdictional immunity.

### 1.  Action Based Upon Commercial Activity In the United States

Both elements of the first clause of the commercial-activity exception are satisfied here. *First,* INAC engaged in commercial activity in the United States. The FSIA defines "commercial activity" as

> either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.

---

[32] The FSIA defines "foreign state" as including "a political subdivision of a foreign state or an agency or instrumentality of a foreign state."  28 U.S.C. § 1603(a).

28 U.S.C. § 1603(d). In assessing the applicability of the exception, the question is "whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in 'trade and traffic or commerce.'" *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992); *Devengoechea v. Bolivarian Republic of Venezuela*, 889 F.3d 1213, 1222 (11th Cir. 2018). Here, INAC's U.S. conduct was not that of a sovereign; rather, it did what private (albeit criminal) actors routinely do: participated in narco-terrorist smuggling of cocaine into the United States, used its U.S. bank account at Italbank to launder ill-gotten proceeds of a scheme to evade U.S. sanctions, and repatriated the funds to Venezuela to support the terrorists who murdered Mr. Albán, and to provide funds for additional criminal exploitation of the Venezuela populace.

Courts routinely recognize that the conduct INAC engaged in here—supporting the smuggling of unlawful narcotics into the United States, evading U.S. sanctions, laundering money through U.S. bank accounts, funding terrorists from U.S. bank accounts, and committing other crimes—is "commercial activity." *See, e.g.*, *United States v. Turkiye Halk Bankasi A.S.*, 16 F.4th 336, 350 (2d Cir. 2021) (holding that "participation in money laundering and other fraudulent schemes designed to evade U.S. sanctions" was commercial activity for purposes of the FSIA because "those core acts constitute 'an activity that could be, and in fact regularly is, performed by private-sector businesses'"), *aff'd in part, vacated in part on other grounds, and remanded*, 143 S. Ct. 940 (2023) (holding that Second Circuit did not need to reach commercial-activity exception to FSIA because FSIA was inapplicable for other reasons); *Bilalov v. Sberbank*, 2022 WL 4225968, at *7 (S.D.N.Y. Sept. 13, 2022) (acts of bribery were commercial activities under the FSIA because they were "actions . . . in which private parties could engage" and were "committed in the course of business or trade"); *Schansman v. Sberbank of Russia PJSC*, 2022 WL 17540666, at *5 (S.D.N.Y. Dec. 6, 2022) (bank's provision of material support and financing to the Donetsk People's Republic, a terrorist group accused of downing a Malaysia Airlines flight over Eastern Ukraine in 2014, was commercial activity under the FSIA; such "classic commercial behavior . . . does not qualify as sovereign conduct"); *Southway v. Cent. Bank of Nigeria*, 198 F.3d 1210, 1213 (10th Cir. 1999) (holding that commercial exception to FSIA could apply to permit civil RICO claims and rejecting Defendants' argument "that the FSIA's commercial activity exception did not

apply to their conduct because … the alleged scheme involved criminal activity in which commercial actors do not typically engage").

*Second*, Plaintiffs' action is "based upon" INAC's commercial activity in the United States, through which INAC provided material support—in violation of the Anti-Terrorism Act—to the terrorists that harmed Plaintiffs. To identify the conduct that the Plaintiffs' action is based upon, the court looks at "the particular conduct that constitutes the gravamen of the suit." *Devengoechea*, 889 F.3d at 1222. In other words, the court focuses on the "the core of the suit—the foreign state's acts that actually injured the Plaintiffs." *Id.*

Here, Plaintiffs' suit is for primary violations of the Florida Anti-Terrorism Act. Those violations center on narco-terrorism conspiracy designed to flood the United States with weaponized cocaine, to launder the proceeds through the United States, and to provide the Maduro Criminal Enterprise with the hard currency that it needs to maintain its authoritarian grip over Venezuela. *See* Compl. ¶ 134-141 ("Maduro's agents" followed Mr. Alban in New York and later the information of his travel back to Venezuela from the United States was received by INAC and the Simón Bolivar International Airport which allowed the Judgment Debtors to kidnap him upon his arrival at the airport), ¶ 205(b) ("The kidnapping of Mr. Albán from Simón Bolivar International Airport in Caracas was in violation of Florida law because it occurred pursuant to, and in furtherance of, *a narco-terrorism conspiracy designed to flood Florida with cocaine and to launder the proceeds through the Florida*, and acts in furtherance of the conspiracy occurred in Florida."), ¶ 206(c) ("The torture of Mr. Albán at SEBIN headquarters in Caracas was in violation of Florida law because it occurred pursuant to, and in furtherance of, a narco-terrorism conspiracy *designed to flood Florida with cocaine and to launder the proceeds through the Florida*, and acts in furtherance of the conspiracy, including trafficking and sales of cocaine and transfers of ill-gotten gains occurred in Florida.").

The Complaint further explains how acts of narco-terrorism and money laundering in Florida are essential to Maduro's ability commit acts of terrorism in Venezuela: "[T]he Maduro Criminal Enterprise, through its earnings from profitable crimes such as narcotics trafficking and public corruption, obtains wealth through which Maduro purchases the loyalty of Maduro Criminal Enterprise's leaders and loyalists, thereby cementing Maduro's authoritarian control over Venezuela." *Id.* ¶ 61(b). "In other words, dirty money is the lifeblood of the Maduro Criminal

Enterprise and the Maduro Criminal Conspiracy." *Id.* The Complaint explains how billions of dollars in dirty money flow through Florida and ultimately help the Maduro Criminal Enterprise silence dissidents, such as Mr. Albán, in Venezuela. Compl. ¶ 107 ("the Maduro Criminal Enterprise choreographed a billion-dollar scheme to launder funds embezzled from Venezuelan state-owned oil company PDVSA using Miami, Florida real estate and sophisticated false investment schemes"); *accord* Compl. ¶¶ 101 to 102.

Based on these and other allegations, this Court's order granting a default judgment for Plaintiffs and against Defendants recognized that: "Plaintiffs have plausibly alleged that the Cartel engaged in two types of terrorism that injured Plaintiffs: (1) narco-terrorism and related terror financing; and (2) conspiracy to kidnap, torture, and murder Mr. Albán. Either, standing alone, is sufficient to give rise to liability under the Florida ATA. . . . [T]he kidnapping, torture, and murder of Mr. Albán violated the Florida ATA because they occurred pursuant to a narco-terrorism conspiracy designed to flood Florida with cocaine and to launder the illegal drug money through Florida, and acts in furtherance of the conspiracy occurred in Florida (such as the possession and sale in Florida of cocaine and the laundering of ill-gotten bank accounts in Florida)." R&R, ECF No. 56 at 17-18, *adopted* ECF No. 58.[33] This terrorist-funding conduct is precisely what INAC achieved through its U.S. commercial activities described above.

Accordingly, the first clause of the commercial-activities exception is satisfied, and INAC cannot invoke sovereign immunity to avoid suit.

## 2. Action Based Upon An Act Outside The Territory of the United States In Connection With Commercial Activity Elsewhere And That Causes A Direct Effect In the U.S.

In addition to the first clause of the commercial-activities exception, the third clause is also satisfied. Unlike the first clause, which asks whether the action is based on "commercial activity" carried on in the United States, the third clause asks more broadly whether the action is based upon an "act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere" and that causes a "direct effect in the United States." 28 U.S.C. § 1605(a)(2); *accord, e.g.*, *Adler v. Nigeria*, 107 F.3d 720, 726 (9th Cir. 1997) ("[Plaintiffs'] claims

---

[33] In addition, INAC's commercial activity also constitutes the gravamen of its conduct as an agency/instrumentality of the judgment debtors. Indeed, it is only through its unlawful, commercial activity that INAC acts as an agency/instrumentality of Marudo the Cartel.

need not be 'based upon' commercial activity; they must merely be based upon acts made 'in connection with' such activity."). Here, the kidnapping and murder of Mr. Albán in Venezuela are "in connection with commercial activity" elsewhere (i.e., INAC's trafficking of narcotics into the United States, laundering the proceeds of sanctions evasion through the United States, Russia, China, Hong Kong, and Hungary, and funding—through INAC's US bank account—the terrorists who kidnapped and murdered Mr. Albán), and the kidnapping and murder of Mr. Albán caused "direct effects" in the U.S. (for example, intimidation, injury and severe emotional harm to Mr. Albán's surviving family that resided in the U.S. at the time of his kidnapping and murder).

A "direct effect" is "one that follows 'as an immediate consequence of the defendant's…activity.'" *Devengoechea*, 889 F.3d at 1224 (quoting *Weltover*, 504 U.S. at 618) (alteration in original). In other words, the court assesses whether the effect is sufficiently direct in that "Congress would have wanted an American court to hear the case[.]" *Id.* (quoting *Guevara v. Republic of Peru*, 608 F.3d 1297, 1309 (11th Cir. 2010)). The direct-effect requirement is satisfied where, for example, commercial activities involve payments to or from the United States. *See, e.g.*, *Turkiye Halk Bankasi A.S.*, 16 F.4th at 349 (direct-effect requirement satisfied where Turkish bank laundered illicit Iranian oil proceeds through the United States financial system); *Exxon Mobil Corp. v. Corporacion CIMEX S.A.*, 534 F. Supp. 3d 1, 18 (D.D.C. 2021) (direct-effect requirement satisfied where state-owned Cuban corporation processed remittances sent from locations in the United States to Cuba). Likewise, the direct-effect requirement is satisfied where a person suffers injury in the United States in connection with commercial activity abroad. *Aldy v. Valmet Paper Machinery*, 74 F.3d 72, 74-76 (5th Cir. 1996) (direct-effect requirement satisfied where injuries were suffered in United States in connection with Finnish state-owned company's design and manufacture of defective product in Finland).

As this Court recognized, Defendants "traffic[] somewhere between 200 and 250 metric tons of cocaine from Venezuela into the United States each year" (R&R at 2-3, *adopted* ECF No. 58), and that includes drug trafficking by means of air and sea traffic facilitated by INAC. Defendants also use INAC to launder their sanctions-evasion proceeds through the United States. ECF No. 1, ¶ 5 (Maduro and his criminal enterprise laundered "ill-gotten gains internationally, including the United States"); R&R at 18 (describing money laundering in Florida). Defendants' use of INAC's U.S. bank account to evade United States sanctions provides yet another example

of the "direct effect" INAC's unlawful commercial conduct has on the United States. Farah Decl. ¶¶ 28 to 33 (explaining INAC money laundering through its Italbank account).

What's more, INAC's wrongdoing extends beyond Venezuela (where the "act" of the defendants' kidnapping and murder of Mr. Albán took place): INAC also works "elsewhere"— including the Caribbean region, Mexico, Russia, China, Hong Kong, and Hungary, among others, to help launder money and traffic narcotics for the Cartel. Farah Decl. ¶ 29.

In addition, the direct-effect requirement is satisfied because Mr. Albán's surviving family (his wife María and their children María Fernanda and Fernando Albán) all resided in the United States at the time the Maduro Criminal Enterprise tortured and murdered Mr. Albán. Compl. ¶¶ 16-18. Mr. Albán's surviving family suffered severe emotional harm in the United States. Compl. ¶ 284. Similarly, a direct effect was also the "intimidation, injury, or coercion" of civilians in the United States, including those opposing the Maduro Regime. *See* Fla. Stat. § 775.30. Under the plain text of the third clause in Section 1605(a)(2), these emotional harms suffered in the United States qualify as "direct effect[s]" even though not "commercial" or financial injuries; indeed, Congress chose to require only a "direct effect in the United States," not a direct commercial effect or direct financial effect in the United States. *See* 28 U.S.C. § 1605(a)(2).

In sum, Mr. Albán's kidnapping and murder in Venezuela is "in connection with" INAC's commercial conduct elsewhere (i.e., supporting narco-trafficking of cocaine into the United States through the use of flights supervised and approved by INAC, and laundering the proceeds of sanctions evasion scams through the United States Russia, China, Hong Kong, and Hungary), and the defendants' kidnapping and murder of Mr. Albán caused "direct effects" in the United States (including the severe emotional harms that Mr. Albán's surviving family suffered in the United States, where they resided at the time of Mr. Albán's kidnapping and murder).

### ii. TRIA Affords This Court Jurisdiction.

Even if the commercial-activities exception were inapplicable, it would not matter because this Court could properly exercise jurisdiction over INAC under TRIA. In *Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 48-49 (2d Cir. 2010), plaintiffs sought to utilize TRIA to attach the assets of Bank Melli, an agency or instrumentality of Iran that had not been a party to the underlying lawsuit and was not a judgment debtor. Bank Melli argued that the Court needed an independent basis for subject-matter jurisdiction over Bank Melli, separate and apart from TRIA.

22

The Second Circuit rejected Bank Melli's argument. *Id.* (rejecting Bank Melli's argument that "TRIA does not provide an independent basis for jurisdiction over an instrumentality of a sovereign state when the instrumentality was not itself a party to the underlying tort action that gave rise to judgment on which plaintiff now seeks to recover").

Explaining that TRIA is not merely "an additional ground for abrogating immunity from attachment," but also an independent grant of jurisdiction, the Second Circuit explained:

> Bank Melli's argument is belied by the plain language of Section 201(a), as well as by its history and purpose. Section 201(a) clearly states that "in *every* case in which a person has obtained a judgment against *a terrorist party* ..., the blocked assets of that terrorist party (*including* the blocked assets of *any agency or instrumentality of that terrorist party*) shall be subject to execution or attachment...." Under Bank Melli's interpretation, the parenthetical language in Section 201(a) of the TRIA that permits attachment of funds from agencies and instrumentalities would be rendered superfluous, since the agency or instrumentality would itself have been a "terrorist party" against which the underlying judgment had been obtained. . . . Instead, however, the statute clearly differentiates between the party that is the subject of the underlying judgment itself, which can be any terrorist party (here, Iran), and parties whose blocked assets are subject to execution or attachment, which can include not only the terrorist party but also "any agency or instrumentality of that terrorist party." If this did not constitute an independent grant of jurisdiction over the agencies and instrumentalities, the parenthetical would be a nullity.

*Id.* (quoting TRIA § 201(a))*; see also FG Hemisphere Assocs., LLC v. Republique du Congo*, 455 F.3d 575, 595 (5th Cir. 2006) ("A finding that an exception to executional immunity applies is a finding that the court has jurisdiction over the garnishment action."); *Weininger v. Castro*, 462 F. Supp. 2d 457, 477 (S.D.N.Y. 2006) (holding that "this Court has subject matter jurisdiction over the enforcement action before it pursuant to TRIA § 201(a)"); *Caballero v. FARC,* 562 F. Supp. 3d 867, 883-84 (C.D. Cal. 2021) ("In effect, TRIA § 201(a) constitutes an independent grant of jurisdiction over the blocked assets of 'any agency or instrumentality' of the terrorist party for the purpose of execution and attachment of a valid ATA judgment.").

### B. The FSIA's Grant Of Immunity From Execution Does Not Preclude Execution On INAC's Assets.

The FSIA provides that the "the property in the United States of a foreign state shall be immune from attachment, arrest and execution except as provided in sections 1610 and 1611" of the FSIA. 28 U.S.C. § 1609. This provision providing for execution immunity "operate[s] independently" of the "the FSIA's provisions governing jurisdictional immunity." *Walters v. Indus.*

*& Commercial Bank of China, Ltd.,* 651 F.3d 280, 288 (2d Cir. 2011). Consequently, "property owned by a foreign state's instrumentalities is generally more amenable to attachment than property owned by the foreign state itself." *Id.*

Section 1610 of the FSIA contains two exceptions that allow attachment, arrest, and execution of INAC's assets in this case: the first is TRIA and the second is a commercial-activities exception for execution (that is similar to, but distinct from, the commercial-activities exception for jurisdiction in 28 U.S.C. § 1605, discussed above).

### i. TRIA Permits Execution Against INAC's Assets.

Section 1610 of the FSIA enumerates exceptions to the FSIA's grant of execution immunity, *see* 28 U.S.C. § 1610. Section 201 of TRIA was enacted as a Note to Section 1610 of the FSIA, and now appears at 28 U.S.C. § 1610(f), creating a broad exception to FSIA execution immunity. Section 201 of TRIA provides in relevant part:

> Notwithstanding any other provision of law,. . . in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605(a)(7) of title 28, United States Code, the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

28 U.S.C. § 1610(f).

Here, as set forth above, each of the elements of Section 201 of TRIA is satisfied. Accordingly, plaintiffs may utilize TRIA to execute against the assets of agencies and instrumentalities of terrorist judgment debtors, notwithstanding that those agencies or instrumentalities might otherwise enjoy FSIA execution immunity. *See Weininger*, 462 F. Supp. at 488 ("This Court concludes that the 'notwithstanding any other provision of law' language in TRIA operates as an exception to immunity from both jurisdiction *and execution*.") (emphasis added); *Hill v. Republic of Iraq*, 2003 WL 21057173, at *2 (D.D.C. Mar. 11, 2003) ("[B]y its plain terms, the TRIA overrides any immunity from execution that blocked Iraqi property might otherwise enjoy under the Vienna Convention or the FSIA. Indeed, any contrary construction of the TRIA would frustrate the statutory objective of ensuring that judgments rendered against terrorist states based upon terrorist acts 'are to be enforced.'").

24

Indeed, courts routinely authorize plaintiffs to execute against the blocked assets of agencies or instrumentalities of terrorists that ordinarily would enjoy immunity from execution under the FSIA.  *See, e.g., Weinstein*, 609 F.3d at 48-49 (plaintiffs could utilize TRIA to execute against the assets of Bank Melli, an agency and instrumentality of Iran); *Est. of Heiser v. Bank of Tokyo Mitsubishi UFJ, New York Branch*, 919 F. Supp. 2d 411, 421 (S.D.N.Y. 2013) (compelling respondent bank to turn over funds belonging to agencies and instrumentalities of Iran and noting that "Section 201 of the TRIA also states that these assets may be subject to attachment in aid of execution of judgment"). Because Section 201 of TRIA overrides sovereign immunity for the purpose of enforcing judgments against terrorist parties, INAC cannot avoid enforcement under TRIA by invoking the FSIA.

### ii. The Commercial-Activities Exception To The FSIA Permits Execution Against INAC's Assets.

TRIA contains an exception to execution immunity for commercial activity that applies when "the judgment relates to a claim for which the agency or instrumentality is not immune by virtue of section 1605(a)(2)." 28 U.S.C. § 1610(b)(2).  As set forth above, INAC is not immune from jurisdiction by virtue of Section 1605(a)(2).  As such, its property in the United States is not immune from execution.[34]

## IV.  A WRIT OF GARNISHMENT ON THE INAC BANK ACCOUNT SHOULD BE GRANTED IMMEDIATELY.

As noted above, TRIA allows terrorism victim judgment holders to execute on blocked assets of any designated party "that is *or was ever* involved" in any aspect of Maduro's narcotics trafficking and money laundering (i.e., the same drug trafficking and money laundering that allows the Maduro Criminal Enterprise to reap enormous profits that enable it to kidnap and torture people like Mr. Albán who speak out against the Maduro Criminal Enterprise's corruption), even if those agencies/instrumentalities are not named defendants. *See, e.g.*, *Stansell II*, 771 F.3d at 725, n.6. Because the evidence discussed throughout this motion shows that INAC and Simon Bolívar

---

[34] In the event that INAC contests Plaintiffs' showing that it is not immune from jurisdiction or and that the Italbank bank account is not immune from garnishment, Plaintiffs reserve the right to seek jurisdictional discovery. *See generally Licea v. Curacao Drydock Co.*, 870 F. Supp. 2d 1360, 1368 (S.D. Fla. 2012) (rejecting challenge of Netherlands to jurisdictional discovery concerning applicable exceptions to FSIA).

International Airport are each an agency/instrumentality of Defendants Maduro and the Cartel, a writ of garnishment should issue now for the Italbank account of INAC and the Italbank CD of Simon Bolívar International Airport.

## **CONCLUSION**

For the foregoing reasons, a writ of garnishment should issue now for the INAC bank account and the Simon Bolívar International Airport CD at issue.

Respectfully submitted on March 1, 2024.

*/s/ Jaime D. Guttman*
Fla. Bar No. 44076
*jaime@scale.law*
Scale Law Partners, LLC
777 Brickell Avenue, Suite 500
Miami, FL 33131
(786) 273-9033 (Main)

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I certify that I filed the foregoing document on March 1, 2024 through CM/ECF, which automatically and electronically delivered notice of filing to counsel of record for all parties that have appeared.

*/s/ Jaime D. Guttman*