IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 1:21-cv-20706-DPG

MEUDY ALBÁN OSIO in her personal capacity
And in her capacity as the personal representative
of the Estate of FERNANDO ALBERTO ALBÁN,
FERNANDO ALBÁN OSIO, and MARIA
FERNANDA ALBÁN OSIO,

    Judgment Creditors,

v.

NICOLAS MADURO MOROS,
FUERZAS ARMADA REVOLUCIONARIAS
DE COLUMBIA ("FARC"); THE CARTEL OF
THE SUNS A.K.A. CARTEL DE LOS SOLES;
VLADIMIR PADRINO LOPEZ; MAIKEL
JOSE MORENO PEREZ; NESTOR LUIS
REVEROL TORRES; and TAREK WILLIAM
SAAB

    Judgment Debtors,

_____/

**JUDGMENT CREDITORS' MOTION FOR
ISSUANCE OF WRITS OF GARNISHMENT**

    The Albán family (the Judgment Creditors) respectfully move for the issuance of writs of garnishment for funds belonging to Diques y Astilleros Nacionales ("DIANCA") and JNV Procurement Corp ("JNV") that have been blocked pursuant to the Venezuela regulations implemented by the Office of Foreign Assets Control ("OFAC").  Both DIANCA and JNV are entities the Judgement Debtors used to launder funds from their illicit activities, thereby propping up the Maduro regime and further enabling Maduro, Padrino Lopez and their henchmen to terrorize dissidents like Mr. Albán.

**INTRODUCTION**

    As this Court has recognized, the Cartel, Maduro and their co-conspirators kidnapped, tortured, and murdered Mr. Albán.  *See* ECF No. 56 (Report and Recommendation on Plaintiffs'

1

Motion for Default Judgment Against Defendant Cartel of the Suns) (the "R&R") at 4, *adopted* ECF No. 58; *see also* ECF No. 89, 90, and 91.  Moreover, "the kidnapping, torture, and murder of Mr. Albán violated the Florida ATA because they occurred pursuant to a narco-terrorism conspiracy designed to flood Florida with cocaine and to launder the illegal drug money through Florida . . . ." ECF No. 56 at 17-1.

Maduro, Padrino Lopez, and the Cartel have engaged, and are continuing to engage, in a conspiracy to flood the United States with cocaine.  ECF No. 1, at ¶ 66. According to a 2023 Report from the United Nations Office on Drugs and Crime, Venezuela remains "a major point of departure for . . . flights" facilitating the northward flow of cocaine."[1]  Indeed, many of the ships and planes loaded with tons of cocaine ultimately destined for the United States originate from Venezuela.

As Assistant Attorney General Brian A. Benczkowski explained, "the Maduro regime is propped up by a sham judiciary and a corrupt military… led by Padrino Lopez…"[2] "But as Minister of Defense, Padrino Lopez instead wielded his power to allow drug traffickers to use Venezuela as a transshipment route for narcotics destined for the United States."[3]

The Albán family now seeks to enforce his judgment against JNV and DIANCA, entities clearly used by the Judgement Debtors to launder funds from their illicit activities to continue to prop up the Maduro regime, and thereby enabling Maduro, Padrino Lopez, and their henchmen to terrorize dissidents like Mr. Albán.  As shown below, JNV and DIANCA are "nodes" in the judgment debtors' vast money laundering and sanctions evasion network that include "testaferros" (front men), shell companies, unethical bankers, corrupt government officials, and other bad actors.

When Congress enacted the Terrorism Risk Insurance Act ("TRIA"), Congress expressly sought to ensure that victims of terrorism, like Mr. Albán's estate and family, could enforce their judgments not only against the judgment debtors themselves (such as the Cartel, Maduro, and

---

[1] United Nations Office on Drugs and Crime, *2023 Global Report on Cocaine* (March 2023)), at 55, available at https://www.unodc.org/documents/data-and-analysis/cocaine/Global_cocaine_report_2023.pdf.

[2] https://www.justice.gov/opa/speech/assistant-attorney-general-brian-benczkowski-delivers-remarks-press-conference-announcing

[3] Id.

Padrino Lopez), but also any agency or instrumentality of the judgment debtors (such as JNV and DIANCA). TRIA expressly authorizes victims of terrorism, such as Mr. Albán's estate and his family, to enforce their judgments against the assets of a terrorist's instrumentalities—here, the assets of JNV and DIANCA—that have been blocked pursuant to sanctions implemented by OFAC.

First, as this Court has already held, PDVSA is an instrumentality of the Judgment Debtors because of its central role in their money laundering operations. ECF Nos. 110, 113. PDVSA, in turn, wholly owns DIANCA, a Venezuela company that services ships and naval vessels, run by a Rear Admiral who reports to Judgment Debtor Vladimir Padrino López, Venezuela's Defense Minister and a senior leader in the Cartel of the Suns.

Several years ago, DIANCA received an arbitral award issued by the International Court of Arbitration of the International Chamber of Commerce. Instead of the funds being paid to DIANCA, DIANCA's agent—without any legitimate reason— sent a large portion of money to JNV Procurement, a newly minted, entirely unrelated Miami-based home business that self-reported its annual proceeds as $10,000/year. In short, the payment had no explanation, no support, and makes no business sense; it is a textbook example of money laundering.

Another portion of the funds that supposedly originated from the arbitration were deposited in an escrow account funded by Raytheon Anschütz GmbH (listed as a "financial transactions processing" company) in 2016, but not reported as belonging to DIANCA until 6 years later. Indeed, it was not until October 2022 that the financial transaction processing company reported the funds as belonging to DIANCA, at which time they were blocked pursuant to Executive Order 13884, Venezuela Sanctions Regulations 31 CFR Part 591.

As explained in the Declaration of Douglas C. Farah—a leading expert on Venezuelan criminal conduct including narcotics trafficking and money laundering—there is a wealth of evidence that JNV and DIANC are "nodes" in the Judgment Debtor's money laundering operations that are centered around PDVSA and that include PDVSA subsidiaries, "testaferros" (front men), shell companies, unethical bankers, corrupt government officials, and other bad actors.

For these and many other reasons discussed below, Mr. Farah correctly concludes that JNV Procurement is an instrumentality of the judgment debtors. As Mr. Farah explains, a wide range of evidence establishes that JNV is an instrumentality of the Judgment Debtors.

## RELEVANT PROCEDURAL BACKGROUND

On September 15, 2022, this Court entered a final judgment against the Cartel of the Suns. ECF No. 59. On February 9, 2023, this Court awarded an amended final default judgment for Plaintiffs and against Defendant Cartel of the Suns in the amount of $217 million. *See* Amended Final Default Judgment, ECF No. 73. On August 6, 2023, this Court awarded a final default judgment against Nicolas Maduro and other individual defendants, jointly and severally with the Cartel, in the same amount. ECF No. 91. As of today, the entire judgment remains unsatisfied. Ex. 1.

## ARGUMENT

**I. THE APPLICABLE LAW ENDORSES AN PRE-HEARING WRIT OF GARNISHMENT.**

The governing law allows even an *ex parte,* pre-hearing writ of garnishment on the assets of agencies and instrumentalities of terrorist judgment debtors—and then affords the agencies and instrumentalities ample notice and a fulsome opportunity to be heard *subsequently*, when the agencies and instrumentalities can no longer abscond with, or dispose of, the assets at issue.

Federal Rule of Civil Procedure 69(a)(1) provides that Florida law governs the procedure on this post-judgment TRIA execution, except to the extent that TRIA applies to supplement or preempt Florida law. *Stansell v. Revolutionary Armed Forces of Colombia* ("*Stansell II*"), 771 F.3d 713, 730 (11th Cir. 2014). In practice, this means that Florida law largely supplies the rules of procedure governing execution, and TRIA largely provides the substantive provisions that allow for executing on assets that OFAC has blocked.

Florida law permits a judgment creditor to obtain a writ of garnishment for "any debt due to defendant by a third person . . . and any tangible or intangible personal property of defendant in the possession or control of a third person." Fla. Stat. § 77.01. Chapter 77, which governs garnishment in satisfaction of a judgment, establishes the process where, as here, judgment creditors such as Plaintiffs seek to garnish property. First, the statute provides that a creditor begins the garnishment by filing a motion for writ of garnishment. *See, e.g.*, Fla. Stat. §§ 77.03 & 77.041. Second, the clerk issues the writ. *Id*. Third, the creditor serves the writ upon the garnishee. *Id*. Lastly, Florida's garnishment statutes require that within 3 business days **after** the writ is served

Plaintiffs must mail a copy of the motion and issued writ to the debtor's last known address. Fla. Stat. §77.041(2). After the motion is served, the garnishees have twenty days to answer. Plaintiff must also, within 5 days of garnishee's answer, mail to the judgment debtors a copy of the answer and a notice of right to move to dissolve. Fla. Stat. §77.055. A judgment lien is created at the moment a writ of garnishment is served on the garnishee, before any service on the debtor is required. § 77.06(1), Fla. Stat. ("Service of the writ creates a lien in or upon any such debts or property at the time of service or at the time such debts or property come into the garnishee's possession or control.").

Judgment Creditors have complied with the Florida garnishment statutes Fla. Stat. §77.03 by filing the instant motion under Fla. Stat. §77.03, and with Fla. Stat. §77.04, form of the writ, and will further comply with statutory notice requirements under Fla. Stat. §77.041(2) (requiring service of motion and writ) and §77.055 (requiring service of garnishee's answer).

In *Stansell II*, the Eleventh Circuit approved *ex parte*, pre-hearing issuance of a writ of execution on the blocked property of a terrorist party's agency or instrumentality, recognizing that terrorism victims' interest in "ensuring adequate satisfaction of judgments against terrorist parties" weighed strongly in favor of issuing an "immediate," pre-hearing writ. 771 F.3d at 729 (citing *Hausler v. JP Morgan Chase Bank, N.A.*, 740 F. Supp. 2d 525, 531 (S.D.N.Y. 2010) (recognizing that Congress's purpose in enacting TRIA § 201 was to "deal comprehensively with the problem of enforcement of judgments rendered on behalf of victims of terrorism")). The Eleventh Circuit recognized that "[d]uring the pendency of execution proceedings, a number of events may occur which make satisfaction using a particular asset impossible," such as the property owner's "mov[ing] the asset (or proceeds from its sale) outside the reach of the United States." *Id.* Issuing a pre-hearing writ of execution to attach the blocked property provides a "minimally intrusive manner of reducing these risks," and as a result, an owner of blocked property is "not constitutionally entitled to a hearing before the writ issue[s]." *Id.*

Here, those same considerations militate in favor of granting an immediate issuance of the writs. To be sure, after the levy, Judgment Creditors will provide the requisite notices of the garnishment. The agency or instrumentality may then elect to appear and attempt to contest its instrumentality status before garnishment is executed, but as the Eleventh Circuit has held, the agency or instrumentality lacks a right to a hearing before the issuance of the writ. *See Stansell v.*

*López Bello* ("*Stansell III*"), 802 F. App'x 445, 448 (11th Cir. 2020) (holding that Claimants "had no entitlement to a hearing prior to attachment or before a writ of execution is issued" and citing *Stansell II*). This Court consequently may enter pre-hearing writs of garnishment.

## II. PLAINTIFFS ARE ENTITLED TO WRITS OF GARNISHMENT UNDER TRIA.

Section 201(a) of the Terrorism Risk Insurance Act of 2002 ("TRIA") provides the substantive law that governs terrorism victims' efforts to satisfy their judgments from the blocked assets of Defendants and their instrumentalities. TRIA permits attaching the blocked property not only of the defendant terrorist/judgment debtor, but also the defendant's instrumentality: "Notwithstanding any other provision of law . . . in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism . . . the blocked assets of that terrorist party (***including the blocked assets of any agency or instrumentality of that terrorist party***) shall be subject to execution or attachment in aid of execution." 28 U.S.C. § 1610 Note (bold added); *Stansell v. Revolutionary Armed Forces of Columbia* ("*Stansell V*"), 45 F.4th 1340, 1346 (11th Cir. 2022) (quoting § 1610).

Thus, to satisfy TRIA § 201, Judgment Creditors must establish that (1) they have obtained a judgment against a terrorist based on an act of terrorism, (2) that assets they seeks are blocked, and (3) that the assets are owned by an agency or instrumentality or the judgment debtor. *Id.* Here, Judgment Creditors easily satisfy all elements.

### A. The judgment is against individual terrorists and a terrorist organization, for acts of terrorism.

*First*, as this Court already concluded, "Plaintiffs' judgment is for acts of terrorism" under TRIA. *See* ECF No. 101, at 5.

*Second*, the Cartel is a "terrorist organization." *See* ECF No. 101, at 5 ("the Cartel is a 'terrorist organization.'").

*Third*, the Judgment Debtors (including Maduro, Padrino Lopez, and the Cartel of the Suns) are also terrorists. TRIA does not define the term "terrorist," which, as noted above, means that the courts "give it its ordinary meaning." *Santos*, 553 U.S. at 511. In ordinary parlance, a terrorist "uses violence such as bombing, shooting, or kidnapping in an attempt to intimidate... especially as a means of achieving a political end." BLACK'S LAW DICTIONARY (11th ed. 2019)

6

(defining "terrorist"). Here, this Court recognized that "Plaintiffs have plausibly alleged two types of terrorism committed by the Individual Defendants . . . : (1) narco-terrorism and related terror financing; and (2) conspiracy to kidnap, torture, and murder Mr. Albán." ECF No. 89, at 11. Notably, the kidnapping and murder of Mr. Albán was to achieve a political end—specifically, it was retribution against him because he "denounced the Maduro regime's human rights abuses to important political leaders at the United Nations General Assembly" *Id.* at 5. Accordingly, the Individual Defendants are terrorists.

### B. The assets at issue are blocked.

Blocking "can be definitively established by the fact that OFAC has taken action against the alleged agency or instrumentality under TWEA or IEEPA."[4] 771 F.3d at 726. In other words, OFAC's designation of a person as an agency or instrumentality automatically renders that person's property blocked as a matter of law. *Id.*

On August 5, 2019, the President through Executive Order 13884 ("E.O. 13884") blocked "all property and interest in property of the Government of Venezuela."[5] Under E.O. 13884, the term "Government of Venezuela" includes Venezuela's agencies, such as DIANCA:

> [T]he state and Government of Venezuela, any political subdivision, agency, or instrumentality thereof, including the Central Bank of Venezuela and Petroleos de Venezuela, S.A. (PdVSA), any person owned or controlled, directly or indirectly, by the foregoing, and any person who has acted or purported to act directly or indirectly for or on behalf of, any of the foregoing, including as a member of the Maduro regime.[6]

In 2016 Raytheon Anschütz GmbH (then listed as a "financial transactions processing" company) funded an escrow account at JPMorgan in the amount of $4,065,659.06. It is unclear if at the time it funded the escrow account, Anschutz disclosed that the funds were connected with

---

[4] Although *Stansell II* mentioned only TWEA and the IEEPA, Congress amended TRIA in 2018 to also apply to assets blocked pursuant to the Kingpin Act. *See Stansell V*, 45 F.4th at 1347 n.2 ("blocked assets under § 201 of the TRIA include the assets of a terrorist party (and the assets of any agency or instrumentality of that terrorist party) seized or frozen by the United States pursuant to the Kingpin Act.").

[5] *See* Executive Order 13884, Blocking Property of the Government of Venezuela (Aug. 5, 2019), available at https://www.federalregister.gov/documents/2019/08/07/2019-17052/blocking-property-of-the-government-of-venezuela.

[6] *Id.*

an arbitral award issued by the International Court of Arbitration of the International Chamber of Commerce in favor of DIANCA. Nonetheless, six (6) years later in October 2022, Raytheon Anschutz reported to JPMorgan that the funds belonged to DIANCA, at which time they were blocked pursuant to Executive Order 13884, Venezuela Sanctions Regulations 31 CFR Part 591.

On November 1, 2023, Citibank filed blocking reports with OFAC, indicating that it had blocked the funds transferred to JNV allegedly originating from the arbitration award in favor of DIANCA. In short, OFAC has blocked the assets at issue.

### C. JNV and DIANCA are instrumentalities of the Cartel and Maduro.

Although TRIA does not define "instrumentality," the Eleventh Circuit has endorsed a broad definition: An "instrumentality" includes any party that provides material support to a terrorist party, whether financial, technological, or the provision of goods or services. *See Stansell V*, 45 F.4th at 1350 (quoting *Stansell II*, 771 F.3d at 724 n.6). In *Stansell II*, the Eleventh Circuit approved the district court's defining an "instrumentality" as any party that:

> "is or was ever involved" in any aspect of the [the defendant's] trafficking operations or that assisted with the [the defendant's] "financial or money laundering network" because it "was either (1) materially assisting in, or providing financial or technological support for or to, or providing goods or services in support" of, the [defendant's] international narcotics trafficking activities; and/or (2) "owned, controlled, or directed by, or acting for or on behalf of" the [the defendant]; and/or (3) "playing a significant role in" the [the defendant's] narcotics trafficking.

771 F.3d at 724 n.6.

As made clear by the language "or was ever involved," a third party who provides material support to a terrorist at any point in time constitutes an agency or instrumentality, even if they purportedly stopped aiding the terrorist. *Id.*; *accord Stansell V*, 45 F.4th at 1350 ("[T]he formulation we expressly approved in *Stansell II* encompassed past involvement or association with a terrorist party."). And even if a person works through an intermediary or third party to provide material support to a terrorist party, they still constitute an instrumentality. *Stansell V*, 45 F.4th at 1351 ("[N]othing in § 201(a) of the TRIA suggests that an instrumentality relationship with a terrorist party needs to be direct.").

The Eleventh Circuit has described knowledge as the key differentiator between an "agency" and an "instrumentality." Unlike an agency, an "instrumentality" need not know that

8

they have provided material support to a terrorist party (whether directly or indirectly). As the Eleventh Circuit explained in *Stansell V*, an instrumentality "refer[s] to unwitting cogs in a criminal scheme." *Id.* at 1354 (citing *United States v. Bachynsky*, 949 F.2d 722, 735 (5th Cir. 1991) ("For each false diagnosis submitted, an unwitting patient was made an instrumentality of the fraud."); Michael N. Giuliano, 22 C.J.S. Criminal Law: Substantive Principles § 170 (May 2022 update) ("Ordinarily, a person who causes a crime to be committed through the instrumentality of an innocent or unwitting agent is punishable as a principal.")).

1. **DIANCA is an instrumentality of the Judgment Debtors**

As this Court has held, PDVSA is an instrumentality of the Cartel of the Suns and Maduro. ECF Nos. 110, 113. DIANCA, in turn, is a PDVSA subsidiary. Farah Decl. ¶ 20. DIANCA builds, maintains, modifies, scraps, and services ships and naval vessels, both for civilian and military purposes. Farah Decl. ¶ 21. The president of DIANCA is Rear Admiral Luis Enrique Castillo, who is under the direct command structure of Defendant/Judgment Debtor Vladimir Padrino López, Venezuela's Defense Minister and a senior leader of the Cartel of the Suns. Farah Decl. ¶ 21. At the behest of Padrino López, the Cartel, and the other Individual Defendants, DIANCA serves as a significant node in the PDVSA network that launders the Judgment Debtor's narcotics proceeds and other ill-gotten funds. Farah Decl. ¶ 22-23. A key feature of the PDVSA money laundering network is its complexity, which makes it easier for the Individual Defendants to conceal and launder ill-gotten gains. *Id.* The multitude of nodes in the network—including DIANCA—are integral to its success. *Id.* Because DIANCA is owned by PDVSA, which is a instrumentality of the Judgment Debtors, and because DIANCA participates in money laundering on behalf of the Judgment Debtors, DIANCA is an instrumentality of the Judgment Debtors. Farah Decl. ¶ 24.

2. **JNV is an instrumentality of the Judgment Debtors**

There is abundant evidence that JNV is part of the Judgment Debtors' money laundering network. On one hand, it does not appear to have any legitimate business operations of its own, and on the other hand, it has received a multi-million-dollar payment from DIANCA with no conceivable business purpose.

9

a. **Background on JNV**

JNV registered to do business as a for-profit corporation in Florida on May 31, 2024. Farah Decl. ¶ 31. JNV registered its principal place of business and mailing address at a Miami office building, the Atrium Court, where a number of Florida corporations also have mailing addresses. Farah Decl. ¶ 31. The Director, President and owner of JNV Procurement (Juan Carrillo) lists the same address in Miami, Florida as his mailing address in the Florida Secretary of State filings. Farah Decl. ¶ 31. On or about February 1, 2023, JNV—through its President, Juan Carrillo—opened an account at Citibank. Farah Decl. ¶ 32. Mr. Carillo indicated (a) he was a Venezuelan citizen with lawful permanent resident status in the United States, (b) he owned 100% of JNV; (c) JNV anticipated annual gross revenue of $500,000, annual net profit of $10,000, and a Citibank account balance of $25,000 to $50,000. Farah Decl. ¶ 32.

In conducting standard know-your-customer ("KYC") account opening due diligence, Citibank further learned from Mr. Carrillo that JNV: (a) had begun its business recently, in June 2022; (b) was a "home based business"; (c) was a "wholesale broker of manufacturing equipment, wholesaler of spare parts, raw materials, USA"; (d) that its source of revenue was the "general public"; and (e) there were not going to be cross-border electronic funds transfers (EFTs) to or from JNV's account. Farah Decl. ¶ 33. For purposes of the account opening application, Mr. Carrillo listed a different address than that listed in the documents filed with the Florida Secretary of State. Specifically, when opening the Citibank account, Mr. Carillo listed JNV's address as a condominium (at the Jockey Club III) that was purchased by a BVI corporation (JC 1458 Holdings) for $10 in 2001. Farah Decl. ¶ 34.

b. **JNV received a major payment from DIANCA with all of the hallmarks of money laundering and sanctions evasion**

While the funds that Anschutz had placed in escrow were blocked when Anschutz disclosed the real beneficiary, i.e. DIANCA, the "settlement" (as set for below) for almost the same amount (with a slight increase to perhaps account for accrued interest) was sent to JNV in an attempt to launder the funds and avoid sanctions.

On or about May 30, 2023, DIANCA entered into a Settlement Agreement with Anschutz, GmbH ("Anschutz"), a German company that, among other things, provides integrated systems for naval vessels. Farah Decl. ¶ 28. The Settlement Agreement supposedly resolved an

outstanding debt that Anschutz owed to DIANCA relating to an arbitration that was resolved in 2012. Farah Decl. ¶ 29. Pursuant to the Settlement Agreement, Anschutz agreed to pay €5,059,665 to Patricio Eduardo Gomez de Larrain, in his capacity as an agent for DIANCA. Farah Decl. ¶ 30. On or about August 25, 2023—about seven months after the JNV opened its account at Citibank, and about a month after the Anschutz would have made its second payment under the DIANCA/Anschutz Settlement Agreement—Mr. Gomez de Larrain initiated a payment in the amount of $2,976,917.83 (€2,751,438) to JNV. Farah Decl. ¶ 35. In the payment to JNV, Mr. Gomez de Larrain included a message explaining that the transfer of funds to JNV was in connection with the payment of the arbitral award from Anschutz to DIANCA. Farah Decl. ¶ 35. This payment exhibits all the hallmarks of money laundering.

First, DIANCA itself is a node in the PDVSA money laundering network, meaning that payments DIANCA makes are likely to be in furtherance of money laundering. Farah Decl. ¶ 37. Second, there is no valid business explanation for the payment from DIANCA to JNV. Farah Decl. ¶ 38. JNV was not a party to the arbitration between Anschutz and DIANCA. *Id.* JNV was not even incorporated until nearly a decade after that arbitration was concluded. *Id.* Nor was JNV a party to the settlement between Anschutz and DIANCA. *Id.* Nor is JNV's business related to that of DIANCA and Anschutz: DIANCA is a Venezuelan entity in the business of servicing ships and naval vessels and Anschutz is a German company in the business of providing equipment to ships and naval vessels, whereas JNV is a U.S. home based business, run from a condo in Miami, that is supposedly a wholesaler of manufacturing equipment, spare parts and raw materials. *Id.* Indeed, JNV said that is source of funds would the "general public," not payments from German judgment debtors. *Id.* As such, there is no apparent business justification for JNV to receive a payment from the Anschutz/DIANCA settlement. *Id.* Third, the payment that JNV received is inconsistent with stated size of JNV's business and the manner in which JNV advised Citibank that that JNV would be using its Citibank account. Farah Decl. ¶ 38, 39. For example, JNV informed Citibank that JNV expected to have $500,000 per year in turnover, $10,000 per year in profits, and an account balance of between $25,000 and $50,000. *Id.* Thus, the payment that JNV received from DIANCA was grossly out of proportion to JNV's size and expectations. *Id.* Such an out of character transaction is characteristic of money laundering. *Id.* JNV further advised Citibank that it would not receive cross-border funds

transfers, yet that is precisely what the DIANCA payment was.  Finally, JNV received the funds from a non-US, non-Venezuelan source, which is consistent with attempting to keep the flow of funds concealed. Farah Decl. ¶ 39, 40.

### c. JNV does not appear to have any legitimate business of its own

JNV does not appear to have any *bona fide* business operations at all.  To begin, JNV's website (which say that JNV offers "procurement and e-commerce solutions") provides no substantive explanation of JNV's business, such as what it "procures," instead, JNV's website offers vague statements as such as "[o]ur procurement services are designed to cater to businesses of all sizes and industries. Whether you're a startup, a growing enterprise, or an established corporation, we have the expertise and resources to meet your unique procurement needs."  Farah Decl. ¶ 41.  JNV's website contact page provides no phone number and no mailing address, only an email portal.  *Id.*  In contrast to what JNV told Citibank (i.e., that JNV is a "wholesaler"), JNV's website makes no mention of "wholesaling." *Id.*  Further, JNV was incorporated only shortly before it received the payment from DIANCA, and was registered in Florida only *after* the funds at issue were blocked.  JNV was, moreover, registered by a Venezuela ex-patriate.  Farah Decl. ¶41.  The address JNV used when opening its Citibank account is a condo that is owned by an offshore company that bought the condo for $10.  *Id.*  The address JNV used when registering with the State of Florida is a corporate office where numerous other companies are registered, and its agent ("Selecta Consulting Services, LLC") has registered myriad companies with generic names.  All of the foregoing is consistent with the conduct of shell companies created by Venezuelan front persons (testaferro) for money laundering purposes.  *Id.*

For all of the foregoing reasons, Mr. Farah correctly concludes "that (1) the payment from DIANCA to JNV was an instance of money laundering, (2) JNV is, like DIANCA, a node in the PDVSA money laundering network that Maduro, the Individual Defendants and the Cartel utilize to launder narcotics proceeds, currency control scam proceeds, and other ill-gotten gains, and (3) consequently, JNV is an instrumentality of Maduro, the Cartel, and the Individual Defendants."  Farah Decl. ¶ 43.

### III. WRITS OF GARNISHMENT ON THE BLOCKED FUNDS SHOULD BE GRANTED IMMEDIATELY.

As noted above, TRIA allows terrorism victim judgment holders to execute on blocked assets of any designated party "that is *or was ever* involved" in any aspect of Maduro's narcotics trafficking and money laundering (i.e., the same drug trafficking and money laundering that allows the Maduro Criminal Enterprise to reap enormous profits that enable it to kidnap and torture people like Mr. Albán who speak out against the Maduro Criminal Enterprise's corruption), even if those agencies/instrumentalities are not named defendants. *See, e.g.*, *Stansell II*, 771 F.3d at 725, n.6. Because the evidence discussed throughout this motion shows that DIANCA and JNV are instrumentalities of Judgment Debtors Maduro, Padrino Lopez, and the Cartel, the writs of garnishment should issue now for the blocked funds held at Citibank and JPMorgan Chase.

### CONCLUSION

For the foregoing reasons, the writs of garnishment should be issued now for the DIANCA and JNV funds. Proposed writs of garnishment are enclosed.

Respectfully submitted on August 16, 2024.

*/s/ Jaime D. Guttman*
Fla. Bar No. 44076
*jaime@scale.law*
Scale Law Partners, LLC
777 Brickell Avenue, Suite 500
Miami, FL 33131
(786) 273-9033 (Main)

*Counsel for Plaintiffs*

13

## **CERTIFICATE OF SERVICE**

I certify that I filed the foregoing document on August 16, 2024 through CM/ECF, which automatically and electronically delivered notice of filing to counsel of record for all parties that have appeared.

*/s/ Jaime D. Guttman*