**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 1:21-cv-20706-DPG**

MEUDY ALBÁN OSIO in her personal capacity
And in her capacity as the personal representative
of the Estate of FERNANDO ALBERTO ALBÁN,
FERNANDO ALBÁN OSIO, and MARIA
FERNANDA ALBÁN OSIO,

       Judgment Creditors / Plaintiffs,

v.

NICOLAS MADURO MOROS,
FUERZAS ARMADA REVOLUCIONARIAS
DE COLUMBIA ("FARC"); THE CARTEL OF
THE SUNS A.K.A. CARTEL DE LOS SOLES;
VLADIMIR PADRINO LOPEZ; MAIKEL
JOSE MORENO PEREZ; NESTOR LUIS
REVEROL TORRES; and TAREK WILLIAM
SAAB,

       Judgment Debtors / Defendants.

_____/

**JUDGMENT CREDITORS' OPPOSITION TO NON-PARTY AD HOC BOARD OF
PDVSA'S MOTION TO VACATE ORDER AND TURNOVER JUDGMENT, DISSOLVE
WRITS OF GARNISHMENT, DENY TURNOVER MOTIONS, AND DISMISS ACTION
WITH PREJUDICE (ECF No. 310)**

## INTRODUCTION

Movant—the Ad Hoc Board of PDVSA (the "AHB")—offers this Court a brief that is the jurisprudential equivalent of throwing spaghetti at the wall to see if any will stick.  The AHB spills ink for pages arguing that two Eleventh Circuit holdings were wrongly decided.  *See* ECF No. 310, at 12-15 (arguing that *Stansell II*'s definition of "agency or instrumentality" was "wrong"); *id.* at 22-23 (arguing that *Stansell IV* was wrong in holding that there is no temporal restriction limiting when conduct giving rise to agency or instrumentality status must occur).  The AHB advances positions that the Eleventh Circuit already rejected, but without citing the Eleventh Circuit decision.  *Id.* at 26 (arguing that TRIA does not apply to assets owned by an agency or instrumentality if the terrorist itself lacks an ownership interest in those assets, contrary to *Stansell II*).  The AHB makes arguments about code sections that are not at issue.  *Id.* at 27 (asserting arguments based on sections of the FSIA that Plaintiffs do not invoke).  The AHB rests on an inapposite, out-of-state district court decision. *Id.* at 18 (asserting the political question doctrine based on a New York case with facts that render any comparison to this matter inapt).  And the AHB barely bothers to develop a handful of its arguments toward the back of its brief.  None works.  The AHB's indiscriminate splatter cannot conceal that fact.

## ARGUMENT

### I.   THE AHB LACKS STANDING AS TO MANY OF THE WRITS IT CHALLENGES.

The AHB seeks to challenge three writs seeking property owned, not by PDVSA, but rather by certain PDVSA subsidiaries.

***First,*** on September 5, 2023, this Court entered a writ of garnishment for the blocked assets of PetroCedeño at JPMC.  ECF No. 165.  As JPMC stated in its answer to that writ, those blocked assets "belong to Petrocedeno," an entity in which PDVSA has "an indirect 100% interest."  ECF No. 242, at 3.  As the Eleventh Circuit has held, this means that only PetroCedeño—and not PDVSA, which is merely an indirect shareholder of PetroCedeño[1]—has standing to contest the writ.  *See Stansell v. FARC ("Stansell II")*, 771 F.3d 713, 744 (11th Cir. 2014) (barring shareholder from challenging TRIA writ of execution seeking blocked assets of his company; holding that "corporations themselves—and not shareholders—are the only parties with standing to contest

---

[1] More specifically, PDVSA is a shareholder of Corporación Venezolana del Petróleo ("CVP"), which in turn is a shareholder of PetroCedeño.

injuries to the corporation"); *Stansell v. FARC*, 2013 WL 12142969, at *4 (M.D. Fla. May 2, 2013) ("[b]ecause the individuals . . . are not the account holder, they lack standing to challenge this TRIA garnishment."); *United States v. Devlin*, 2013 WL 275968, at *8 (M.D. Fla. Jan. 22, 2013) (same). Thus, PDVSA does not have standing to contest the PetroCedeño writ.

Moreover, PetroCedeño, as a subsidiary (indeed, an indirect subsidiary) of PDVSA, lacks sovereign immunity. *See Dole Foods v. Patrickson*, 538 U.S. 468, 473 (2003) ("a subsidiary of an instrumentality is not itself entitled to instrumentality status"); *Santiago v. Nsi Ins. Grp.*, No. 05-cv-22307, 2006 WL 8433177, at *10 (S.D. Fla. July 7, 2006) (holding that subsidiary in which foreign government had an indirect interest was not covered by the FSIA). PetroCedeño was properly served in accordance with Fla. Stat. § 77.041 (ECF No. 167) and Fla. Stat. § 77.055 (ECF No. 247). PetroCedeño defaulted when it failed to respond within 20 days, i.e., by December 4, 2024. *Id.* Thus, PetroCedeño has forfeited its right to contest the writ for its blocked assets. *See* Fla. Stat. § 77.07(2) ("Failure of the defendant or other interested person to timely file and serve the motion to dissolve within such time limitation shall result in the striking of the motion as an unauthorized nullity by the court, and the proceedings shall be in a default posture as to the party involved."). The AHB cannot gloss over this dispositive fact by camouflaging its objections to the PetroCedeño writ amongst its objections to writs for assets of PDVSA.

*Second*, on August 15, 2024, the Court entered a writ of garnishment for the blocked assets of Bariven (ECF No. 134) at Pierce Manufacturing ("Pierce"). As Pierce stated in its answer to that writ, Bariven, S.A. is the "beneficiary" of the blocked assets. ECF No. 143, at 1. Bariven is a wholly owned subsidiary of PDVSA. ECF No 132, at 1. Accordingly, for the reasons set forth above, PDVSA lacks standing to contest the Bariven writ and Bariven lacks sovereign immunity. Moreover, Bariven was properly served in accordance with Fla. Stat. § 77.041 (ECF No. 137) and Fla. Stat. § 77.055 (ECF No. 145), and defaulted when it failed to contest the writ within 20 days, i.e., by September 10, 2024. Bariven has thus forfeited its right to contest the writ.

*Third,* on October 8, 2024, the Court entered a writ of garnishment for the blocked assets of Petromar. ECF No. 180. The facts are law are materially the same for this writ, too.

## II. THIS COURT HAD (AND CONTINUES TO HAVE) SUBJECT-MATTER JURISDICTON

### A. TRIA Abrogates Jurisdictional Immunity

"[T]he TRIA confers courts with subject-matter jurisdiction over enforcement actions, such as this one, that would otherwise fall under the parameters of immunity provided by the

FSIA." *Hausler Republic of Cuba v. Comcast IP Phone II*, No. 09-20942-CV-JORDAN, 2010 WL 11442514, at *5 (S.D. Fla. Oct. 14, 2010); *Villoldo v. Castro Ruz*, 113 F. Supp. 3d 435, 437 (D. Mass. 2015), *aff'd*, 821 F.3d 196 (1st Cir. 2016) ("Congress has created certain terrorism-related exceptions [including TRIA § 201] to the general immunity that foreign sovereigns enjoy in federal and state courts"); *Weininger v. Castro*, 462 F. Supp. 2d 457, 488 (S.D.N.Y. 2006) ("TRIA operates as an exception to immunity from both jurisdiction and execution."); *see also Stansell v. Revolutionary Armed Forces of Colombia*, No. 8:09-CV-2308-RAL-MAP, 2011 WL 13141950, at *3 (M.D. Fla. Oct. 11, 2011) (holding that it is "clear beyond cavil that Section 201(a) of the TRIA provides courts with subject matter jurisdiction over post-judgment execution and attachment proceedings against property held in the hands of an instrumentality of the judgment-debtor, even if the instrumentality is not itself named in the judgment." (quoting *Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 50 (2d Cir. 2010))).

The AHB is wrong that TRIA lifts only immunity from execution, and not jurisdictional immunity. ECF No. 310, at 13. To begin, that is not what courts in this jurisdiction have held. *E.g., Hausler Republic of Cuba,* 2010 WL 11442514. Moreover, it is the common sense interpretation of TRIA: "it would be contradictory for Congress in the same breath to expressly make assets subject to execution and at the same time make the owner of those assets immune from suit to recover those assets." *Weininger*, 462 F. Supp. 2d at 488. And most fundamentally, this is what the plain language of TRIA dictates.

TRIA § 201 specifies that judgments against terrorist parties shall be satisfied "in every case" by execution against the assets of those terrorist parties' agencies and instrumentalities. And TRIA provides for this result "notwithstanding any other provision of law," including not only execution immunity under FSIA §§ 1609 and 1611, but also jurisdictional immunity under FSIA § 1604. The text extends TRIA's reach to "*any* agency or instrumentality" of *any* "terrorist party," words broader than those used by Congress in the FSIA when referring only to foreign states. Each of the foregoing textual components, which have well-established meanings in statutory construction, demonstrates that TRIA's exemption from immunity applies to both jurisdictional and executional immunity.

To begin, the Supreme Court has held that "use  of such a 'notwithstanding' clause clearly signals the drafter's intention that the provisions of the 'notwithstanding' section override conflicting provisions of any other section." *Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 18

(1993). The Court further explained "the Courts of Appeals generally have interpreted similar 'notwithstanding' language to supersede all other laws, stating that 'a clearer statement is difficult to imagine.'" *Id.* (cleanup up) (quoting *Liberty Maritime v. United States*, 928 F.2d 413, 416 (D.C. Cir. 1991)); *Stansell*, 2011 WL 13141950, at *4 (same).

Moreover, the text of TRIA makes plain that that the notwithstanding clause applies broadly to any provisions that may stand in the path of execution, wherever codified. "[T]he operative language begins with the phrase '[n]otwithstanding any other provision of law,' thus making plain that the force of the section extends *everywhere*." *Weinstein*, 609 F.3d at 48-49 (emphasis added) (holding that TRIA prevailed over international treaties that were invoked for reasons other than immunity from execution). As the Eleventh Circuit puts it, "'there are no limits' to the scope of the 'notwithstanding' clause in the TRIA." *Stansell v. FARC (*"*Stansell V*"), 45 F.4th 1340, 1362 n.11 (11th Cir. 2022) (quoting *United States v. All Funds On Deposit With R.J. O'Brien & Assoc.*, 783 F.3d 607, 620-21 (7th Cir. 2015)). Similarly, in *Miccosukee Tribe of Indians of Florida v. U.S. Army Corps of Engineers*, 619 F.3d 1289, 1301 (11th Cir. 2010), the Eleventh Circuit concluded that the "notwithstanding" clause in an appropriations provision was not limited to preempting appropriations laws.

In addition, Congress expressly limited the scope of § 201(a)'s notwithstanding clause by specifying in a subclause that it applies to "any other provision of law, . . . except as provided in subsection (b)." Under the canon of *expressio unius est exclusio alterius*, under which "the mention of one thing implies the exclusion of another," the fact that Congress identified the carveouts it was affording indicates that Congress was not allowing for other exceptions. *Christian Coal. of Fla., Inc. v. United States*, 662 F.3d 1182, 1193 (11th Cir. 2011) ("Where Congress has provided a comprehensive statutory scheme of remedies, as it did here, the interpretive canon of *expressio unius est exclusio alterius* applies.")

For all of the foregoing reasons, the plain language of TRIA demonstrates that the cases cited above were correct to hold that TRIA lifts subject-matter immunity. The remaining language of TRIA § 201 reinforces this conclusion. Notably, in drafting TRIA, Congress paired the "notwithstanding" clause with yet another broad edict that TRIA must be applied "in every case" that meets its criteria. *See United States v. All Funds on Deposit with R.J. O'Brien & Assocs.*, 783 F.3d 607, 621 (7th Cir. 2015) ("[W]ords of broad application bookend TRIA's 'notwithstanding' clause."). Similarly, Section 201(a) mandates that when a judgment is obtained against a terrorist

party, "the blocked assets of *any* agency or instrumentality of that terrorist party . . . shall be subject to execution," with "terrorist party" defined as a "terrorist," a "terrorist organization," *or* a "foreign state designated as a state sponsor of terrorism." TRIA § 201(a), (d)(4) (emphasis added). Thus, by its terms, the statute reaches "*any* agency or instrumentality" of "*any* terrorist party," without regard to whether the agency or instrumentality is a foreign state ordinarily entitled to § 1604 immunity. Finally, TRIA provides that, when its conditions are satisfied, covered assets "shall be subject to execution." TRIA § 201(a). The word "shall" is "mandatory, not precatory." *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 486 (2015). Thus, if TRIA's elements are satisfied, the court must authorize execution, without regard to other obstacles.

Finally, the foregoing reading effectuates Congress's intent in enacting TRIA, which was to "'deal comprehensively' with the problem of enforcement of judgments rendered on behalf of victims of terrorism.'" *Stansell II,* 771 F.3d at 732 (quoting H.R. Rep. No. 107–779, at 27 (2002) (Conf. Rep.), *reprinted in* 2002 U.S.C.C.A.N. 1430, 1434)); 147 Cong. Rec. 23,377 (2001) (explaining that a draft version of § 201 "removes foreign sovereign immunity and is designed to ensure that victims of terrorism receive the compensation they are owed").[2]

### B. The Also Court Has Jurisdiction Under the Commercial Activities Exception

Under the commercial-activity exception, "[a] foreign state [including its instrumentalities] shall not be immune from the jurisdiction of courts of the United States or of the States in any case":

> in which the action is based [1] upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2). When the Plaintiffs moved for a writ against PDVSA, the Judgment Creditors demonstrated that "at least the first clause ('a commercial activity carried on in the United States by the foreign state') and the third clause ('an act outside the territory of the

---

[2] Congress enacted TRIA as a freestanding measure; it was not enacted as an amendment to the FSIA. *See generally* Terrorism Risk Insurance Act of 2002. Nothing can be inferred from its placement in the notes of the FSIA. As a choice made by the Office of Law Revision Counsel, not Congress, its placement "should be given no weight," *North Dakota v. United States*, 460 U.S. 300, 310 n.13 (1983).

6

United States in connection with a commercial activity of the foreign state elsewhere and that caused a direct effect in the United States') each strips PDVSA of jurisdictional immunity." ECF No. 94, at 30. In response, the AHB argues that "for purposes of the commercial-activity exception, an action is 'based upon' the 'particular conduct' that constitutes the 'gravamen' of the suit." ECF 310, at 14. This argument fails for three, independent reasons.

*First*, the "gravamen" requirement upon which AHB relies is only applicable to lifting sovereign immunity under the commercial exception's first clause (which reads "based upon a commercial activity"), not the third clause (which reads "based upon . . . upon an act outside the territory of the United States *in connection with* commercial activity"). *See Adler v. Nigeria*, 107 F.3d 720, 726 (9th Cir. 1997) (explaining, in the context of the third clause, that "[Plaintiffs'] claims need not be 'based upon' commercial activity; they must merely be based upon acts made 'in connection with' such activity."). To satisfy the third clause, Plaintiffs must satisfy the "direct effects" test, under which commercial activity elsewhere causes an immediate consequence in the United States. *Devengoechea v. Bolivarian Republic of Venezuela*, 889 F.3d 1213, 1222 (11th Cir. 2018). The AHB makes no argument that direct effects test was not satisfied. Nor may it add such an argument later on reply. *Movie Prop Rentals LLC v. Kingdom of God Glob. Church*, No. 22-22594-CIV, 2024 WL 4215630, at *6 (S.D. Fla. Aug. 13, 2024) (Torres, J.), *report and recommendation adopted*, No. 22-CV-22594, 2024 WL 4120033 (S.D. Fla. Sept. 9, 2024). In any event, as set forth in Plaintiffs' motion for a writ (ECF No. 94, at 33-36), the direct-effects test is satisfied here.

*Second*, the entire premise of the AHB's jurisdiction argument is that these garnishment proceedings are "independent civil actions" that require an "independent basis for jurisdiction." ECF No. 310, at 12-13. The gravamen of that "independent civil action," *i.e.*, the TRIA enforcement action against PDVSA, is that PDVSA is an agency or instrumentality of the Judgment Debtors because it engaged in *commercial* activity on their behalf, including laundering money, supporting currency scams, and even smuggling cash and cocaine. ECF No. 94, at 3-19.

*Third*, the "gravamen" of Plaintiffs' underlying complaint is that Defendants used the United States as a platform for terrorist fundraising, thereby violating the Florida Anti-Terrorism Act and causing the Plaintiffs injuries. This focus on terrorist financing as the basis for liability is well-recognized in ATA cases. *See, e.g., Boim v. Holy Land Foundation for Relief and Dev.*, 549 F.3d 685 (7th Cir. 2008) (affirming judgment holding Islamic charities liable under the Anti-

Terrorism Act for financial support of Hamas, supporting Hamas murder of plaintiff); *Linde v. Arab Bank*, 882 F.3d 314, 318 (2d Cir. 2018) (explaining that "Plaintiffs charged the bank with facilitating the attacks at issue by knowingly providing financial services to Hamas" in violation of the ATA).  Plaintiffs' complaint follows those precedents.  Indeed, this Court held that the Plaintiffs had alleged a claim for ***terrorist financing*** that was sufficient, standing alone, to give rise to liability under the Florida ATA.  *See* R&R, ECF No. 56 at 17-18, *adopted* ECF No. 58. And as for the "kidnap, torture, and murder" of Mr. Albán, even those acts violated the Florida ATA "because they occurred pursuant to a narco-terrorism conspiracy designed to flood Florida with cocaine and to launder the illegal drug money through Florida."  *Id.*

**C.  In Any Event, FSIA § 1604 Is Inapplicable To These Enforcement Proceedings**

Section 1604 applies only to claims against a foreign state for *in personam* relief, and these garnishment proceedings do not assert such claims against PDVSA.  Section 1604 provides immunity to foreign states—but only as to the "category of cases . . . contemplated in [28 U.S.C.] § 1330."  *Turkiye Halk Bankasi*, 143 S. Ct. 940, 949 (2023).  Section 1330(a), in turn, provides that "district courts shall have original jurisdiction . . . of any nonjury civil action against a foreign state . . . as to any claim for relief *in personam* [subject to certain exceptions]."  28 U.S.C. § 1330(a).  As a result, § 1604 applies only to claims against a foreign state seeking relief *in personam*.  As the Second Circuit explained in *U.S. v. Assa*, 934 F.3d 185, 188-89 (2d Cir. 2019), a suit directed against property of a foreign state "is . . . not a suit against a foreign state." *Id*.  As a result, "[n]o jurisdiction flows from § 1330(a), and no immunity flows from § 1604." *Id; see also Peterson v. Islamic Republic of Iran*, 876 F.3d 63, 88 (2d Cir. 2017) (§ 1604 is "no impediment to an order" directing a garnishee to turn over state assets to a judgment creditor), *summarily vacated sub nom. Bank Markazi v. Peterson*, 140 S. Ct. 813 (2020), *reinstated in relevant part*, 963 F.3d 192, 196 (2d Cir. 2020).

**III.  PDVSA IS SUBJECT TO PERSONAL JURISDICTION IN FLORIDA**

**A.  Plaintiffs Properly Served PDVSA**

The AHB argues that Plaintiffs failed to serve PDVSA in accordance with the FSIA.  Not so.  Plaintiffs properly service PDVSA under 28 U.S.C. § 1608(b), which governs service on an agency or instrumentality of a foreign state.  Under Section 1608(b), "if no special arrangement for service exists" (and the AHB admits there is none, ECF No. 310, at 16), then service may occur "by delivery of a copy of the summons and complaint either to an officer, a managing or general

agent, or to ***any other agent authorized*** by appointment or ***by law*** to receive service of process in the United States; or in accordance with an applicable international convention on service of judicial documents." *Id.* (emphasis added). Here, Plaintiffs served the Florida Secretary of State. *See* ECF No. 105, at 1-2 (confirming service in compliance with laws incorporated under Rule 4); *see also* Fed. R. Civ. P. 4(j)(1) (incorporating by reference FSIA § 1608). As courts routinely recognize, where federal law permits service on an "agent authorized by law"—as the FSIA does— Plaintiffs may effectuate service on the Secretary of State. *See Clarendon Am. Ins. Co. v. Krishna Assocs. of Titusville, Inc.*, No. 606CV819-ORL-18JGG, 2006 WL 3762076, at *1 (M.D. Fla. Dec. 20, 2006) (because Rule 4(h) authorized service on "agent authorized by . . . law," substitute service on the Florida Secretary of State was appropriate); *see also Casares v. Altman Specialty Plants, LLC*, No. 1:22-CV-00885-MLG-LF, 2023 WL 6162328, at *2 (D.N.M. Sept. 21, 2023) ("service was made upon an agent authorized by law to receive service of process: the Secretary of State"); *Miller v. Collectron Corp.*, No. 98-CV-2221 (JG), 1999 WL 730981, at *7 (E.D.N.Y. Sept. 16, 1999) (Rule 4(h) of the Federal Rules of Civil Procedure provides that service on a corporation is effected by delivering a copy of the summons and complaint to any 'agent authorized . . . by law to receive service of process.' In New York, the Secretary of State is an agent authorized by law to receive service of process for a New York corporation."); *S.E.C. v. Am. Land Co.*, No. CIV.A. 87-1453, 1987 WL 19930, at *4 (D.D.C. Nov. 6, 1987) ("As a matter of Delaware law, therefore, it seems beyond peradventure that the Secretary of State may become an authorized agent for purposes of service of process. It seems equally evident, then, that in such a case the Secretary of State also becomes "an agent authorized by law to receive service of process" within the plain language and meaning of Federal Rule 4(d)(3).").

Moreover, the law holding that the phrase "agent authorized by law" includes the Secretary of State was well established when Congress utilized that phrase when it enacted the FSIA in 1976. *See, e.g., Magelssen v. Hale*, 81 F. Supp. 138, 139 (W.D. Mo. 1948) (under Missouri statute requiring that nonresident motorist agree that Secretary of State shall be lawful attorney and agent for service of process, Secretary of State was an "agent authorized by law" within federal rule providing that service may be had upon individual by delivering copy of summons and complaint to an "agent authorized by law"); *Atl. Enterprises, Inc. v. Nat'l Equip. Rental, Ltd.*, 208 F. Supp. 710, 711 (D.P.R. 1962) (same); *Clancy v. Balacier*, 27 F. Supp. 867, 869 (S.D.N.Y. 1939) (same). Accordingly, Congress is presumed to have incorporated this interpretation when it enacted the

FSIA.  *Lamar, Archer & Cofrin LLP v. Appling*, 584 U.S. 709, 721 (2018) ("When Congress use[s] the materially same language in [a more recent enactment], it presumptively [is] aware of the longstanding judicial interpretation of the phrase and intend[s] for it to retain its established meaning.").

Here, the Florida Secretary of State was authorized to accept service on behalf of PDVSA. First, PDVSA conducts business in Florida, including laundering money and smuggling cocaine. *See generally* ECF No. 94, at 10-11 (describing indictment of PDVSA executives in Florida); ECF No. 94-5 (describing PDVSA conduct through the United States, including Florida).  Second, Fla. Stat. § 48.181 ("Substituted service on non-residents and foreign businesses engaging in business in state or concealing their whereabouts."), provides that "the acceptance by any foreign business entity of the privilege extended by law to nonresidents to operate, conduct, engage in, or carry on a business or business venture in this state, or to have an office or agency in this state, is deemed to constitute an appointment by the individual or foreign business entity of the Secretary of State of this state as its agent on whom process in any action or proceeding against the individual or foreign business entity.").  Here, as set forth in the motion for a writ (ECF No. 94), PDVSA has engaged in business in Florida, thereby appointing the Secretary of State as its agent for service of process.  Accordingly, Plaintiffs' service on the Florida Secretary of State was service on "an agent authorized by law," satisfying the FSIA.  Nor does the AHB assert that PDVSA lacked actual notice of Plaintiffs' enforcement efforts.  "[R]eceipt of actual notice is an important factor in considering whether service of process is adequate."  *Prewitt Enters., Inc. v. Org. of Petroleum Exporting Countries*, 353 F.3d 916, 925 n.14 (11th Cir. 2003)

***Second,*** even if service was inadequate (and it was not), the proper remedy, as Judge Torres has explained, is not dismissal: "[i]t is generally held that dismissal of a complaint should be avoided when there is a reasonable prospect for effective service."  *See Bodyup Fitness, LLC v. 2080039 Ontario, Inc.*, No. 07-22223-CIV, 2008 WL 516996, at *5 (S.D. Fla. Feb. 23, 2008) (Torres, J.) (collecting cases); *Jack E. Dominik, P.A. v. Comsof N.V.*, 293 F. Supp. 2d 1288, 1288 (S.D. Fla. 2003) (same); *Cayago Tec GmbH v. iAQUA (Hong Kong) Ltd.*, 664 F. Supp. 3d 1361, 1364 (S.D. Fla. 2023) (same); *Winmark Corp. v. Brenoby Sports. Inc.*, No. 13CIV62697SCOLAVALLE, 2014 WL 11706427, at *1 (S.D. Fla. May 30, 2014) (same). Accordingly, because service may be effectuated here (as it was in the underlying action), the Court should permit that to occur, if it has any concerns about service.  This is particularly

10

appropriate because the AHB disingenuously urges that service should proceed through the Hague Convention, which, as the AHB knows, will be received by Maduro's Central Authority and never delivered. As this Court and others around the country have recognized, service to Venezuela through the Hague Convention is not feasible as the Maduro Regime refuses to accept service of process from the U.S. (*see* ECF No.60 (granting alternative service of process); *see also Marron v. Maduro Moros, et al.*, No. 1:2021-cv-23190-FAM (S.D. Fla.) (ECF No. 33) (same).    As such, the AHB should not be heard to complain about affording Plaintiffs an opportunity to serve. *Cf. Corrado v. New York Unified Ct. Sys.*, 163 F. Supp. 3d 1, 16 (E.D.N.Y. 2016), *aff'd.*, 698 F. App'x 36 (2d Cir. 2017) (a party "cannot evade service . . . and then complain that he was prejudiced by not receiving service.").

### B.  Exercising Jurisdiction Over PDVSA Is Consistent With Due Process

The AHB does not dispute that PDVSA engaged in extensive conduct in Florida directly relevant to its status as a TRIA agency or instrumentality.  The AHB's only argument—i.e., that these contacts cannot be attributed to PDVSA because PDVSA was controlled by the unlawful Maduro regime at the time, ECF No. 310, at 17—is wrong as a matter of law and fact.  As a legal matter, it does not matter who controlled PDVSA, the court looks to "***all contacts*** between the nonresident defendant and the forum state" to assess personal jurisdiction.  *Del Valle v. Trivago GMBH*, 56 F.4th 1265, 1276 (11th Cir. 2022) (emphasis added).  Plaintiffs cite no authority for the proposition that ongoing contacts caused by bad actors are excluded from the personal jurisdiction analysis, which would serve only to improperly insulate entities committing the worst misconduct from personal jurisdiction.

Further, as a factual matter, the U.S. government did not recognize "interim President Juan Guaido and the National Assembly"—from which the AHB asserts it derives its authority—until January 2019. *See* Venezuela: A Democratic Crisis, U.S. Dep't of State, https://2017-2021.state.gov/a-democratic-crisis-in-venezuela/; *accord* ECF No. 310, at 17-18.  But PDVSA's conduct in Florida, sufficient to support jurisdiction, also occurred before that date. *See, e.g.,* ECF No. 94-5 (Declaration of Douglas C. Farah), at ¶¶ 40-44  (describing the use of the aircraft subject to the writ of execution here to, among others, transport members of the Maduro Criminal Enterprise in October 2018)).  Plaintiffs once again cite no authority for the novel proposition that a change of legal ownership of a corporation (e.g., the asserted change of PDVSA's legal owners/operators from the Maduro regime to the AHB) erases contacts arising before the

change.

## IV.   THE POLITICAL QUESTION DOCTRINE IS NOT A BAR TO APPLYING TRIA.

The AHB's "political question" argument raises an illusory concern.  The Court can (and appropriately did) make a determination that PDVSA is an agency/instrumentality of Judgment Debtor Maduro, in his personal capacity, without even implying, let alone making any determination, concerning which government is the rightful government of Venezuela.  As this Court explained, it was PDVSA's aid to Maduro (in his personal capacity) and the Cartel of the Suns that was the basis for its holding that PDVSA is an agency or instrumentality of Maduro.  *See* ECF No. 110, at 7 ("PDVSA supports *Mr. Maduro* in orchestrating illegal activity") (emphasis added).

"In general, the Judiciary has a responsibility to decide cases properly before it, even those it 'would gladly avoid.'" *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 194 (2012) (quoting *Cohens v. Virginia,* 6 Wheat. 264, 404, 5 L.Ed. 257 (1821)).  The political question doctrine is a "narrow exception" to that rule.  *Id.*  In *Zivotofsky*, the Supreme Court addressed the same argument the AHB makes here, *i.e.*, that a decision in the case at bar would infringe on the Executive's prerogative to recognize, or decline to recognize, foreign states, and therefore was a non-justiciable political question.  In *Zivotofsky*, Congress enacted a statute providing that Americans born in Jerusalem may elect to have "Israel" listed as the place of birth on their passports, but the State department declined to follow that law, citing its policy of not taking a position on the political status of Jerusalem.  When a U.S. citizen sued, invoking the statute, the State Department argued that the court could not determine the case under the political question doctrine.

Rejecting the State Department's argument, the Supreme Court explained that the plaintiff "does not ask the courts to determine whether Jerusalem is the capital of Israel. He instead seeks to determine whether he may vindicate his statutory right, under § 214(d), to choose to have Israel recorded on his passport as his place of birth." *Id.* at 195.  Similarly, here, Plaintiffs do not ask the Court to determine which government is the rightful government of Venezuela, Plaintiffs simply ask the Court to determine whether they may vindicate their statutory right, under TRIA § 201, to collect from an agency or instrumentality or a judgment debtor.  The Supreme Court in *Zivotofsky* further explained:

The existence of a statutory right . . . is certainly relevant to the Judiciary's power

> to decide Zivotofsky's claim. The federal courts are not being asked to supplant a foreign policy decision of the political branches with the courts' own unmoored determination of what United States policy toward Jerusalem should be. Instead, Zivotofsky requests that the courts enforce a specific statutory right. To resolve his claim, the Judiciary must decide if Zivotofsky's interpretation of the statute is correct . . . . This is a familiar judicial exercise.

*Id.* at 196. The same reasoning applies with equal force here. This Court is not being asked to make an "unmoored determination of what United States policy toward [Venezuela] should be," it is being asked to "enforce a specific statutory right." Indeed, "the executive and legislative branches have demonstrated a clear intent that not only permits but affirmatively encourages the judiciary to resolve the issues surrounding restraint and turnover of [of terrorist] assets. . . . [T]he sheer multitude of statutory and executive pronouncements directly and unquestionably applicable to the motions before this Court makes any political question argument baseless." *Peterson v. Islamic Republic of Iran*, No. 10-cv-4518, 2013 WL 1155576, at *22 (S.D.N.Y. Mar. 13, 2013), *aff'd*, 758 F.3d 185 (2d Cir. 2014), *aff'd sub nom. Bank Markazi v. Peterson*, 578 U.S. 212 (2016) (denying political question challenge because relief requested was authorized by statutes, including TRIA, "which allows a court to execute against blocked assets of a terrorist party").

There is nothing unfair or inappropriate about utilizing blocked PDVSA assets to satisfy a judgment against Maduro. Through TRIA, Congress specifically provided that *any* blocked assets of *any* instrumentality—state or non-state—of the terrorist party against whom judgment was entered could be used to satisfy a judgment against the terrorist party. Looking to the plain text, there is no requirement that the judgment debtor itself own the assets, and there is no limitation on TRIA's application where the instrumentality is simultaneously a foreign-state entity. Plaintiffs are not taking advantage of an unanticipated "loophole" in the statutory text. Permitting enforcement against the blocked PDVSA assets is how TRIA was ***designed*** to work, and is the result of the considered choices of the political branches.

When Congress authorized terror victims to collect the blocked assets of "any" agency or instrumentality of "any" terrorist party by enacting TRIA on November 26, 2002, it was well understood that state entities can and sometimes do support non-state terrorists. Indeed, TRIA was enacted in the wake of 9/11, when allegations that Saudi Arabian officials had sponsored the hijackers were top of mind. *See* Bob Egelko, *9/11 Families Sue Saudis, Sudan for $3 Trillion – Defendants Accused of Funding al Qaeda*, San Francisco Chronical (Aug. 16, 2002). It was

therefore wholly foreseeable to Congress that terror victims would use TRIA to satisfy judgments against nonstate terrorists (such as al Qaeda) with the assets of sovereign entities (such as Saudi Arabia) that allegedly provided material support to those terrorists.  And by allowing terror victims to recover from the assets of *any* entities that provide material support to non-state terrorists, *Stansell II*, 771 F.3d at 732 (setting forth material support test for agency or instrumentality status under TRIA), Congress wrote the statute in a way that would permit just that to occur.  The President, too, has deliberately made a policy judgment: On January 28, 2019, OFAC responded to the ongoing corruption and abuse at PDVSA by sanctioning the company under the IEEPA and Executive Order 13850, *see* 84 Fed. Reg. 3282, thereby subjecting the assets to TRIA.  And the President has stuck with the policy decision, reflected in the fact that OFAC has not released all of PDVSA's blocked assets to the AHB or the Interim Government.  PDVSA has remained an instrumentality of the Maduro Regime and the U.S. has continued to enforce its sanctions post January 2019 (*see e.g.* https://home.treasury.gov/news/press-releases/sm884 ("[PdVSA's] Falcon 200EX (YV3360) also was used throughout 2019 to transport senior members of the former Maduro regime in a continuation of the former Maduro regime's misappropriation of PdVSA assets.")).

The case that the AHB cites, *In re Terrorist Attacks on September 11, 2001* ("*In re 9/11*"), 657 F. Supp. 3d 311 (S.D.N.Y. 2023)—a non-binding district court decision that is currently on appeal—does not warrant a different result.  Even if that case could be reconciled with *Zivotofsky* and *Peterson* (which is not possible[3]), it involved very different circumstances.  There, Plaintiffs sought to utilize the blocked assets of the Central Bank of Afghanistan ("DAB") to satisfy the judgment debt of the Taliban.  Because the Taliban was acting as the *de facto* of government of Afghanistan, Plaintiffs argued that the Taliban controlled DAB, making DAB an agency or instrumentality of the Taliban.  The *In re 9/11* court held that the political question doctrine precluded "a finding that the Taliban regime is in control of DAB . . . [and] thus acts as the government of Afghanistan." *Id.* at 335.  In other words, "[a]ccepting the Taliban's 'appointments' to DAB as legitimate . . . bestows recognition on the Taliban that this Court may not

---

[3] In discussing the political question doctrine, *In re 9/11* relies on the irrelevant holding that the statute at issue was unconstitutional because *Congress* encroached on the President's power to recognize foreign states, while ignoring *Zivotovsky*'s relevant holding that the political question doctrine did not preclude the *courts* from addressing plaintiffs' rights under the statute.

constitutionally confer." *Id.* But here, Plaintiffs did not argue, nor did this Court hold, that PDVSA was an instrumentality of Maduro because he controlled PDVSA through legitimate appointments. It held that PDVSA was an agency or instrumentality because OFAC determined that it provided material support to Maduro. ECF No. 110, at 7 ("PDVSA supports Mr. Maduro in orchestrating illegal activity."). That conclusion says nothing about whether the Maduro regime is legitimate or not.

In any event, if this Court has concerns (it should not), the solution is simple: the Court may hold that PDVSA is an agency or instrumentality of Maduro based on its conduct prior to January 2019, before the U.S. government recognized Juan Guido's Interim Government. There is ample evidence that PDVSA provided material support to Maduro and the Cartel long before there were any questions about which government the United States would recognize. *See, e.g.*, ECF 94-5, at 9 (describing Maduro's use of PDVSA to launder funds in "the early 2000s"). Such early conduct is sufficient to support an agency or instrumentality finding. *See Stansell II*, 771 F.3d at 724 n.6 (approving the district court's defining an "agency or instrumentality" as any party that is or was ever involved" in any aspect of [the defendant's] trafficking operations or that assisted with the [the defendant's] financial or money laundering network") (cleaned up); *accord Stansell V*, 45 F.4th at 1350 ("[T]he formulation we expressly approved in *Stansell II* encompassed past involvement or association with a terrorist party."). Therefore, the Court can simply sidestep the "issue" the AHB has concocted.

## V.   TRIA IS APPLICABLE TO PDVSA

### A.   TRIA Is Not Limited To State Sponsors of Terrorism

As the AHB "acknowledges," its argument that "as used in TRIA § 201(a), the term 'agency or instrumentality' should be given the meaning ascribed to it under § 1603(b) [of the FSIA]" is foreclosed by the Eleventh Circuit's holding *Stansell II* that § 1603(b)'s definition of "agency or instrumentality" does not apply to its use in TRIA. ECF No. 310, at 19 (AHB claiming that "*Stansell II* was wrongly decided"). The AHB is wrong. *See Kirschenbaum v. 650 Fifth Ave. & Related Properties*, 830 F.3d 107, 135 (2d Cir. 2016) (following *Stansell II* and adopting a materially similar definition of agency or instrumentality), *abrogated in part on other grounds Rubin v. Islamic Republic of Iran*, 583 U.S. 202 (2018). In any event, *Stansell II* is binding. Plaintiffs reserve their right to oppose the AHB's other arguments challenging *Stansell II*, including on appeal.

**B.  PDVSA Is An Agency/Instrumentality of Maduro and the Cartel**

The AHB's arguments that PDVSA is not an agency or instrumentality of the Maduro and the Cartel are in error.   To begin, because PDVSA was properly served and failed to appear, its challenge to the agency or instrumentality finding is a nullity.  Fla. Stat. § 77.07(2); *see Guzman Mila v. Big Steve's Deli, LLC*, No. 20-60367-CIV, 2020 WL 9460229, at *2 (S.D. Fla. Oct. 26, 2020), *report and recommendation adopted*, No. 0:20-CV-60367, 2021 WL 2753937 (S.D. Fla. July 2, 2021) (granting default judgment against party that failed to timely contest writ of garnishment).  Even if this Court were permitted to consider the AHB's untimely arguments, the AHB's argument would need to be considered under the motion to reconsider standard, i.e., "to prevail on a motion to reconsider, the moving party must demonstrate why the court should reverse its prior decision by setting forth facts or law of a strongly convincing nature." *Makozy v. Westcor Land Title*, No. 21-cv-14367, 2022 WL 3682081, at *1 (S.D. Fla. Apr. 18, 2022).  Here, the AHB offers no factual evidence whatsoever, and its legal arguments are far from "strongly convincing." Indeed, even measured by the most liberal standards, its arguments are wholly without merit.

*First*, the AHB argues that PDVSA is not responsible for its material support of Maduro and the Cartel because PDVSA was "abused" and a "victim."  ECF No. 310, at 22.  The AHB cites no authority for this misguided view.  That is hardly surprising, because corporations are regularly held responsible for their bad acts, even if their owners (*i.e.*, their shareholders) or their new managers did not desire, and perhaps abhorred, the misconduct.  *See, e.g.,* Department of Justice, Press Release, BP Exploration and Production Inc. Agrees to Plead Guilty to Felony Manslaughter, Environmental Crimes and Obstruction of Congress Surrounding Deepwater Horizon Incident (Nov. 15 , 2012), available at https://tinyurl.com/2u82jyyc.

*Second*, as the AHB admits, the Eleventh Circuit has rejected its argument that "as a critical threshold matter . . . Plaintiffs have not and cannot put forward any allegations or evidence that PDVSA was an 'agency or instrumentality' of Maduro or the Cartel, ***at the time the enforcement*** proceedings against PDVSA's assets began in 2024."  ECF No. 310, at 22 (emphasis added).  This Court should decline the AHB's invitation to ignore the binding Eleventh Circuit precedent set forth in *Stansell V,* 45 F.4th at 1357, holding that there is no such temporal limitation.   In any event, the AHB is wrong that Plaintiffs have not, and cannot, provide evidence for the fact that PDVSA remains an agency or instrumentality of Maduro and the Cartel.  Among other things, OFAC continues to block the PDVSA based on its initial finding that it supported Maduro's

corruption.  *See also* ECF 94, at 10 ("[d]uring the Maduro regime," "PDVSA employed (and continues to employ) numerous schemes to assist in the laundering of drug proceeds").

**Third**, contrary to the AHB's assertions, Plaintiffs have presented evidence sufficient to meet "their *prima facie* burden of entitlement to the garnished, blocked funds under the Terrorism Risk Insurance Act."  ECF No. 121 (Report & Recommendation), at 4; *see Marron*, 2024 WL 4434196, at *1 (same).

To begin, this Court may take judicial notice of the OFAC designation of PDVSA, and the reason therefore, *i.e.*, support for corruption by Maduro.  *ABC Charters, Inc. v. Bronson*, No. 08-cv-21865, 2009 WL 1010435, at *4 (S.D. Fla. Apr. 14, 2009) (taking judicial notice of OFAC license); *Sutherlin v. Wells Fargo & Co.*, 297 F. Supp. 3d 1271, 1276 (M.D. Fla. 2018), *aff'd sub nom. Sutherlin v. Wells Fargo Bank N.A.*, 767 F. App'x 812 (11th Cir. 2019) (taking judicial notice of "the public records of OFAC").  The AHB does not address these records, which this Court correctly concluded establish PDVSA roles as an agency/ instrumentality of Maduro.  The Court need look no further to deny the AHB's challenge.

Moreover, the Court's conclusion is also fully supported by Mr. Farah's expert declaration.  ECF No. 94-5.  The AHB is wrong that *Touhy* is a bar to Mr. Farah's testimony.  To begin with, as private parties, the AHB has no standing to assert the DoD or DHS's *Touhy* regulations, which are not intended to protect private parties.  *See U.S. for Use & Benefit of Treat Bros. Co. v. Fid. & Deposit Co. of Md.*, 986 F.2d 1110, 1119 (7th Cir. 1993) (holding that private litigant lacked standing to object to trial testimony on the grounds that it violated military regulations governing disclosure procedures); *U.S. ex rel. Howard v. Caddell Constr. Co.*, 7:11-cv-270, 2018 WL 2291300, at *3 (E.D.N.C. Feb. 23, 2018) (citation omitted) (ruling that relator initiating suit on government's behalf nonetheless lacked standing "to litigate governmental regulations the purpose of which is only to provide guidance for the internal operation of the [agency]"); *Christison v. Biogen Idec*, 2:11-cv-01140, 2015 WL 3489494, at *1 (D. Utah June 2, 2015) (rejecting argument that "all litigants—not just the government—should be able to invoke the DHHS *Touhy* regulations"); *U.S. ex rel. Liotine v. CDW Gov't, Inc.*, No. 05-33-DRH, 2012 WL 2807040, at *1, 6 (S.D. Ill. July 10, 2012) (holding that former government-contractor defendant, "a private party, lack[ed] standing to claim a violation of the [*Touhy*] regulations at issue"); *see also Chrysler Corp. v. Brown*, 441 U.S. 281, 310 (1979) (5 U.S.C. § 301, under which *Touhy* regulations are implemented, grants authority only to enact internal "rules of agency organization procedure or

practice").

In any event, the regulations that the AHB cites apply to "official information," but (with the possible exception of information about PDVSA's bulk cash smuggling through the Learjet 45—a point on which this Court did not rely, and which is severable from the remainder of Mr. Farah's testimony), Mr. Farah's declaration does not contain any "official information." The DOD defines "official information" as "[a]ll information of any kind and however stored that is in the custody and control of the DoD, relates to information in the custody and control of the DoD, or was acquired by DoD personnel due to their official duties or status." 32 C.F.R. 97.3; *see also* 6 C.F.R. § 5.41 ("official information means all information of any kind, however stored, that is in the custody and control of the Department [of Homeland Security], relates to information in the custody and control of the Department, or was acquired by Department employees, or former employees, as part of their official duties or because of their official status within the Department while such individuals were employed by or served on behalf of the Department.").

Mr. Farah's declaration (other than the one exception noted above) does not contain any of the foregoing categories of information. Mr. Farah's declaration explains his sources and methods. It makes clear that he did not rely on information in the control of DoD or DHS, related to information in the control of DoD or DHS, or that he obtained due to his office duties or status at DoD or DHS. Rather, he relied on the his personal research—the same research that led him to testify scores of times before Congress (ECF No. 94-5, at 26-27), publish nearly a dozen books and book chapters (*id.* at 28-29), and a raft of articles (*id.* at 29-32). Mr. Farah explains: "My opinions are based on my education, training and approximately 33 years of experience in Latin America and also based upon my research, field work, investigations and experience. I have conducted field work on these particular issues for a period of more than 10 years, with document collection and interviews spanning more than eleven countries." *Id.* at ¶ 14. Mr. Farah's vast body of work as a private journalist and investigator does not become "official information" merely because the government has sometimes sought his expertise and insights.

The cases that the AHB cites illustrates what is meant by "official information," and why Mr. Farah's testimony is not. In *McMahon v. Presidential Airways, Inc.*, No. 6:06-cv-1002, 2009 WL 10705562, at *1 (M.D. Fla. Nov. 5, 2009), for example, the official information was obtained from the DoD, by General Horner, during his Air Force service, and discussed "operating in a war zone environment," using "special tactics suited only for combat." Similarly, *Boca Raton Cmty.*

*Hosp. v. Tenet Healthcare Corp.*, No. 05-cv-80183, ECF No. 212, at 5 (S.D. Fla. Apr. 24, 2006), the official information was obtained by a former HHS employer from the HHS, during his HHS service, and discussed how HHS operated the Medicare program. Mr. Farah's information does not come from the DoD or DHS; it does not reflect information about the DoD or DHS or contained in their files; it is not information to which he was privy due to DoD or DHS status. Accordingly, the *Touhy* regulations are inapplicable.

**Fifth**, the documents that the AHB mistakenly claims are inadmissible hearsay (prosecutorial documents, news articles, think tank reports, press releases, ECF No. 310, at 25), are the type of materials that are "routinely relied upon and exchanged by other experts" in Mr. Farah's field. ECF No 94-5, at ¶ 17. As such, Mr. Farah is permitted to rely upon them. *Simkovitz v. Jetran Int'l, Ltd.*, 496 F. App'x 907, 910 (11th Cir. 2012) (experts may rely on hearsay evidence in forming their opinions if it is the type of evidence reasonably relied on by experts in that particular field) (citing Fed. R. Evid. 703). And even if Mr. Farah were not permitted to rely upon these documents, these documents merely supplement Mr. Farah's first-hand research (including "multiple interviews with . . . those working for or with PDVSA that have direct knowledge of ways that PDVSA launders money," ECF No. 94-5, at ¶ 15) that the AHB does not challenge. In short, the admissibility of these documents is not essential to Mr. Farah's report.

**Sixth**, in the event that this Court wishes to afford the AHB an opportunity to contest the Court's agency or instrumentality finding, Plaintiffs must be afforded discovery from PDVSA. *Stansell v. FARC*, 120 F.4th 754, 766-67 (11th Cir. 2024) (affirming orders requiring party contesting its status as an agency or instrumentality under TRIA to provide discovery to Plaintiffs).

### C. The Assets Sought Are Assets of a Judgment Debtor

The AHB's argument that the terrorist party must own the assets (and that it is not sufficient for the agency or instrumentality to own the assets) is not the law of this circuit. *Stansell II,* 771 F.3d at 726 ("TRIA execution requires two separate determinations regarding the property being executed: (i) that the asset is blocked, and (ii) that the owner of the asset is an agency or instrumentality of the judgment debtor."); *Stansell v. Lopez Bello*, 802 F. App'x 445, 446 (11th Cir. 2020) (affirming TRIA turnover judgment "concerning his [López Bello's] property," without requiring showing that the FARC owned the property).

### D. Plaintiffs Do Not Ignore PDVSA's Form

Plaintiffs agree with the AHB that PDVSA and its subsidiaries (PetroCedeño, Petromar,

and Bariven) are separate entities, distinct from PDVSA.  That is why Plaintiffs advised the Court, when seeking writs for assets owned by these entities, that these were not PDVSA, but rather PDVSA subsidiaries.  ECF Nos. 134, 165, 180.  That is why PDVSA lacks standing to contest the writs issued to these entities.  *See* Point I, *supra.*  Nor are Plaintiffs attributing PDVSA's status as an agency and instrumentality of Maduro to PDVSA's subsidiaries.  Rather, PDVSA's subsidiaries are agencies/instrumentalities in their own right, as nodes in the Maduro/Cartel of the Sun money laundering enterprise.  ECF No. 94-5, at ¶ 23-38 (explaining how PDVSA utilizes a money laundering network in which related companies are nodes); ECF No.138-2, at ¶ 23 ("a key feature in the PDVSA money laundering network is its complexity, which makes it easier for Defendants to launder ill-gotten gains.  The myriad nodes in the network . . . are integral to its success").

## VI.    SECTION 1610(c) OF THE FSIA IS IRRELEVANT

The AHB's argument that Plaintiffs failed to satisfy Section 1610(c) of the FSIA is irrelevant, because that section applies to enforcement pursuant to Sections 1610(a) and 1610(b) of the FSIA.  Here, Plaintiffs are not seeking enforcement under Section 1610 of the FSIA; they are seeking enforcement under TRIA.

In any event, 1610(c) merely requires (1) notice in the case of a default judgment against a foreign state (here, there is no default judgment against a foreign state, so this is inapplicable); and (2) that the Court determine that a reasonable amount of time from the judgment has elapsed before the Court orders issuance of a writ (something the Court can do now, *nunc pro tunc*, given that the writ was issued five months after the judgment).  *Compare* ECF No. 91 (Final Default Judgment, August 6, 2023) *with* ECF No. 94 (Motion for Writ as to Learjet 45, Jan. 5, 2024).

## VII.   THIS COURT HAS IN REM JURISDICTION TO ISSUE THE JPMC WRIT

The AHB is wrong on the issue of *in rem* jurisdiction.  Plaintiffs respectfully refer the Court to their briefing on this at ECF Nos. 301, at 5-9; 308, at 5-8.

### CONCLUSION

For the foregoing reasons, the AHB's motion should be denied in its entirety.

Respectfully submitted on January 9, 2024.

/s/ Jaime D. Guttman
Fla. Bar No. 44076
jaime@scale.law
Scale Law Partners, LLC
777 Brickell Avenue, Suite 500
Miami, FL 33131
(786) 273-9033 (Main)

/s/ Alex C. Lakatos
Alex C. Lakatos (pro hac vice)
alakatos@mayerbrown.com
Cloe M. Anderson (pro hac vice)
canderson@mayerbrown.com
Mayer Brown LLP
1999 K Street NW
Washington, DC 20006
(202) 263-3000 (Main)

Counsel for Plaintiffs / Judgment Creditors

## CERTIFICATE OF SERVICE

I certify that I filed the foregoing document on January 9, 2025, through CM/ECF, which automatically and electronically delivered notice of filing to counsel of record for all parties that have appeared.

/s/ Jaime D. Guttman