## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 21-cv-20706-GAYLES/TORRES

MEUDY ALBÁN OSIO, et al.,

    *Plaintiffs,*

v.

NICOLAS MADURO MOROS, et al.,

    *Defendants.*

_____/

### REPORT AND RECOMMENDATION ON MOTION TO VACATE

This cause comes before the Court on a Motion by non-party, Petroleos de Venezuela, S.A. ("PDSVA"), to vacate myriad writs and turnover orders, and deny several pending turnover motions. [D.E. 310]. Plaintiffs, the beneficiaries of those orders and writs, and the filer of those pending turnover motions, have filed their opposition [D.E. 344], to which PDVSA has replied. [D.E. 355]. The Motion, therefore, is ripe for disposition.[1] After careful review of the briefing and relevant authorities, and for the reasons set forth below, we recommend that PDVSA's Motion be **GRANTED in part** and **DENIED in part**.

---

[1] On November 8, 2024, the Honorable Darrin P. Gayles referred all post-judgment matters to the Undersigned Magistrate Judge for disposition. [D.E. 233].

## I.   BACKGROUND

This lawsuit stems from Defendants' kidnapping, torture, and murder of Plaintiffs' decedent, Fernando Alberto Alban. On August 4, 2023, final default judgment was entered in Plaintiffs' favor on all eight counts of their complaint for a total judgment of $217,000,000.00.

To satisfy that judgment, Plaintiffs have pursued assets that belong not only to Defendants, but Defendants' agencies and instrumentalities. This plan of attack is permitted under the Terrorism Risk Insurance Act ("TRIA"), which authorizes victims of terrorism to satisfy their judgment vis-à-vis assets of the terrorist organization's agencies or instrumentalities. While operating under the TRIA, Plaintiffs procured several writs and turnover judgments of assets that belong to PDVSA—an agency or instrumentality of Defendants—and its subsidiaries. Plaintiffs have also filed several motions for turnover judgments to secure similar assets.

In the pending Motion, PDVSA seeks to dissolve many of those writs, vacate several of those turnover orders, and deny two of those pending turnover motions. Specifically, PDVSA requests the Court provide the following relief:

- Vacate July 1, 2024 Order granting Writ of Execution pertaining to an aircraft owned by PDVSA [D.E. 113];

- Dissolve Writs of Garnishment that pertain to assets owned by PDVSA or its subsidiaries [D.E. 114; 134; 150; 165; 180; 198; 237; and 380[2]];

- Vacate the November 14, 2024 Turnover Judgment that pertains to funds held by M&T Bank Corporation in the name of PDVSA and its subsidiaries [D.E. 250];

- Deny the two pending turnover motions that pertain to assets owned by PDVSA and/or its subsidiaries. [D.E. 161; 256]; and

- Dismiss this action, with prejudice, as to PDVSA.

This sweeping relief, argues PDVSA, is appropriate for numerous reasons. For one, PDVSA argues that Plaintiffs—in pursuing PDVSA's assets—bypassed the Foreign Sovereign Immunity Act's ("FSIA") requirements both as to subject matter jurisdiction and personal jurisdiction. Further, PDVSA avers that this Court cannot conclude that PDVSA is an agency or instrumentality under the TRIA, because that determination implicates a non-justiciable political question. Moreover, for several reasons, PDVSA argues that it does not fall within the purview of the TRIA, and that Plaintiffs have failed to satisfy the service requirements of the FSIA.

In response, Plaintiffs argue that, as an initial matter, PDVSA lacks standing to challenge several of the writs because the underlying assets belong not to PDVSA, but its subsidiaries. Plaintiffs also argue that the Court has jurisdiction over PDVSA under multiple statutes—the TRIA being one, and the FSIA's "commercial activities" provision being another. Moreover, Plaintiffs argue that

---

[2] This writ was identified in PDVSA's supplement [D.E. 389] to the pending Motion, as the writ was procured after the briefing for the pending Motion had been completed.

they properly served PDVSA at all turns and that personal jurisdiction is otherwise proper. PDVSA, Plaintiffs further argue, is certainly subject to the TRIA; and the question of whether PDVSA is an agency or instrumentality is indeed justiciable under Eleventh Circuit precedent.

We will address below whether any of PDVSA's arguments have merit such that we should award the sweeping relief requested.

## II.   ANALYSIS

The Court will address in turn the parties' primary arguments: (1) whether the Court lacks an independent basis for jurisdiction to hold PDVSA liable for Plaintiffs' judgments; (2) whether Plaintiffs have established personal jurisdiction; (3) whether determination of "agency or instrumentality" status is a justiciable question; (4) whether the TRIA applies to PDVSA; and (5) whether § 1610(c) of the FSIA should apply (and if so, whether Plaintiffs complied).

### A.   *Independent Basis for Jurisdiction*

PDVSA first argues that Plaintiffs cannot collect PDVSA's assets without initiating an independent action against PDVSA. In support, PDVSA argues that, because PDVSA is an agency or instrumentality of a foreign state, the FSIA is the only avenue through which the Court can obtain jurisdiction over PDVSA. And under the FSIA, PDVSA contends that "Plaintiffs were required to bring an action against PDVSA based upon an exception to PDVSA's presumptive immunity under … the FSIA." [D.E. 310 at 13].

4

In response, Plaintiffs argue that the contours of the FSIA are not necessary because jurisdiction is founded by the TRIA. Indeed, Plaintiffs contend, the TRIA confers jurisdiction in certain cases that might otherwise invoke the immunity provisions of the FSIA. Accordingly, it is inapposite whether the FSIA's requirements are satisfied, because the TRIA exempts Plaintiffs from satisfying those requirements.

We agree with Plaintiffs that our subject matter jurisdiction is conferred by the TRIA—not the FSIA. The pertinent provision of the TRIA states: "Notwithstanding any other provision of law … in every in case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism … the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment …." TRIA § 201(a). Based on this plain language (i.e., "[n]otwithstanding any other provision of law"), it is clear that the "the TRIA provides courts with subject matter jurisdiction over post-judgment execution and attachment proceedings against property held in the hands of an instrumentality of the judgment-debtor, even if the instrumentality is not itself named in the judgment." *Bennett v. Islamic Republic of Iran*, 825 F.3d 949, 958 (9th Cir. 2016) (quoting *Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 50 (2d Cir. 2010)).

Consequently, a multitude of courts—including our district—have held that the TRIA nullifies any immunity that "terrorist entities might otherwise enjoy

under the FSIA." *Hausler Republic of Cuba v. Comcast IP Phone II*, No. 09-20942-CV-JORDAN, 2010 WL 11442514, at *5 (S.D. Fla. Oct. 14, 2010) (citing *Weininger v. Castro, et al.*, 462 F. Supp. 2d 457, 478 (S.D.N.Y. 2006)) ("The purpose of the TRIA is to override any immunity from execution that the 'blocked assets' of terrorist entities might otherwise enjoy under the Foreign Sovereign Immunities Act. … In other words, the TRIA confers courts with subject-matter jurisdiction over enforcement actions, such as this one, that would otherwise fall under the parameters of immunity provided by the FSIA."); *see also Hill v. Republic of Iraq*, No. CIV.A. 1:99CV03346TP, 2003 WL 21057173, at *2 (D.D.C. Mar. 11, 2003) (internal citation omitted) ("Section 201 of the TRIA states that '[n]otwithstanding any other provision of law,' the blocked assets of a terrorist party 'shall be subject to execution or attachment in aid of execution.' As this Court has frequently recognized, 'the phrase "notwithstanding any other provision of law," or a variation thereof, means exactly that; it is unambiguous and effectively supersedes all previous laws. Accordingly, by its plain terms, the TRIA overrides any immunity from execution that blocked Iraqi property might otherwise enjoy under the Vienna Convention or the FSIA. Indeed, any contrary construction of the TRIA would frustrate the statutory objective of ensuring that judgments rendered against terrorist states based upon terrorist acts 'are to be enforced.'").

This proposition remains true (under the plain language of the TRIA) where the relevant assets belong not to the judgment debtors themselves, but to the judgment debtors' agencies or instrumentalities. *See Kirschenbaum v. 650 Fifth*

*Ave. & Related Properties*, 830 F.3d 107, 132 (2d Cir. 2016) ("Section 201(a) of the TRIA confers an independent basis for subject matter jurisdiction over post-judgment execution and attachment proceedings against property held in the hands of an agency or instrumentality of the terrorist party, even if the agency or instrumentality is not itself named in the judgment."); *Weininger*, 462 F. Supp. 2d at 468 (holding that the TRIA "provides an exception to [FSIA] immunity from execution over the funds in question" where the plaintiffs sought to execute on assets that belonged to agencies or instrumentalities of Cuba).

Accordingly, Plaintiffs' argument is well taken that the TRIA confers subject matter jurisdiction over these PDVSA post-judgment proceedings, notwithstanding the presumptive immunity that the FSIA may provide under different facts. We therefore recommend that PDVSA's Motion be denied on this score.

### B.      *Sufficiency of Service*

While the TRIA may confer subject matter jurisdiction, PDVSA objects separately to this Court's personal jurisdiction. To that end, PDVSA contends that, regardless of the TRIA's application as to subject matter jurisdiction, the FSIA governs as to personal jurisdiction. And Plaintiffs have failed to comply with the FSIA's specific service requirements: Plaintiffs served the Florida Secretary of State, which in PDVSA's view, was not compliant with the FSIA.

Plaintiffs, in response, agree that service is governed by the FSIA. But they contend that service of Florida's Secretary of State was proper. And further, Plaintiffs argue that any procedural non-compliance with the FSIA is nullified by

PDVSA's concession that they received actual notice of Plaintiffs' enforcement proceedings.

Our focus, then, is whether Plaintiffs service was sufficient under the FSIA. Under § 1608(b):

> (b) Service in the courts of the United States and of the States shall be made upon an agency or instrumentality of a foreign state:
>> (1) by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the agency or instrumentality; or
>> (2) if no special arrangement exists, by delivery of a copy of the summons and complaint either to an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process in the United States; or in accordance with an applicable international convention on service of judicial documents; or
>> (3) if service cannot be made under paragraphs (1) or (2), and if reasonably calculated to give actual notice, by delivery of a copy of the summons and complaint, together with a translation of each into the official language of the foreign state—
>>> (A) as directed by an authority of the foreign state or political subdivision in response to a letter rogatory or request or
>>> (B) by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the agency or instrumentality to be served, or
>>> (C) as directed by order of the court consistent with the law of the place where service is to be made.

Plaintiffs aver that, because "no special arrangement exists for service between the plaintiff and the agency or instrumentality," Plaintiffs were permitted to serve "any other agent authorized … by law to receive service of process in the United States …." § 1608(b)(2). And Florida's Secretary of State, argue Plaintiffs, is an "agent authorized by law to receive service of process." *Id*. Further, Plaintiffs

argue that even if service was procedurally imperfect under the FSIA, PDVSA concedes that it received actual notice; thus, any technical deficiencies are moot.

We find that, because PDVSA concedes that it received actual notice of Plaintiffs' enforcement efforts, any technical non-compliance with the FSIA is inapposite. Eleventh Circuit precedent in *Harris Corp. v. Nat'l Iranian Radio & Television* is both on point and binding. 691 F.2d 1344 (11th Cir. 1982). There, the plaintiff attempted to serve the instrumentality-defendant under § 1608(b). That service, however, did not precisely comport with § 1608(b). The defendant, as a result of this faulty service, challenged the court's personal jurisdiction. Crucially, the defendant did not argue that it lacked actual notice. Rather, it "bas[ed] its objections on the technical requirements of § 1608," and "cite[d] deficiencies in each of the methods of service of process used by" the plaintiff. *Id.* at 1349. The court, cognizant that the defendant received actual notice, held:

> NIRT does not deny that it had notice of this action. The attacks made by NIRT go only to asserted noncompliance with certain FSIA requirements that exist merely to assure that actual notice be received. Under the circumstances, we hold that service was sufficient. The failure to follow precisely those steps in § 1608 designed to insure that actual service be made should not override and invalidate the fact that in this case notice was actually received.

*Id.* And while the court clarified in dicta that it "admonish[es] those seeking to invoke the FSIA to follow the service provisions it contains," that did not alter the court's holding; any technical deficiencies were nullified by actual notice.

The Eleventh Circuit is not alone in its application of this "actual notice" standard. In fact, the majority of circuits have deemed that "substantial compliance" with the FSIA (i.e., a meaningful service effort that culminates in

actual notice) suffices to confer personal jurisdiction under § 1608(b). *See Magness v. Russian Fed'n*, 247 F.3d 609, 617 (5th Cir. 2001) ("Our holding as to section 1608(b) is in accord with the Third, Sixth, Ninth, Eleventh, and D.C. Circuits, all of which have determined that substantial compliance with section 1608(b) is sufficient so long as the defendants have actual notice of the suit. … [I]n *Harris* … the Eleventh Circuit similarly adopted the substantial compliance test under § 1608(b), finding that actual notice should override technical deficiencies in service under that section."); *Velidor v. L/P/G Benghazi*, 653 F.2d 812, 821 (3rd Cir. 1981), *cert. denied*, 455 U.S. 929, 102 S.Ct. 1297, 71 L.Ed.2d 474 (1982) (citing H.R.Rep. No. 94–1487 at 23–24) ("Rather than making service on foreign instrumentalities a rigid, technical, or cumbersome procedure, Congress sought to facilitate the ability of private plaintiffs to serve foreign entities. In addition, Congress wished to insure that the sovereign owner would receive actual notice. In the present controversy, officers of CALTRAM immediately became aware of the suit, so service on the master fully achieved the objective of actual notice. Under these circumstances, for us to hold that the master was not CALTRAM's agent within the meaning of s 1608(b) would be to impose on plaintiffs a procedural burden at odds with the avowed congressional desire to expand the means of serving process on the instrumentalities of foreign sovereigns."); *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 153 (D.C. Cir. 1994) ("The authorities generally hold that section 1608(b) may be satisfied by technically faulty service that gives adequate notice to the foreign state.").

Here, similarly, PDVSA concedes that it received actual notice of these proceedings. PDVSA does not argue that it lacked actual notice in its initial motion. Consequently, in their response brief, Plaintiffs point out that PDVSA does not contend that "it lacked actual notice of Plaintiffs' enforcement efforts." [D.E. 344 at 10]. And in their reply, PDVSA once again does not contest that it received actual notice; rather, it argues that actual notice is not dispositive of this issue. [D.E. 355 at 5].

Accordingly, with no persuasive reason (or authority) to depart from Eleventh Circuit precedent, we find that, even if Plaintiffs' service attempt contained deficiencies under the FSIA, those deficiencies "should not override and invalidate the fact that in this case notice was actually received." *Harris*, 691 F.2d at 1349.

Of course, had PDVSA not conceded its receipt of actual notice, or argued that the imperfect method of service caused prejudice, our calculus may have differed. *Cf. Ezemarval, LLC v. El Instituto Postal Dominicano*, No. 22-21822-CIV, 2022 WL 18465685, at *4 (S.D. Fla. Dec. 16, 2022) (finding that the plaintiff failed to satisfy *Harris* because, even if mere substantial compliance is required under the FSIA, *Harris* does not cure non-compliance with the FSIA absent the defendant's actual notice); *Magness*, 247 F.3d at 618 (holding that service under section 1608(b) was inadequate because "[m]ost importantly, there is no evidence to establish that the defendants had actual notice of the suit").

Moreover, PDVSA fails to provide any relevant authority in which (1) an agency or instrumentality of a foreign state received actual notice of the proceedings

against it, but (2) in the absence of material prejudice, service was nonetheless found to be inadequate because of procedural non-compliance under the FSIA.

Absent any on-point authority by PDVSA, coupled with the binding precedent in *Harris* (as well as the Third, Fifth, Sixth, Ninth, and D.C. Circuits), we find that the assertion of personal jurisdiction is permitted because PDVSA has conceded its receipt of actual notice, and has not identified any prejudice caused by the imperfect method of service employed by Plaintiffs.[3] *See Absolute Trading Corp v. PDVSA Servs., Inc.*, No. 10-21371-CIV, 2010 WL 11451772, at *5 (S.D. Fla. Nov. 18, 2010) ("In so holding, the Court is mindful that Bariven has received actual notice of this action and will not be prejudiced. *See, e.g., Harris*, 691 F.2d at 1352 ('The failure to follow precisely those steps in § 1608 designed to insure that actual service be made should not override and invalidate the fact that in this case notice was actually received.'). Accordingly, the Court will deny the Motion to Dismiss based upon insufficient service of process.").

Thus, we recommend that PDVSA's Motion be denied on this score.

**C.    *Due Process***

PDVSA further argues that due process is lacking. That is, even if Plaintiffs service sufficed under the FSIA, Plaintiffs have not established PDVSA's minimum contacts with Florida. Specifically, PDVSA argues that it is improper to attribute to

---

[3] We do not reject PDVSA's argument that Plaintiffs' method of service (via the Florida Secretary of State) may lack footing under the FSIA. But *Harris* (because there is actual notice and no proffered prejudice) directly resolves this dispute notwithstanding Plaintiffs' procedural missteps.

PDVSA the "unauthorized misuse of PDVSA assets by members of the illegitimate, unrecognized Maduro regime." [D.E. 310 at 17].

In response, Plaintiffs argue that even if PDVSA did not act wrongfully, it is indisputable that PDVSA—innocent or not—had extensive contacts with Florida. Otherwise, argues Plaintiffs, bad actors could simply exclude themselves from lawsuits by manipulating an innocent actor to carry out the bad acts.

We once again agree with Plaintiffs. Tellingly, PDVSA fails to cite an iota of authority for its good soldier defense, even if it were factually credible. More specifically, PDVSA offers nothing to substantiate its argument that, because PDVSA was an ostensibly-innocent actor carrying out Maduro's maleficent orders, its contacts with Florida should be discounted from the due process analysis. And further, PDVSA makes no argument that it lacked contact with Florida; it argues only that those contacts were directed by Maduro.

PDVSA, then, makes no meaningful effort to undermine Plaintiffs' argument that PDVSA was used as a cog in Defendants' money laundering scheme; and more specifically, that PDVSA sent money from its accounts to various contractors in South Florida to perpetuate a money laundering and bribery scheme. [D.E. 1 at ¶ 101]. Thus, Plaintiffs have satisfied their initial burden of sufficiently alleging PDVSA's minimum contacts, and PDVSA has not met its consequent burden of providing evidence to contradict those allegations. PDVSA's argument is therefore unpersuasive and should be rejected. *See Del Valle v. Trivago GMBH*, 56 F.4th 1265, 1277 (11th Cir. 2022) (holding that due process was complied with where the

defendants "purposefully availed themselves of Florida in such a way that they could reasonably foresee being haled into court there").

### D.    *Political Question Doctrine*

PDVSA also argues that, to determine its status as an agency or instrumentality of the Maduro regime, the court is being asked to resolve a non-justiciable political question. That is because, in PDVSA's view, it would require this Court to "identify the legitimate political leadership of a foreign country"—a power which belongs exclusively to the Executive Branch. [D.E. 310 at 10].

Under the TRIA, "in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism … the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment …." TRIA § 201(a).

Time and time again, the United States Government has recognized PDVSA as an agency or instrumentality. Indeed, at the present time, the Office of Foreign Assets Control's webpage (within the U.S. Department of Treasury's website) specifies the following:

> Unless exempt or authorized by OFAC, all property and interests in property of persons meeting the definition of the Government of Venezuela (see section 6(d) of E.O. 13884 of August 5, 2019) that are in, or come within, the United States or the possession or control of a United States person are blocked, pursuant to E.O. 13884. The term "Government of Venezuela," as defined in E.O. 13884, includes the state and Government of Venezuela, any political subdivision, agency, or instrumentality thereof, including the Central Bank of Venezuela and Petroleos de Venezuela, S.A. (PdVSA), any person owned or controlled, directly or indirectly, by the foregoing, and any person who

14

> has acted or purported to act directly or indirectly for or on behalf of,
> any of the foregoing, including as a member of the Maduro regime.

Office of Foreign Assets Control | U.S. Department of the Treasury, *Frequently Asked Questions - Recently Updated: Office of Foreign Assets Control*, January 9, 2023 (accessed March 20, 2025) (https://ofac.treasury.gov/faqs/updated/2023-01-09). Any argument, then, that the Court is powerless until the Executive Branch speaks on this matter is inapposite. As shown above, the Executive Branch has clearly spoken and—in plain terms—presently identifies PDVSA as an agency or instrumentality and blocks its assets. PDVSA's argument is therefore without merit and should be rejected.

### E.   *Application of the TRIA*

Separately, PDVSA argues that, even if its agency or instrumentality status is justiciable, the TRIA is not applicable to PDVSA for several reasons. First, PDVSA argues that it cannot be an agency or instrumentality because the Court, having already found PDVSA to be an agency or instrumentality, applied the wrong standard. Further, even if the Court applied the correct standard, PDVSA avers that it still is not an agency or instrumentality because PDVSA is a victim—not a perpetrator—of Maduro's criminal activity. Moreover, the assets that Plaintiffs have sought, argues PDVSA, are not assets that belong to a judgment debtor, but rather belong to PDVSA. Lastly, because PDVSA has a corporate form, it argues that its subsidiaries' assets should remain untouched.

We will address each argument in turn.

### 1.    *Agency or Instrumentality Standard*

In the Court's since-adopted Report and Recommendation [D.E. 110], we found that PDVSA was an agency or instrumentality of Defendants. In doing so, we applied the standard identified in *Stansell v. Revolutionary Armed Forces of Colombia*, 771 F.3d 713, 724 (11th Cir. 2014) (*Stansell II*).

Here, "PDVSA respectfully submits that *Stansell II* was wrongly decided, particularly where the Court was without the benefit of the United States … and therefore preserves this issue for appellate review." [D.E. 310 at 20]. While PDVSA is entitled to preserve this issue, we are undoubtedly powerless to squarely overrule Eleventh Circuit precedent. Accordingly, to the extent PDVSA seeks relief on this argument (outside of appeal preservation), PDVSA's argument should be rejected.

### 2.    *Agency or Instrumentality Showing*

Further, PDVSA argues that, even if the correct standard was applied, Plaintiffs failed to show that PDVSA is an agency or instrumentality. Primarily, PDVSA argues that the Maduro regime abused PDVSA to carry out criminal activity—not that PDVSA meaningfully partook.

We disagree. Myriad evidence supports our determination that PDVSA is an agency or instrumentality. First, OFAC has blocked PDVSA's assets and deemed it to be an agency or instrumentality. We must apply OFAC determinations absent a showing that the determination was "arbitrary or capricious"; PDVSA has not made that showing. *See De Cuellar v. Brady*, 881 F.2d 1561, 1565 (11th Cir. 1989) (directing that the "decision of the OFAC is entitled to great deference, and should

be reversed only if arbitrary and capricious"); *see also Paradissiotis v. Rubin*, 171 F.3d 983, 987 (5th Cir. 1999) (noting that an OFAC designation "receives an even greater degree of deference than the *Chevron* standard, and must prevail unless plainly inconsistent with the regulation"); *Stansell v. Revolutionary Armed Forces of Colombia (FARC)*, No. 8:09-CV-2308-RAL-MAP, 2011 WL 13136526, at \*6 (M.D. Fla. Sept. 6, 2011) (citing *Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 50 (2d Cir. 2010) ("OFAC's designations of the Ocean Bank, N.A. account holders as SDNTs or SDNTKs are factual determinations. OFAC's decisions are entitled to great deference."); *Stansell*, 2019 WL 5291044, at \*7 (holding that an entity was an agency or instrumentality of a terrorist organization because, in part, "we must give great deference to OFAC with regard to its designation of El Aissami and Lopez Bello as SDNTs") (citing *De Cuellar*, 881 F.2d at 1565).

Second, apart from OFAC's potent factual determination, Plaintiffs also presented an affidavit from Douglas C. Farah. The Court detailed Mr. Farah's findings in their Report and Recommendation, and see no need to rehash those facts here. Rather, it suffices to say that the affidavit included persuasive, sworn findings that PDVSA has engaged in a detailed money laundering scheme in privity with the Maduro regime.

In response to both OFAC's findings and Mr. Farah's affidavit, PDVSA has presented no counter-evidence to support its contention that its agency or instrumentality status should be reversed. Accordingly, because Plaintiffs have made a sufficient evidentiary showing and have not faced meaningful resistance, we

recommend PDVSA's motion be denied on this front. *See Stansell*, 2019 WL 5291044, at *8 (finding that an entity was an agency or instrumentality of a terrorist organization where Mr. Farah's testimony connected the two through the terrorist organization's "financial activities undertaken on behalf of" the instrumentality); *Stansell v. Revolutionary Armed Forces of Colombia*, No. 8:09-CV-2308-RAL-MAP, 2011 WL 13176719, at *3 (M.D. Fla. Sept. 19, 2011) (finding that entities were agencies or instrumentalities of the defendant-cartel because there was evidence that they provided "financial or money laundering services to the [defendant-cartel] or its trafficking partners, directly or indirectly").

### 3.    Owner of Blocked Assets

PDVSA next argues that, to be recoverable, assets must be "blocked assets of [the] terrorist party." [D.E. 310 at 26]. And because, PDVSA argues, Plaintiffs have not alleged that the assets are property "of" the judgment debtors, the TRIA is not implicated.

This argument, too, is without merit. The Eleventh Circuit has made clear that, when seeking to execute or garnish property under the TRIA, "the owner of the asset" may be "an agency or instrumentality of the judgment debtor." *Stansell II*, 771 F.3d at 726. Further, there exists no authority in the Eleventh Circuit that the judgment debtor (as opposed to its agency or instrumentality) must own the property.

This argument should therefore be rejected. *See id*. ("TRIA execution requires two separate determinations regarding the property being executed: (i) that the

asset is blocked, and (ii) that the owner of the asset is an agency or instrumentality of the judgment debtor.”); *Stansell v. Lopez Bello*, 802 F. App'x 445, 447 (11th Cir. 2020) (explaining that a plaintiff operating under the TRIA may “execute against the assets of a terrorist organization's agency or instrumentality”).

### 4.    *PDVSA's Corporate Form*

Next, PDVSA seeks to dissolve three writs that pertain to accounts held by PDVSA's subsidiaries: Petrocedeno, Petromer, and Bariven. [D.E. 134, 165, 180]. In the same vein, PDVSA also moves to deny pending turnover motions as to two of those garnished accounts. [D.E. 161, 256]. In support, PDVSA argues that these accounts belong not to PDVSA, but PDVA's subsidiaries. Under the TRIA, PDVSA argues, Plaintiffs lack authority to ignore PDVSA's corporate form and execute on PDVSA's subsidiaries assets, without first proving that the subsidiaries are themselves agencies or instrumentalities.

In response, Plaintiffs agree that these entities are subsidiaries and thus distinct from PDVSA. Consequently, Plaintiffs argue, PDVSA lacks standing to assert those entities' rights. Rather, those entities—all of which, in Plaintiffs' view, are agencies or instrumentalities in their own right—must assert their own defenses.

In its reply, PDVSA points out that Plaintiffs have not established that the subsidiaries are agencies or instrumentalities. Rather, Plaintiffs sought the assets on the basis that PDVSA owns those subsidiaries, and thus the assets are reachable vis-à-vis PDVSA's agency or instrumentality status.

19

As an initial matter, PDVSA is correct that Plaintiffs identify PDVSA as the owner of the funds. For example, as to the Petrocedeno asset, Plaintiffs argued in their motion for writ of garnishment that "PDVSA, through Petrocedeno owns the funds." [D.E. 163 at 1–2]. Plaintiffs cannot on one hand use PDVSA's status to attach the subsidiaries' assets under the guise that PDVSA controls the money, but on the other hand foreclose PDVSA from asserting defenses to protect those assets on grounds that the money does not belong to PDVSA. Plaintiffs' standing argument is therefore without merit.

The crux of the question, then, is whether Plaintiffs made a sufficient showing to attach the assets of Petrocedeno, Petromer, and Bariven. We find that they have not. In their response, Plaintiffs concede that PDVSA and the subsidiaries are separate entities. Plaintiffs then argue that "PDVSA's subsidiaries are agencies/instrumentalities in their own right, as nodes in the Maduro/Cartel of the Sun money laundering enterprise." [D.E. 344 at 20].

But aside from this conclusory assertion, Plaintiffs—in their motions for writ of garnishment, motions for turnover order, and/or their response to the pending Motion—fail to make a particularized showing as to any (let alone each) subsidiary. Rather, Plaintiffs merely note that PDVSA's money laundering network is expansive, without offering any evidence or argument as to how the subsidiaries are included in that network.

Plaintiffs also point us to no authority that, just because the subsidiaries are wholly owned by PDVSA, the subsidiaries' assets are presumptively recoverable.

Short of some showing that (1) any of the subsidiaries are an agency or instrumentality, (2) PDVSA's corporate veil should be pierced, and/or (3) a subsidiary of an agency or instrumentality's assets are presumptively recoverable under the TRIA, the Court has no choice but to accept PDVSA's argument. *See* TRIA § 201 (providing that "the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment," but providing nothing about subsidiaries of agencies or instrumentalities).

Accordingly, we recommend that PDVSA's motion be granted on this score and conclude that: (1) the three relevant writs of garnishment should be dissolved [D.E. 134, 165, 180]; and (2) the two pending turnover motions as to those writs of garnishment should be denied. [D.E. 161, 256].

To be clear, we make no finding that these subsidiaries *are not* agencies or instrumentalities under the TRIA; they very well may be. We find, conversely, that Plaintiffs have not carried their burden (or even attempted to carry their burden) of showing that these subsidiaries are agencies or instrumentalities. As a result, we cannot deem their assets collectible under the TRIA (or any other governing law).[4] These writs and motions, however, should be dissolved/denied without prejudice, to allow Plaintiffs to pursue the assets again with a proper showing that the subsidiaries are agencies or instrumentalities.

---

[4] PDVSA also argues that, as to one particular writ [D.E. 165], the Court lacks subject matter jurisdiction. But that writ proceeding has been transferred to the Southern District of New York [D.E. 395]; this argument is therefore moot.

### F.      *Requirements of FSIA § 1610(c)*

Lastly, PDVSA argues that Plaintiffs have failed to comply with § 1610(c) of the FSIA. That subsection provides: "No attachment or execution … shall be permitted until the court has ordered such attachment and execution after having determined that a reasonable period of time has elapsed following the entry of judgment and the giving of any notice required under section 1608(e) of this chapter." § 1610(c). Essentially, this requirement is tacked on to the FSIA's "commercial activities" exception, which provides an exception to the immunity that an agency or instrumentality of a foreign state would otherwise enjoy under the FSIA. § 1610(b).  PDVSA avers that Plaintiffs have not requested an order from the court to permit attachment or execution, nor have Plaintiffs served their default judgment or July 1 turnover order on PDVSA. Therefore, argues PDVSA, Plaintiffs have failed to satisfy § 1610(c).

In response, Plaintiffs argue that § 1610(c) is inapposite—Plaintiffs have operated under the TRIA to procure the relevant assets, not the FSIA.

We agree that § 1610(c) does not apply. This sub-section's requirements— according to PDVSA—stem from instances in which subject matter jurisdiction is conferred via the FSIA's "commercial activities exception." But Plaintiffs are not operating under that sub-section. Rather, as we discussed thoroughly in Section A of our analysis, our subject matter jurisdiction is founded by the TRIA—not the FSIA. And the very purpose of the TRIA is to eliminate immunity that terrorists might otherwise enjoy under the FSIA. To apply requirements that are occasioned

by, and specific to, those immunity provisions—when the purpose of the TRIA is to obviate those immunity provisions—is nonsensical. *See Bank Markazi v. Peterson*, 578 U.S. 212, 216–17 (2016) ("Victims of state-sponsored terrorism, like others proceeding under an FSIA exception, may obtain a judgment against a foreign state on 'establish[ing] [their] claim[s] ... by evidence satisfactory to the court.' § 1608(e). After gaining a judgment, however, plaintiffs proceeding under the terrorism exception 'have often faced practical and legal difficulties' at the enforcement stage. … To lessen these enforcement difficulties, Congress enacted the Terrorism Risk Insurance Act of 2002 (TRIA), which authorizes execution of judgments obtained under the FSIA's terrorism exception against [certain blocked assets]."); *Hausler Republic of Cuba*, 2010 WL 11442514, at *5 (citing *Weininger*, 462 F. Supp. 2d at 478) ("The purpose of the TRIA is to override any immunity from execution that the 'blocked assets' of terrorist entities might otherwise enjoy under the Foreign Sovereign Immunities Act.").

PDVSA also cites to no authority that, even though Plaintiffs are operating under the TRIA, Plaintiffs should be bound by § 1610(c). Accordingly, PDVSA's argument is without merit and should be rejected.

## IV.   CONCLUSION

For the reasons set forth above, we recommend that PDVSA's Motion [D.E. 310] be granted in part and denied in part.

PDVSA's Motion should be **GRANTED** to the extent PDVSA seeks to dissolve the writs of garnishment targeted at Petrocedeno, Petromer, and Bariven.

Those writs [D.E. 134, 165, 180] should be dissolved. Further, the two pending turnover motions [D.E. 161, 256] as to those writs should be denied. Subsequently, Plaintiffs can seek to re-garnish those same assets with a showing that the assets are recoverable under the TRIA or other authority.

The remainder of PDVSA's Motion should be **DENIED**.

Pursuant to Local Magistrate Rule 4(b) and Fed. R. Civ. P. 73, the parties have fourteen (14) days from service of this Report and Recommendation within which to file written objections, if any, to the District Judge. Failure to timely file objections shall bar the parties from *de novo* determination by the District Judge of any factual or legal issue covered in the Report *and* shall bar the parties from challenging on appeal the District Judge's Order based on any unobjected-to factual or legal conclusions included in the Report. 28 U.S.C. § 636(b)(1); 11th Cir. Rule 3-1; *see, e.g., Patton v. Rowell,* 2017 WL 443634 (11th Cir. Feb. 2, 2017); *Cooley v. Commissioner of Social Security,* 2016 WL 7321208 (11th Cir. Dec. 16, 2016).

**DONE and SUBMITTED** in Chambers at Miami, Florida this 9th day of April, 2025.

/s/ *Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge