**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
**CASE NO. 1:21-cv-20706-DPG**

MEUDY ALBÁN OSIO in her personal capacity
And in her capacity as the personal representative
of the Estate of FERNANDO ALBERTO ALBÁN,
FERNANDO ALBÁN OSIO, and MARIA
FERNANDA ALBÁN OSIO,

       Judgment Creditors / Plaintiffs,

v.

NICOLAS MADURO MOROS,
FUERZAS ARMADA REVOLUCIONARIAS
DE COLUMBIA ("FARC"); THE CARTEL OF
THE SUNS A.K.A. CARTEL DE LOS SOLES;
VLADIMIR PADRINO LOPEZ; MAIKEL
JOSE MORENO PEREZ; NESTOR LUIS
REVEROL TORRES; and TAREK WILLIAM
SAAB,

       Judgment Debtors / Defendants.

_____/

**PLAINTIFFS/JUDGMENT CREDITORS' OPPOSITION TO NON-PARTY PDVSA'S**
**OBJECTIONS TO THE REPORT AND RECOMMENDATION (ECF No. 414)**

## INTRODUCTION

Magistrate Judge Torres's April 9, 2025 Report and Recommendations ("R&R") agrees with Plaintiffs on some of their arguments, and agrees with Petróleos de Venezuela, S.A.'s ("PDVSA") on some of its arguments. In the end, PDVSA got nearly everything it requested: the R&R recommends dissolving three of Plaintiffs' writs against PDVSA subsidiaries and denying two pending turnover motions involving those subsidiaries' assets. R&R 23-24. But while Plaintiffs have taken to heart the R&R's ruling to make a more particularized showing as to the agency-or-instrumentality status of PDVSA's subsidiaries and lodged no objections to the R&R, PDVSA has taken the opposite tack. In its objections, PDVSA throws everything but the kitchen sink at the R&R. Its objections—premised in large part on a statement of interest that neither the Eleventh Circuit nor any other court has adopted and positions foreclosed by Eleventh Circuit precedent (as even PDVSA sometimes concedes)—are meritless.

The R&R comprehensively and thoughtfully addresses, and correctly resolves, each of the issues raised by PDVSA's motion to vacate. It explains how subject matter jurisdiction here is appropriately premised on the Terrorism Risk Insurance Act ("TRIA"), which by its plain terms (and as recognized by several courts, including in Florida) applies notwithstanding the Foreign Sovereign Immunities Act ("FSIA"). R&R 4-7, 22-23. It discusses in great detail why there is personal jurisdiction over PDVSA, concluding that Plaintiffs' service was sufficient and that the exercise of jurisdiction comports with due process. *Id.* at 7-14. It explains why the political question doctrine is inapplicable (*id.* at 14-15) and goes through each of PDVSA's arguments about why TRIA supposedly cannot reach PDVSA or its subsidiaries (*id.* at 15-21) before ultimately concluding that the appropriate course of action is to dissolve some of the writs and deny some of the turnover motions without prejudice to re-garnishment (*id.* at 23-24). The Court should adopt the Magistrate Judge's R&R in full.

## ARGUMENT

**I.    THE R&R IS CORRECT THAT TRIA PROVIDES SUBJECT MATTER JURISDICTION OVER PLAINTIFFS' ENFORCEMENT PROCEEDINGS**

PDVSA's contention (at Obj. 5-7) that the Court lacks subject matter jurisdiction is baseless.[1] The R&R correctly recognizes that subject matter jurisdiction here is conferred under

---

[1] PDVSA's arguments concerning the FSIA (*see* Obj. I, II.A, IV.A, IV.D) do not apply to the writs directed to the assets of PDVSA's subsidiaries (Petrocedeño, Petromar, Barivan, and

TRIA. R&R 5-7. As the R&R notes, the "plain language" of TRIA sweeps broadly: It provides that, "*[n]otwithstanding any other provision of law* . . . in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism . . . the blocked assets of that terrorist party (including the blocked assets of *any agency or instrumentality of that terrorist party*) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment." *Id.* at 5 (quoting TRIA § 201(a)). It is unsurprising that TRIA displaces "any other provision of law." TRIA § 201(a). It do so because Congress fashioned TRIA to "deal comprehensively with the problem of enforcement of judgments rendered on behalf of victims of terrorism." *Stansell v. FARC ("Stansell II"),* 771 F.3d 713, 732 (11th Cir. 2014).

There is no indication in TRIA's text suggesting that it must yield to the FSIA when the assets belong to an agency or instrumentality of a foreign state. *Contra* Obj. 6-7. Just the opposite: Section 201(a) of TRIA mandates that when a judgment is obtained against a terrorist party, "the blocked assets of *any* agency or instrumentality of that terrorist party[] shall be subject to execution," and it goes on to define "terrorist party" as a "terrorist organization" *or* a "foreign state designated as a state sponsor of terrorism." TRIA § 201(a), (d)(4) (emphasis added). Thus, by its terms, the statute reaches "*any* agency or instrumentality" of "*any* terrorist party," without regard to whether the agency or instrumentality is a foreign state ordinarily entitled to FSIA § 1604 immunity. *See id.* There is simply no reason for the FSIA to control over TRIA, particularly for subsidiaries that do not have any rightful FSIA protections in the first place. *See, e.g.*, *Santiago v. Nsi Ins. Grp.*, 2006 WL 8433177, at *10 (S.D. Fla. July 7, 2006) (holding that a subsidiary in which a foreign government had an indirect interest was not covered by the FSIA).

The R&R carefully goes through case after case in which courts have recognized that "TRIA nullifies any immunity that 'terrorist entities might otherwise enjoy under the FSIA.'" R&R 5-6 (quoting *Hausler Rep. of Cuba v. Comcast IP Phone II*, 2010 WL 11442514, at *5 (S.D. Fla. Oct. 14, 2010)) (collecting cases). Because of its broad "notwithstanding" language, "TRIA confers subject matter jurisdiction over enforcement actions . . . that otherwise fall under the parameters of immunity provided by the FSIA." *Weininger v. Castro*, 462 F. Supp. 2d 457, 478

---

PetroMonagas), which are not covered by the FSIA. *See Dole Foods v. Patrickson*, 538 U.S. 468, 473 (2003); *Singh v. Caribbean Airlines Ltd.*, 2014 WL 11878439, at *2 (S.D. Fla. Jan. 27, 2014) ("An entity owned by an agency or instrumentality of a foreign state cannot claim the protections of the FSIA."), *aff'd*, 798 F.3d 1355 (11th Cir. 2015).

(S.D.N.Y. 2006); *Villoldo v. Castro Ruz*, 113 F. Supp. 3d 435, 437 (D. Mass. 2015), *aff'd*, 821 F.3d 196 (1st Cir. 2016). Indeed, that is the entire point of a "notwithstanding" clause. It signals the intent to "override conflicting provisions of any other section" of a law or "supersede all other laws." *Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 18 (1993) ("A clearer statement is difficult to imagine.") (quotations omitted). And as the Eleventh Circuit put it, "'there are no limits' to the scope of the 'notwithstanding' clause in the TRIA." *Stansell v. FARC (*"*Stansell V*"), 45 F.4th 1340, 1362 n.11 (11th Cir. 2022) (alterations omitted).

PDVSA's assertion that "none of the cases cited in the R&R" supports the R&R's holding that "TRIA exempts Plaintiffs from satisfying the requirements of the FSIA" is simply wrong. Obj. 6. PDVSA's argument is that—although cases cited in the R&R hold that TRIA overrides the FSIA and affords this Court with subject matter jurisdiction in the enforcement context—what those cases somehow mean (but never actually say) is that TRIA overrides the FSIA and affords jurisdiction over execution actions **only** if plaintiffs first obtain a judgment against a sovereign state. *Id.* at 6 (arguing that TRIA provides jurisdiction "only where a valid judgment has been entered against the sovereign"). But that is not at all what *Hausler*—the first case cited in the R&R—holds. *Hausler* explains:

> The purpose of the TRIA is to override any immunity from execution that the "blocked assets" of terrorist entities might otherwise enjoy under the Foreign Sovereign Immunities Act ("FSIA"). . . . Specifically, § 1609 of the FSIA renders the property of a foreign state in the United States immune from execution or attachment, including garnishment, unless §§ 1610-11 provide an exception to this immunity. *See* 28 U.S.C. § 1609. In other words, the TRIA confers courts with **subject-matter jurisdiction** over enforcement actions, such as this one, that would otherwise fall under the parameters of immunity provided by the FSIA.

2010 WL 11442514, at *5 (citations omitted; emphasis added). Nothing about *Hausler*'s holding set forth above, nor the logic animating that holding, requires that plaintiffs first obtain a judgment against a foreign sovereign before utilizing TRIA's grant of subject matter jurisdiction in the **enforcement** context. The same is true of *Weininger*, 462 F. Supp. 2d at 478, and *Hill v. Republic of Iraq*, 2003 WL 21057173, at *2 (D.D.C. Mar. 11, 2003), the next two cases cited by the R&R (at R&R 6): both say that TRIA affords subject matter jurisdiction in enforcement actions, and neither suggests that TRIA's grant of jurisdiction over enforcement actions is available only if the underlying judgment was against a sovereign.

Not only does PDVSA wrongly fault the R&R for relying on cases that are facially relevant, PDVSA misses the mark when it tries to prove its point by citing a case, *Vera v. Banco Bilbao Vizcaya Argentaria, S.A.*, 946 F.3d 120, 133 (2d Cir. 2019), that the R&R never mentions. Obj. 6. And as PDVSA points out (*id.*), *Vera* rests on *Weinstein v. Islamic Republic of Iran*, 609 F.3d 43 (2d Cir. 2010). In *Weinstein*, the Second Circuit explained that TRIA "clearly differentiates between the party that is the subject of the underlying judgment itself, which can be ***any*** terrorist party (here, Iran), and parties whose blocked assets are subject to execution or attachment, which can include not only the terrorist party but also 'any agency or instrumentality of that terrorist party.' If this did not constitute ***an independent grant of jurisdiction*** over the agencies and instrumentalities, the parenthetical would be a nullity." 609 F.3d at 52 (quoting TRIA § 201(a)) (emphasis added). In other words, the underlying judgment need not be against a sovereign; it can be against any terrorist party, and TRIA will afford independent subject matter jurisdiction as to enforcement actions against agencies or instrumentalities.[2]

PDVSA also mentions in passing a handful of cases involving jurisdiction under the FSIA. *See* Obj. 6 (discussing *Rubin v. Islamic Rep. of Iran*, 583 U.S. 202 (2018); *Argentine Rep. v. Amerada Hess Shipping Corp.*, 488 U.S. 428 (1989); *Butler v. Sukhoi Co.*, 579 F.3d 1307 (11th Cir. 2009)). But none of those cases concern jurisdiction under TRIA, much less do they hold that TRIA cannot independently provide jurisdiction for enforcement actions against entities that just so happen to be "agencies or instrumentalities" of a "foreign state." TRIA § 201(a), (d)(4). Indeed, *Butler* does not mention TRIA at all. *See* 579 F.3d 1307. Nor does *Argentine*, 488 U.S. 428— which is unsurprising because it predates TRIA by over a decade.

The rest of PDVSA's argument consists of pretending that suggestions a previous administration made in a different case about how it believed the interplay between TRIA and FSIA should work somehow constitute binding legal precedent with which the R&R had to "grapple." Obj. 6 (discussing ECF No. 310-1, U.S. Statement of Interest, *Caballero v. FARC*, No. 20-MC-40 (W.D.N.Y. Sept. 20, 2022)); Obj. 20 (arguing that "*Stansell II* was wrongly decided"

---

[2] Moreover, as Plaintiffs explained below, FSIA § 1604 only applies to claims against a foreign state for *in personam* relief, not enforcement proceedings like those here. ECF No. 344 at 8. And even if the FSIA applied instead of TRIA, the Court would have jurisdiction under the FSIA's "commercial activities" exception, 28 U.S.C. § 1605(a)(2). *Id.* at 6-8.

because the Eleventh Circuit lacked the U.S. Statement of Interest). It is telling that PDVSA does not cite a single case that ever adopted those arguments.

## II.    THE R&R IS CORRECT THAT THERE IS PERSONAL JURISDICTION OVER PDVSA

### A.    Plaintiffs Properly Served PDVSA, and in Any Event, PDVSA Had Actual Notice.

PDVSA's objections about service on it (Obj. 8-10) are unavailing (and as noted, inapplicable to its subsidiaries). As explained below, Plaintiffs properly served PDVSA under the FSIA, which authorizes service on an "agent authorized . . . by law" (28 U.S.C. § 1608(b)(2)), and Florida law, which supplies that agent (Fla. Stat. § 48.181). *See* pp. 7-9, *infra*. And even had Plaintiffs not satisfied every aspect of the FSIA's service-of-process provisions (they did), the R&R appropriately concludes that PDVSA's actual notice of Plaintiffs' enforcement efforts was sufficient to establish personal jurisdiction despite "any technical non-compliance." R&R 9. That conclusion follows from a long line of cases—including "binding precedent" from the Eleventh Circuit, *id.* at 12—recognizing that "actual notice should override technical deficiencies in service under [28 U.S.C. § 1608(b)]," *id.* at 10 (quotations omitted); *id.* at 10-12 (collecting cases).

PDVSA tries to circumvent this case law by claiming that the Court's decision in *Republic of Sudan v. Harrison*, 587 U.S. 1 (2019), implicitly upends it. Obj. 8-9. Tellingly, despite *Sudan* being on the books for several years, PDVSA does not point to a single case taking that position. And for good reason: *Sudan* has nothing to do with the FSIA service provision at issue here. Obj. 8-9. *Sudan* involved a different provision of the FSIA—Section 1608(a)(3), which deals only with "foreign states" and provides that a "foreign state may be served by means of a mailing that is 'addressed and dispatched . . . to the head of the ministry of foreign affairs of the foreign state concerned.'" *Sudan*, 587 U.S. at 4 (quoting 28 U.S.C. § 1608(a)(3)). Unsurprisingly, the Court held that this language did not authorize actual notice or service on an agent. *Id.* at 15-16.

In fact, to reach its holding about Section 1608(a)(3), the *Sudan* Court **expressly distinguished** the service provision at issue here—*i.e.*, Section 1608(b)(2), which concerns service on "an agency or instrumentality of a foreign state." 587 U.S. at 11 (quoting 28 U.S.C. § 1608(b)(2)). The Court observed that, unlike Section 1608(a)(3), "Section 1608(b)(2) provides for delivery of a service packet to an officer or a managing or general agent of the agency or instrumentality of a foreign state or 'to any other agent authorized by appointment or by law to receive service of process in the United States.'" *Id.* at 13. The Court also noted that

"§ 1608(b)(3)(B), unlike § 1608(a)(3), contains prefatory language saying that service . . . is permissible 'if reasonably calculated to give actual notice.'" *Id.* at 11-12. Congress's inclusion of this sort of flexible language in Section 1608(b)(2) but not in Section 1608(a)(3) is one of the principal reasons why the Court read the latter's requirements as inflexible. *Id.* at 11-13.

PDVSA's other authorities are similarly inapposite. As with *Sudan*, both *Barot v. Embassy of the Republic of Zambia*, 785 F.3d 26 (D.C. Cir. 2015) and *Magness v. Russian Federation*, 247 F.3d 609 (5th Cir. 2001) (both cited at Obj. 8) only deal with service under Section 1608(a)(3), not Section 1608(b)(2). And *Prewitt Enterprises v. OPEC*, 353 F.3d 916 (11th Cir. 2003) (cited at Obj. 8) does not deal with service under the FSIA at all. *See Prewitt*, 343 F.3d at 922 n.9 ("It is clear that OPEC is not a foreign state or political subdivision of a foreign state pursuant to § 1608 of the FSIA."); *id.* at 923-24 (assessing only the adequacy of service under Fed. R. Civ. P. 4(f)).

PDVSA also attacks the R&R's reliance on the straightforward holding in *Harris Corporation v. National Iranian Radio & Television*, 691 F.2d 1344 (11th Cir. 1982), by twisting that case into knots. *See* Obj. 9. As the R&R notes (at R&R 9), *Harris* held that service on a foreign agency or instrumentality that did not precisely comport with Section 1608(b) was nonetheless valid. *Harris*, 691 F.3d at 1353. PDVSA not only seeks to transform stray parts of footnote dicta in *Harris* into a holding but, in doing so, would reach the opposite result of the Court's actual holding. That is, the *Harris* Court **rejected** PDVSA's notion that "deficiencies in [the] methods of service of process" premised "on the technical requirements of § 1608" control the inquiry into whether adequate service-of-process occurred:

> [National Iranian Radio and Television (NIRT)] does not deny that it had actual notice of this action. The attacks made . . . go only to asserted noncompliance with certain FSIA requirements that exist merely to assure that actual notice be received. . . . The failure to follow precisely those steps in § 1608 designed to insure that actual service be made should not override and invalidate the fact that in this case actual notice was received.

*Id.* PDVSA seizes on an accompanying footnote noting that parties "seeking to invoke the FSIA [should] follow the service provisions it contains. *Id.* at 1352 n.16. But PDVSA neglects to mention that in the very same footnote the Court added that it nevertheless "[found] service adequate" despite technical non-compliance. *Id.*

PDVSA now mentions in passing that it "learned of [Plaintiffs'] enforcement action only after Plaintiffs had obtained the July 1 Order" adopting an earlier R&R and granting Plaintiffs' motion for a writ against PDVSA (ECF No. 113). Obj. 8 (emphasis omitted). But PDVSA never

argued below that it lacked adequate actual notice here. *See* ECF No. 310 (PDVSA's Motion to Vacate); ECF No. 355 (PDVSA's Reply). Just the opposite, PDVSA "conceded its receipt of actual notice." R&R 11. It cannot now sandbag the Magistrate Court by "expand[ing] upon and redram[ing] arguments already made and considered by the magistrate judge." *Grace Inc. v. City of Miami,* 674 F. Supp. 3d 1141, 1148 (S.D. Fla. 2023); *accord Williams v. McNeil,* 557 F.3d 1287, 1292 (11th Cir. 2009) (parties cannot "shift gears before the district judge"); *Behavior Analyst Certification Bd., Inc. v. Rodriguez,* 2022 WL 4466621, at *2 (S.D. Fla. Sept. 26, 2022) ("[Parties must take before the magistrate judge not only their best shot but all of their shots.") (quotations omitted). Tellingly, elsewhere in its objections, PDVSA is just as cagey as it was before, nitpicking Plaintiffs' method of service at a level of abstraction seemingly designed to obscure precisely when it received actual notice. *See, e.g.*, Obj. 9 (complaining that "Plaintiffs' purported service had no reasonable hope of providing PDVSA with actual notice").

PDVSA's extended discussion about how substantial compliance with the FSIA's provisions is as or more important than actual notice (Obj. 8-9) makes no sense. The R&R extensively discusses substantial compliance and Plaintiffs' service here. R&R 9-11. And PDVSA is wrong that Plaintiffs did not substantially comply with the FSIA. Indeed, Plaintiffs fully complied. Under the relevant provision in the FSIA, "if no special arrangement for service exists"—and PDVSA conceded below that there is none here, *see* ECF No. 310 at 16—then service may occur "by delivery of a copy of the summons and complaint either to an officer, a managing or general agent, or to **any other agent authorized** by appointment or **by law** to receive service of process in the United States; or in accordance with an applicable international convention on service of judicial documents." 28 U.S.C. § 1608(b) (emphasis added). Plaintiffs did exactly that— they served an agent of PDVSA authorized by law (Fla. Stat. § 48.181): the Florida Secretary of State. *See* ECF No. 105, at 1-2 (confirming service in compliance with laws incorporated under Rule 4); *see also* Fed. R. Civ. P. 4(j)(1) (incorporating by reference FSIA § 1608).

Courts routinely recognize that where, as here, federal law permits service on an "agent authorized by law," plaintiffs may effectuate service on the Secretary of State. *See , e.g.*, *Clarendon Am. Ins. Co. v. Krishna Assocs. of Titusville, Inc.*, 2006 WL 3762076, at *1 (M.D. Fla. Dec. 20, 2006) (because Rule 4(h) authorized service on "agent authorized by . . . law," substitute service on the Florida Secretary of State was appropriate); *Casares v. Altman Specialty Plants, LLC*, 2023 WL 6162328, at *2 (D.N.M. Sept. 21, 2023) ("service was made upon an agent authorized by law

to receive service of process: the Secretary of State"); *Miller v. Collectron Corp.*, 1999 WL 730981, at *7 (E.D.N.Y. Sept. 16, 1999) ("Rule 4(h) of the Federal Rules of Civil Procedure provides that service on a corporation is effected by delivering a copy of the summons and complaint to any 'agent authorized . . . by law to receive service of process.' In New York, the Secretary of State is an agent authorized by law to receive service of process for a New York corporation."); *SEC v. Am. Land Co.*, 1987 WL 19930, at *4 (D.D.C. Nov. 6, 1987) ("As a matter of Delaware law, . . . it seems beyond peradventure that the Secretary of State may become an authorized agent for purposes of service of process. It seems equally evident, then, that in such a case the Secretary of State also becomes 'an agent authorized by law to receive service of process' within the plain language and meaning of Federal Rule 4(d)(3).") (quotations omitted).[3]

There is thus nothing to PDVSA's assertion that Plaintiffs "did not even attempt proper service here" (Obj. 9), because the Florida Secretary of State was "authorized . . . by law" to accept service on behalf of PDVSA. 28 U.S.C. § 1608(b)(2). After all, PDVSA conducts business in Florida, including laundering money and smuggling cocaine. *See generally* ECF No. 94 at 10-11 (describing indictment of PDVSA executives in Florida); ECF No. 94-5 (describing PDVSA's conduct throughout the United States, including Florida). And Florida's statute on "substituted service on non-residents and foreign businesses engaging in business in the state" provides that "the acceptance by any foreign business entity of the privilege extended by law to nonresidents to operate, conduct, engage in, or carry on a business or business venture in this state, or to have an office or agency in this state, is deemed to constitute an appointment by the individual or foreign business entity of the Secretary of State of this state as its agent on whom process in any action or proceeding against the individual or foreign business entity." Fla. Stat. § 48.181. By doing business

---

[3] The understanding that the phrase "agent authorized by law" in Section 1608(b) includes state Secretaries of State was established long before Congress enacted the FSIA in 1976. *See, e.g., Magelssen v. Hale*, 81 F. Supp. 138, 139 (W.D. Mo. 1948) (under state statute requiring nonresident motorist agree that Secretary of State shall be lawful attorney and agent for service of process, Secretary of State was an "agent authorized by law" within federal rule providing that service may be had upon individual by delivering copy of summons and complaint to an "agent authorized by law"); *Atl. Enters., Inc. v. Nat'l Equip. Rental, Ltd.*, 208 F. Supp. 710, 711 (D.P.R. 1962) (same); *Clancy v. Balacier*, 27 F. Supp. 867, 869 (S.D.N.Y. 1939) (same). Congress is presumed to have incorporated these background principles into the FSIA. *See, e.g., Lamar, Archer & Cofrin LLP v. Appling*, 584 U.S. 709, 721 (2018) ("When Congress use[s] the materially same language in [a more recent enactment], it presumptively [is] aware of the longstanding judicial interpretation of the phrase and intend[s] for it to retain its established meaning.").

in Florida, the state's Secretary of State became an "agent authorized . . . by law" to accept service on behalf of PDVSA. 28 U.S.C. § 1608(b)(2).

      **B.**     **PDVSA Has Sufficient Contacts with Florida to Satisfy Due Process.**

The R&R correctly concludes that PDVSA's contacts with Florida render its due process objections invalid. R&R 12-14.

To attack the R&R's recommendation, PDVSA begins by inventing a fictitious procedural problem with the R&R. It claims that the R&R "improperly places the burden on PDVSA to establish that the Court does not have personal jurisdiction." Obj. 10 (emphasis omitted). But the R&R does no such thing. Just the opposite, the R&R concludes that "***Plaintiffs*** have satisfied ***their*** initial burden of sufficiently alleging PDVSA's minimum contacts." R&R 13 (emphasis added). Indeed, PDVSA concedes as much just a few sentences later, when it complains that the "R&R erroneously finds that Plaintiffs have carried their burden" of showing sufficient contacts. Obj. 10.

PDVSA's only substantive argument—that Florida contacts cannot be attributed to it because it was controlled by the unlawful Maduro regime at the time, Obj. 10—is wrong as both a matter of law and fact. As a legal matter, it is irrelevant who controlled PDVSA because courts look to "***all contacts*** between the nonresident defendant and the forum state" to assess personal jurisdiction. *Del Valle v. Trivago GMBH*, 56 F.4th 1265, 1276 (11th Cir. 2022) (emphasis added). Plaintiffs cite no case for the proposition that ongoing contacts caused by bad actors must be excluded from the personal jurisdiction analysis, *see* Obj. 13—a counterintuitive result that would only serve to insulate entities committing the worst misconduct from personal jurisdiction. It is "telling[] that "PDVSA fails to cite an iota of authority for its good soldier defense" (R&R 13)— both prior to the issuance of the R&R and now again in objecting to the R&R.

As a factual matter, PDVSA is wrong that it never "'itself created'" contacts "with Florida." Obj. 10 (quoting *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (alterations omitted)). The R&R appropriately deems PDVSA's attempt to paint itself as an "ostensibly innocent actor carrying out Maduro's maleficent orders" not "factually credible." R&R 13 ("PDVSA sent money from its accounts to various contractors in South Florida to perpetuate a money laundering and bribery scheme."). That is, for years in a variety of ways, PDVSA "purposefully availed" itself of Florida, which is sufficient to comply with due process. *Id.* at 13-14 (quoting *De Valle*, 56 F.4th at 1277).

PDVSA's attempt to muddy the waters with the notion that recognizing these extensive contacts somehow "implicitly recognizes Maduro's claim to control the government of Venezuela"

(Obj. 10) rings hollow. The U.S. government did not recognize interim President Juan Guaidó and the National Assembly—from which PDVSA now claims to derive its authority, *see id.* at 10-11— until January 2019. *See* Venezuela: A Democratic Crisis, U.S. Dep't of State, https://2017-2021.state.gov/a-democratic-crisis-in-venezuela/; *accord* ECF No. 310 at 17-18. PDVSA committed sufficient conduct in Florida **before** that date. *See, e.g.*, ECF No. 94-5 (Declaration of Douglas C. Farah) at ¶¶ 40-44 (describing the use of the aircraft subject to the writ of execution here to transport, among others, members of the Maduro Criminal Enterprise in October 2018). And PDVSA once again cites no authority for the novel proposition that a change in legal ownership of a corporation—*i.e.*, the asserted change of PDVSA's legal owners and operators from the Maduro regime to the PDVSA Ad Hoc Board—erases contacts arising before the change.

## III.   THE R&R IS CORRECT THAT TRIA APPLIES TO PDVSA.

### A.   Binding Circuit Precedent Forecloses PDVSA's Argument That It Is Not an Agency or Instrumentality under TRIA.

PDVSA devotes several pages to arguing that the R&R should not have recommended applying TRIA to it in the first place. Obj. 12-14. But PDVSA concedes that its argument is foreclosed by binding circuit precedent and only re-urges it to preserve it for appellate review. *Id.* at 12. There is thus no need for the Court to consider PDVSA's argument—which in any event is unpersuasive, relying on a crabbed reading of old cases discussing the common law definition of an "agent" (*id.* at 14); a thin slice of TRIA's supposed legislative history, *e.g.*, a single senator's floor statement (*id.* at 13-14);[4] and citations to an unadopted reading of TRIA and the FSIA that a previous administration once "advocated" in a New York case (*id.* at 13). *See, e.g.*, *Bova v. Wainwright*, 674 F. Supp. 834, 835 (S.D. Fla. 1987) ("[T]his Court is bound by precedent and to follow the teachings and instructions of the Eleventh Circuit Court of Appeals.") (adopting R&R).

### B.   PDVSA Is an Agency or Instrumentality of the Judgment Debtors.

PDVSA also takes issue with various aspects of the R&R's analysis of its agency-or-instrumentality status with respect to Maduro and the Cartel. Obj. 15-16. None of them is valid. As an initial matter, there is a sound reason why the R&R does not "explicitly address" PDVSA's argument about "temporal limits for assessing agency-or-instrumentality status." *Id.* at 15. It is foreclosed by Eleventh Circuit precedent. The Eleventh Circuit approved of defining "agency or

---

[4] *See, e.g.*, *N.L.R.B. v. SW Gen., Inc.*, 580 U.S. 288, 307 (2017) ("[F]loor statements by individual legislators rank among the least illuminating forms of legislative history.").

instrumentality" in TRIA to reach any party "that is or *was ever involved* in any aspect of [the defendant's] trafficking operations or that assisted with the [the defendant's] financial or money laundering network." *Stansell II*, 771 F.3d at 724 n.6; *accord Stansell V*, 45 F.4th at 1350 (noting that "the formulation [the Court] expressly approved in *Stansell II* encompassed **past** involvement or association with a terrorist party") (emphasis added).

PDVSA's contention (at Obj. 15-16) that there is inadequate factual support for its agency-or-instrumentality status is similarly misplaced.[5] After all, "myriad evidence supports [the R&R's] determination that PDVSA is an agency or instrumentality." R&R 16. Chief among them is that OFAC "has blocked PDVSA's assets and deemed it to be an agency or instrumentality." *Id.* PDVSA quibbles that the R&R gives deference to OFAC's determination. Obj. 15. But deference is appropriate. Indeed, it is well established that the "decision of the OFAC is entitled to great deference, and should be reversed only if arbitrary and capricious." *DeCuellar v. Brady*, 881 F.2d 1561, 1565 (11th Cir. 1989). And the R&R does not "rely solely" on OFAC's determination. Obj. 15 (quotations omitted). The R&R also points to Plaintiffs' expert affidavit from Douglas C. Farah, which the R&R aptly describes as filled with "persuasive, sworn findings that PDVSA has engaged in a detailed money laundering scheme in privity with the Maduro regime." R&R 17; *see also Stansell v. FARC*, 2019 WL 5291044, at *8 (S.D. Fla. Aug. 21, 2019) (pointing to Mr. Farah's testimony regarding "financial activities undertaken on behalf of" the instrumentality to support a finding of agency-or-instrumentality status).

Moreover, there is nothing to PDVSA's suggestion that Mr. Farah's testimony is inadmissible under federal *Touhy* regulations. Obj. 15. A private party like PDVSA has no standing to assert U.S. Department of Defense ("DoD") or U.S. Department of Homeland Security ("DHS") *Touhy* regulations. The statute under which *Touhy* regulations are implemented only grants authority to enact internal rules of agency organization, procedure, or practice. *Chrysler Corp. v. Brown*, 441 U.S. 281, 310 (1979) (discussing 5 U.S.C. § 301). Unsurprisingly, courts have rejected the idea that "all litigants—not just the government—should be able to invoke the [] *Touhy* regulations." *Christison v. Biogen Idec,* 2015 WL 3489494, at *1 (D. Utah June 2, 2015); *accord,*

---

[5] PDVSA argues that the evidence of agency-or-instrumentality status must be "compelling," but the case that it cites does not apply that standard to agency-or-instrumentality determinations. Obj. 15 (citing *Kim v. Dem. People's Rep. of Korea*, 774 F.3d 1044 (D.C. Cir. 2014)). Nor is that the standard in the Eleventh Circuit. *See Stansell II*, 771 F.3d at 731-32, 742.

*e.g.*, *United States ex rel. Treat Bros. Co. v. Fid. & Deposit Co. of Md.,* 986 F.2d 1110, 1119 (7th Cir. 1993) (holding that a private litigant lacked standing to object to trial testimony on the grounds that it violated military regulations governing disclosure procedures).

In any event, Mr. Farah's declaration does not contain official information subject to *Touhy* regulations.[6] Mr. Farah explains his sources and methods, making clear that he did not rely on information in the control of (or related to information in the control of) DoD or DHS, or that he obtained due to his office duties or status at DoD or DHS. Rather, he relied on his own personal research—the same research that led him to testify scores of times before Congress (ECF No. 94-5 at 26-27) and publish nearly a dozen books and book chapters (*id.* at 28-29) and a raft of articles (*id.* at 29-32). Mr. Farah's vast body of work as a private journalist and investigator does not become "official information" merely because the government has sometimes sought his expertise and insights.[7] Nor does PDVSA rebut any of this evidence. Its only submission (Obj. 16 (citing ECF No. 310-2–10)) relates to the role of the Ad Hoc Board in managing PDVSA, but PDVSA's actions (not the party that managed it) are dispositive of its agency-or-instrumentality status—and PDVSA never rebuts those.

Finally, PDVSA inserts a truncated version of its political question argument to take issue with the R&R's agency-or-instrumentality recommendation. Obj. 16. That argument fails for the reasons discussed below. *See* IV, *infra*. In any case, PDVSA's argument only concerns activities with respect to Venezuela's government taken "after January 2019." Obj. 16. And there is no such

---

[6] DoD defines "official information" as "[a]ll information of any kind and however stored that is in the custody and control of the DoD, relates to information in the custody and control of the DoD, or was acquired by DoD personnel due to their official duties or status." 32 C.F.R. 97.3. And DHS similarly defines "official information" as "all information of any kind, however stored, that is in the custody and control of the [DHS], relates to information in the custody and control of [DHS], or was acquired by [DHS] employees, or former employees, as part of their official duties or because of their official status within the [DHS] while such individuals were employed by or served on behalf of [DHS]." 6 C.F.R. § 5.41.

[7] Indeed, PDVSA's own case law (at Obj. 15) amply illustrates what is meant by "official information" and why Mr. Farah's testimony is not that. For instance, in *McMahon v. Presidential Airways, Inc.,* 2009 WL 10705562 (M.D. Fla. Nov. 5, 2009), official information was obtained by General Horner *from DoD* during his Air Force service, and he discussed "operating in a war zone environment" and using "special tactics suited only for combat." *Id.* at *1. By contrast, Mr. Farah's information does not come from DoD or DHS or reflect information made privy to him there.

temporal limitation in a TRIA agency-or-instrumentality determination. *Stansell V*, 45 F.4th at 1350; *Stansell II*, 771 F.3d at 724 n.6.

      **C.**    **There Is Nothing to PDVSA's Contention That the Blocked Assets Must Be Directly Owned by the Judgment Debtor.**

Even though the R&R *agrees* with PDVSA that Plaintiffs need to do more to show that the blocked assets are subject to turnover (*see* R&R 20-21), PDVSA nonetheless rehashes its argument that TRIA only reaches assets directly owned by the judgment debtor itself, and does not reach assets owned by an agency or instrumentality of the judgment debtor. Obj. 16-17. As the R&R put it, that argument "is without merit," because the "Eleventh Circuit has made clear that, when seeking to execute or garnish property under the TRIA, 'the owner of the asset' may be an 'agency or instrumentality of the judgment debtor.'" R&R 18 (quoting *Stansell II*, 771 F.3d at 726). That is, *Stansell II* "directly address[ed]" (Obj. 16) PDVSA's contention that TRIA is limited only to judgment debtor assets, and roundly rejected it. Likewise, in *Stansell v. Lopez Bello*, the Court affirmed a TRIA turnover judgment "concerning [López Bello's] property" without ever so much as suggesting that there must be a showing that the judgment debtor (there, the FARC) owned the property along the lines of what PDVSA would require here. 802 F. App'x 445, 446 (11th Cir. 2020). No argument lifted from statements of interest in a couple out-of-circuit cases (*see* Obj. 16-17)—which went unadopted by either court in which they were made—alters that.

Besides being foreclosed by this circuit's precedent, PDVSA's supposed "plain text" argument that TRIA's reference to "blocked assets *of* that terrorist party (*including* the blocked assets of any agency or instrumentality of that terrorist party)" limits recovery only to assets directly owned by the terrorist party makes no sense. Obj. 16 (quoting TRIA § 201(a)). By its plain terms, TRIA reaches "assets of any agency or instrumentality of th[e] terrorist party." TRIA § 201(a). Thus, under TRIA, assets owned by a terrorist party's "agency or instrumentality" are just as much "of that terrorist party" (*id.*) as any assets directly "belonging to[] the terrorist party," Obj. 16 (arguing that TRIA should be read as authorizing only the execution of "property belonging to[] the terrorist party") (quotations omitted). Nor is there any principled reason to exempt the assets that a judgment debtor manages to hide behind additional forms of corporate formalities. *Contra id.* at 16-17. PDVSA's argument would have the bizarre result of insulating any terrorist funds that the terrorist keeps two or more artificial degrees removed from itself.

**D.      Plaintiffs Did Not Have to Comply with FSIA Section 1610(c).**

PDVSA argues that Plaintiffs did not follow the enforcement procedures in Section 1610(c) of the FSIA when seeking to enforce the writs against it (which, as noted, is irrelevant to its subsidiaries). Obj. 17. But the R&R correctly concludes that Section 1610(c) "does not apply" here. R&R 22. After all, that section is "tacked on to the FSIA's 'commercial activities' exception," which is not the basis of this Court's jurisdiction. *Id.* at 22 (discussing 28 U.S. § 1610(b), (c)). Because Plaintiffs sought enforcement under TRIA, the FSIA's procedures for its own separate exception to sovereign immunity are inapplicable. *See* I, *supra*.[8]

Faced with that, PDVSA tries to pivot, arguing that Section 1610(c) should apply even though TRIA is the basis for the Court's subject matter jurisdiction. Obj. 17. But PDVSA never made that argument to the Magistrate Court. Instead, Plaintiffs only discussed Section 1610(c) in the context of enforcement actions jurisdictionally premised on the FSIA. *See* ECF No. 310 (PDVSA's Motion to Vacate) at 20; ECF No. 355 (PDVSA's Reply) at 9-10. It is well established that a party cannot "shift gears before the district judge." *Williams*, 557 F.3d at 1292. A "party's objections [to an R&R] are improper if they expand upon and reframe arguments already made and considered by the magistrate judge, or simply disagree with the magistrate judge's conclusions." *Grace*, 674 F. Supp. 3d at 1148. PDVSA does not get a "'second bite at the apple' when [it] file[s] objections to a R & R." *Id.*; *accord Behavior Analyst*, 2022 WL 4466621, at *2.

In any event, "no authority" stands for the notion that, "even though Plaintiffs are operating under the TRIA, Plaintiffs should be bound by § 1610(c)." R&R 23. PDVSA's authorities are entirely beside the point. For instance, no one doubts that a "federal statute governs to the extent it applies." Obj. 17 (quoting Fed. R. Civ. P. 69(a)(1)). But that has nothing to do with the interplay between TRIA and the FSIA; after all, TRIA is a federal statute. And as the R&R puts it, "[t]he very purpose of the TRIA is to eliminate immunity that terrorists might otherwise enjoy under the FSIA." R&R 22. It would thus be "nonsensical" to nonetheless "apply requirements that are occasioned by, and specific to, those [FSIA] immunity provisions—when the purpose of the TRIA is to obviate those immunity provisions." *Id.* at 22-23 (citing *Bank Markazi v. Peterson*, 578 U.S.

_____

[8] In any event, Section 1610(c) merely requires (1) notice of any default judgment against a foreign state (here, there is no such judgment); and (2) that the Court determine that a reasonable amount of time from the judgment has elapsed before issuing the writ—something that would undoubtedly be true given the time between the judgment and the issuance of the contested writs.

212, 216-17 (2016); *Hausler*, 2010 WL 11442514, at *5; *Weininger*, 462 F. Supp. 2d at 478).

## IV.    THE R&R IS CORRECT THAT PDVSA'S AGENCY-OR-INSTRUMENTALITY STATUS IS NOT A NON-JUSTICIABLE POLITICAL QUESTION

The R&R correctly rejects PDVSA's effort to insulate the Judgment Debtors' agencies or instrumentalities from liability under the auspices of the political question doctrine. R&R 14-15. PDVSA's attempt to reframe the issue here as indisputably nonjusticiable is disingenuous at best. PDVSA falsely claims that "[t]he R&R does not disagree with PDVSA that deciding the identity of 'the legitimate political leadership of a foreign country' presents a nonjusticiable political question." Obj. 10 (quoting R&R 14). But the passage of the R&R from which PDVSA quotes simply describes PDVSA's argument. *See* R&R 14 ("***PDVSA also argues that***, to determine its status as an agency or instrumentality of the Maduro regime, the court is being asked to resolve a non-justiciable political question. That is because, ***in PDVSA's view***, it would require this Court to identify the legitimate political leadership of a foreign country—a power that belongs exclusively to the Executive Branch.") (quotations omitted) (emphasis added).

Regardless, this case does not require identifying the legitimate political leadership of Venezuela. *Contra* Obj. 11. Courts have "a responsibility to decide cases properly before it, even those it would gladly avoid." *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 194 (2012) (quotations omitted). The political question doctrine is a "narrow exception" to that rule. *Id.* at 195. In *Zivotofsky*, the Supreme Court rejected much the same argument PDVSA makes here. Congress enacted a statute providing that Americans born in Jerusalem may elect to have "Israel" listed as the place of birth on their passports, but the State department declined to follow that law, citing its policy of not taking a position on the political status of Jerusalem. *Id.* at 197-98. When a U.S. citizen sued, invoking the statute, the State Department argued that the court could not determine the case under the political question doctrine. *Id.* at 198. The Supreme Court rejected that argument, reasoning that the plaintiff "does not ask the courts to determine whether Jerusalem is the capital of Israel" but "instead seeks to determine whether he may vindicate his statutory right . . . to choose to have Israel recorded on his passport as his place of birth." *Id.* at 195; *accord id.* at 196 ("The federal courts are not being asked to supplant a foreign policy decision of the political branches with the courts' own unmoored determination of what United States policy toward Jerusalem should be. Instead, Zivotofsky requests that the courts enforce a specific statutory right.").

Similarly, here, Plaintiffs never attempted to have the Court determine the rightful government of Venezuela. Plaintiffs have simply sought a determination as to whether they may vindicate their statutory right, under TRIA § 201, to collect from an agency or instrumentality of a judgment debtor. That is, there is no need to make an "unmoored determination of what United States policy toward [Venezuela] should be"; rather, all that is required is to "enforce a specific statutory right." *Zivotofsky*, 566 U.S. at 196.

Nor is there anything unfair or inappropriate about utilizing blocked PDVSA assets to satisfy a judgment against Maduro. *Contra* Obj. 11. Through TRIA, Congress specifically provided that ***any*** blocked assets of ***any*** instrumentality—state or non-state—of the terrorist party against whom judgment was entered could be used to satisfy a judgment against the terrorist party. There is no requirement that the judgment debtor itself own the assets, and there is no limitation on TRIA's application where the instrumentality happens to be a foreign-state entity. Permitting enforcement against the blocked PDVSA assets is how TRIA was ***designed*** to work, and is the result of the considered choices of the political branches.[9]

In any event, there is no risk of encroaching on the Executive Branch's prerogative to conduct foreign policy here. When it comes to PDVSA, the R&R correctly notes that the Executive Branch has spoken: "Time and again, the United States Government has recognized PDVSA as an agency or instrumentality" and, indeed, maintains that position to this day. R&R 14 (discussing Office of Foreign Assets Control, U.S. Dep't of Treasury, *Frequently Asked Questions – Recently Updated: Office of Foreign Assets Control* (Jan. 9, 2003), https://ofac.treasury.gov/faqs/updated/2023-01-09). The Executive Branch has also made a deliberate policy judgment to treat PDVSA as a hostile rogue power in light of ongoing corruption and abuse there, sanctioning PDVSA under

---

[9] When Congress authorized terror victims to collect the blocked assets of "any" agency or instrumentality of "any" terrorist party by enacting TRIA in 2002, it was well understood that state entities can and sometimes do support non-state terrorists. Indeed, TRIA was enacted in the wake of 9/11, when allegations that Saudi Arabian officials had sponsored the 9/11 hijackers were top of mind. *See* Bob Egelko, *9/11 Families Sue Saudis, Sudan for $3 Trillion – Defendants Accused of Funding al Qaeda*, San Francisco Chron. (Aug. 16, 2002). It was therefore wholly foreseeable to Congress that terror victims would use TRIA to satisfy judgments against nonstate terrorists (such as al Qaeda) with the assets of sovereign entities (such as Saudi Arabia) that allegedly provided material support to those terrorists. And by allowing terror victims to recover from the assets of ***any*** entities that provide material support to non-state terrorists, Congress opened the door for victims to do so. *See Stansell II*, 771 F.3d at 732 (discussing the criteria for agency-or-instrumentality status under TRIA).

the International Emergency Economic Powers Act, 50 U.S.C. § 1701 *et seq.* and Executive Order 13850, thereby subjecting its assets to TRIA. *See* 84 Fed. Reg. 3282 (Jan. 28, 2019). And the President has stuck with that policy decision, as reflected in the fact that OFAC has not released all of PDVSA's blocked assets to the Ad Hoc Board of PDVSA or to the Interim Government. Indeed, the United States continues to enforce sanctions against PDVSA as an instrumentality of the Maduro regime. *See e.g.*, U.S. Dep't of Treasury, *United States Continues Pressure on Former Maduro Regime* (Jan. 21, 2020), https://home.treasury.gov/news/press-releases/sm884 (blocking PDVSA aircraft "used throughout 2019 to transport senior members of the former Maduro regime in a continuation of the former Maduro regime's misappropriation of PdVSA assets").

In short, here, "the executive and legislative branches have demonstrated a clear intent that not only permits but affirmatively encourages the judiciary to resolve the issues surrounding restraint and turnover of [terrorist] assets." *Peterson v. Islamic Rep. of Iran*, 2013 WL 1155576, at *22 (S.D.N.Y. Mar. 13, 2013), *aff'd*, 758 F.3d 185 (2d Cir. 2014), *aff'd sub nom. Bank Markazi*, 578 U.S. 212 (denying political question challenge because relief requested was authorized by statutes, including TRIA, "which allows a court to execute against blocked assets of a terrorist party"). And "the sheer multitude of statutory and executive pronouncements directly and unquestionably applicable to the motions before this Court makes any political question argument baseless." *Id.*

In the face of all this, PDVSA relies entirely on one case—*In re Terrorist Attacks on September 11, 2001*, 657 F. Supp. 3d 311 (S.D.N.Y. 2023) ("*In re 9/11*"). Obj. 12. But that case does not counsel a contrary result. For one thing, it is a non-binding district court decision, currently up on appeal. *In re 9/11*, *appeal filed*, No. 23-263 (Mar. 1, 2023). For another, it is entirely beside the point, because the circumstances are materially different. There, plaintiffs sought to use the blocked assets of the Central Bank of Afghanistan ("DAB") to satisfy the Taliban's judgment debt and premised the connection only on the notion that the Taliban served as the current *de facto* government of Afghanistan. *In re 9/11*, 657 F. Supp. 3d at 335-36. The *In re 9/11* court held that the political question doctrine precluded "a finding that the Taliban regime is in control of DAB . . . [and] thus acts as the government of Afghanistan." *Id.* at 335. In other words, the court feared that "[a]ccepting the Taliban's 'appointments' to DAB as legitimate . . . bestows recognition on the Taliban that this Court may not constitutionally confer." *Id.* Here, by contrast, Plaintiffs never argued, and this Court never held, that PDVSA is an instrumentality of

Maduro because he exercises current *de facto* control over PDVSA through legitimate appointments to that body. Instead, the Court held that PDVSA was an agency or instrumentality because OFAC determined that it provided material support to Maduro. ECF No. 110 at 7 ("PDVSA supports Mr. Maduro in orchestrating illegal activity."). That says nothing about the Maduro regime's legitimacy.

Moreover, unlike the DAB and the Taliban in *In re 9/11*, PDVSA is an agency or instrumentality of Maduro based on its conduct ***prior*** to January 2019—that is, before the U.S. government recognized Juan Guaidó's interim government. There is ample evidence that PDVSA provided material support to Maduro and the Cartel long before any question about which government the United States would recognize. *See, e.g.*, ECF No. 94-5 at 9 (describing Maduro's use of PDVSA to launder funds in "the early 2000s"). And, again, the Eleventh Circuit has made clear that prior conduct is sufficient to support an agency-or-instrumentality finding. *See Stansell II*, 771 F.3d at 724 n.6 (approving the district court's definition of an "agency or instrumentality" as any party "that is or ***was ever involved*** in any aspect of [the defendant's] trafficking operations or that assisted with [the defendant's] financial or money laundering network") (cleaned up) (emphasis added); *accord Stansell V*, 45 F.4th at 1350 ("[T]he formulation we expressly approved in *Stansell II* encompassed past involvement or association with a terrorist party.").

## V.   THE R&R IS CORRECT THAT THE WRITS SHOULD BE DISSOLVED *WITHOUT PREJUDICE*

### A.   Plaintiffs Should Be Permitted an Opportunity to Make the Requisite Agency-or-Instrumentality Showing for PDVSA's Subsidiaries.

PDVSA takes a short, one-paragraph break from airing its list of grievances with the R&R to praise the R&R for "correctly recommend[ing] that the writs" against several PDVSA subsidiaries "be dissolved and the associated turnover motions denied." Obj. 18. But PDVSA then immediately goes back to criticizing the R&R for not going the extra step of foreclosing Plaintiffs entirely from rectifying those deficiencies. *See id.* PDVSA does not marshal a single case to support its counterintuitive proposition that Plaintiffs must be denied leave to make the requisite showing that the PDVSA subsidiaries are agencies or instrumentalities under TRIA, particularly when the R&R recounts how "PDVSA was used as a cog in Defendants' money laundering scheme" (R&R 13) and observes that PDVSA's subsidiaries "very well may be" agencies or instrumentalities of Defendants, *id.* at 21.

It is unclear just what point PDVSA is trying to make by emphasizing that Plaintiffs "attempted to cure [their] deficiency with supplemental filings submitted *after* the R&R was issued." Obj. 18. After all, Plaintiffs submitted those supplemental filings—*i.e.*, amended declarations from Mr. Farah—*because of* the R&R. Those filings are not "improper" "sur-replies." *Id.* They fully comply with the R&R's instruction for Plaintiffs to come forward "with a proper showing that the subsidiaries are agencies or instrumentalities." R&R 21; *see also id.* at 22 ("Plaintiffs can seek to re-garnish those same assets with a showing that the assets are recoverable under the TRIA or other authority."). That is what Plaintiffs did. As PDVSA notes, it has moved to strike Plaintiffs' filings. *See* Obj. 18 (discussing ECF No. 413). But it gives no reason why that separately briefed request—to which Plaintiffs, too, have separately responded, *see* ECF No. 420—should be subsumed within this one.

In any event, PDVSA is wrong to suggest that Plaintiffs could not possibly marshal any additional facts to "overcome the presumption of corporate separateness" between PDVSA and its subsidiaries. Obj. 18. After all, "by definition . . . a presumption can be rebutted." *United States v. Davis*, 924 F.3d 899, 904 (6th Cir. 2019). Moreover, the part of the R&R that PDVSA praises (Obj. 18) makes clear that Plaintiffs could make the requisite showing to satisfy TRIA § 201 in a variety of ways—"by showing that (1) any of the subsidiaries are an agency or instrumentality, (2) PDVSA's corporate veil should be pierced, and/or (3) a subsidiary of an agency or instrumentality's assets are presumptively recoverable under the TRIA." R&R 21. As Plaintiffs have demonstrated in a supplemental filing that PDVSA has moved to strike (ECF No. 413), at least one PDVSA subsidiary (PetroMonagas) is an agency or instrumentality in its own right, without any need to pierce the veil between PDVSA and the subsidiary. *See* ECF No. 405-1 (Declaration of Douglas C. Farah) at 7-14.

There is also considerable tension in PDVSA's position that its subsidiaries are simultaneously separate from it *but nonetheless* that PDVSA has standing to make arguments on those subsidiaries' behalf. For all of PDVSA's talk about the importance of respecting corporate formalities (Obj. 18), PDVSA seems to think that it can speak and act for those subsidiaries in this Court. After all, Petrocedeño, Petromar, and Barivan never entered appearances, never moved to vacate the writs against them, and indeed never filed objections to the R&R. That counsel for PDVSA has seemingly presumed to represent those subsidiaries *sub silencio* puts a lie to the notion that there is some insurmountable barrier between those PDVSA subsidiaries and PDVSA itself.

PDVSA cannot have it both ways. One of two things is true: either Petrocedeño, Petromar, and Barivan are part and parcel of PDVSA or PDVSA lacks standing to contest enforcement proceedings on their behalf. *Cf. Stansell II*, 771 F.3d at 744 (barring a corporate shareholder from challenging a TRIA writ of execution seeking blocked assets of his company because "corporations themselves—and not shareholders—are the only parties with standing to contest injuries to the corporation"); *Stansell v. FARC,* 2013 WL 12142969, at *4 (M.D. Fla. May 2, 2013) ("Because the individuals . . . are not the account holder, they lack standing to challenge this TRIA garnishment."); *United States v. Devlin,* 2013 WL 275968, at *8 (M.D. Fla. Jan. 22, 2013) (same).

**B.    The R&R Does Not Overlook the PetroMonagas Writ.**

PDVSA is wrong that the R&R somehow "overlooks" Plaintiffs' writ concerning another of PDVSA's subsidiaries, PetroMonagas. Obj. 19 (capitalization omitted). The R&R directly addresses the writ against PetroMonagas at the outset of its discussion alongside the writs against Petrocedeño, Petromar, and Barivan (R&R 3 & n.2) but intentionally omits PetroMonagas from its recommendation to grant PDVSA's motion only "to the extent PDVSA seeks to dissolve the writs of garnishment targeted at Petrocedeno, Petromar, and Barivan," *id.* at 23. Notably, although PDVSA asserts that the R&R "overlooked" the PetroMonagas writ, PDVSA never brought the supposed oversight to Magistrate Judge Torres's attention before filing their objections.

Moreover, there is a good reason why the R&R treated the PetroMonagas differently than the other writs that the R&R recommended be dissolved. The writ against PetroMonagas is not "on all fours" (Obj. 19) with the others because it came much later, with briefing still ongoing. Indeed, at the time of the R&R, Valero Marketing & Supply Company had just answered, (and Valero Energy Corporation had not yet answered) the PetroMonagas writ; both raised an affirmative defense that compliance would be unlawful absent "compliance with the [TRIA]." ECF No. 402 at 5; ECF No. 390 at 4. Under Florida law, Plaintiffs had an opportunity—and arguably an obligation—to file a timely response. Fla. Stat. § 77.061. Given that Plaintiffs' response to Valero's answer was unfiled when the R&R was issued (and Plaintiffs' response to Valero's answer was on the horizon when the R&R was issued), it was perfectly reasonable for the R&R to conclude that Plaintiffs could resolve any deficiencies concerning PetroMonagas's connection to PDVSA and the Maduro regime without needing to dissolve the writ.

## <u>CONCLUSION</u>

For the foregoing reasons, and those stated in the R&R, the Court should adopt the R&R.

Respectfully submitted on May 7, 2025.

/s/ Jaime D. Guttman
Fla. Bar No. 44076
jaime@scale.law
Scale Law Partners, LLC
777 Brickell Avenue, Suite 500
Miami, FL 33131
(786) 273-9033 (Main)

/s/ Alex C. Lakatos
Alex C. Lakatos (pro hac vice)
alakatos@mayerbrown.com
Mayer Brown LLP
1999 K Street NW
Washington, DC 20006
(202) 263-3000 (Main)

Counsel for Plaintiffs / Judgment Creditors

## CERTIFICATE OF SERVICE

I certify that I filed the foregoing document on May 7, 2025, through CM/ECF, which automatically and electronically delivered notice of filing to counsel of record for all parties that have appeared.

/s/ Jaime D. Guttman