UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No.: 1:21-cv-20706-DPG

MEUDY ALBÁN OSIO, et. al.,

      Plaintiffs,

v.

NICOLAS MADURO MOROS, et. al.,

      Defendants,

v.

VITOL INC.,

      Garnishee.

_____/

## DECLARATION OF RICHARD J. EVANS

I, Richard J. Evans, state as follows:

1. I am over the age of 18, of sound mind, and competent to testify as to the facts contained in this declaration.

2. The statements made herein are based on my own personal knowledge and if called as a witness I could, and would, competently testify thereto.

3. I am the Senior Vice President and Chief Financial Officer of Vitol Inc. and a director serving on the board of directors of Vitol Inc. In these capacities, I have knowledge of and access to the books and records of Vitol Inc.

**Vitol Inc.'s Business and Operations**

4. Vitol Inc. is a U.S.-based energy and commodities trading company organized and existing under the laws of the State of Delaware, with its principal place of business, in Houston,

Texas. Vitol Inc. is part of a multinational global commodity trading organization comprised of numerous corporate entities ("Vitol Group").

5. Vitol Inc. is registered to do business in the State of Florida, but does not maintain any offices or business licenses in Florida. Vitol Inc. had registered to do business in connection with refined products inventories stored in Florida but maintained at third-party storage facilities. Vitol Inc. wound that portion of its refined products trading business down over the first several months of 2025. As of May 31, 2025, Vitol Inc.'s terminaling storage agreement related to this business had expired by its own terms as part of the normal course of wind-down activities. All refined products inventories previously maintained by Vitol Inc. in Florida had been sold off prior to that date. This was the only commercial activity Vitol Inc. had maintained with regular activities in or relating to Florida over the past several years. As of the date of this Declaration, Vitol Inc. has no regular commercial activities in or relating to Florida.

6. Vitol Inc. does not own, lease, rent or use property in Florida.

7. Vitol Inc. does not have any mailing addresses or telephone listings in Florida, and only has a registered agent in Florida for the purposes of accepting service of process.

8. Vitol Inc. does not have any bank accounts in Florida.

9. Vitol Inc. has an international client base and does not specifically target Florida-based businesses or focus its sales or marketing efforts on Florida in any manner.

10. In the last three years, a minimal number of Vitol Inc.'s counterparties have been based in Florida, and none of these counterparties are related to the Plaintiffs or any Judgment Debtors in the above-captioned case.

11. Vitol Inc. does not generate a significant portion of its revenue from business activities in or relating to Florida and does not specifically target Florida-based or Florida-related business.

12. Vitol Inc. has not performed any work for any Florida-based person or entity that required conduct or performance by Vitol Inc. personnel in Florida.

13. Vitol Inc. employees visit Florida infrequently for business-related purposes typically limited to occasional business meetings or widely attended conferences.

14. Vitol Group corporate entities other than Vitol Inc. may have interests or activities in or relating to Florida. None of those entities are subsidiaries of or are otherwise owned or controlled by Vitol Inc., and none are a direct or indirect parent of Vitol Inc. To the extent they do engage in Florida-related business, it is in furtherance of their own corporate interests or activities. None of those entities acts as an agent or alter ego of Vitol Inc. in any respect.

15. This includes the Seaport Canaveral Terminal and other terminal assets in Florida, in which Vitol Group entities other than Vitol Inc. own interests and whose operations do not involve and are entirely unrelated to Vitol Inc.

16. Vitol Inc. has not done business with or established a course of conduct with the Plaintiffs or Judgment Debtors.

17. Vitol Group maintains an internet website, which is located at www.vitol.com, hereinafter referred to as the "Vitol Website".

18. The Vitol Website does not provide customers with the ability to purchase services online directly therefrom. The Vitol Website does not have a "shopping cart" or a facility to receive or process payments. The Vitol Website does not provide customers with the ability to place orders

online and pay offline or in some other manner. In other words, the Vitol Website is a passive website and is not an e-commerce or shopping website. It is informational only.

19. The Vitol Website does not target any particular state and does not seek to collect information from persons in any particular state.

20. Vitol Inc. does not operate, conduct, engage in or otherwise carry on a business venture in the State of Florida. Nor does Vitol Inc. have substantial and not isolated activity within the State of Florida.

**Blocked Property Potentially Relevant to the Writ**

21. At the time the Writ of Garnishment issued as to Vitol Inc. in the above-referenced action (the "Writ") was served on Vitol Inc., the only blocked property Vitol Inc. had in its possession, custody, or control was unresolved and unliquidated trade debt still subject to further negotiation ("Blocked Trade Debt"). The subsequent imposition of sanctions required blocking these property interests and cessation of further negotiating them.

22. The Blocked Trade Debt remains on Vitol Inc.'s books and records located at Vitol Inc.'s office in Houston, Texas.

23. The Blocked Trade Debt all relates to transactions between Vitol Inc. and other parties occurring wholly outside of and with no connection to Florida of which Vitol is aware.

24. Vitol Inc. determined that it had to block this debt as a "property interest" that fell within the scope of the Venezuela Sanctions Regulations (31 C.F.R. Part 591) and related Executive Orders, as those are interpreted by the U.S. Department of Treasury's Office of Foreign Assets Control ("OFAC"). The Blocked Trade Debt is all contingent, but cannot be further negotiated, netted or otherwise written off because applicable sanctions prohibit Vitol Inc. from doing so without a license issued by OFAC. It consists entirely of debts related to contingent

liabilities that Vitol Inc. and contractual counterparties were still negotiating the validity and value of at the time sanctions were imposed.

25. The Blocked Trade Debt all relates to transactions with parties that at some point became subject to sanctions. Upon imposition of those sanctions, and expiration of all OFAC licenses allowing wind-down of transactions involving those parties, Vitol Inc. ceased further commercial dealings with them. All activities relating to the blocking of these property interests, wind-down of relevant business dealings and cessation of commercial dealings subject to sanctions restrictions were managed from Vitol Inc.'s offices in Houston, Texas, with no related activities occurring in or with any connection to Florida.

26. The most recent contract to which any of the Blocked Trade Debt is related dates to 2014. The Blocked Trade Debt has all been subject to blocking since no later than February 2020. At no time since the imposition of relevant sanctions starting in 2019 has any interested party with any putative claim to the Blocked Trade Debt initiated any legal action or otherwise made any claim on the Blocked Trade Debt. Accordingly, Vitol Inc. considers the Blocked Trade Debt to be uncollectible due to the passage of more than four years since any cause of action for collection of the debt would have accrued (consistent with Tex. Civ. Prac. & Rem. Code § 16.004).

27. As potentially relevant to the Writ, Vitol Inc., has also been involved with a set of blocked assets no longer in Vitol Inc.'s possession, custody or control. This set of blocked funds comprises refunds Vitol Inc. previously owed LDC Supply International, LLC ("LDC"), a wholly owned U.S. subsidiary of PDV Holding, Inc. ("PDV Holding"), a U.S. company.

28. Vitol Inc. transferred these LDC-related funds into a blocked account with JPMorgan Chase ("JPMC") on or about February 25, 2019 ("LDC Blocked Account") that was set up specifically for that transaction. The funds were blocked pursuant to Venezuela General

License 12 ("GL 12") (a copy of which is attached as Exhibit A), as reflected in the instructions issued by Vitol Inc. to JPMC directing the bank to carry out the fund transfer (a copy of which are attached as Exhibit B). The account, numbered 550352881, is named "BLK ACC VITOL INC FBO LDC SUPPLY INTERNATIONAL LLC."

29. The funds transferred into the LDC Blocked Account relate to a series of five transactions between Vitol Inc. and LDC completed prior to February 2019; they comprise refunds owed by Vitol Inc. to LDC once the final values of five cargoes were calculated after delivery and LDC's prepayments to Vitol Inc. were determined to exceed the final values. GL 12, now expired, was a license allowing for the wind-down of transactions involving PdVSA or entities PdVSA owned directly or indirectly, which went into effect on January 28, 2019. It authorized the wind-down of transactions involving PdVSA entities such as LDC, and in subpart (c) instructed that payments allowed under GL 12 that were for the direct or indirect benefit of a blocked person had to be paid into a blocked, segregated account maintained in the United States. Vitol Inc. took a conservative view that the payments at issue were for the direct or indirect benefit of a blocked PdVSA entity, but at no time were they an indebtedness owed by Vitol Inc. directly to PdVSA.

30. To Vitol Inc.'s knowledge, the funds remain in the LDC Blocked Account, and the account is maintained at a JPMC branch in New York.

31. Vitol Inc. did not select the location of the LDC Blocked Account. Rather, because this was to be a compliance-operated account at JPMC, Vitol Inc. acted at the direction of JPMC on the mechanics of making the payment to LDC pursuant to GL 12. Although Vitol Inc. understood at the time of the payment that a JPMC compliance team located in Tampa, Florida would be administering the account, it had no visibility into nor discretion as to where the account

would be located. Vitol Inc. is not aware whether any of the funds transferred into the LDC Blocked Account were ever transferred into or through any account located in Florida.

32. Vitol Inc.'s payment into the LDC Blocked Account had no connection whatsoever to any business activities of Vitol Inc. in or with any connection to Florida. Further, the underlying transactions between Vitol Inc. and LDC had no connection of any kind to Florida of which Vitol Inc. is aware.

33. Consistent with GL 12(c), Vitol Inc. considered the deposit of these funds into the LDC Blocked Account to be a payment to LDC to which LDC would have immediate access if and when applicable sanctions were lifted or LDC was able to secure an unblocking license from OFAC.

34. With respect to the LDC Blocked Account and the funds contained therein, it was Vitol Inc.'s intention and is Vitol Inc.'s current position that as of the time the funds were deposited, Vitol Inc. no longer had any legal or beneficial interest in the funds or the account, including no possession, custody or control over the account or the funds contained in it. The funds were specifically placed into a blocked, segregated "For the Benefit Of" or "FBO" account for which LDC is the sole beneficiary. Based on the express language and mechanics of GL 12(c), payment into the blocked FBO account was payment to LDC, whereby LDC took legal possession of the account.

35. Vitol Inc. does not have sufficient knowledge or information to determine and takes no position as to whether parties other than the parties whose assets have been subject to blocking or who currently maintain custody over any blocked assets have an ongoing interest in these funds.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 18th, 2025.

_____
Richard J. Evans

Executed on June 18th, 2025.

_____
Richard J. Evans

## **EXHIBIT A**



DEPARTMENT OF THE TREASURY
WASHINGTON, D.C. 20220

## OFFICE OF FOREIGN ASSETS CONTROL

### Executive Order 13850 of November 1, 2018
### Blocking Property of Additional Persons Contributing to the Situation in Venezuela

### GENERAL LICENSE NO. 12

### Authorizing Certain Activities Necessary to Wind Down of
### Operations or Existing Contracts with Petróleos de Venezuela, S.A. (PdVSA)

(a) Except as provided in paragraphs (c) and (d) of this general license, all transactions and activities prohibited by Executive Order 13850 that are ordinarily incident and necessary to the purchase and importation into the United States of petroleum and petroleum products from PdVSA or any entity in which PdVSA owns, directly or indirectly, a 50 percent or greater interest are authorized through 12:01 a.m. eastern daylight time, April 28, 2019.

(b) Except as provided in paragraphs (c) and (d) of this general license, all transactions and activities prohibited by Executive Order 13850 that are ordinarily incident and necessary to the wind down of operations, contracts, or other agreements, including the importation into the United States of goods, services, or technology not authorized in paragraph (a) of this general license, involving PdVSA or any entity in which PdVSA owns, directly or indirectly, a 50 percent or greater interest and that were in effect prior to January 28, 2019 are authorized through 12:01 a.m. eastern standard time, February 27, 2019.

(c) Except as authorized by Venezuela General Licenses 7, 8, 11, or 13, any payment to or for the direct or indirect benefit of a blocked person that is ordinarily incident and necessary to give effect to a transaction authorized in paragraph (a) of this general license must be made into a blocked, interest-bearing account located in the United States in accordance with 31 C.F.R. part 591.

(d) This general license does not authorize:

(1) The divestiture or transfer of any debt, equity, or other holdings in, to, or for the benefit of the blocked persons identified above;

(2) The exportation or reexportation of any diluents from the United States to Venezuela, PdVSA, or any entity in which PdVSA owns, directly or indirectly, a 50 percent or greater interest;

(3) Any transactions or dealings with ALBA de Nicaragua (ALBANISA) or any entity in which ALBANISA owns, directly or indirectly, a 50 percent or greater interest; or

(4) Any transactions or dealings otherwise prohibited by Executive Order 13850 of November 1, 2018, Executive Order 13835 of May 21, 2018, Executive Order 13827 of March 19, 2018, Executive Order 13808 of August 24, 2017, Executive Order 13692 of March 8, 2015, or any part of 31 C.F.R. chapter V, or any transactions or dealings with any blocked person other than the blocked persons identified in paragraph (a) of this general license.

Andrea Gacki
Director
Office of Foreign Assets Control

Dated: January 28, 2019

## **EXHIBIT B**



**Vitol Inc.**
2925 Richmond Ave., 11th Floor
Houston, Texas 77098
Phone: (713) 230-1000
Fax: (713) 230-1111

February 25, 2019

Dear Jennifer Caruso,

Vitol Inc. authorizes JPMorgan Chase ("JPMC") to debit account number 304920134 in the amount of USD $9,444,116.76 and credit segregated OFAC blocked account number 550352881 which was opened for the purpose of holding the funds. The funds are Vitol Inc.'s blocked property, which represent an amount payable to LDC Supply International, LLC, which are blocked property in compliance with the requirements of paragraph (c) of Venezuela General License 12, "Authorizing Certain Activities Necessary to Wind Down of Operations or Existing Contracts with Petroleos de Venezuela, S.A. (PdVSA)."

Sincerely,

Richard Evans
CFO and Treasurer
Vitol Inc.