IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 1:21-cv-20706-DPG

MEUDY ALBÁN OSIO in her personal capacity
And in her capacity as the personal representative
of the Estate of FERNANDO ALBERTO ALBÁN,
FERNANDO ALBÁN OSIO, and MARIA
FERNANDA ALBÁN OSIO,

  Plaintiffs / Judgment Creditors,
v.

NICOLAS MADURO MOROS,
FUERZAS ARMADA REVOLUCIONARIAS
DE COLUMBIA ("FARC"); THE CARTEL OF
THE SUNS A.K.A. CARTEL DE LOS SOLES;
VLADIMIR PADRINO LOPEZ; MAIKEL
JOSE MORENO PEREZ; NESTOR LUIS
REVEROL TORRES; and TAREK WILLIAM
SAAB

  Defendants / Judgment Debtors.

_____/

**<u>JUDGMENT CREDITORS' MOTION FOR FINAL TURNOVER JUDGMENT AS TO
BLOCKED PETROMONAGAS FUNDS HELD BY GARINSHEE VALERO
MARKETING AND SUPPLY</u>**

  On March 10, 2025, Plaintiffs obtained a writ of garnishment, directed to Valero Marketing and Supply Company ("VMSC") for blocked assets of Petroleos de Venezuela ("PDVSA") and its subsidiaries, including PetroMonagas S.A., ("PetroMonagas"). ECF No. 380. On April 1, 2025, VMSC answered the Writ of Garnishment, confirming that it is still holding $24,242,018.63 in blocked funds due and owing to PetroMonagas. ECF No. 390.

  The 20-day window for VMSC or the Judgment Debtors to move to dissolve the writ under Fla. Stat. § 77.055 expired on April 1, 2025. PDVSA moved to dissolve the writ (ECF No. 389), and this Court denied that motion (ECF Nos. 401, 583). As a result, Judgment Creditors respectfully move for a final order directing VMSC to turn over to Judgment Creditors the $24,242,018.63 (plus accrued interest) it owes to PetroMonagas.

1

**RELEVANT PROCEDURAL HISTORY**

As this Court has recognized, Defendants/Judgment Debtors kidnapped, tortured, and murdered Mr. Albán. *See* ECF No. 56, *adopted by* ECF No. 58; ECF No. 89, *adopted by* ECF Nos. 90 & 91. Moreover, "the kidnapping, torture, and murder of Mr. Albán violated the Florida ATA because they occurred pursuant to a narco-terrorism conspiracy designed to flood Florida with cocaine and to launder the illegal drug money through Florida . . . ." ECF No. 89 at 12.

On June 10, 2024, this Court found that Judgment Creditors met a prima facie burden of showing that PDVSA is an instrumentality of Maduro and the Cartel. ECF No. 110 at 6-7. As the Court recognized, OFAC designated and blocked PDVSA to "help prevent further diverting of Venezuela's assets by Maduro," and "PDVSA has long been a vehicle for corruption." *Id*., at 7 (quoting ECF No. 40). The Court further recognized that "OFAC has identified PDVSA as the 'primary conduit for corruption' by Maduro and described PDVSA as a Maduro-created 'secret network to evade sanctions' and to 'plunder Venezuela's resources for personal gain.'" *Id*. at 7 (quoting ECF No. 45).

On March 10, 2025, Judgment Creditors moved for a writ of garnishment on blocked funds belonging to PDVSA and its subsidiaries, including PetroMonagas held by VMSC. ECF No. 378.[1] The next day, a Writ of Garnishment, directed to VMSC, was issued. ECF No. 380. Judgment Creditors timely served the writ in compliance with Florida Stat. § 77.041. *See* ECF No. 381 (certificate of service in compliance with Fla. Stat. § 77.041).

On April 1, 2025, VMSC answered the Writ of Garnishment. ECF No. 390. In its answer, VMSC confirmed that it is holding $24,242,018.63 in blocked funds owed to PetroMonagas and raised various affirmative defenses. *Id.* Judgment Creditors timely served a copy of VMSC's answer to the Writ of Garnishment in compliance with Fla. Stat. § 77.055. *See* ECF No. 391 (notice of compliance with Fla. Stat. § 77.055).

On March 28, 2025, PDVSA moved to dissolve the writ of garnishment as to PetroMonagas. ECF No. 389. On April 9, 2025, Chief Magistrate Judge Torres issued a Report and Recommendation (the "R&R") that declined to recommend that PDVSA's motion to dissolve the PetroMonagas writ be granted. ECF No. 401, at 3 fn. 2, 21. The R&R further explained that that Judgment Creditors must make a "particularized showing" that any PDVSA subsidiary whose

---

[1] In that motion, Judgment Creditors explained (among other things) how PetroMonagas, as a subsidiary of PDVSA, operates as an instrumentality of Judgment Debtors. *Id.* at 2 (*citing* ECF Nos. 110, 113, 224, 250).

2

assets Plaintiffs seek to execute against under TRIA § 201—here, PetroMonagas—is "an agency or instrumentality of the judgment debtors" (or is otherwise subject to TRIA). *Id.* at 20-21.

On April 15, 2025, Judgment Creditors timely replied to VMSC's Answer. ECF No. 406. Together with that reply, and in accordance with the R&R's directive, Plaintiffs submitted an affidavit of Douglas Farah, setting forth a particularized showing that PetroMonagas is an agency or instrumentality of the Judgment Debtors. ECF No. 406-5.

On April 23, 2025, PDVSA filed objections to the R&R, arguing that the PetroMonagas writ should be dissolved and that the R&R's failure to recommend that the PetroMonagas writ be dissolved was an "oversight." ECF No. 414, at 19. On July 9, 2025, the Court adopted the R&R in relevant part. ECF No. 583.

On July 9, 2025, PDVSA filed a notice of appeal insofar as it "denied PDVSA its sovereign immunity defenses under the Foreign Sovereign Immunities Act of 1976 . . . [and] is therefore immediately appealable under 28 U.S.C. § 1291 and the collateral order doctrine." ECF No. 586. As discussed further below, this Court's order with respect to PetroMonagas is not, and cannot be, part of that appeal.

## ARGUMENT

This Court has denied PDVSA's objections to the writ of garnishment; no other party appeared to object to the garnishment; the Affirmative Defenses listed in VMSC's Answer are without merit; and PDVSA's Foreign Sovereign Immunities Act ("FSIA") appeal is not an obstacle because it does not apply to PetroMonagas. Accordingly, and as shown below, Judgment Creditors are entitled to a final order directing garnishee VMSC to turn over the blocked funds to Judgment Creditors.

**I. Plaintiffs Satisfy TRIA's Collection Requirements.**

TRIA's requirements for garnishing the blocked funds are amply satisfied here. Judgment Creditors have obtained a judgment against a terrorist based on an act of terrorism; the assets they seek are blocked; and the assets are owned by an agency or instrumentality of the judgment debtor.

*First*, the Court has already concluded that "Plaintiffs' judgment is for acts of terrorism." ECF No. 101 at 5 ("Plaintiffs satisfy the INA's definition in several ways, any one of which is sufficient to satisfy TRIA. . . . Mr. Albán was assassinated for political reasons) (internal quotations omitted); ECF No. 56 at 18 ("The high-profile kidnapping and murder of Mr. Albán by Maduro regime agents was designed to deter other opposition members from speaking out against

3

the Venezuelan government."). Furthermore, the Court has found that Defendant Cartel of the Suns constitutes a "terrorist organization." ECF No. 110 at 5-6.

*Second*, the amount sought does not exceed Judgment Creditors' compensatory damages. The Court awarded Judgment Creditors $217 million in compensatory damages, plus accrued interest. ECF No. 90; *see* ECF No. 113 at 2. The amounts collected by the Judgment Creditors have been applied to accrued interest, and the entire principal amount of the judgment still remains outstanding. *See, e.g.*, *Devex Corp. v. Gen. Motors Corp.*, 749 F.2d 1020, 1025 n.6 (3d Cir. 1984) (explaining that "[t]he United States rule, which provides that payments be applied first to accrued interest and then to principal, has been followed by the federal courts for almost a century and a half," and holding that the United States rule applies under 28 U.S.C. § 1961 unless the parties agree otherwise) (collecting cases).

*Third*, the assets of PetroMonagas are blocked. Blocking "can be definitively established by the fact that the U.S. Department of Treasury's Office of Foreign Assets Control ('OFAC') has taken action against the alleged agency or instrumentality under TWEA or IEEPA." *Stansell v. FARC*, 771 F.3d 713, 726 (11th Cir. 2014). In other words, OFAC's designation of a person as an agency or instrumentality automatically renders that person's property blocked as a matter of law. *Id.* Here, OFAC has designated PDVSA as a sanctioned entity under the International Emergency Economic Powers Act ("IEEPA"). *See* Treasury Press Release announcing sanctions against PDVSA, available at https://home.treasury.gov/news/press-releases/sm594 (finding that "Venezuela's state owned oil company, PdVSA has long been a vehicle for corruption" and blocking all property and interests including subsidiaries of PDVSA). Accordingly, all entities owned by PDVSA are also subject to U.S. sanctions, and their property is blocked. *See* Dep't of Treasury, Revised Guidance on Entities Owned by Persons Whose Property or Interests in Property Are Blocked (Aug. 14, 2013) (providing that entities owned 50% or more by a blocked person are also subject to OFAC sanctions, meaning that their property also is blocked), available at https://ofac.treasury.gov/media/6186/download?inline. PetroMonagas is blocked because it is a directly controlled subsidiary of PDVSA. VMSC has in its possession $24,242,018.63 in blocked funds belonging to PetroMonagas. *See* ECF No. 390 at 5-6.

*Fourth*, PetroMonagas' status as an agency and instrumentality of the Judgment Debtors is demonstrated below.

### A. PetroMonagas is an Instrumentality of Maduro, the Individual Defendants, and the Cartel of the Suns.

#### a. Structure, Ownership, and Operations of PetroMonagas.

PetroMonagas S.A. was formed as a joint venture between PDVSA subsidiary Corporación Venezolana del Petróleo ("CVP") and Rosneft, a Russian state-controlled oil company, which is a common PDVSA practice in order to allow subsidiaries to create the maximum profits for the foreign partner. *See* Declaration of Douglas C. Farah (ECF No. 406-1) ("Farah") at ¶ 20. The privileged relationship between the Maduro regime and the Putin regime (Maduro's most important international ally) made joint ventures beneficial to both countries' sanctions evasions and criminal activities, priorities for PDVSA. *Id.* Initially, the ownership was divided with CVP holding a majority stake (approximately 83.33%) and a subsidiary of Rosneft holding the remaining minority stake (approximately 16.67%). *Id.* In 2016, Rosneft increased its stake in PetroMonagas from 16.67% to 40%. *Id.* This move aimed to strengthen Rosneft's presence in Venezuela's oil industry and secure access to the country's vast oil reserves. *Id.* In 2020, Rosneft transferred its shares in several of its Venezuelan oil joint ventures, including PetroMonagas, to Roszarubezhneft, a company wholly owned by the Russian government. *Id.*, at ¶ 21. This transfer was likely driven by the imposition of secondary sanctions on Rosneft by the US government, which aimed to limit the company's involvement in Venezuela's oil sector. *Id.* This transfer maintained Russian state control over a portion of the assets while attempting to shield Rosneft from U.S. sanctions. *Id.*

PetroMonagas, as a subsidiary of PDVSA, is subject to U.S. sanctions imposed on the Venezuelan oil sector. *Id.*, at ¶ 22. These sanctions are intended to limit the Maduro Regime's access to revenue and prevent the use of oil proceeds for illicit purposes. *Id.*

#### b. PetroMonagas' Laundering of Proceeds of Narcotics Trafficking Through the United States on behalf of Maduro and the Cartel.

PetroMonagas, like much of Venezuela's oil industry, has faced significant operational challenges, including power outages, lack of maintenance, and shortages of diluents needed to process the heavy crude. *Id.*, at ¶ 27. These disruptions, while sometimes due to infrastructure issues, can also be exploited to create opportunities for illicit activities and to obscure the true volume of oil being produced and exported. *Id.*

The schemes in which Petromonagas has been implicated often involve the use of opaque financial structures, shell companies, and third-party intermediaries to obscure the origin and

5

destination of funds. *Id.*, at ¶ 28. The involvement of foreign entities, particularly from countries with less stringent financial regulations, further complicates efforts to track these illicit flows. *Id.* While some individuals have been successfully prosecuted in the US, the network created by members of the Maduro Regime, the Cartel of the Suns, and the Individual Defendants remains vast, and he sums transacted in these illicit transfers extremely large. *Id.*

In some (but by no means all) instances, PDVSA and its subsidiaries, including PetroMonagas, have been publicly implicated in various schemes to evade sanctions, launder money, and engage in corruption on behalf of Maduro, the Cartel, and the Individual Defendants. *Id.*, at ¶ 29. For example, Jhonnatan Teodoro Marin Sanguino ("Marin Sanguino") served as mayor of Guanta, a port city in the Orinoco belt of Venezuela (where PetroMonagas operates) from in or around 2008 until in or around 2017. *Id.*, at ¶ 30. In April 2022, Marin Sanguino was indicted in the U.S. District Court for the Southern District of Florida for, among others, money laundering. *Id.* Marin Sanguino's money laundering conspiracy included "companies [that] received tens of millions of dollars in payments on contracts from the PDVSA Subsidiaries into bank accounts in South Florida." *Id.* Some of the PDVSA subsidiaries that were involved in this multi-million-dollar money laundering conspiracy in the Southern District of Florida include: Petrocedeño S.A., Petropiar S.A., PetroMonagas S.A., Petrolera Sinovensa S.A., and PetroMiranda S.A. *Id.*

For another example, PetroMonagas and Petrocedeño were both involved in the "PDVSA-Crypto" corruption scandal. *Id.*, at ¶ 31. A 2023 report by Transparencia Venezuela on the PDVSA-Crypto corruption scandal noted that a company named Poes Internacional, C.A., whose employee Ximena Cagide Parada was implicated in the broader investigation, had signed contracts with PetroMonagas and Petrocedeño back in 2016. *Id.*

    **c. PetroMonagas' Role in PDVSA's Broader Money Laundering Network.**

PetroMonagas also plays an important role in supporting money laundering on behalf of Maduro and the Cartel that is conducted by PetroMonagas' parent, PDVSA. *Id.*, at ¶ 32.

By way of background, in the early 2000s, PDVSA used to generate over $100 billion a year in legitimate oil sales. *Id.*, at ¶ 33. Because of the amount of money that PDVSA was moving for lawful purposes, and the fact that the funds flowed around the world, PDVSA became the key hub of a multi-billion-dollar money laundering system on behalf of Maduro and Cartel. *Id.* Moreover, because PDVSA was engaging in US Dollar denominated transactions, its money

6

laundering transactions cleared through the United States.  *Id.*

As PDVSA's role in money laundering for the Cartel expanded, the Cartel—working closely with PDVSA—became a one-stop-shop for narcotics traffickers throughout the region.  *Id.*, at ¶ 34.  Many criminal organizations could obtain chemicals needed for narcotics production as well as launder their ill-gotten gains through PDVSA, with PDVSA and the Cartel reaping additional profits for these money laundering services.  *Id.*

Maduro, through PDVSA, directly controls PetroMonagas, which is then used as a tool to facilitate PDVSA money laundering.  *Id.*, at ¶ 35.  To begin, given PDVSA's ownership of PetroMonagas through its subsidiary, CVP, significant control and oversight (including board representation) would originate from PDVSA and CVP leadership.  *Id.*  Individuals heading CVP, such as Orlando Chacin (arrested in 2017 amidst a corruption purge) or the more recently appointed Marco Magallanes, exercise influence over the governance and strategic direction of JVs like PetroMonagas and Petrocedeño.  *Id.*

Whoever Maduro happened to install to a role in PDVSA's leadership was able to reap vast sums of money for themselves, personally, by laundering drug profits.  *Id.*, at ¶ 36.  To avoid internal conflicts and jealousies, members of the Maduro Criminal Enterprise regularly rotated PDVSA's senior executive, board, and other leadership posts amongst senior insiders in the Maduro Criminal Enterprise in order for everyone to have the opportunity to participate in reaping the illicit gains.  *Id.*  PetroMonagas exhibits characteristics of a Venezuelan organization corrupted by, and beholden to, Maduro, the Individual Defendants, and the Cartel of the Suns.  *Id.*

The current president of PetroMonagas, Luis Vasquez, fits the foregoing profile.  *Id.*, at ¶ 37.  He is a career PDVSA official and regime loyalist and close to vice president and regime power broker Delcy Rodriguez.  *Id.*  Vasquez was also reportedly close to former PDVSA head and Minister of Industry, Col. (r) Pedro Rafael Tallechea, whose arrest and sudden fall from power from the regime's inner circle in October 2024 shocked the country.  *Id.*  Tallechea was formally accused of working for U.S. intelligence when arrested.  *Id.*

Moreover, Maduro is responsible for appointing the key leadership of PetroMonagas' parent, PDVSA, including the company's President and Vice Presidents.  *Id.*, at ¶ 38.  Recent examples include the appointment of Hector Andres Obregon Perez as PDVSA President in August 2024, and Jovanny Martinez as Executive Vice President in early 2025.  *Id.*  Notably, these appointments often favor military officers or individuals with strong political ties to Maduro's

7

party, the United Socialist Party of Venezuela (PSUV), reinforcing the regime's grip on the company. *Id.*

In short, Maduro's choices for PDVSA and its subsidiaries including PetroMonagas are part of a pattern of regime corruption that reinforces the conclusion that the entire PDVSA organization, including its subsidiary PetroMonagas, operates to support Maduro's illegitimate criminal operations and authoritarian control of Venezuela. *Id.*, at ¶ 39.

### d. OFAC's Designation Blocking Petromonagas.

On January 28, 2019, OFAC blocked PetroMonagas' parent entity, PDVSA. *Id.*, at ¶ 40. This had the effect of blocking PetroMonagas as well. *Id.*

## II. VMSC'S AFFIRMATIVE DEFENSES LACK MERIT.

### A. First Affirmative Defense: Personal jurisdiction

VMSC does not contest service of process.[2] The Answer raises personal jurisdiction as an affirmative defense, but that is not a valid defense.

The Supreme Court has recently addressed the appropriate jurisdictional analysis for claims—like those here—that arise under federal law, and hence are governed by the Due Process Clause of the Fifth Amendment. *See Fuld v. Palestinian Liberation Organization*, — U.S. —, 2025 U.S. Lexis 2384 (June 20, 2025). The Court declined to apply the "familiar Fourteenth Amendment framework,"—i.e., the framework under which a court evaluates general and specific jurisdiction over a party in cases arising under state law—and instead concluded that "Due Process Clause of the Fifth Amendment necessarily permits a more flexible jurisdictional inquiry commensurate with the Federal Government's broader sovereign authority." *Id.* at *19.

The Court explained that the flexible approach to the jurisdictional inquiry under the Fifth Amendment was particularly appropriate because *Fuld*, like the instant case, involved the exercise of jurisdiction to protect victims of terrorism, an area where the U.S. sovereign interest is at its apex:

> Of particular salience here, we have also recognized the National Government's interest in holding accountable those who perpetrate an "act of violence against" U. S. nationals—who, even when physically outside our borders, remain "under the particular protection" of American law. *Gamble* v. *United States*, 587 U. S. 678, 687 (2019). So too the National Government's corresponding authority to make "the killing of an American abroad" punishable as a federal offence "that can be prosecuted in [U. S.] courts." *Ibid.* (*citing* 18 U. S. C. §2332(a)(1)); *see also* Art. I,

---

[2] Although VMSC raises seven affirmative defenses, it does not contest service of process.

8

>§8, cl. 10 (giving Congress power to "define and punish" certain extraterritorial offenses). Indeed, that background context informed the enactment of the ATA [Anti-Terrorism Act], which legislators hoped would "ope[n] the courthouse door to victims of international terrorism" by "extend[ing] the same jurisdictional structure that undergirds the reach of American criminal law to the civil remedies that it defines." S. Rep. No. 102-342, p. 45 (1992).

*Id.* at *18.

Accordingly, the Court held that a statute permitting the exercise of jurisdiction over the PLO in ATA cases, based upon either the PLO's conduct and activity in the United States (even activity with no specific nexus to the claims at issue), or based upon the PLO's general practice of paying salaries to deceased terrorists abroad, did not exceed the bounds of the Fifth Amendment's Due Process clause. Indeed, the Supreme Court left open the possibility that the Fifth Amendment's Due Process clause has no bounds at all, agreeing that the Court "need not address the private petitioner's unbounded jurisdictional theory today," because the exercise of jurisdiction rested on "conduct closely related to the United States that implicates important foreign policy concerns," which was sufficient to satisfy due process. *Id.* at *22. In other words, due process in the Fifth Amendment context, to the extent it cabins that reach of the US courts in federal matters, is satisfied where there is a sufficient sovereign interest in the dispute, *i.e.*, where the challenged conduct relates to the United States and implicates important U.S. interests.

The due process standard set forth in *Fuld* is readily satisfied here, too. The conduct on which this Court would be exercising its jurisdiction—the blocking of assets by VMSC in response to OFAC sanctions against PDVSA due to its direct and criminal support for Nicolas Maduro, to allow for the satisfaction of a judgment on behalf of U.S. citizens under the Anti-Terrorism Act–is precisely what *Fuld* deems sufficient: "conduct closely related to the United States that implicates important foreign policy concerns."

Lest there be any doubt that this Court's exercise of jurisdiction is consistent with the Fifth Amendment's Due Process clause under the flexible standard in *Fuld*, the result is the same under a traditional (and more demanding, but no longer applicable) pre-*Fuld* analysis. Under that analysis, the Court may exercise jurisdiction based upon VMSC's nationwide contacts. As noted above, VMSC does not contest service of process—and it was served under federal statutes that authorize nationwide service, thereby allowing the satisfaction of due process based on nationwide contacts.

9

To begin, Rule 4.1 governs the service of writs of garnishment. *United States ex rel. Tanos v. St. Paul Mercury Ins. Co.*, 361 F.2d 838, 839 (5th Cir. 1966) (explaining that Rule 4(c), the predecessor to Rule 4.1, governs that procedures for serving a writ of garnishment, and Florida law does not); *Rentz v. Dynasty*, 2007 U.S. Dist. LEXIS 105274 (S.D. Fla. Oct. 1, 2007) (same, following *US ex rel Tanos*). Under Rule 4.1 ("Serving Other Process"), process "may be served anywhere within the territorial limits of the state where the district court is located, *and, if authorized by a federal statute, beyond those limits.*" Fed. R. Civ. P. 4.1 (emphasis added). Here, Judgment Creditors have alleged both ATA claims (ECF No. 1, at ¶¶ 192-205) and the Racketeer Influenced and Corrupt Organizations Act ("RICO") claims (*id*, at ¶¶ 219-240), and accordingly, there are two federal statutes that have "authorized . . . [service] beyond those limits."

RICO authorizes nationwide service of process for (1) any summons, 18 U.S.C. § 1965(a); (2) for any subpoena, *id.,* at § 1965(c); and (3) "all other process," *id.,* at § 1965(d). Section 1965(d), which applies to "all other process," is broad and sweeping, allowing that: "***All*** other process in ***any*** action or proceeding under this chapter may be served on ***any*** person in ***any*** judicial district in which such a person resides, if found, has an agent, or transacts his affairs." *Id.* § 1965(d). The reference to "all other process" means "process other than a summons of defendant or subpoena of a witness." *PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65, 72 (2d Cir. 1998). Such process (*i.e.*, process other than a summons or subpoena) includes writs of garnishment, because "[a] writ of garnishment is a form of process." *Phoenix NPL LLC v. Capital Hotel, Inc.*, 2018 U.S. Dist. LEXIS 93713 (M.D. Fla. June 4, 2018); *In re Premier Sports Tours*, 283 B.R. 601, 603 (Bankr. M.D. Fla. 2002) (same); *see also SEC v. Bilzerian*, 378 F.3d 1100 (D.C. Cir. 2004) (The word "process" "generally refers to 'a summons or writ.'" (quoting BLACK'S LAW DICTIONARY 1222 (7th Ed. 1999)). Accordingly, when it comes to serving a writ of garnishment or execution under Section 1965(d), nationwide service is authorized. *See Rep. of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 940 (11th Cir. 1997) (holding that 18 U.S.C. § 1965(d) is "RICO's nationwide service of process provision").

Similarly, the ATA provides "process in such a civil action [for violation of the ATA] may be served in any district where the defendant resides, if found, or has an agent." 18 U.S.C. § 2334(a). Once again, the phrase "process" covers writs of garnishment, and such process can be served nationwide. *See Waldman v. Palestine Liberation Organization*, 835 F.3d 317, 325 (2d Cir. 2016) (parenthetically describing § 2334(a) as "providing for nationwide service of process

10

and venue under the ATA"); *Estates of Ungar & Ungar ex rel. Strachman v. Palestinian Authority*, 325 F. Supp. 2d 15, 59 (D.R.I. 2004) ("[T]he court finds by a preponderance of the evidence that it has personal jurisdiction over the PLO and the PA by virtue of the nationwide service of process provision of 18 U.S.C. § 2334(a)"); *Burnett v. Al Baraka Investment & Development Corp.*, 274 F. Supp. 2d 86, 95 (D.D.C. 2003) ("[18 U.S.C. § 2334(a)] provides for nationwide service of process").

*In re Premier Sports Tours*, 283 B.R. 601, 603 (Bankr. M.D. Fla. 2002) denied a motion to quash a writ of garnishment in a similar situation. There, the judgment creditor obtained a writ of garnishment from a Florida court and served it on Corus Bank, N.A., an out-of-state bank based in Illinois. The judgment creditor argued that this was appropriate due to the nationwide service of process provision in F.R.B.P. 7004(d), which—much like the nationwide service of process provisions in RICO and the ATA—provides that "[a] summons and complaint (and all *other process*, except a subpoena) may be served anywhere within the United States." The court agreed. It explained that, because there was "no evidence . . . that the Writ was not issued in full compliance with the laws of the State of Florida governing writs," the only question was whether the writ "was served in compliance with the due process requirements of the Constitution and the rules governing service of process." *Id.* at 603. Turning to the applicable federal statute providing for service of process of writs in that case—Fed. R. Bankr. P. 7004(d)—the court explained that the relevant statute provided for nationwide service of process. *Id.* Accordingly, the court concluded that the Florida writ was properly served on the Illinois garnishee. *Id.* at 604; *see also Allison v. Gate Elecs., Inc. (In re Mycro–Tek, Inc.)*, 191 B.R. 188, 191 (Bank. D. Kan. 1996) (same); *Mayex II v. Du-An Products, Inc. (In re Mayex Corp.)*, 178 B.R. 464, 468 (Bankr. W.D. Mo. 1995); *United States ex rel. Bunk v. Gosselin Worldwide Moving N.V.,* 2017 U.S. Dist. LEXIS 211269 (E.D. Va. August 22, 2017) (provision in Fair Debt Collection Practice Act that "any **writ**, order, judgment, or other process, including a summons and complaint, filed under [the FDCPA] may be served in any State," expanded service to all locations nationwide, but not outside of the United States).

In sum, Judgment Creditors' writ of garnishment was served in accordance with RICO's nationwide service of process provision and the ATA's nationwide service of process provision. Where, as here, service has been effectuated pursuant to a nationwide service of process provision, the traditional due process analysis for personal jurisdiction purposes asks whether the defendant

11

has adequate jurisdictional contacts with the United States. *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935 (11th Cir. 1997). VMSC has its headquarters in San Antonio, TX and is registered to conduct business in Florida. Accordingly, it has sufficient minimum contacts with the United States to support the exercise of personal jurisdiction over it under the traditional due process analysis. Given that jurisdiction is appropriate under a traditional due process analysis, it is beyond cavil that due process is satisfied under *Fuld.*

Finally, in the event that VMSC chooses to brief a jurisdictional challenge and the Court has any doubts as to jurisdiction, Plaintiffs should be permitted to conduct jurisdiction discovery. As the Eleventh Circuit has explained, there is a "qualified right" to jurisdictional discovery when a court's jurisdiction is genuinely in dispute. *Eaton v. Dorchester Dev., Inc.*, 692 F.2d 727, 729 n.7 (11th Cir. 1982).

### B.     Second Affirmative Defense:  Jurisdiction over the blocked funds

VMSC maintains that this Court lacks jurisdiction over property "located outside the State of Florida." ECF 553, at 4. That is wrong. Previously, the issue of whether an out-of-state debt could be subject to garnishment in Florida was fairly characterized as a "contentious question." *See Alban* ECF No. 357, at 11-14 (discussing precedent on both sides). But on May 22, 2025, Florida amended Fla. Stat. § 772.13, and conclusively resolved the question with legislation under which—in terrorism-related cases such as this one—Florida permits garnishment of debts regardless of the supposed situs of those debts or accounts. The amended statute confirms that this Court has jurisdiction to garnish accounts and debts wherever located.

The newly enacted amended Florida Statute provides, in relevant part and with new provisions underscored, that:

> (6)(a) In any postjudgment execution proceedings to enforce a judgment entered <u>against a terrorist party</u> under this section or under 18 U.S.C. s. 2333 or a substantially similar law of the United States or of any state or territory of the United States <u>including postjudgment execution proceedings against any agency or instrumentality of the terrorist party not named in the judgment pursuant to s. 201(a) of the Terrorism Risk Insurance Act, 28 U.S.C. s. 1610</u>:
>
> . . .
>
> <u>3. Creditor process issued under chapter 56 or chapter 77 may be served upon any person or entity over whom the court has personal jurisdiction. Writs of garnishment issued under s. 77.01 and proceedings supplementary under s. 56.29 apply to intangible assets wherever located, without territorial limitation, including</u>

12

> bank accounts as defined ins. 674.104(1) (a), financial assets as defined ins. 678.1021(1) or other intangible property as defined ins. 717.101 [which includes, among other things, "Credit balances, customer overpayments, security deposits"]. The situs of any intangible assets held or maintained by or in the possession, custody, or control of a person or entity so served shall be deemed to be in this state for the purposes of a proceeding under chapter 56 or chapter 77. Service of a writ or notice to appear under this section shall provide the court with in rem jurisdiction over any intangible assets regardless of the location of the assets;

Thus, the statute establishes that:

- Writs of garnishment "may be served on any person or entity over whom the court has personal jurisdiction;"
- Writs of garnishment apply to intangible assets, including bank accounts, credit balances, customer overpayments, and the like, wherever they are "located;"
- The situs of any of the foregoing assets held or maintained by or in the possession custody and control of a garnishee shall be deemed to be in Florida for purposes of final process or garnishment proceedings;
- Service of a writ of garnishment under the new statute provides the court with *in rem* jurisdiction over any intangible assets regardless of the location of the assets.

Accordingly, intangible assets belonging to judgment debtors (or their agencies or instrumentalities) are subject to execution regardless of where they are being held. Here, this Court has *in rem* jurisdiction over these assets identified in VMSC's answer, which are intangible assets in the form of debts to agencies or instrumentalities of the judgment debtors.

### C.     Third Affirmative Defense: Venue

Contrary to VMSC's affirmative defense, venue is proper in this judicial district. Under 28 U.S.C. § 1391, venue is proper in any judicial district where any defendant resides. 28 U.S.C. § 1391(b)(1). For these purposes, a defendant is resident in any judicial district where it is subject to personal jurisdiction. 28 U.S.C. § 1391(c). Here, as set forth above, VMSC is subject to jurisdiction in this district.

### D.     Fourth Affirmative Defense: Compliance with TRIA.

Plaintiffs agree with VMSC that the blocked funds are subject to OFAC sanctions and that VMSC cannot release those funds absent a "court order directing the release of the funds pursuant to TRIA." Accordingly, Plaintiffs now seek an appropriate order of this Court under TRIA for turnover of those funds.

13

E. **Fifth Affirmative Defense: Property or Assets of Agencies/Instrumentalities.**

The Answer states an objection to the writ "to the extent that any of the blocked funds are not funds belonging to 'agencies or instrumentalities' of the defendants." ECF No. 553, at 5. This defense fails for three separate reasons.

*First*, the Answer does not argue that the blocked funds belong to a party *other* than an agency or instrumentality of the Judgment Debtors/Defendants.

*Second*, Plaintiffs have demonstrated that PetroMonagas is an agency or instrumentality of the Judgment Debtors, and VMSC's Answer admits that the funds at issue belong to PetroMonagas (ECF No. 553, at ¶ 6).

*Third*, as a third-party garnishee, VMSC lacks standing to raise defenses that are not its own; *i.e.*, any interests of third-party claimants to the funds at issue. *Navon, Kopelman & O'Donnell, P.A. v. Synnex Informaion Techs. Inc.*, 720 So. 2d 1167, 1168 (Fla. Dist. Ct. App. 1998) ("The statutory right to move to dissolve the writ is granted only to the defendant and any other person having an ownership interest in the property, as disclosed by the garnishee's answer.") (emphasis omitted).

F. **Sixth Affirmative Defense: Indispensable Parties Under FRCP 19.**

VMSC's Answer objects "to the extent" that various parties with a potential interest in the funds according to Valero's Answer (*i.e.*, Red Tree, the *Stansell* Plaintiffs, the *Caballero* Plaintiffs, PdVSA and/or its joint ventures, beneficiaries, or affiliates) "are indispensable parties to the garnishment proceedings under Rule 19 of the Federal Rules of Civil Procedure." ECF No. 553, at 5.

First, Plaintiffs have served the foregoing parties in accordance with Fla. Stat. § 77.055. *See* ECF No. 558. Accordingly, the parties have been afforded an opportunity to appear if they wish to do so.

Second, the Answer does not maintain that any particular party is an indispensable party. In any event, there are no indispensable parties absent from these judgment enforcement proceedings. To begin, competing judgment creditors are not indispensable parties; indeed, they are routinely denied the right to intervene in judgment-enforcement proceedings. *See Doe v. Ejercito De Liberacion Nacional*, 2013 WL 8170186, at *3 (S.D. Fla. June 17, 2013) ("[C]ourts have consistently found that the fact that one party's proceeding might impair the collectability of another party's judgment is insufficient to justify intervention. . . . If it were sufficient, then every

post judgment execution proceeding would be subject to derailment so long as a competing judgment creditor decided to intervene."). Nor are third parties, such as PetroMonagas, with potential claims to the assets to be garnished, considered indispensable. *See Stansell v. FARC*, 2013 WL 12156399, at *2 (M.D. Fla. Apr. 25, 2013), *aff'd,* 771 F.3d 713 (11th Cir. 2014) (defaulting defendants and their instrumentalities were not "proper or indispensable parties").

### G. Seventh Affirmative Defense: Reservation of Rights

In its final defense, VMSC "gives notice of its intent to rely upon any other defense that may become available or apparent during the course of these proceedings and reserves its rights to amend this Answer to assert any such defense." VMSC, however, has waived any affirmative defense that it has failed to raise, and Plaintiffs reserve their rights to respond in full to any new defense that VMSC later raises.

### III. PDVSA's Appeal Is Not Relevant to This Turnover Motion.

PDVSA's appeal has no bearing on this turnover motion for three, independent reasons. First, insofar as PDVSA has a right to an immediate appeal, that right applies only to the portion of this Court's ruling that denied *PDVSA's* claim to immunity under the FSIA. *See* PDVSA's Notice of Appeal, ECF. No. 586 (asserting a right to appeal under 28 U.S.C. § 1291, and citing *S & Davis Int'l, Inc. v. The Republic of Yemen*, 218 F.3d 1292, 1297 (11th Cir. 2000), which provides for appellate "jurisdiction over interlocutory orders denying claims of sovereign immunity under the FSIA"). But this Court did not issue an order denying a claim by *PetroMonagas* for sovereign immunity. To begin, PetroMonagas does not have any rights under the FSIA. *Dole Foods v. Patrickson*, 538 U.S. 468, 473 (2003); *Singh v. Caribbean Airlines Ltd.*, 2014 WL 11878439, at *2 (S.D. Fla. Jan. 27, 2014) ("An entity owned by an agency or instrumentality of a foreign state cannot claim the protections of the FSIA."), *aff'd*, 798 F.3d 1355 (11th Cir. 2015). Moreover, neither PDVSA nor PetroMonagas ever *asserted* that PetroMonagas has any right to sovereign immunity. And as such, this Court did not issue an order denying any claim by PetroMonagas to sovereign immunity—no such claim existed, and no such claim was made. Accordingly, there is no immediate right to appeal with regard to PetroMonagas. *See Honduras Aircraft Registry, Ltd. v. Gov't of Honduras,* 129 F.3d 543, 545 (11th Cir. 1997) (appellate jurisdiction extends only to interlocutory orders "denying claims of immunity under the FSIA").

Second, PDVSA does not have standing to assert PetroMonagas' rights on appeal. As set forth in VMSC's Answer, the debt at issue is owed only to PetroMonagas. ECF No. 390. As the

15

Eleventh Circuit has held, this means that only PetroMonagas—and not PDVSA, which is merely an indirect shareholder of PetroMonagas[3]—has standing to contest the writ. *See Stansell v. FARC* ("*Stansell II*"), 771 F.3d 713, 744 (11th Cir. 2014) (barring shareholder from challenging TRIA writ of execution seeking blocked assets of his company; holding that "corporations themselves—and not shareholders—are the only parties with standing to contest injuries to the corporation"); *Stansell v. FARC*, 2013 WL 12142969, at *4 (M.D. Fla. May 2, 2013) ("[b]ecause the individuals . . . are not the account holder, they lack standing to challenge this TRIA garnishment."); *United States v. Devlin*, 2013 WL 275968, at *8 (M.D. Fla. Jan. 22, 2013) (same). Thus, PDVSA does not have standing to contest the PetroMonagas writ.

Third, as to PetroMonagas itself, it has forfeited its right to contest the writ for its blocked assets. *See* Fla. Stat. § 77.07(2) ("Failure of the defendant or other interested person to timely file and serve the motion to dissolve within such time limitation shall result in the striking of the motion as an unauthorized nullity by the court, and the proceedings shall be in a default posture as to the party involved."). The PDVSA cannot gloss over this dispositive fact by taking an appeal of entirely different issues for entirely an entirely different party.

## CONCLUSION

For the foregoing reasons, Judgment Creditors are entitled to an order directing the turnover of the blocked funds belonging to VMSC in the amount of $24,242,018.63, plus any accrued interest. Attached as Exhibit 1 is a proposed turnover judgment directing the distribution of the blocked assets at issue to Judgment Creditors.

---

[3] More specifically, PDVSA is a shareholder of Corporación Venezolana del Petróleo, which in turn is a shareholder of PetroMonagas.

| | |
|---|---|
| Respectfully submitted on<br>August 4, 2025 | */s/ Jaime D. Guttman*<br>Jaime D. Guttman<br>Fla. Bar No. 44076<br>*jaime@scale.law*<br>Scale Law Partners, LLC<br>777 Brickell Avenue, Suite 500<br>Miami, FL 33131<br>(786) 273-9033 (Main)<br><br>*/s/ Alex C. Lakatos*<br>Alex C. Lakatos (*pro hac vice*)<br>*alakatos@mayerbrown.com*<br>Cloe M. Anderson (*pro hac vice*)<br>*canderson@mayerbrown.com*<br>Mayer Brown LLP<br>1999 K Street NW<br>Washington, DC 20006<br>(202) 263-3000 (Main)<br><br>*Counsel for Plaintiffs* |

17

## **CERTIFICATE OF SERVICE**

I certify that I filed the foregoing document on August 4, 2025 through CM/ECF, which automatically and electronically delivered notice of filing to counsel of record for all parties that have appeared.

*/s/ Jaime D. Guttman*